# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KARL HAMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No. 07-2221 (ESH) |
| EDWARD SCHAFER, | ) | |
| United States Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS

Defendant, United States Department of Agriculture, by its undersigned attorneys, hereby respectfully moves this Court to dismiss several causes of action in Plaintiff's Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6).  The Plaintiff, Karl Hampton, has not exhausted administrative remedies on certain claims in his Complaint and also has failed to file certain claims in a timely fashion.

A Memorandum of Points and Authorities in support of this Motion and a proposed Order are filed herewith.  For the reasons provided in the attached Memorandum of Points and Authorities, Counts III and IV and Counts VII through X of Plaintiff's Complaint should be dismissed with prejudice.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/_____
CHRISTIAN NATIELLO, D.C. BAR #473960
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Room #4112
Washington, D.C.  20530
(202) 307-0338

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KARL HAMPTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    Civil Action No. 07-2221 (ESH) |
| EDWARD SCHAFER, | ) |
| United States Department of Agriculture, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

BACKGROUND

Plaintiff brings the instant Complaint alleging that he was discriminated and retaliated against while employed at the United States Department of Agriculture ("USDA").

In his Complaint, Plaintiff alleges ten different Counts against Defendant. Six of the ten Counts should be dismissed. Defendant moves to dismiss Counts III and IV based on their untimeliness. Defendant further moves to dismiss Counts VII through X based on Plaintiff's failure to exhaust his administrative remedies.

At this juncture, it is indisputable that several of Plaintiff's claims must fail because he has not exhausted his administrative remedies, as required in employment discrimination matters brought before federal courts, and that several of his claims are time barred. Accordingly, six of Plaintiff's Counts in his Complaint should be dismissed with prejudice.[1]

---

[1]    Defendant is not answering the remaining four counts of the Complaint at this time pursuant to Fed. R. Civ. P. 12(a)(4), which relieves Defendant of the obligation to answer during the pendency of a motion to dismiss. The proposed Order submitted herewith includes a provision for the Court to set a due date for Defendant's answer following the Court's disposition of this motion.

1

<u>ARGUMENT</u>

**I.      <u>Standard of Review</u>.**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a claim if Plaintiff's complaint fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also In re Sealed Case*, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing *Twombly*). Hence, the focus is on the language in the complaint, and whether that language sets forth sufficient factual allegations to support plaintiff's claims for relief.

The Court must construe the factual allegations in the complaint in the light most favorable to Plaintiff and must grant Plaintiff the benefit of all inferences that can be derived from the facts as they are alleged in the complaint. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). However, the Court need not accept any inferences or conclusory allegations that are unsupported by the facts pleaded in the complaint. *Kowal*, 16 F.3d at 1276. Moreover, the Court need not "accept legal conclusions cast in the form of factual allegations." *Id.* Generally speaking, the Court should not consider matters beyond the pleadings without converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(b)(6).

These standards apply equally in employment cases. *See, e.g., Kassner v. Second Ave. Delicatessen, Inc.*, 496 F.3d 229, 240 (2d Cir. 2007); *EEOC v. Concentra Health Servs., Inc.*, 496

2

F.3d 773 (7th Cir. 2007); *Ofori-Tenkorang v. American Internat'l Group, Inc.*, 460 F.3d 296, 307 (2d Cir. 2006).  Although a plaintiff need not specifically plead the facts supporting a *prima facie* case, *see Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), the Court is to rely on the factual allegations in the complaint as pleaded and, along with reasonable inferences therefrom, draw appropriate legal conclusions from those facts.  It does not appear, therefore, that simply pleading "discrimination," per *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), suffices to survive a motion to dismiss a complaint of employment discrimination.  *See Kassem v. Washington Hosp. Ctr.*, 513 F.3d 251, 253-54 (D.C. Cir. 2008) (citing *Sparrow* only for standard of appellate review and citing *Twombly* for standard on motion to dismiss).

II.        **The Claims That Plaintiff Raised Before The FSGB Are Time Barred.**

Plaintiff's allegations were addressed in two forums at the administrative level.  The EEOC considered the issue of discrimination and reprisal regarding several circumstances that occurred while Plaintiff was employed at the USDA.  The FSGB considered the issue of Plaintiff's termination ("cause for separation for misconduct").  *See* FSGB Final Decision at p. 6 (attached as Exhibit A).  On its face, though, Plaintiff's Complaint is an appeal of the EEOC decision only.  In the section of his Complaint entitled "Exhaustion of Administrative Remedies," Plaintiff refers solely to the EEOC litigation.  *See* Complaint, p. 2.  Defendant admits that the Counts based on the appeal of the EEOC litigation were timely filed.[2]  The EEOC issued its Final Agency Decision on September, 25, 2007 and Plaintiff filed his Complaint on December 6, 2008 – well within the 90 day filing time period.

---

[2]        Defendant denies, however, that all of the EEOC claims are properly before the Court.  Rather, Defendant contends that several of the Counts in Plaintiff's Complaint are improper for failure to exhaust his administrative remedies.  *See* Section III, *infra.*

3

Plaintiff, however, was not timely with regard to the Counts based on the issues he raised before the FSGB.  Counts III and IV of Plaintiff's Complaint deal with Plaintiff's termination. *See* Complaint at p.10.  The issue of Plaintiff's termination was litigated before the FSGB.  On June 6, 2007, the FSGB issued its Final Decision supporting Plaintiff's proposed termination. Specifically, the FSGB wrote that it "readily conclude[s] that the agency has established cause for separating [Plaintiff] from the service."  *See* FSGB Final Decision, p. 39 (attached as Exhibit A). Plaintiff's employment was terminated the next day.

Foreign Service regulations permit an employee to appeal an administrative decision to a district court, but the appeal must be made within 180 days of the final decision.  Chapter 11 of the Foreign Service Act states:

> **SEC. 1110. JUDICIAL REVIEW.—**
> (a) Any aggrieved party may obtain judicial review of a final action of the Secretary or the Board on any grievance in the district courts of the United States in accordance with the standards set forth in chapter 7 of title 5, United States Code, if the request for judicial review is filed not later than <u>180 days after the final action of the Secretary or the Board</u> (or in the case of an aggrieved party who is posted abroad at the time of the final action of the Secretary or the Board, if the request for judicial review is filed not later than 180 days after the aggrieved party's return to the United States).  Section 706 of title 5, United States Code, shall apply without limitation or exception.  (Emphasis added).

Plaintiff's Complaint was not filed within the 180 day period required by the Foreign Service Act.  *See Egan v. Natsios*, 2003 U.S. Dist. LEXIS 27066, *aff'd*, 381 F.3d 1 (D.D.C. 2004) (court calculated the plaintiff's claim as being due precisely 180 days after the final decision by the FSGB was issued).  Again, the FSGB's decision was announced on June 6, 2007.  Counting 180 days from the next day,  June 7, 2007, Plaintiff had until December 3, 2007 to file his claims based on the FSGB decision.  But he filed on

4

December 6, 2007.  Plaintiff's claims based on his termination are untimely.[1]  As such,

Counts III and IV of Plaintiff's Complaint should be dismissed with prejudice.

### III. Several of Plaintiff's Claims Were Not Raised Before The EEOC Or FSGB And Therefore Should Be Dismissed For Failure to Exhaust Required Administrative Remedies.

Prior to seeking relief in federal court under Title VII, a Federal employee must

exhaust all available administrative remedies.  *See* 42 U.S.C. § 2000e-16(c)); 29 C.F.R. §

1614.407; *Kizas v. Webster*, 707 F.2d 524, 544 & n.99 (D.C. Cir. 1983); *see e.g., United

Airlines v. Evans*, 431 U.S. 553, 555 (1977); *McDonnell Douglas*, 411 U.S. at 555; *Brown

v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985).

The procedural requirements governing a plaintiff's right to bring a Title VII claim

in court are not unimportant.  "It is part and parcel of the Congressional design to vest in

the federal agencies and officials engaged in hiring and promoting personnel 'primary

responsibility' for maintaining nondiscrimination in employment."  *Kizas*, 707 F.2d at 544.

"Exhaustion is required in order to give federal agencies an opportunity to handle matters

internally whenever possible and to ensure that the federal courts are burdened only when

reasonably necessary."  *Brown*, 777 F.2d at 14.  Plaintiff alleges several claims in his

Complaint that he failed to exhaust at the administrative level.  By way of background, the

EEOC considered whether Plaintiff was subjected to discrimination and reprisal only when

Plaintiff:

1. was denied a promotion in October 2004;

---

[3]    Plaintiff may claim that he brought his termination to the EEOC's attention, but this is incorrect. Plaintiff included the issue of the January 2005 proposal for termination in his initial EEOC complaint on July 19, 2004.  He did not include any allegations regarding the actual termination.  A proposal for termination is distinct from actual termination.  *See Berg-Warner v. United States Equal Employment Opportunity Commission*, 81 F. Supp. 2d 20, 25-26 (D.D.C. 2000).

5

2.    was not allowed to serve as Acting Director, because his supervisor refused to institute rotating acting assignments;

3.    was denied a stretch assignment in November 2004;

4.    was denied an at-grade assignment in December 2004;

5.    was denied the opportunity to participate in the Foreign Service Promotion Boards in September 2005; and

6.    was denied promotion benefits and an overseas assignment temporary tour of duty in October or November of 2005. *See* EEOC Final Decision, p. 6 (attached as Exhibit B).

Contrast what was actually litigated before the EEOC with Counts VII and VIII in Plaintiff's Complaint, which allege that Plaintiff was subjected to a hostile work environment. The counts regarding a hostile work environment were not even *alleged* before the EEOC, nevermind actually litigated before it. Accordingly, these counts should be dismissed. *See* 42 USC 2000e-16(c); *Maryland v. Sodexho*, 474 F. Supp. 2d 160, 161-162 (D.D.C. 2007) (precluding plaintiff's religious discrimination claim, for failure to raise the claim at the administrative level); *Park v. Howard University*, 71 F.3d 904 (D.D.C. 1995) (plaintiff's hostile work environment claim improper because it was not litigated before the EEOC).

Plaintiff also alleges that he was discriminated against based on his being put on leave without pay on April 26, 2006. Complaint at p. 7. This claim was not alleged before the FSGB and while the issue of Plaintiff's leave without pay was raised before the EEOC, the EEOC did not address that allegation. Moreover, any issue Plaintiff had with his alleged leave with*out* pay – an entirely different and separate issue – was not litigated before the FSGB or the EEOC. Plaintiff thus has not exhausted his administrative remedies with regard to his leave without pay. These claims, found in Counts IX and X of Plaintiff's Complaint, should therefore be dismissed.

## **CONCLUSION**

In summary, Defendant moves to dismiss several of Plaintiff's claims for two different reasons. Defendant moves to dismiss Counts III and IV of Plaintiff's Complaint based on their untimeliness. Defendant further moves to dismiss Counts VII through X of Plaintiff's Complaint based on Plaintiff's failure to exhaust his administrative remedies.

WHEREFORE, the United States Department of Agriculture requests that this Motion be granted and that Counts III and IV and Counts VII through X of Plaintiff's Complaint be dismissed.

Dated March 26, 2008.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/_____
CHRISTIAN A. NATIELLO D.C. BAR # 473960
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Room E4112
Washington, D.C.  20530
(202) 307-0338

Exhibit A

# BEFORE THE FOREIGN SERVICE GRIEVANCE BOARD

In the Matter Between

| | |
|---|---|
| Karl Hampton<br>Charged Employee | Record of Proceedings<br>FSGB No. 2006-012 |
| And | Date:  June 6, 2007 |
| Foreign Agricultural Service<br>Department of Agriculture | **DECISION** |

For the Foreign Service Grievance Board:

| | |
|---|---|
| Board Members: | Walter Greenfield<br>Johnny Young |
| Special Assistant: | Janet M. McGhee |

| | |
|---|---|
| Representative for the Charged Employee: | E. Ned Sloan, Esq. |
| Representative for the Department: | Ejike H. Obineche, Esq. |
| Employee Exclusive Representative: | American Foreign Service Association |

# CASE SUMMARY

**HELD:** Cause for separation for misconduct has been established because the sustained charges adversely affect the efficiency of the service.

## OVERVIEW

On May 11, 2006, the Department of Agriculture (agency) notified the Board of its decision to separate for misconduct Karl Hampton, a Foreign Agricultural Affairs Officer. In accordance with 22 CFR 906.2, the agency requested that a hearing be conducted to establish that proper cause had been established. A hearing on this matter was conducted on January 18-19, 2007.

On January 27, 2005, the agency notified the charged employee that it proposed to remove him from the service. Hampton responded to the proposed action both orally and in writing in March 2005. After reviewing the record, and conducting an additional investigation (completed in July 2005), the deciding official issued a final decision in April 2006 in which four of the original six charges were sustained; (1) Submitting False Documents for Travel Claims, Specifications 1-9; (2) Failure to Reconcile Travel Voucher; (3) Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specification 1-4; and (4) Providing False Information During an Official Investigation.

Citing several alleged procedural and substantive errors, Hampton opposed the agency's action to involuntarily separate him, *e.g.*, reliance on stale charges; initiation of a supplemental investigation after the record was established; failure to prove that employee "knowingly" and "willfully" violated regulations; agency's inclusion of charges not originally proposed; agency's failure to notify him that he could be criminally culpable; and improper reliance on copies of documents and hearsay evidence. In addition, the charged employee asserted that the actions of the proposing and deciding officials amounted to reprisal for having engaged in a protected activity (whistle blowing).

In regard to the specific charges:

Charge 1: Hampton claims that he was ignorant of travel regulations requiring him to use a government contractor-furnished credit card for all transactions related to official travel in the absence of a waiver. Moreover, government charges were stale since they referred to periods of travel two years in the past, and the agency incorrectly relied on copies of documents rather than originals.

Charge 2: The charged employee claimed that his failure to properly reconcile a travel voucher resulted from an oversight and sloppy record keeping, and not from an attempt to defraud the government

FSGB 2006-012

(Hampton failed to reconcile a travel voucher after receiving a credit to his credit card for an overcharge despite the fact he had already received a full claimed reimbursement).

Charge 3: Charged employee claimed that his failure to list his ownership of a food processing company for four required reporting years, in violation of agency disclosure requirements, resulted from ignorance of his responsibilities. Hampton contends that since the company (though incorporated) had never been built or generated any income, he was unaware of the requirement that he report his interest.

Charge 4: Hampton maintains that he never discussed the details of his food processing venture with a Mississippi Department of Agriculture official, and that agency incorrectly relied on third-party testimony in concluding that he had given false testimony during an investigation of the matter.

We examined all of the charged employee's affirmative defenses and challenges and found no support for his assertions. After careful review of the record, and the testimony of witnesses provided during the hearing, we conclude that the agency has met its burden by a preponderance of evidence that the charged employee did commit the acts he is charged with, and knew, or should have known, that such acts could be grounds for separation; there is a nexus between those acts and the efficiency of the service; and the penalty is proportional to the acts committed and consistent with those imposed for similar acts of misconduct. Separation for cause was established.

FSGB 2006-012

## DECISION

### I. REQUEST TO SEPARATE FOR CAUSE

On May 4, 2006, the Department of Agriculture (agency) notified the Board of its

intention to separate for cause Karl Hampton (charged employee), FO-03, and requested

a hearing as provided by 22 U.S.C. 4010(a)(2).  The Board acknowledged receipt of the

agency's request on May 11, 2006.  Hampton filed a memorandum with the Board on

June 26, 2006 entitled "Grievance for FSGB Case No. 2006-012" which the Board

considered not to be a grievance, but rather a response to the agency's submission.  On

April 30, 2007, the Board issued a Summary Decision on the merits.  The Board now

issues its full writing,  which provides a detailed presentation of the positions of the

parties, the evidence, the Board findings, and the reasons for the decision.

### II. BACKGROUND

On January 27, 2005, the agency notified Hampton that it proposed to remove

him from his position and from the federal service for misconduct.  He began his career

with the Foreign Agricultural Service (FAS) in April 1987, and at the time of the

proposed removal he was a FO-0135-03-11 Foreign Agricultural Affairs Officer.  The

original proposal included six charges and set forth thirteen specifications.  The charged

employee responded to the proposed action both orally and in writing on March 21 and

March 31, 2005, respectively.  After reviewing the record, the deciding official requested

further investigation, which was completed on July 29.  In its final decision issued on

April 25, 2006, the agency sustained only the following four of the six original charges:

- Submitting False Documents for Travel Claims
- Failure to Reconcile Travel Voucher
- Failure to Disclose Financial Interests in Financial Disclosure,
  Statement (OGE Form 450 or 450A)

- Providing False Information During an Official Investigation

Hampton defends against the agency's action to separate him involuntarily based on the four sustained charges. He contends that the agency's action amounts to a reprisal against him for having engaged in a protected activity (whistle blowing), and that it committed a procedural error by allowing Roy Henwood, FAS Director of External Affairs (who was his reviewing officer, also referred to as second line supervisor), to act as the deciding official. In addition, he asserts that Henwood violated administrative procedures by initiating another investigation on May 3, 2005, after the record for discovery had already been closed. Hampton further questions the legality of having Henwood sign the April 2006 decision letter recommending his termination since he was then on detail to the Senate. He alleges, also, that his supervisor failed to inform him that he was the target of a management-initiated investigation in which disciplinary action and possible criminal charges were being sought, in violation of his rights under 3 FAM 4322.3 (i). The agency, Hampton asserts, failed to review prior treatment in similar cases, and did not consider "progressive disciplinary action" before proposing his penalty of removal. He contends, too, that the agency's action is the result of discrimination against him based on race (African-American), gender (male), and national origin.

For remedies, he requests that remedies be granted to him under 22 CFR Chapter IX Part 908.1, 908.2, 908.3, and 909-b.[1]

A pre-hearing conference was held on October 17, 2006, during which the parties agreed upon procedural ground rules and a timetable. Since Hampton had already filed an EEO complaint raising similar issues, the agency insisted that he could not proceed

---

[1] In citing Section 909-b it seems likely Hampton meant 909.3. Given our decision this uncertainty has no bearing herein.

before the Board. In its "Summary of Pre-hearing Conference and Order" issued on November 27, 2007, the Board memorialized the matters discussed at the pre-hearing conference and directed that the parties brief the issue of whether the charged employee could be required to waive his right to a hearing before this Board regarding his termination. The parties responded in a timely manner.[2] In our Order of November 27, 2006 we determined that since Section 610(a)(2) provides that a member may not be separated from the Service without a hearing before this Board unless the member waives this right in writing or the member's appointment expires, neither of which had occurred in this matter, and since Section 610(a)(2) of the Foreign Service Act mandates a hearing on the issue of whether the agency established "cause for separation," Hampton could not be required to waive his right to a proceeding before the Board. However, we limited the subject of the proceeding to the removal for cause.

An oral hearing was held on January 18 and 19, 2007. At the hearing the parties were given the opportunity to present documentary and testimonial evidence.[3] The following witnesses testified on behalf of the agency: Roy Henwood, Confidential Assistant to the Administrator of FAS; Richard Maxwell, FAS Investigator; Dale Miller, FAS Director, Office of Outreach and Exporter Assistance; Lacy Muir, former FAS Human Resources Employee Relations Specialist, and Tanya Willis, FAS Human Resources Specialist. The charged employee did not present any witnesses. Neither did

---

[2] In his submission, Hampton stated that he had filed EEO complaints with the agency on July 19, 2003 regarding agency's failure to promote him, and on February 8 and February 22, 2005, regarding revocation of his security clearance, his proposed termination and other allegations. The agency contends the agency complaints were filed on October 30, 2004, January 26, 2005, and February 13, 2006, and that a complaint was filed with the Equal Employment Opportunity Commission some time after February 13, 2006. Here again these discrepancies do not bear upon our decision.

[3] Witnesses testified under oath and the hearing was transcribed. The transcript is cited as "Tr," followed by "I" for January 18 proceedings and "II" for January 19 proceedings, followed by the page number.

he testify.  The parties submitted written closing arguments and the Record of

Proceedings (ROP) was closed on March 21, 2007.  We issued a Summary Decision on

April 30 and this is a statement of facts and conclusions to support and explain that

Decision.  *See* 3 FAM 4366b.

## III.  POSITIONS OF THE PARTIES

### The Agency

Charge 1:  Submitting False Documentation for Travel Claims, Specifications 1-9

Under this charge the agency listed nine specifications (individual travel claims

by dates) in which it claims the charged employee deliberately altered hotel receipts to

create the appearance of legitimate expenses in order to claim multiple requests for

reimbursement of approved travel.  The periods of travel, as set out in the specifications,

ranged from August 2002 to February 2004, with six trips occurring in 2002, two in

2003, and one in 2004.

These charges are supported by the documentation and the statements of

witnesses interviewed during its investigation.  It dismisses the charged employee's

attempt to explain the inconsistencies by claiming a lack of familiarity with government

travel regulations, changes in travel plans, and the suggestion that others may have

deliberately altered the records in order to malign his character.  A Foreign Service

Officer with over eighteen years of federal service and whose assignment requires travel

should be well-versed in travel and other pertinent federal regulations.

Hampton's refusal to allow the hotels to cooperate in the investigation constitutes

proof of his misconduct.  He had warned the hotels which were contacted by the agency

during the investigation that he would initiate a lawsuit against any hotel that cooperated

and provided the agency with requested documents. Hampton could have no legitimate

reason for refusing to sign an access release for its investigator, or for threatening hotel

officials with legal action if they provided copies of hotel receipts pertaining to his

lodging, other than they would provide evidence of conduct demonstrating

untrustworthiness, unreliability, and poor judgment. Even so, the agency maintains that

the repeated irregularities in the travel claims are otherwise well-documented and amount

to repeated attempts to defraud the government for personal gain. Taken alone, these

false claims under Charge 1 provide sufficient grounds for the penalty of separation.

Charge 2:  Failure to Reconcile Travel Voucher

The charged employee knowingly failed to properly reconcile a travel voucher for

eleven months, resulting in a reimbursement overpayment of $301.48 for official travel

undertaken from June 25-30, 2003. Hampton stayed at the Peabody Hotel in Memphis,

Tennessee. He was charged $1,225.28 (as shown on his credit card statement). He

submitted to the agency his travel claim in July, seeking full reimbursement in the

amount of $1,225.28. One month after his stay, Hampton notified the hotel of a $301.48

overcharge, and was given a credit by the hotel in that amount to offset the overcharge.

Even so, he never reconciled his travel claim or repaid the government until questioned

about it by an agency investigator in September 2004. Since the overpayment amounted

to a credit on the charged employee's government credit card (cards that are issued in the

name of the employee and maintained by that employee), the agency asserts that he had

during this time access to the $301.48 of unauthorized funds. It rejects Hampton's

explanation of insufficient record keeping and ignorance of agency procedures. In its

view, the rapidity with which Hampton was able to discover the overcharge and initiate

FSGB 2006-012

action to receive the credit (within one month of the occurrence) demonstrates that he monitored his government-issued credit card statements more frequently than he suggested or admitted. His long delay in reimbursing the government, and not until he was questioned by investigators, raises skepticism about his intentions with respect to the overcharge.

### Charge 3:  Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specifications #1-4

The deciding official sustained the charge that grievant should have known that he was required to report certain stock holdings and ownership of a private company in his annual financial disclosure report (OGE Form 450 or 450A) from 1998 through 2002.

In June 1998, Hampton incorporated a small sweet potato processing plant in Mississippi called Syrisia's Foods. As the sole shareholder/owner, he stated that he intended to build a manufacturing facility to produce sweet potato pies using his mother's recipes. The plant was never built, but he invested some $40,000 in start-up costs and travel expense.

In October 1998 , Hampton failed to disclose on his statement his proprietorship of this business, as well as his ownership of shares of four common stocks (McDonald's, Intel, Disney, and WorldCom). He later amended his 1998 statement to include the stock holdings mentioned, but did not include Syrisia's Foods, as required by United States Department of Agriculture (USDA) regulation Ethics Issuance Section 4:14, for the years 1998-2002.

Since Hampton was a senior-level employee, the deciding official found his explanation of unfamiliarity with agency ethics requirements, and poor record keeping, unpersuasive. The agency requires that employees take annual ethics training and,

therefore, grievant should have known that his holdings and majority interest needed to

be reported.  Tanya Willis, agency ethics official, testified that Hampton should have

known that he had to report his ownership of Syrisia's Foods because the instructions are

contained in the reporting form.

<u>Charge 4:  Providing False Information during an Official Investigation</u>

The charged employee knowingly failed to provide accurate information during

an official investigation in violation of USDA Employee Responsibilities and Conduct,

Section 735-208c and in doing so, caused doubt as to his honesty and integrity in

fulfilling a position of trust in the federal government.

Hampton, in a signed sworn statement to investigators, stated that he had never

discussed his sweet potato processing facility or business venture with Benny Graves, a

Mississippi Department of Agriculture official.  However, Graves subsequently told

investigators that he had discussed funding for the charged employee's sweet potato

processing facility and that Hampton had stated that he planned to use his mother's sweet

potato recipes in the process.  In addition, Graves provided investigators with an e-mail

message from Hampton in which Hampton requested that a letter from the Mississippi

Sweet Potato Council be sent to USDA Rural Development in support of his processing

facility and feasibility study.  Graves also provided a copy of another e-mail message in

which he discussed the charged employee and his sweet potato business.

The deciding official, in the absence of any independent rebuttal from the charged

employee, found the corroborating evidence obtained from Graves sufficiently persuasive

to support the allegation that Hampton and Graves had discussed Hampton's sweet potato

FSGB 2006-012

processing facility. This evidence stood in direct contradiction to the charged employee's sworn statement to agency investigators and raised doubts about his credibility.

**The Charged Employee**

<u>Charge 1: Submitting False Documentation for Travel Claims, Specifications 1-9</u>

Hampton did not intentionally submit false documents for travel claims as specified under this charge. He only recently became aware of the travel regulation that requires claims for lodging reimbursement to be charged to a government credit card.

> Only recently, January 27, 2005, did I become aware of the travel regulation that requires claims for lodging reimbursement to be charged to the government credit card. I have mistakenly paid cash in the past and used other forms of payment for some hotel charges. This would explain the lack of charges to my government credit card. I cannot with accuracy attest to why some hotel records are allegedly different than what I actually received and submitted as my claim for reimbursement, except that there could be a glitch in the hotels' record systems. I had no prior knowledge or counsel of the travel regulation that indicates charges not charged to the government credit card for lodging could be subject to forfeiture.

> According to the ROI the reimbursement claims in question totals *[sic]* $590.92. I understand now that these charges are subject to forfeiture. I have stated from the outset, that if I made an unintended mistake, I would take the appropriate corrective measure. I am more than willing to do so. However, I did not willfully or intentionally make this mistake. If the Agency decides to deny these claims, I will reimburse the full amount in question. My lack of familiarity with this rule, however, should not be cause for termination.

Further, Hampton asserts, the charge that he knowingly submitted fraudulent documents in support of his travel reimbursement claims is merely circumstantial and unsubstantiated. Whereas the agency asserts that he filed inaccurate hotel receipts with his travel vouchers, it does not provide copies of the actual receipts of his stays from the hotels in question, relying instead on sample templates or blank receipts.

FSGB 2006-012

Charge 2:  Failure to Reconcile Travel Voucher

The charged employee maintains that he did not fail to reconcile his travel

voucher reflecting his June 2003 stay at the Peabody Hotel in Memphis as charged by the

agency:

> In fact, upon notification by CRS of the Peabody hotel *[sic]* credit,
> I immediately sent a personal check to IAB/FMD on September 8, 2004 in
> the full amount. The hotel made an honest error in over charging me. I
> attempted in good faith to settle the disagreement, but the hotel insisted I
> was correctly charged. I subsequently filed for reimbursement. I was
> unaware that the hotel credited the government charge card three months
> after my inquiry. (*See* Tab 7). However, as soon as I was made aware of
> the credit, I reconciled the voucher with the Agency.

Charge 3:  Failure to Disclose Financial Interest in Financial Disclosure
Statement (OGE Form 450 or 450A), Specifications #1-4

Hampton denied that he knowingly failed to list his ownership of Syrisia's Foods,

in violation of agency financial disclosure requirements:

> In 2003, I was advised of my error and correctly filed a new form
> 450 that included my stock in Syrisia's Food[s]. In discussions in 2004
> with Tonya Willis, Ethics Officer, it was concluded that I did not willfully
> and knowingly violate any ethical standards and that Syrisia's Food[s]
> was not a conflict of interest. Prior to the Agency administrative review,
> my ownership of stock holdings had been reported on form *[sic]* 450 for
> more [than] two years and none of the stocks were a conflict of interest.
> When questioned by CRS investigator Maxwell as to why he had failed to report

ownership of Syrisia's Foods from 1998 to 2003, Hampton said:

> I was unaware I needed to file. I did not work for or receive
> income or compensation from an outside source, entity or the company. I
> incorporated the company in June and honestly forgot about it when filing
> the disclosure forms. I did not receive any income or other benefit from
> my employment with FAS. My financial situation had not changed so I
> copied the same information to the new form.

> It is my understanding that I did not violate any ethical standards.
> I do not work for any outside source or entity and do not receive a salary
> or compensation from an outside company, source, or entity. The
> company does not benefit from my FAS responsibilities nor does it

FSGB 2006-012

conflict with my FAS duties. I have not nor do I conduct personal business while on official duty.

The investigator asked Hampton if he had ever considered the possibility that his activities involving Syrisia's Foods constituted the appearance of a conflict of interest and using his office for personal gain, he responded:

> I promote exports of agricultural products in foreign markets and have not used my public office for private gains nor presented the appearance of a conflict of interest. Syrisia's Food[s] is not a functioning manufacturing company or competing to export products abroad in the area for which I serve.
>
> I have not used or abused my position for personal gains. I have not discussed my personal ventures while on duty with officials. I am the sole shareholder of the June 1998 MS incorporated and copy righted company Syrisia's Foods. I incorporated the company with the idea to build a manufacturing facility to produce sweet potato pies using my mother ['s] *[sic]* recipies *[sic]*. The company is not generating any cash flow and I have never received any salary from the company.

Hampton further elaborated in his response to the proposing official's recommendation that he be separated for cause:

> Prior to 2003, I forgot about the company and the one stock issued in 2001 because the company was not viable. When it was brought to my attention that I should have noted this interest in October 2003, I took corrective action and filed a new form *[sic]* 450 that included the company's information. In discussions in 2004 with the Ethics Officer, it was concluded that I did not willfully and knowingly violate any ethical standards nor was there a conflict of interest.
>
> Although incorporated on paper in 1998, the company was and is not operational, as the manufacturing facility was and is not built. I have not received a salary from the company or any other outside source. I had 1500 certificates made when I incorporated the company and issued myself one share in 2001.

<u>Charge 4: Providing False Information during an Official Investigation</u>

In addressing this charge, Hampton outlined the agency's burden:

> With respect to such a charge the Agency must prove that I "knowingly supplied incorrect information with the intent of deceiving the agency." *Blake v. Dept. of Justice*, 81 MSPR 394 at 409 citing *Coleman v. Dept. of the Air Force*, 66 MSPR 498 at 506 (1995), aff'd 79 F.3d 1165 (Fed. Cir. 1996). The information provided was correct. Intent to deceive must be proven by the totality of the circumstance.

Hampton denies that he provided false information to investigators. This sustained charge stems primarily from allegations that he discussed his sweet potato processing venture with Benny Graves in 2002:

> As with charge 1 and charge 4, I note for the record that the Agency is again alluding to conversations and activities that allegedly occurred well over two years ago. To propose disciplinary action now, particularly something as severe as separation, on such stale charges is unduly punitive and unfair per FAM restriction and FSGB [case] law regarding timeliness in disciplinary action. According to the record of Mr. Graves' interview with Compliance, Mr. Graves obtained information about the company through the letter I sent to the state for technical assistance. I note for the record that this letter was not directed to Mr. Graves and did not identify me as a USDA employee or in any way indicate that I was pursuing this through my official position. Mr. Graves works for the state as an entomologist. He inspects fields and commodities for pests. I do not know who Candy Houck is, or why Mr. Graves sent her the email at attachment 36 to the Agency's proposal. There is certainly no evidence that I solicited or otherwise directly asked Mr. Graves for assistance in my capacity as a government employee. Nor is there evidence that the speculation enunciated by Mr. Graves in his email was based on a conversation with me. As stated during my interview with compliance, I do not recall discussing my sweet potato processing venture with Mr. Graves. I did not make a false statement at that time. I provided accurate information to the best of my knowledge and recollection during the interview and in my official statement. The Agency has not met its burden of proof that I intentionally or maliciously provided inaccurate or false information sufficient to sustain this charge.

Hampton expanded on his response to this charge in his June 26, 2006 letter to the Board:

FSGB 2006-012

During the investigation I provided accurate information to the best of my memory, and; I never discussed my *[personal]* interests with anyone during work hours or while on official business travel. According to the information presented by the proposing official Mr. Graves *[sic]* information was obtained through a third party not directed to him.

## IV. DISCUSSION AND FINDINGS

This case is a proposed Separation for Cause from the Foreign Service on grounds of misconduct. It is governed by Section 610(a)(2) of the Foreign Service Act which requires that cause for such action must be established at a hearing before this Board, unless the hearing is waived in writing by the charged employee.

In this action, the agency must establish by a preponderance of the evidence that the proposed separation is for such causes as will promote the efficiency of the service. (*See* 22 CFR 905.3).

In considering whether the agency has carried its burden, we focus on these factors:

(1) Did the agency meet its burden of establishing that the charged employee committed the acts with which he is charged?

(2) Did the agency meet its burden of showing that the charged employee knew, or should have been reasonably expected to have known, that those acts were improper and could lead to separation? (The principles of due process require that employees be properly informed of rules of conduct through written procedures, regulations, or commonly understood policies.)

(3) Did the agency meet its burden of showing that there is a nexus between the employee's conduct and the efficiency of agency operations?

After a careful review of the documents of record, and the testimony of witnesses provided during the hearing, we conclude that the agency has met its burden by a preponderance of evidence that the charged employee did commit the acts he is charged with, and knew, or should have known, that such acts could be grounds for separation;

15                                FSGB 2006-012

there is a nexus between those acts and the efficiency of the service; and that separation

for cause has been duly established because of his conduct.

Before addressing the four sustained charges presented by the agency in support

of its separation for cause action, we address the defenses raised by the charged

employee.

### Violation of the Employee's Rights under the Whistleblower Protection Act (WPA)

Hampton asserts that his rights under 5 U.S.C. 2302 (b)(8)(A) and (B), which

limits disciplinary action against him as a whistleblower, were violated.  He contends that

his first line supervisor, and the proposing official, Dale Miller, retaliated against him for

reporting Miller's prohibited practices regarding Leslie Burket, another FAS officer.  He

had raised this allegation in a September 9, 2004 letter to Martin Brumback, Chief,

Personnel Document Security Division, USDA after his security clearance was

suspended:

> In a similar situation (*see* Carol Brunnert emailed *[sic]* dated
> 6/04/02 to Keith Adams, FAS AgExport services, exhibit C) involving my
> colleagues *[sic]* Leslie Burket's presentation to our partner the Department
> of Commerce with whom we have a Memorandum of Understanding, no
> CRS investigation was open *[sic]* on Ms. Burket.  Instead of an
> investigation, Mr. Miller and Mr. Lee had Ms. Burket write a letter of
> apology to all involved and she continued to carry out her GS-14 acting
> deputy director duties.  I am struck by the disparate treatment that I am
> receiving when Ms. Burket was merely admonished and required to write
> an apology.

He raised the matter again in a January 7, 2005 memo to the agency's Office of

Civil Rights with regard to an EEO complaint:

> Mr. Hampton's security clearance was suspended due to an ill-
> warranted but deliberate investigation as a reprisal for whistle blowing on
> his colleague Leslie Burket and the agency's discrimination for lack of
> action toward her, a white female, compared to FAS proposed suspension
> (July 12, 2002) for Mr. Hampton, an African American male with great

leadership skills and excellent career advancement potential who is non-bias *[sic]* towards people, colleagues and leaders.

. . .

The Agency (Dale Miller, Frank Lee and Roy Henwood) looked into Leslie Burket ['s] misrepresentation of FAS (email dated June 4, 2002 from Carol Brunnert, Missouri Department of Agriculture to Keith Adams of FAS regarding Leslie Burket) only after Mr. Hampton included it in his August 16, 2002 reply letter to FAS Administrator Terpstra regarding Dale Miller's proposed suspension of Mr. Hampton. Patricia Perkins can attest to that along with Robert Tse.

Hampton charges that Miller's action constitutes reprisal under 3 FAM 4329,

which states in pertinent part:

Whistleblower protections extend to any employee who makes disclosures protected of what he or she reasonably believes to be a violation of any law, rule, or regulation; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health and safety. A disciplinary action or other personnel action intended to punish an employee for whistleblowing may be investigated by the OIG or the Office of Special Counsel as a *reprisal*, a prohibited personnel practice under 5 U.S.C. 2302(b)(8)(A) and (B). A supervisor or other employee who is found to have committed a *reprisal* is subject to serious sanctions, including, but not limited to, removal, reduction in grade, and debarment from Federal employment. (Emphasis added).

The WPA protects from reprisal federal employees who disclose government

wrongdoing, and is liberally construed. The provisions of Section 105 of the Foreign

Service Act of 1980 were designed to shield members from prohibited personnel actions

and are therefore grievable. While the charged employee initially made what he

considered to be a protected disclosure for the purpose of supporting a charge of

*disparate treatment* for similar acts of misconduct, he alleges in this proceeding that this

same disclosure subjected him to reprisal.

FSGB 2006-012

To sustain charges of retaliation and reprisal with respect to whistleblower allegations, a grievant must meet the standards established in FSGB Case No. 97-090 (May 16, 2001), which found in part:

> . . . if grievants are able to establish by a preponderance of evidence that they made protected disclosures which prompted adverse personnel action and which were a contributing factor regarding the actions grieved, they will have made a *prima facie* showing. If so, USAID/OIG can defend itself only if it can show by clear and convincing evidence that it would have taken the same actions even in the absence of such disclosures.

What the charged party must provide is a non-frivolous allegation that he made protected disclosures and that these disclosures were a contributing factor in the adverse action he suffered. In order to prevail, Hampton must prove these elements by a preponderance of evidence. If he does, the burden will shift to the agency to establish by clear and convincing evidence that it would have taken the same action in the absence of any disclosures. *Morgan v. Dept. of Energy*, A24 Fed 1271 (Fed. Cir. 2005).

Here, Hampton offered nothing but bare allegations. A party cannot prevail on allegations alone; evidentiary support is required. *Wilkins v. Dept. of Defense*, 2004 WL 2829047 9 Fed. Cir. 2004). Moreover, whistle blowing is not a shield against misconduct charges. We therefore conclude that the charged employee has failed in establishing a *prima facie* case that he was a victim of reprisal in this instance.[4]

## The Reviewing Officer May Propose Separation but the Deciding Official has to be the Head of the Agency

Hampton asserts that his reviewing officer may propose separation for cause, but under 3 FAM 4361 the deciding official has to be the head of the agency. He maintains that the deciding official in this case, Roy Henwood, was his reviewing officer, and not

---

[4] Even if we were to conclude Hampton made a *prima facie* showing, the agency has shown by clear and convincing evidence that the agency would have taken the same action.

the FAS Administrator. The charged employee also contends that since Henwood was the proposing official's supervisor, a conflict of interest existed.

Notwithstanding the fact that the charged employee fails to offer any explanation as to why Henwood, simply as Miller's supervisor, creates a conflict of interest, we conclude that Hampton misinterpreted the pertinent regulation 3 FAM 4361 (a) which reads:

> It is the responsibility of the head of the agency, or his or her designee, to determine whether to propose separation and/or to separate an employee for cause under Section 610 of the Act (22 U.S.C. 4010).

In the Department of Agriculture, the head of the agency has authorized the rating officer (also referred to as the first line supervisor) to serve as the proposing official. (*See* 3 FAM 4362). In this case, Miller is the charged employee's rating officer, hence appropriately the proposing official. Henwood, as his reviewing officer, was designated as the deciding official. We find agency action to be consistent with 3 FAM 4300 procedures. We see no evidence of a conflict of interest or that the agency members have not acted in good faith. And, we see no prejudice to Hampton.

### The Agency Violated Administrative Procedures by Initiating Additional Investigation after the Record was Closed

Hampton alleges that the agency violated administrative procedures and his rights by initiating an additional investigation during the administrative inquiry, after the record for discovery had been closed. He further alleges that he and his representative were denied an opportunity to review and comment on this supplemental investigation. The supplemental investigation was requested by Henwood in May 2005, and a report was issued in July 2005. Henwood testified that the investigation became necessary because he still had additional questions regarding two of the charges after reviewing Hampton's

written and oral response to the charges, and after considering his refusal to grant a release of original hotel materials relating to his stays. The purpose of the supplemental investigation was deemed necessary to explore further because Hampton raised "reasonable questions" about the charges against him.

In separation for cause actions, the rules regarding a charged employee's access to relevant materials are set forth at 3 FAM 4364.1:

> (6) That the employee shall be granted a reasonable amount of official time to:
>
>> (a) Review only the material relied on in proposing the action; and
>> (b) Prepare a response to the notice;

The regulation requires that the charged employee be given a reasonable amount of official time, *i.e.*, work time, to review those materials relied on by the proposing official. Hampton has not raised access questions regarding the materials used by the proposing official, Miller, in the notice proposing separation for cause. Moreover, he does not show how his case has been prejudiced by not receiving the materials in question until May 2006, since the charges he had already responded to remained unchanged, and the next step in this process , *i.e.*, this proceeding, was still eight months in the future. We find no harmful violation of regulation or procedural error in this instance and no prejudice to Hampton. He had adequate review time.

**The Agency Relied on Stale Charges**

Hampton cites 3 FAM 4321 in maintaining that disciplinary procedures should be carried out in a fair, timely, and equitable manner. Because he was not notified of the agency's proposal to separate him until January 2005, three years after several of the alleged violations had occurred, he contends that since seven of the nine specifications

(trips) listed in Charge 1 range from August 2002 (six trips) to February 2004 (one trip), they should be considered untimely:

> As the Foreign Service Grievance Board has found in a number of cases with regard to disciplinary actions, the pivotal question in the case was whether the Department complied with the regulatory requirement that disciplinary procedures be carried out in a timely manner. FSGB No. 98-011 (January 5, 1999) (quoting FSGB No. 91-071 dated May 19, 1992 *[sic]*.

In FSGB Case No. 91-071, over nineteen months passed between the date of the alleged violation and the proposed discipline. And the Board found the delay to be unduly prejudicial and violative of the FAM and vacated the proposed discipline. He further notes that in FSGB Case No. 98-011, the Board found that a delay of four years was also unfairly prejudicial and could not be used to sustain the charges against the grievant.

The agency counters that its action was not untimely and the charges were not stale under the circumstances, since the misconduct was first discovered in 2004 when the charged employee submitted the Quality Inn receipt which prompted the management inquiry. The findings in that inquiry led to a review of records for the preceding two years.

In reviewing allegations of staleness of charges, the Board looks at each case individually. In this matter, Richard Maxwell, who conducted the investigation, testified that in conducting inquiries of this nature, he generally looked at records dating back one to two years in an employee's travel history in order to see if there is a pattern of misconduct regarding travel regulations. The agency initiated its investigation promptly, and under these circumstances the Board finds the two-year investigative period to be reasonable. Hampton argues in his closing brief that he was prejudiced because he "was

unable to provide any witnesses to testify in his behalf because of the long period of time." However, he neither offers information on why witnesses could not testify nor does he allege how any missing witnesses would have disproved the agency's contention that he purposefully altered his travel vouchers for personal gain. Hampton has not demonstrated that he was in any way prejudiced by the delay. An extensive investigation was necessary because of the complex factual pattern and Hampton's refusal to cooperate in the investigation. *Jones v. Department of Justice*, 87 MSPR 91, 95 (Oct. 10, 2000). The charged employee's reference to FSGB case law in support of his timeliness argument is not on point. FSGB Case No. 98-011, quoting from FSGB Case No. 91-071:

> That case involved a proposal of discipline for loss of control of a diplomatic pouch in Leningrad for a period of hours. The Board declared that the pivotal question in the case was whether the Department complied with the regulatory requirement that disciplinary procedures be carried out in a timely manner. Finding that over nineteen months passed between the date of the security violation and the proposed discipline, the Board held that the Department had failed to do so and found for the grievant in vacating the proposed discipline.
>
> While "timeliness" is not defined in the regulation, we find it difficult to reconcile this requirement with an unexplained delay of some four years in bringing disciplinary action. The evidence in this case was apparently obtained in late 1992. There is no suggestion that further or prolonged investigation was required after that. In addition, eight months elapsed between the delivery of the report of investigation to PER/ER and the notification to grievant of the proposal of discipline. The proposal to discipline him faced grievant with the evidently difficult task of defending himself by gathering evidence concerning two runs by the embassy car which had taken place four or five years before.
>
> Finding in the *instant case* that the period of delay is more than twice that in the cited case, and mindful of its conclusion that the Department clearly did not act with the speed appropriate to that situation and so violated its own regulations, and concluding that the delay in the *instant case* unfairly disadvantaged grievant's ability to defend himself on this specification, we do not sustain the specification of misuse of GOVs for the transport of flowers.

FSGB Case No. 91-071 is not seen as a bar herein. In the instant case, Hampton submitted a questionable travel voucher in February 2004 which resulted in a management inquiry. The inquiry was concluded in May 2004. This is the earliest point at which the *clock could start ticking* in comparison to FSGB Case No. 91-071, *i.e.*, the point at which management became aware of a possible violation. The proposal to separate for cause report was issued in January 2005, less than a year after the travel voucher was submitted. More importantly, the Board made it abundantly clear in FSGB Case No. 98-011 that its ruling in that matter extended only to that case and its particular facts. The Board concluded that the agency had clear knowledge of the grounds for the disciplinary action four or five years before bringing the action, and thus created an undue delay to the detriment of the employee. The Board has relied on *Heffron v. United States*, 405 F. 2d 1307 (Ct. C. 1969) in determining/analyzing whether charges are "stale." In Heffron, the employee charged that he had suffered from a nine-month delay between his alleged misconduct and a proposal to separate. The Court stated:

> . . . [W]e do not see and plaintiff has not offered any evidence to show any way in which he has been harmed by the delay. Because of the gravity of the charges and the consequences that would result from them, it was not unreasonable for the agency to await a complete investigation before bringing charges against plaintiff.

Using this analysis, in FSGB Case No. 2002-014, the Board reasoned:

> . . . [grievant], does not indicate how the lapse of 10 months has prejudiced his ability to present a defense against the charge of "Failure to follow instructions." His observation "The longer the length of time between an incident and a proposal for discipline, the more difficult it becomes for an employee to respond to charges" merely states the obvious.

Using the case-by-case analysis, we conclude that the charged employee has not demonstrated by the preponderant evidence how the agency's proposal to separate him for cause was untimely under 3 FAM 4321 or more importantly, how he was prejudiced by the delay. *See Hoover v. Dept. of the Navy*, 957 Fed 861 (Fed. Cir. 1992), where the Court held that to be untimely there must be shown by the one alleging harm an unreasonable delay and prejudice because of the delay. Hampton has not made that showing.

**Agency Failed to Prove Employee Knowingly and Willfully Violated Regulations**

The charged employee asserts that the agency must prove that he "knowingly supplied incorrect information with the intent of . . . deceiving the agency" in order to sustain Charges 1 and 2. In considering the issue of "intent," the Merit System Protection Board has stated:

> To sustain a falsification charge, the agency must prove by preponderant evidence that the employee knowingly supplied incorrect information with the intention of defrauding or deceiving the agency. *See Coleman v. Dept. of the Air Force*. While requisite intent can be established by direct or circumstantial evidence, the fact that the employee supplied incorrect information cannot in itself control the question of intent, and plausible explanations are to be supplied intentionally. The issue of the employee's intent to deceive must be resolved from the *totality* of the circumstances. (*See Blake v. Dept. of Justice*, Merit Systems Protection Board, Docket # CH-0752-97-0402-I-1 (03/30/99). (Emphasis added).

Utilizing this "totality of circumstances" standard, we conclude that the agency met its burden of proof on this issue. Hampton acted knowingly. We note first that it was the charged employee himself who submitted the challenged vouchers as valid. Once the agency raised questions as to the integrity of the vouchers, Hampton would not cooperate in the investigation and even threatened the hotels with litigation if they

cooperated with the agency's investigation by submitting his original receipts.
Unquestionably the best person to supply the original receipts was Hampton. Yet he
chose to submit the challenged documents. After that he had ample opportunity to either
provide documentary or testimonial evidence that they were valid or to submit corrected
vouchers. He did neither. We have carefully reviewed the challenged documents and
considered the supporting documentary and testimonial evidence offered by the agency.
There is credible testimonial and documentary evidence that the documents do not appear
to be genuine. We so find. We do not know who created the documents, but we do know
that Hampton knowingly and intentionally submitted them with his travel vouchers
thereby implying their accuracy. He has provided no plausible explanation as to their
inaccuracy.

**Agency's Separation for Cause Charges included a Charge not Proposed**

Hampton asserts that he was denied due process when Henwood concluded that
he (Hampton) was trying to impede the investigation when he wrote to Raj Patel, General
Manager at the Comfort Inn/Southwest, Jackson, Mississippi, threatening legal action if
Patel shared any information with the agency relative to his stays at the hotel.

> According to a faxed hotel receipt and comments made by Richard
> Maxwell, Compliance Review staff, Foreign Ag Service, in February of
> 2004, you discussed and provided information to him on my hotel stay
> with you without my consent. If so, this is a violation of my rights under
> the Privacy Act and is subject to legal action under the law.

Henwood stated that he was "shocked" by the letter and viewed it as *"indicting"* and an
attempt to *"impede the investigation."* Hampton argues that the deciding official relied
on his personal feelings rather than on an objective fair assessment of the facts to
determine whether the evidence supported the charge. The charged employee contends

that Henwood's conclusions amount to an "abuse of discretionary authority and was also arbitrary and capricious."

We find the charged employee's argument to be specious in this instance. He was charged with knowingly falsifying travel vouchers. In defending himself against this charge, he repeatedly challenged the agency's reliance on copies of hotel receipts rather than the originals, but refused to provide originals and/or sign a release to allow the hotels to release true copies of or replicas of the originals. In fact, he went a step further, by threatening legal action against the hotels that provided the true copies of originals. The charged employee did not explain why he was concerned with the hotel manager's cooperation. In the absence of knowing and agreeing with his reason, we do not find Henwood's concerns to be unreasonable. Hampton was not charged with failing to cooperate in the investigation, and the deciding official's consideration of his lack of cooperation is not a violation of Hampton's due process rights. Employees are expected to cooperate in investigations, not impede them. In the "totality" of the circumstances, it is logical.

### The Supervisor Failed to Notify the Employee of an Investigation which could Result in Disciplinary Action

The charged employee asserts that the deciding official, by his testimony and subsequent action, charged him with impeding the investigation, but failed to make this a formal charge. Hampton charges that in doing so, the agency violated his rights under Union Agreement Right 3.4c and 3 FAM 4322.3 (i). There is no requirement that the investigator inform grievant of his rights under Federal law until he is being interviewed. We note that personnel actions that are disciplinary in nature are handled in accordance with either the AFSA or AFSCME contracts as appropriate to the agency. Since the

AFSA contract advises the agency to follow 3 FAM 4300 for disciplinary actions, we disregard the charged employee's assertions in regard to the AFSCME contract.

The agency investigator testified that he initiated an investigation of Hampton at the request of Miller in 2003. The investigation related to some alleged questionable activities on the charged employee's part. It is this inquiry that the charged employee alleges violates the regulations. Miller did not inform Hampton of the initial investigation into his ownership of Syrisia's Foods, or his application for a Value Added Development Grant (VADG) from USDA's Rural Development Agency. The applicable regulation at 3 FAM 4322.3 reads:

> (d)     As a general rule, an investigating official should give the employee appropriate notice that an administrative inquiry has been opened, unless such notice might compromise the inquiry.
>
> . . .
>
> (i)     If an employee is interviewed concerning matters for which he or she could be criminally prosecuted, the *investigating official* will inform the employee of the employee's rights under Federal law. (Emphasis added).

We see no violation of this regulation in regard to Miller's actions. Section (d) does not require the supervisor to notify the target of the inquiry. Section (i) requires the investigator to inform an employee of his rights under Federal law if he is interviewed concerning matters which could be criminally prosecuted. We note that Maxwell obtained sworn testimony from the charged employee, in the presence of his official representative, in February-March 2004, and, therefore, conclude that Hampton was appropriately informed of his legal vulnerabilities.

**Agency Relied on Non-Original Documents and Third-Party Evidence**

Hampton asserts in both his response to the agency's action and to the Board that

the charges of misconduct attributed to him are based upon circumstantial and

unsubstantiated evidence and do not meet the agency's burden of proof:

> The charges attributed to me are based on evidence that is
> circumstantial and unsubstantiated and does not meet the Agency's burden
> of proof. For example, the proposal asserts that I filed inaccurate hotel
> receipts with my travel claims for official travel re-imbursements [sic] for
> lodging, yet does not provide copies of the actual receipts the hotels in
> question should have of my stays, relying on sample templates of empty
> receipts.

The charged employee does not explain why the receipts he submitted with his

travel vouchers would not have probative value when compared to receipt templates of

the hotels in question. The investigator testified that the receipts submitted by Hampton

himself appeared to be altered legitimate receipts, transcribed onto computer-generated

ones. His assessment is supported by information obtained from Patel, the general

manager of the Comfort Inn/Southwest, in Jackson, MS, where Hampton stayed on

several occasions in August, October, and November 2002 and for which he submitted

challenged vouchers.

Patel stated that the copied receipts submitted by Hampton were fraudulent,

altered, and did not correspond with his data. He added that he could not release the

corresponding hotel receipts without the charged employee's permission. The charged

employee argued that since the templates were provided in 2004, almost two years after

the period in question, there was no way to determine if the same templates were used in

2002 and 2003. However, Patel's assessment supports the agency's other testimonial and

documentary evidence. Patel, as general manager, would have been aware of the types of

receipts being utilized by the hotel in 2002 and 2003, especially since he had the hotel

records in hand.

The decisions of the Board are based upon criteria established in 22 CFR 909.1:

Decisions of the Board shall be based upon the record of
proceedings, shall be in writing, shall include findings of fact, and shall
include a statement of the reasons for the decision.

In determining facts, we do not agree that circumstantial and hearsay evidence, when

viewed in context of the whole report of the investigation, is insufficient in helping the

agency to meet its burden. We credit it. The Board held in FSGB Case No. 2003-012

(August 27, 2004):

Hearsay evidence is admissible in administrative proceedings and
may even constitute substantial evidence. *See Richardson v. Perales*, 402
U.S. 389 (1971) and *Hoska v. Dept. of Army*, 677 F.2d 131 (D.C. Cir.
1982). At that, we recognize that whatever probative value hearsay
evidence carries rests upon the circumstances in each case and, as the
ultimate trier of fact, we weigh its probative value. In making our
determination of whether hearsay evidence constitutes evidence sufficient
to support the proposed disciplinary action we consider such evidence in
light of the entire record, including comparing its credibility against
contrary evidence. If it has probative value and bears indicia of reliability,
it may constitute substantial evidence.

**The Agency Violated Employee's Rights by Excluding Him from Premises**

The charged employee asserts that the agency violated his rights under 3

FAM 4323 by excluding him from the premises. This contention need not be

considered because it is not relevant to the separation for cause.

**Henwood Lacked Legal Authority to Decide or Recommend Employee Separation**

The charged employee questioned Henwood's legal authority to act as the

deciding official while he was detailed to the U.S. Senate. Henwood was detailed to the

Senate in the fall of 2005, and was still there on detail when he signed the decision to

recommend separation for cause in April 2006. A "detail" is a temporary assignment and does not change the official's position assignment. The official continues to be the incumbent of the position from which he was detailed and retains those responsibilities incident to his official assignment. *See Barton v. Dept. of Education,* 20 MSPR 451(1984) and *Frankel v. Dept. of Education* 17 MSPR 453 (1983). Hampton has presented no legal or factual argument to support his contention that Henwood lacked legal authority to decide Hampton's case merely because he was on detail. It is clear from Farmer's letter (Human Resources Division, HR/D) that as the reviewing officer Henwood had been designated as the deciding official. The fact that he was subsequently and properly detailed to the Senate does not negate the fact that he remained the deciding official of record.

Having addressed the charged employee's overarching procedural complaints as outlined to this Board in his response to agency proposed action and the ROP, we turn to the specific charges.

Charge 1:  Submitting False Documentation for Travel Claims, Specification 1-9

The agency charged Hampton with deliberately altering hotel receipts to create the appearance of legitimate expenses in order to claim multiple requests for reimbursements. In February 2004, an agency travel official questioned a copy of a hotel receipt which had been submitted by the charged employee. In her opinion, the receipt appeared to have been altered. She contacted the hotel in question and received a faxed copy of an original form, and concluded the document submitted by the charged employee had indeed been altered. An investigation was initiated, which uncovered similar discrepancies covering travel claims dating back to 2002.

Hampton contends that the agency has not proven by a preponderance of the evidence that he intentionally submitted false documents for travel claims. And he asserts that the agency's action is untimely because it refers to events which occurred two to three years earlier. In addition, he discounts the agency's reliance on copies of the receipts in question rather than the original documents, and the testimony of hotel officials. Additionally, he claims ignorance of key aspects of agency/federal travel regulations, *e.g.*, required use of government contractor credit card in paying for official travel.

We conclude that the agency has proven by a preponderance of the evidence that the charged employee did submit false documentation in support of the travel claims in question.

The investigator found that some of Hampton's challenged receipts had been altered, and others were actually created by the charged employee. The receipts show stays that did not occur, had altered departure dates, and included non-existent charges. The agency's charge was brought in a timely manner after an altered travel receipt was brought to the attention of Hampton's supervisor in February 2004. He initiated an administrative inquiry which concluded in May of the same year. This is the earliest point at which *the clock could start ticking* in comparison to FSGB Case No. 91-071. The proposal to separate for cause report was compiled in December and issued in January 2005 -- hardly an excessive amount of time given the complexity of the investigation and the serious nature of the charges. Hampton has alleged but not established laches. He shows no harm.

Allegedly he was unaware, until recently, of travel regulations which require the use of government contractor credit cards in paying official travel expenses.[6] Even so, he is unable to say how he paid for the claimed expenses in question, but proffers that he must have used cash or some other means (by that we can conclude that he means by personal check or money order). If by personal check or money order, it seems to us that it would be possible to obtain a record of the transaction even a few years later. In any case, the Board has consistently held that employees are responsible for knowledge of their agencies' regulations, as those regulations pertain to them. At a minimum, employees must make a reasonable effort to understand their responsibilities. *(See* FSGB Case No. 2005-050, April 10, 2006.) We simply do not accept this exculpatory explanation.

We find evidence to support the agency's conclusion that he submitted false claims. In so doing, we sustain Charge 1 and all of its specifications are sustained.

The agency also charges that Hampton knowingly failed to *properly reconcile* a travel voucher for eleven months, resulting in an overpayment of $301.48. This charge resulted from a stay by Hampton at the Peabody Hotel in Memphis while on official travel in June 2003. He submitted his travel voucher in July 2003 for the full amount, and then he notified the hotel of an overcharge. In October 2003, the hotel credited Hampton's government contractor issued credit card for the $301.48. Hampton did not reconcile his voucher until September 2004 and, only then, after he was questioned about it by agency investigators in March 2004 and told there was a discrepancy.

---

[6]  This contention has little credibility. In July 2003, Hampton wrote to the Peabody Hotel requesting a credit to his Government-issued credit card.

Consequently, the agency charges that he had access, through his credit card, to unauthorized funds for a period of eleven months.

The charged employee maintains that he did not fail to reconcile his travel voucher as charged by the agency. As a sign of his good faith, he states that he sent a personal check to the agency's finance section as soon as the oversight was brought to his attention by investigators.[7] In actuality, Hampton sent a personal check for $301.38 to the agency's financial section on September 8, 2004 to cover the overcharge. In a manner of explanation, he explained in his response to the agency's proposal to separate for cause that he had tried, to no avail, to get the hotel to recognize its error before submitting his voucher for the full amount in July 2003. He admits that he made a mistake in not checking his credit card statement more closely, but laments that "after three months of getting nowhere with the Hotel I had given up." We question how the charged employee counts three months in his effort to settle the issue with the hotel before submitting his voucher, since the voucher was submitted in July and by his own account, a letter was sent to the Peabody Hotel requesting the adjustment on July 21, 2003, and he heard nothing further until notified by the investigators in 2004.

In any case, the agency rejected the charged employee's explanation of insufficient record keeping, and ignorance of departmental procedures, and that it was not a deliberate effort to defraud. The deciding official correctly concluded that Hampton's explanation of inattention was not credible when considered alongside the rapidity with which he notified the hotel of the overcharge. We conclude, based on the chronology presented above as well as by Hampton's promptness in notifying the hotel of the

---

[7] Here again his credibility is doubted. Maxwell says he told Hampton about the discrepancy on March 22, 2004.

overcharge, that the agency met its burden that Hampton failed to reconcile promptly his

statement as required.  Charge 2 is sustained.

### Charge 3:  Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specifications 1-4

Disclosure of financial interest reports are required for designated federal

employees in order to avoid conflicts of interest, or potential conflicts of interest.  The

agency asserts that the charged employee should have known that he was required to

report his ownership of a private company in his annual financial disclosure report (OGE

Form 450 or 450A) for the years 1998 through 2002, hence the four specifications under

this charge.  The agency bases its assertion on the fact that instructions detailing the

reporting requirements are stated on the form, and designated employees are given

frequent training in ethics/financial matters.  The argument that this failure may have

been an oversight is not convincing -- or even believable -- in light of other findings in

the investigation.  This was another indication that the charged employee just did not

have the judgment or the trustworthiness that was required.

The charged employee denies that he knowingly failed to list his ownership of

Syrisia's Foods in violation of agency financial disclosure requirements.  He states that he

incorporated the company in June 1998 with 1500 shares, one of which he issued to

himself in 2001, and simply forgot[8] about it when filing his disclosure reports.  He also

asserts that the facility was never built, and he received no income from the company,

and thus he saw no need to disclose his ownership until it was brought to his attention in

---

[8] It is not believable that an individual who invested $40,000 in a project of which he would be the owner simply "forgot" about it.  He even submitted an application for Articles of Incorporation in the company to the Secretary of State of Mississippi.

2003. But this does not excuse his obligation to disclose. Instructions on the form alerted him.

Charge 3 with all of its specifications is sustained.

Charge 4:  Providing False Information during an Official Investigation

The agency alleges that the charged employee knowingly failed to provide accurate information during an official investigation in violation of USDA Employee Responsibilities and Conduct, Section 735-208c. In doing so Hampton created concern in his agency about his honesty and integrity in fulfilling a Federal government position of trust.

More specifically, it charges that Hampton stated -- in a sworn statement to investigators--that he had never discussed his sweet potato processing facility with Benny Graves. But Graves informed investigators that he had indeed discussed with Hampton the facility and his plans for turning his mother's sweet potato recipes into marketable processed foods. For proof, Graves provided investigators with an email he had received from Hampton requesting that a letter be sent to USDA's Rural Development Agency in support of a grant to fund a feasibility study for his processing facility. In addition, he presented another e-mail in which he discussed Hampton's sweet potato business.

In the absence of any evidence to the contrary from the charged employee, the deciding official properly found the corroborating evidence obtained from Graves persuasive in supporting the allegation that Graves had indeed discussed Hampton's sweet potato processing facility with him. This evidence stands in direct contradiction to the charged employee's sworn statement to agency investigators. And it is more believable than Hampton's denials.

The charged employee denies that he intentionally or maliciously provided inaccurate or false information sufficient to sustain this charge. He contends that he provided accurate information to the best of his memory, and that he never discussed his personal interests with anyone during work hours and that the information cited was obtained from a third party and was not directed to Graves.

> According to the record of Mr. Graves' interview with Compliance, Mr. Graves obtained information about the company through the letter I sent to the state for technical assistance. I note for the record that this letter was not directed to Mr. Graves and did not identify me as a USDA employee or in any way indicate that I was pursuing this through my official position. Mr. Graves works . . . as an entomologist. I do not know who Candy Houck is, or why Mr. Graves sent her the email at attachment 36 to the Agency's proposal. There is certainly no evidence that I solicited or otherwise directly asked Mr. Graves for assistance in my capacity as a government employee. Nor is there evidence that the speculation enunciated by Mr. Graves in his email was based on a conversation with me. As stated during my interview with Compliance, I do not recall discussing my sweet potato processing venture with Mr. Graves.

But intent can be inferred from circumstances. Hampton further argues that the charge relates to conversations which allegedly occurred more than two years before, and as such, constitutes a "stale" charge that is unduly punitive and unfair per FAM restrictions and FSGB case law. Moreover, he asserts that the agency has the further burden of proving that he knowingly provided incorrect information to investigators with the intent to deceive, citing *Blake v. Dept. of Justice*, 81 MSPR 394 at 409 citing *Coleman v. Dept. of the Air Force*, 66 MSPR 498 at 506 (1995), aff'd 79 F.3d 1165 (Fed. Cir. 1996).

The charged employee argues strongly that the charge is stale; that the agency relied on third party input; and that he never used his official position, particularly during official travel, in trying to obtain support for his sweet potato processing facility. He is

less assertive in defending himself against the charge that he provided *false* information when questioned by investigators about his contact with Graves. The question was whether or not he had discussed his sweet potato venture with Graves:

> Q. What is your relationship with Mr. Bennie *[sic]* Graves?
>
> A. I believe Mr. Graves is state entomologist for the Mississippi Department of Agriculture.
>
> Q. Have you ever discussed your sweet potato processing facility or venture with him?
>
> A. I have not discussed the *details* of my sweet potato processing facility with Mr. Graves. (emphasis added).

Hampton appears to leave himself a little room by using the qualifying word *details* when answering the investigator's question as to whether or not he had discussed his venture with Graves. In any case, the deciding official concluded that Graves' July 1, 2002 e-mail had provided sufficient corroboration to support the allegation that the charged employee had discussed the specifics of his sweet potato processing facility with him. We agree. His untruthful statement has been established.

There is no "timeliness" issue here. In February 2004, Maxwell questioned Hampton about his relationship with Graves dating back two years. It seems logical that if he remembered Graves at all, he should have remembered the context in which he knew him. He has not demonstrated how the issue of time has prejudiced his case, *i.e.*, that witnesses such as Graves were no longer available. *See Kumfeman v. Dept. of the Navy*, 785 Fed 286 (Fed. Cir. 1986). Likewise, he has not demonstrated how Graves' knowledge of the letter he sent to the Mississippi Department of Agriculture, requesting assistance in obtaining support for his VDAG application, and the July 1, 2002 e-mail in which Graves discusses the sweet potato venture, would not constitute strong

circumstantial evidence of Graves' intimate knowledge of Hampton's business. The charge is not whether Hampton demonstrated a conflict of interest by conducting his personal business while on official business. The charge is that he provided false information during an investigation in violation of USDA Employee Responsibilities and Conduct, Section 735-208 c, which reads: "Employees are obligated to give information they possess to authorized representatives of the Department or Mission Area or Agency when called upon . . . ." We conclude that agency met its burden of proof on this charge. Charge 4 is sustained.

**Nexus**

The agency maintains that the charged employee's misconduct has a severe impact on the efficiency of the service which can only be remedied by his separation. They assert that his actions led to a breach of trust and a breach of fiduciary responsibility, which caused the agency to lose faith in his judgment and trustworthiness. Without this confidence, the agency asserts that it can no longer trust the charged employee to work, unsupervised, in the field in assisting the agency to carry out its mission. They point to his prior suspension for misconduct and the evidence of past deception for personal gain in holding out little hope for any rehabilitative possibilities. The agency cites FSGB Case No. 2001-007 (April 2, 2002) in maintaining that the Board has held in prior cases that falsification of documents "constitutes misconduct that goes to the employee's reliability, veracity, trustworthiness, and ethical conduct, and thereby affects the efficiency of the service."

We find that a nexus does exist between the charged employee's conduct, and the efficiency of the service. His conduct resulted in a loss of agency trust and confidence in

his ability to act in an unsupervised fashion in carrying out its mission. We conclude that the conduct, as described here, could reasonably have affected the ability of the agency to carry out its mission.

## CAUSE HAS BEEN ESTABLISHED

We readily conclude that the agency has established cause for separating Hampton from the service. This is not the first time he has been disciplined for misconduct. In 2002, the charged employee was suspended for seven days for misusing government equipment (personal computer) to print sexually explicit materials. In his defense, he stated that he had been away from the office on detail during the relevant period, and someone else may have accessed his PC, or that he may have inadvertently caused the materials to be downloaded. His conduct in the current proceeding:

1. Was a breach of the trust an agency can require of its employees;

2. Caused the agency to lose faith in his judgment and honesty, and;

3. Adversely impacted on the efficiency of the Foreign Service in carrying out its mission.

In this proceeding the Separation for Cause has been based upon misconduct. Accordingly, under 3 FAM 4361 (b) Hampton had a right to a pre-termination hearing. 3 FAM 4366(a) states:

a. After conducting a hearing on a proposed separation for cause, the Foreign Service Grievance Board shall issue a decision:

(1) Finding cause was established for separating the employee from the Service; or
(2) Finding cause was not established for separating the employee from the Service.

In making our decision here, 3 FAM 4366 describes our role as finding cause was – or was not -- established for separating the employee from the Service. Once we have made our decision, the Deciding Official then makes a determination as to what penalty to impose per 3 FAM 4367.

Making false claims for official travel is a serious offense for it goes to the very heart of the employer-employee relationship. Henwood gave reasoned and detailed testimony, already described, about why he sustained the four charges he did sustain. He considered both aggravating and mitigating circumstances. He noted Hampton was a senior employee, that his misconduct was widespread and, to some extent, raised doubts about his integrity. Not just that, but because of the involvement of the public, he could bring discredit on the agency.

On the other hand, he noted Hampton had a long career with the agency and maintained a good relationship with his peers and others.

His conclusion to separate Hampton for cause was the result of serious misconduct aggravated by the fact of prior misconduct. We find the facts were as Henwood detailed them and cause has been established by the preponderant evidence.

Procedurally he has shown no harmful error.

Based upon a careful analysis of the record and the arguments of the parties, we hold that the agency has established by preponderant evidence that the proposed separation from the Foreign Service is for such cause as will promote the efficiency of the service. We do not consider Hampton as being truthful during this proceeding.

## V. DECISION

For the reasons discussed, we find that cause for separation from the Foreign Service for Karl Hampton has been established.

Exhibit B

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507-1002

KARL HAMPTON,
     Complainant,

         v.

MIKE JOHANNS,
Secretary,
Department of
Agriculture,
     Agency

EEOC No.
100-2006-00080X

Agency No.
FAS-2005-00909

Washington, D.C.

Tuesday, September 25, 2007

U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Room 1037
Washington, D.C. 20250

The bench decision commenced at
1:07 p.m.

BEFORE:

JOEL A. KRAVETZ
Administrative Judge

APPEARANCES:

    On behalf of the Complainant:

        KARL HAMPTON, pro se
        1250 4th Street, S.W.
        Washington, D.C. 20024
        (202) 484-5150
        hamptonk27@hotmail.com

    On behalf of the Agency:

        ROBERT HARDIN, ESQ.
        U.S. Department of Agriculture
        Office of the General Counsel
        Civil Rights Division
        1400 Independence Avenue, S.W.
        Washington, D.C. 20250
        (202) 720-3962/3955
        (202) 720-4089 fax

## TABLE OF CONTENTS

Bench Decision by Joel A. Kravetz,
      Administrative Judge          4

Closing Instructions          71

Adjourn          73

1    P R O C E E D I N G S

2                                 1:07 p.m.

3        JUDGE KRAVETZ:  We are back on the

4    record.    It  is  just  after  1  o'clock  on

5    Tuesday,  September  25th  and  we  were  off  the

6    record  for  several  hours  while  I  worked  on  and

7    prepared  a  bench  decision  in  this  case.  I  gave

8    the  parties  instructions  off  the  record  about

9    what  would  happen  in  this  matter.   I  explained

10   to  them  that  I  would  issue  a  bench  decision

11   and  then  issue  the  transcripts.   The  Agency

12   will  then  have  40  days  to  implement  or  not

13   implement  my  decision.   From  that  Final  Order,

14   Complainant  may  then  take  action.

15               At    this    time,    I    am    ready    to

16   proceed  with  the  bench  decision.

17               BENCH DECISION

18   I am reconvening this hearing in the matter of

19   Karl Hampton vs. The Department of Agriculture

20   in  order  to  issue  a  decision  from  the  bench.

21   As  noted  previously,  EEOC  procedures  provide

22   for  AJs  to  issue  decisions  from  the  bench.   I

1  note that the record is comprised of 49

2  Complainant exhibits, which will be referred

3  to as C-1, C-2, et cetera. I note, however,

4  that Exhibit C-49 was marked for

5  identification only and was not admitted into

6  evidence. There are also 17 Agency exhibits,

7  which will be referred to as A-1, A-2, et

8  cetera, and one Administrative Judge exhibit,

9  which will be referred to as AJ-1.

10      I note that the record also contains a

11  few different Reports of Investigation or ROI.

12  First, the two volume ROI will be referred to

13  as either volume one or volume two of the ROI.

14  Second, the Supplemental Report of

15  Investigation will be referred to as the SROI.

16  Finally, there is an addendum to the

17  Supplemental Report of Investigation, and if

18  or as necessary, it will be referred to as the

19  ASROI.

20              Claims

21  Whether Complainant was discriminated against

22  on the bases of race (black), age (date of

1    birth  May  27,  1962),  gender  (male),  and

2    reprisal(for  engaging  in  prior  EEO  activity)

3    when,

4

5    1. in October 2004, he was denied a promotion;

6    2.  he  was  not  allowed  to  act  because  his

7    supervisor    refused    to    institute    rotating

8    acting assignments;

9    3. in November of 2004 he was denied a stretch

10   assignment;

11   4. in December of 2004,  he  was  denied  an  at-

12   grade assignment;

13   5.   he   was   denied   the   opportunity   to

14   participate  in  the  September  of  2005  Foreign

15   Service Promotion Boards; and

16   6.  he  was  denied  promotion  benefits  and  an

17   overseas  assignment  temporary  tour  of  duty  in

18   October or November of 2005.

19

20   I  note  that  there  were  several  other  claims

21   raised by Complainant, and the record contains

22   several prior orders that helped to determine

1  the remaining claims to be adjudicated before

2  me. With the agreement of Complainant and the

3  Agency, these six claims were brought forward

4  and litigated at the hearing. There was

5  originally a claim seven, and that was dropped

6  voluntarily by Complainant prior to the

7  hearing because I did not have jurisdiction

8  over that claim. Finally, I also note that

9  natural origin as a basis of discrimination

10 was also withdrawn prior to the hearing.

### Findings of fact

11 I note that the parties have set forth a

12 series of 13 stipulations of fact. However,

13 the parties made handwritten edits to the list

14 of stipulations, so the original number of 13

15 stipulations has been reduced. See Exhibit

16 AJ-1. I find that Exhibit AJ-1 presents some

17 background evidence as to what occurred in

18 this particular case. Any additional facts

19 will be raised and discussed as appropriate in

20 the analysis section in the interest of

21 brevity.

22

1          <u>Analysis</u>

2          **A.  Prima Facie case**

3          In a claim involving non-selection or

4     non-promotion, Complainant may establish a

5     <u>prima facie</u> case by demonstrating that: 1) he

6     belongs to a statutorily protected group; 2)

7     that he was qualified for the position at

8     issue; 3) that he was not selected or not

9     promoted; and 4) that the selectee or promotee

10    was outside his protected group.  See <u>Thornton</u>

11    <u>v.    National    Aeronautics    and    Space</u>

12    <u>Administration</u>., EEOC Appeal No. 01931357 (May

13    19, 1994).  <u>See also</u>, <u>McDonnell Douglas v.</u>

14    <u>Green</u>, 411 U.S. at 792, 802 (1973); <u>Krodel v.</u>

15    <u>Young</u>, 748 F. 2d 71, 76 (D.C. Cir. 1984).

16    The <u>McDonnell Douglas</u> framework,

17    although developed in the context of a Title

18    VII case, is equally applicable to cases under

19    the Age Discrimination and Employment Act,

20    ADEA, as amended 29 U.S.C. 623(a)(1).  <u>See</u>

21    <u>Reeves v. Sanderson Plumbing Products, Inc.</u>,

22    533 U.S. 133, 141 (2001) (applying <u>McDonnell</u>

1    Douglas to age discrimination cases). When a
2    complainant alleges that he or she has been
3    disparately treated by the Agency as a result
4    of unlawful age discrimination, then
5    "liability depends on whether the protected
6    trait (under the ADEA, age) actually motivated
7    the employer's decision." Id. at 141 (citing
8    Hazen Paper Company v. Biggins, 507 U.S. 604,
9    610) (1993). In an age case, the comparative
10   need not be outside the protected group (i.e.,
11   under age 40) but must be substantially
12   younger than Complainant. O'Connor v.
13   Consolidated Coin Caterers Corp., 517 U.S.
14   308, 311 (1996).

15        To establish a prima facie case of
16   retaliation, Complainant must show that (i) he
17   engaged in a protected activity; (ii) that the
18   Agency was aware of his protected activity;
19   (iii) subsequently, he was subjected to
20   adverse treatment by the Agency; and (iv) a
21   nexus exists between the protected activity
22   and the adverse action. Zysk v. U.S. Postal

1    Service., EEOC Appeal No. 01992995 (May 3,

2    2002);  O'Neal  v.  Ferguson  Construction

3    Company, 237 F.2d 1248, 1252 (10th Cir. 2001);

4    Hochstadt  v.  Worchester  Foundation  for

5    Experimental Biology, 425 F. Supp. 318, 324

6    (D. Mass.) aff'd, 545 F.2d 222 (1st Cir.

7    1976).

8            I  note,  however,  that  the

9    established  order  of  analysis  in

10   discrimination cases need not be followed in

11   all cases.  Where the Agency has articulated

12   legitimate, nondiscriminatory reasons for the

13   employment decisions at issue, the factual

14   inquiry can proceed directly to the third step

15   of the McDonnell Douglas analysis, that is,

16   the ultimate issue of whether Complainant has

17   shown by a preponderance of the evidence that

18   the  Agency's  actions  were  motivated  by

19   discrimination.  U.S. Postal Service Board of

20   Governors v. Aikens, 460 U.S. 711, 713-14

21   (1983); Lau v. Department of Justice, EEOC

22   Appeal No. 01A32849 (January 3, 2005); George

1    v. Environmental Protection Agency, 407 F.3d

2    405, 411-12 (D.C. Cir. 2005).

3        Therefore, even assuming, arguendo, that

4    Complainant can establish a prima facie case,

5    I find that the Agency articulated legitimate,

6    nondiscriminatory reasons for its actions.

7    Texas Department of Community Affairs v.

8    Burdine, 450 U.S. 248, 253-54 (1983);

9    McDonnell Douglas, 411 U.S. at 802. First,

10   regarding claim one, involving Complainant's

11   allegation that he was not promoted in 2004.

12   Margaret Ting, (Asian female, date of birth

13   December 5, 1955, with prior EEO activity)

14   explained that she was the Chairperson of the

15   2004 Promotion Board who considered grade FS-

16   03 Foreign Service Officers (or FSOs) for

17   promotion to an FS-02 grade position.

18       In this respect, Complainant testified

19   and the parties stipulated that the

20   Complainant had previously been promoted to an

21   FS-03 position. See Exhibit AJ-1 at paragraph

22   3. Complainant also explained that in the

1    Foreign Service, the higher grade the employee

2    is, the lower the grade levels are. Thus, an

3    FS-01 is more senior to an FS-02, et cetera.

4         Eventually, the most senior FSOs join

5    the equivalent of a Senior Executive Service

6    and are no longer on the FS grade or salary

7    system.

8         Ting explained that as Chair of the

9    Promotion Board, she helped guide the panel's

10    discussion of the candidates, and she is

11    responsible for signing off on the Promotion

12    Board results.  Ting also explained that each

13    FSO Promotion Board is comprised of five

14    panelists.  Three are Foreign Agricultural

15    Service or FAS, FSOs, and one is an FSO from

16    another Agency that employs FSOs, such as the

17    State Department or the Animal and Plant

18    Health Inspection Service (APHIS) within USDA.

19         The final promotion board member is a

20    member of the general public.  According to

21    Ting, each of the five panelists performs an

22    independent assessment of the candidates for

1    promotion, and scores the packages independently.

2    Then, an aggregate score for each candidate

3    is calculated based on each of the individual

4    scores assigned by the panelists.  Ting also

5    explained that each Promotion Board is guided

6    by a set of precepts that instruct the Board

7    how to assess the candidate's application

8    packages.  See Exhibit A1, 2004, Foreign

9    Service Selection Board - instructions.  See

10   also Exhibit C-40, Article 25 Foreign Service

11   Selection Board's instructions.

12   Ting noted that when assessing each

13   candidate for promotion, the panelists will

14   consider, among other things, the experience

15   and ability to perform at the next higher

16   grade level, the extent and quality of

17   supervisory management experience, a

18   demonstrated ability to make targets and

19   goals, and significant accomplishments at that

20   grade.  Id.  Ting also explained that while

21   some panel members may know the candidates,

22   they are instructed not to consider outside

1    factors and only to weigh the application

2    packages when assigning scores to each

3    candidate.

4        In this respect, Ting explained that the

5    panelists must apply a forced ranking system,

6    meaning that only one candidate can receive

7    the highest score and each candidate down the

8    line must receive a score not assigned to

9    another candidate. Therefore, the panelists

10   must place each candidate in rank order from

11   one, the lowest score, to ten, the highest

12   score.

13       Ting explained that based on the results

14   of the 2004 Promotion Board, several

15   candidates were recommended by the panel for

16   promotion, but Complainant was not among those

17   recommended. See Exhibit A-2, (Results of

18   2004 Foreign Service Selection Process.) Ting

19   then reviewed the application package of four

20   of the selectees, as well as Complainant, and

21   explained why the panel selected these

22   individuals, but did not select Complainant.

1    Regarding selectee Ali Abdi, an African-

2    American male, age and prior EEO activity

3    unknown, Ting noted, among other things, that

4    he performed significant work addressing beef

5    issues after Mad Cow disease became a threat,

6    and also noted how he worked with the Deputy

7    Prime Minister of Egypt on projects that

8    impacted U.S. wheat marketing. See Exhibit A-

9    3 (application of Abdi.)    Ting noted that

10    Abdi's assessment and performance demonstrated

11    strong management skills and he received a

12    strong rating by his supervisor and ~~rater~~ reviewer. Id.

13    Regarding selectee Casey Bean, a white

14    male, date of birth and prior EEO activity

15    unknown, Ting noted his duel language

16    proficiency in Chinese and Japanese, two

17    difficult languages, and his work opening

18    markets in these difficult environments. See

19    Exhibit A-4 (Application of Bean.)    Ting also

20    noted that Bean was able to get the Chinese to

21    lift restrictions, allowing several meat

22    packing plants to ship to China.    Ting also

1    emphasized   that   Bean   helped   to   improve

2    relationships between the Food Safety, and

3    Inspection Service, or FSIS, and APHIS.  Id.

4    Ting   further   noted,   among   several   other

5    things,   that   Bean   helped   negotiate   a   new

6    stream-lined system of food additive approvals

7    and   foresaw   the   Mad   Cow   program   arising   in

8    Japan   and   took   steps   to   prevent   problems   with

9    the shipment of meat.  Id.

10        Regarding   selectee   Brian   Goggin,   a

11   Caucasian   male,   age   and   prior   EEO   activity

12   unknown,   Ting   noted,   among   other   things,   that

13   Goggin   helped   reopen   the   Romanian   market   for

14   processed   poultry   products.   Ting   also   noted

15   that   Goggin   had   excellent   supervisor   ratings

16   and   he   often   represented   the   Agency   in

17   negotiations   with   minister   level   officials.

18   See Exhibit A-5.

19        Finally,   regarding   selectee   David

20   Williams,   a   white   male,   date   of   birth   and

21   prior   EEO   activity   unknown,   Ting   noted   among

22   other   things   that   he   helped   run   a   joint   U.S.

1    Agency for International Development (USAID)/

2    USDA mission and negotiated NAFTA issues

3    regarding dried beans with the government of

4    Mexico. See Exhibit A-6 (application of David

5    Williams.)

6        By contrast, when discussing

7    Complainant's application, Ting noted that

8    Complainant's materials lacked significant

9    accomplishments, and she did not observe a

10   pattern of increasing responsibility in his

11   body of work. See Exhibit A-7 (application of

12   Complainant.) Ting also noted that

13   Complainant's participation and training and

14   on committee advisory committees was

15   important, but no outcomes or accomplishments

16   were demonstrated by Complainant as a result

17   of such participation. Id. Likewise, while

18   Complainant was detailed to an assignment with

19   OMB to work on the Farm Bill, no specific

20   accomplishment was listed by Complainant as a

21   result of his work at OMB or on the Hill. Id.

22   Based on Ting's review of Complainant's

1    application, she explained that Complainant

2    did not demonstrate sufficient experience to

3    meet the criteria, as compared with her

4    colleagues, to be recommended for a promotion.

5        Regarding claim two, where Complainant

6    alleges that he was not allowed to act because

7    his supervisor refused to institute acting or

8    rotating assignments, I note that Dale Miller,

9    (Caucasian, male, DOB February 11, 1953, with

10   no prior EEO activity), testified that as

11   early as July 2001, when he was Acting

12   Director of the relevant office where

13   Complainant worked and was Complainant's

14   direct supervisor, Miller issued a memo to

15   institute rotating assignments among three GS-

16   14 senior staff, Leslie Burkett, (Caucasian

17   female, date of birth and prior EEO activity

18   unknown); Tim Powers, (Caucasian male, date of

19   birth and prior EEO activity unknown); and

20   Marlene Phillips, (female white ~~with race,~~ with age, and

21   prior EEO activity unknown), that did not

22   include Complainant.   Miller stated that he

1  inquired with the human resources department

2  whether it would be appropriate to allow

3  Complainant to be included among those who

4  acted for him in his absence. Miller noted,

5  however, that he was informed by Pat Carter in

6  human resources that it would be unwarranted

7  and unreasonable to allow Complainant, a

8  lower-graded Foreign Service Officer, or FSO,

9  to act along with his higher-graded co-

10  workers.

11      Later in 2001, after an audit by human

12  resources, it was determined that two

13  additional employees, Robert Tse, (Asian,

14  male, date of birth and prior EEO activity

15  unknown); and Complainant should be placed in

16  position descriptions that provide for GS-14

17  or equivalent job duties. See Exhibit A-10 at

18  page 3 (memo noting audit completed and

19  Complainant should be at GS-14 or equivalent

20  position.) At a subsequent senior level staff

21  meeting, it was recommended that Complainant

22  and Tse have position descriptions to reflect

1   their   higher   levels   of   responsibility

2   equivalent to a GS-14 grade.  See Exhibit A-

3   10, page 2 (Executive Advisory Group or (EAG)

4   minutes noting that Complainant should be

5   reassigned to GS-14 position description.);

6   Exhibit C-8, page three (same).

7        In July of 2002, Miller testified that

8   he drafted another memo to the Acting Deputy

9   Administrator establishing 30-day rotating

10  assignments to include the three original

11  employees from the prior rotation schedule, as

12  well as Complainant and Tse.  See Exhibit A-10

13  at page 1, (memo dated January 29, 2002, from

14  Miller instituting 30-day rotating assignments

15  to include Complainant.)

16       Thus, each month, if Miller was absent

17  during that month, the person who was assigned

18  to act during that month would do so.

19  Complainant was scheduled to act in June of

20  2002, but because Miller testified that he was

21  not out during that month, Complainant

22  therefore did not have any opportunity to act.

1     Miller then explained that in July of

2     2002, Roy Henwood, (Caucasian, male, DOB March

3     19, 1946, no prior EEO activity), arrived.

4     They decided that Henwood would act for Miller

5     in Miller's absence because he was Miller's

6     direct supervisor.

7          Miller then explained that this occurred

8     until sometime in the spring of 2004, when the

9     Union filed a grievance to complain that

10    management was not implementing the terms of a

11    prior class action settlement agreement,

12    whereby employees would be rotated to act for

13    their supervisors. See Exhibit C-5 (paperwork

14    related to a fall of 2004 grievance.); Exhibit

15    C-6, copy of class action settlement agreement

16    in Brooks et al. v. USDA, dated May 6, 1991.

17         Miller testified that management agreed

18    to reinstitute rotating assignments as long as

19    the employees received some management and

20    supervisory training.  If the employee was not

21    present during the 30-day period when he or

22    she was scheduled on the rotation calendar to

1    act, then Henwood would act for Miller.   The

2    Union was not satisfied and in the late summer

3    of 2004, a modified agreement was reached

4    whereby if the employee was not present during

5    the 30-day period when he or she was scheduled

6    on the rotation calendar to act, then another

7    employee    on    the    alphabetical    list    of

8    employees, not Henwood, would be permitted to

9    act for Miller. See ROI, volume 2, Tab 6B at

10   468 (email dated August 6, 2004 announcing new

11   rotational   policy   consistent   with   grievance

12   resolution.); p. 480 (email dated September 9,

13   noting that the next eligible staff member on

14   the rotation list would be assigned to act).

15       Miller then testified that on September

16   8, 2004, he was out of the office and the

17   designated person, Burkett, was scheduled to

18   act.   However, Burkett was also out of the

19   office.   Therefore, based on the new agreement

20   with   the   Union   that   was   announced   in   a

21   subsequent September 9 email, Complainant then

22   acted for Miller.   See Exhibit A-8, at page 1

1   (email  announcement  that  Complainant  was

2   acting  the  afternoon  of  September  8,  2004);

3   ROI volume 2, tab B at 481.

4        Subsequently,  on  November  2,  2004,

5   Complainant was also named acting director for

6   Miller.  Id. at page 2; ROI Volume II, Tab 6B

7   at  486.    Miller  denied  that  any  action

8   regarding  acting  assignments  were  based  on

9   race, gender, age, or prior EEO activity.

10       Regarding  claims  three  and  four,  where

11  Complainant alleges that he was denied both a

12  stretch  and  an  at-grade  assignment,  I  first

13  note  that  Complainant  explained  the

14  distinction  between  these  two  types  of

15  assignments.  Complainant explained that as an

16  FSO,  he  had  the  ability  to  be  assigned  to

17  perform work up to two grade levels higher

18  than  his  originally  assigned  grade.    Such

19  assignments  are  referred  to  as  stretch

20  assignments, because the incumbent 'stretches'

21  to  perform  a  career  enhancing  assignment

22  beyond his or her grade level.  By contrast,

1    FSOs can also be assigned to perform work at

2    their assigned grade, and quite logically,

3    such assignments are referred to as at-grade

4    assignments.

5    Complainant noted that pursuant to the

6    collective bargaining agreement, or CBA,

7    between the Agency and the FSOs, all FSOs are

8    required to bid on overseas assignments.

9    Complainant noted that there are rules

10   pertaining to the minimum and maximum number

11   of stretch or at-grade assignments that one

12   can bid on for overseas posts. Complainant

13   also noted that an FSO can only work in the

14   United States eight years, and he or she must

15   then bid on and be assigned to an overseas

16   post pursuant to the eight year rule.  See

17   Exhibits C-14 (article 28, limitations and

18   waivers for U.S. tours, eight year rule);

19   Exhibit C-13 (Complainant's request for a

20   waiver and the Agency's response).

21   Accordingly, Complainant submitted a bid form

22   requesting four stretch assignments and three

1    at-grade assignments. See Exhibit C-11. See

2    also Exhibit C-42 (instructions to complete

3    bid form), Exhibit C-43, (article 27 –

4    assignment policy.)

5        Franklin Lee, (African-American, male,

6    DOB March 13, 1947, with no prior EEO

7    activity) testified that during the relevant

8    time, he was the Deputy Administrator of

9    Commercial and Marketing Programs, and he has

10   been a career FSO with FAS for several

11   decades. Lee testified that as a Senior FSO

12   and Deputy Administrator, all Deputy

13   Administrators meet to form an Executive

14   Advisory Group (EAG). The EAG is responsible

15   for, among other things, personnel issues

16   which includes making decisions on stretch and

17   at-grade assignments for FSOs. See Exhibit C-

18   8 at 1(summary of responsibilities of EAG.)

19       Lee testified that during relevant EAG

20   meetings in late 2004, the group was informed

21   that Complainant's security clearance had been

22   suspended or revoked. See Exhibit C-12 at 3

1    (memo dated June 30, 2004, suspending

2    Complainant's security clearance). This memo

3    was also in the ROI, volume 1, tab 2 at 68 and

4    SROI tab 2 at 67. See also SROI Tab 6C at 253

5    (affidavit of Lyle Sebranek, (Caucasian male,

6    date of birth and prior EEO activity unknown),

7    noting that Complainant cannot be assigned

8    overseas until the issues regarding his Top

9    Secret security clearance suspension are

10   resolved.

11       Lee noted that FSOs must be able to

12   obtain and maintain a Top Secret clearance

13   because overseas post assignments require

14   access to classified documents sent through

15   the State Department cable system. Lee also

16   explained that there is a secure area in all

17   U.S. Embassies often referred to as 'the

18   bubble' where the Ambassador and all FSOs

19   would discuss classified matters. Lee

20   therefore explained that because the group was

21   informed by a member of the EAG, that

22   Complainant's security clearance had been

1    suspended, he was not considered or placed in

2    any overseas stretch or at grade assignments

3    when the EAG convened and determined such

4    assignments in the fall of 2004. See Exhibit

5    A-17 (email message from Susan Schayes, Lee's

6    Deputy, to Lee outlining the reasons for

7    Complainant's non-consideration. See also

8    Exhibit C-11 (paperwork from EAG noting those

9    who received what assignment). Lee explained

10    that race, gender, age or prior EEO activity

11    was not a factor, and that EEO activity was

12    not divulged during these meetings.

13    Sheila Thomas Bruce (African-American,

14    female, DOB October 25, 1960, with prior EEO

15    activity), a Branch Chief of the Foreign

16    Operations Branch of the human resources

17    department in FAS during the relevant time,

18    also testified that FAS Administration had the

19    final say as to which FSOs receive stretch or

20    at grade overseas assignments based on their

21    bids. Bruce noted that EAG member Sobranek is

22    responsible for presenting recommendations for

1   which  FSO  should  serve  in  what  overseas

2   assignment  and  in  what  capacity  --  stretch  or

3   at  grade.   The  EAG  members  would  then  discuss

4   each  of  Sobranek's  recommendations  and

5   ultimately  vote  on  the  assignment  of  FSOs  to

6   the  various  stretch  and  at  grade  assignments

7   that  needed  to  be  filled.   Bruce  also

8   explained  that  Complainant's  security

9   clearance  had  been  suspended  during  the

10  relevant  time.

11         Regarding  claim  5,  which  involves

12  Complainant's  allegation  that  he  was  denied

13  the  opportunity  to  participate  in  the

14  September  of  2005  Foreign  Service  Promotion

15  Boards,  I  note  that  Complainant  testified  that

16  he  was  never  permitted  the  opportunity  to

17  participate  in  the  Promotion  Board.

18  Complainant  testified  and  acknowledged  that  he

19  was  on  administrative  leave  with  pay  during

20  the  relevant  time,  but  opines  that  he  should

21  have  been  informed  about  the  Promotion  Board

22  being  convened,  and  allowed  to  submit  an

1    assessment of his own performance consistent

2    with past practice.

3        In this respect, Complainant testified

4    that all promotion packages contain, among

5    other things, a performance accomplishment

6    statement that is created by the candidate.

7    See SROI Tab 8 at 267 (Complainant's

8    performance accomplishment statement noting

9    that nothing was submitted by Complainant).

10   Complainant then noted that both the

11   supervisor and reviewing official complete

12   statements and Complainant is permitted an

13   opportunity to submit a rebuttal to these

14   supervisory statements. Id. at 268 and 269.

15   Complainant testified that he was not

16   permitted to submit either a rebuttal or his

17   own original assessment of his performance for

18   consideration by the 2005 promotion board.

19       Bruce testified that as Branch Chief,

20   she is responsible for ensuring that all

21   Promotion Boards are conducted consistent with

22   the CBA, the Foreign Service promotion

1    precepts -- or instructions, and the Foreign

2    Service Act of 1980. Bruce then testified

3    that Complainant was not denied the

4    opportunity to participate in the September of

5    2005 Foreign Service Promotion Boards. Bruce

6    explained that in the late summer of 2005, in

7    anticipation of the Promotion Boards meeting

8    in the fall, a question arose as to whether or

9    not Complainant's promotion package should be

10   submitted and considered by the 2005 Promotion

11   Board because Complainant was on

12   administrative leave with pay pending an

13   internal administrative investigation of

14   allegations of misconduct. Bruce explained

15   that the CBA was silent on whether employees

16   in such a leave status should be considered

17   for promotion. Bruce decided that because the

18   CBA was silent on whether or not Complainant's

19   package of materials should be submitted to

20   the Promotion Board, she erred on the side of

21   including his materials.

22       Therefore, Complainant's promotion package

1    was considered by the 2005 Promotion Board.

2    See SROI Tab 8 at 266 to 269 (containing

3    portions of relevant documents in

4    Complainant's 2005 promotion package that was

5    considered by the Promotion Board). Bruce

6    testified that she knew Complainant's gender

7    and race, but that his race and sex were not

8    factors in her decision.

9        Bruce also testified that it is not her

10   responsibility or the responsibility of the

11   employee's supervisor to inform or apprise the

12   employee that he or she can submit their

13   accomplishment statement. Rather, it is the

14   responsibility of the employee to submit such

15   a statement. Bruce noted that the Promotion

16   Boards convene at the same time each year, and

17   all FSOs should know the routine to submit

18   appropriate paperwork in anticipation of the

19   September Promotion Board meetings.

20       Asif Chaudhry (Asian, male, DOB November

21   15, 1956, with prior EEO activity outside

22   USDA), testified that he was the chairperson

1    of the 2005 Promotion Board that considered

2    Grade FS-03 FSOs like Complainant for

3    promotion to the FS-02 grade level. Chaudhry

4    testified that the Promotion Board followed a

5    set of guidelines or precepts and considered

6    the application packages of all candidates,

7    including Complainant. See Exhibit A-13

8    (Precepts and Instructions to the 2005

9    Promotion Board).

10    Chaudhry testified that during the

11    review process, each Board member reviews the

12    promotion folders for each candidate and ranks

13    the packages on a numerical scale, with 1

14    being the lowest score. Chaudhry explained

15    that the Board uses a forced ranking system,

16    thus forcing the Board members to assign the

17    highest score to certain candidates, while the

18    lowest scores must also be assigned so that

19    all scores are distributed among the

20    candidates. Chaudhry then explained that from

21    his review of the scoring matrix, all five

22    Board members gave Complainant a score of 1,

1   so Complainant received the lowest possible

2   score -- 5 -- on the scoring matrix. See SROI

3   Tab 10 at 277. Chaudhry also explained that

4   after reviewing and tallying the scores, a

5   natural break emerged, and Chaudhry drew a

6   line and signed his name. Thus, all

7   candidates above the line were considered as

8   qualified for promotion by the Board, and all

9   those below the line would not be recommended

10  for promotion by the Board. Id.

11  Complainant's name fell below the line, so he

12  was not recommended for a promotion by the

13  Board. Id.

14      Chaudhry then provided additional

15  details about three of the candidates

16  selected. Based on his review of the

17  application packages, he explained why all

18  three candidates received higher scores based

19  on the work performed and results achieved by

20  these candidates as demonstrated in their

21  respective application packages. See Exhibits

22  A-14 through A-16 (application packages of

1    three of the selectees.)  Chaudhry explained

2    that the Board looks for language in the

3    assessment forms that demonstrates leadership,

4    communication skills, management skills,

5    initiative and projects that demonstrate

6    results.  Chaudhry then explained how each of

7    the above selectees demonstrated these

8    attributes in their promotion packages.

9        Chaudhry noted, for example, that

10    selectee W. Garth Thornburn II, an African-

11    American male like Complainant, date of birth

12    and prior EEO activity unknown, demonstrated

13    great achievements in trade policy where sales

14    in his region increased 600 percent and better

15    market access was achieved in his region for

16    U.S. Products.  See Exhibit A-15.  Chaudry

17    also explained how selectee Kimberly Svec, a

18    Caucasian female, dated of birth and prior EEO

19    activity unknown, handled a touchy situation

20    with an APHIS employee very well, and she also

21    provided training to a new attaché in her

22    embassy.  See Exhibit A-14.

1      By contrast, Chaudhry noted that the

2  information in the application package about

3  Complainant's work explained that Complainant

4  attended conferences, but it did not express

5  the value to FAS of Complainant's attendance.

6  The lack of any demonstration of achievements

7  or explanation of how projects demonstrated

8  concrete results resulted in Complainant's

9  promotion package receiving a very low score.

10  See also SROI Tab 12 at 286 (listing

11  Complainant as a candidate not recommended for

12  promotion).  Chaudhry noted that the third

13  selectee was also an African-American male

14  like Complainant, and that at no time during

15  deliberations of the candidates for promotion

16  was a candidate's race, gender, age or prior

17  EEO activity considered.

18      Finally, regarding claim six wherein

19  Complainant alleges that he was denied

20  promotion benefits and an overseas

21  assignment/temporary tour of duty in October

22  or November of 2005, I note that this claim in

1    and of itself really amounts to nothing more

2    than a restatement of Claims 1, 3, 4 and 5,

3    with additional detail related to promotion

4    benefits such as special leave and salary

5    benefits that flow from being placed in an

6    overseas assignment. I note that prior to the

7    hearing, it was unclear if there was a

8    separate incident that gave rise to an adverse

9    action as set forth in Claim 6. I note that

10   Complainant did not articulate any specific

11   adverse action beyond the denial of a

12   promotion from both the 2004 and 2005

13   Promotion Boards -- Claims 1 and 5, as well as

14   the denial of stretch and at grade assignments

15   -- Claims 3 and 4. Thus, it appears that

16   Complainant believes he should have received

17   such benefits solely as a result of those

18   claims that he has already brought before and

19   are being adjudicated at this hearing.

20        Even assuming _arguendo_ that Claim 6 is

21   in and of itself a cognizable claim, I note

22   that Lacy Muir (Caucasian, female, DOB

1    September  24,  1966,  with  some  prior  EEO

2    activity)  who  was  a  member  of  the  Human

3    Resources  Department  within  FAS  during  the

4    relevant  time,  explained  that  FSOs  are  not

5    entitled  to  promotion  benefits  if  the  FSO  is

6    not  selected  for  any  of  assignment  to  an

7    overseas  post,  be  it  an  at  grade  assignment,

8    stretch  assignment  or  a  promotion.

9        Because    the    Agency    articulated

10   legitimate,  nondiscriminatory  reasons  for  its

11   actions,  Complainant  must  now  establish  that

12   these    reasons    are    a    pretext    for

13   discrimination.    Hicks,    509    U.S.  at  511;

14   Burdine,    450    U.S.    at    253-54;    McDonnell

15   Douglas,  411  U.S.  at  804.  In  this  regard,  I

16   note  that  a  finding  of  pretext  may  be  based  on

17   the  elements  of  a  prima  facie  case  and  a

18   determination  that  the  employer's  explanation

19   is  not  credible.    Reeves  v.  Sanderson  Plumbing

20   Products,  Inc.,  530  U.S.  133,  146-147  (2000);

21   Hicks,  509  U.S.  at  511.    However,  Complainant

22   always    retains    the    ultimate    burden    of

1  persuading the trier of fact that the Agency

2  unlawfully discriminated against him.  Hicks,

3  509 U.S. at 511; Aikens, 460 U.S. at 715.

4  After reviewing the evidence and

5  assessing the credibility of the witnesses at

6  the hearing, I conclude that Complainant

7  failed to establish by a preponderance of the

8  evidence that discrimination or retaliation

9  more likely than not motivated the Agency's

10  actions.  In reaching this conclusion, I note

11  that none of Complainant's arguments, either

12  alone or in the aggregate, are sufficient to

13  call into question any of the legitimate,

14  nondiscriminatory reasons proffered by Agency

15  management officials who testified at the

16  hearing.

17  Regarding Claim 6, the denial of

18  benefits flowing from not being assigned to an

19  overseas post or being promoted, I note that

20  Complainant presented no independent evidence

21  that he should have received such benefits,

22  and that such benefits were denied because of

1   his race, gender, age, or prior EEO activity.

2   Complainant's arguments relate back to his

3   specific denial of promotions, at grade or

4   stretch assignments, and are not independent

5   of those claims.  Accordingly, when I assess

6   those claims, I will be considering and

7   assessing all of Complainant's arguments.

8       Regarding Claim 2, Complainant presents

9   evidence from a co-worker, Patricia Perkins

10  (African-American, female, DOB July 14, 1949,

11  with prior EEO activity), in an effort to

12  demonstrate that he was discriminatorily

13  denied the opportunity to act.  Perkins

14  testified that she and Complainant worked

15  together and reported to Miller.  Perkins

16  was very active in the Union as the local shop

17  steward and also Treasurer of the National

18  Union for a year.  Perkins recounted the

19  Agency's failure to abide by the 1991 class

20  action settlement agreement and institute

21  rotating assignments, thus necessitating a

22  grievance.  See Exhibits C-5 and C-6.

1    Perkins, like Complainant, testified that

2    Complainant was never given the opportunity to

3    act for Miller.

4    In contrast to both Perkins and

5    Complainant, Miller testified as to the

6    reasoning behind how rotational assignments

7    were first instituted, then removed, and

8    subsequently reinstituted. I note that the

9    initial acting assignments between 2001 and

10   early 2004 comprise only background evidence,

11   as any denials would have comprise discrete

12   acts that occurred beyond the 45-day period

13   that Complainant had to contact an EEO

14   counselor. See ROI Volume I, Tab 2 at 100

15   (noting the date of EEO counselor contact as

16   July 19, 2004). Notwithstanding the lack of

17   timely EEO counselor contact relating back to

18   the prior opportunities to act between 2001

19   and early 2004, I note that during a part of

20   that time, Complainant was not considered as

21   even occupying the equivalent of a GS-14

22   position. Ultimately, an audit was certified

1    and the EAG recommended placing Complainant

2    into a GS-14 position.  See Exhibit A-10 at

3    page 2.    Thus, it is logical that the

4    Complainant would not act if he was not

5    considered among the senior staff.

6        Subsequently, Miller and Henwood's

7    action between 2002 and 2004 deprived all

8    employees, regardless of race, gender, age or

9    EEO activity, the right to act in Miller's

10   absence.    Finally, the Union negotiated a

11   resolution to their grievance in or around the

12   late summer or fall of 2004.    Finally, and

13   contrary to the testimony of both Complainant

14   and Perkins, there is documentary evidence

15   that Complainant was indeed assigned to act on

16   a couple of occasions.    See Exhibit A-8.

17   Thus, the record belies both Complainant's and

18   Perkins' testimony that Complainant never

19   acted as supervisor in Miller's absence.    In

20   light of such contemporaneous records

21   demonstrating otherwise, I do not find

22   Complainant's or Perkins' testimony credible

1    regarding this aspect of Complainant's claim.

2    I note that while Complainant and Perkins

3    present other evidence of animus by Miller, I

4    will assess and address such evidence when

5    analyzing the remaining claims regarding the

6    denial of promotions, stretch, and at grade

7    assignments.

8        Regarding Complainant's non-promotion

9    claims in 2004 (Claim 1) and 2005 (Claim 5), I

10   note that Complainant presents no evidence

11   that any of the members of the selection

12   board, in particular its chairperson, harbored

13   animus or took any actions to discriminate or

14   retaliate against Complainant. In this

15   regard, I note that both Ting and Chaudhry

16   were very credible witnesses in how they

17   consistently recounted how the selection

18   process works and how their respective panels

19   arrived at their conclusions as to who they

20   recommended for promotion. They both

21   explained credibly that Complainant's

22   candidate package did not demonstrate the

1  requisite    levels    of    experience    or

2  accomplishments that would rank him among the

3  most qualified of his colleagues in a forced

4  ranking system that requires the panelists to

5  rank all candidates against each other.

6      Complainant's theory of discrimination

7  and retaliation stems from his belief that the

8  selection process was tainted from the onset

9  by the actions of his former supervisors,

10  Human Resources staff, such as Muir and

11  Davies, and FAS management, in particular

12  Miller and Henwood. ①

13      Complainant argues that from the time of

14  his employment through to Miller's supervision

15  of him, his supervisors have harbored animus

16  because he's an African-American employee from

17  the south who has engaged in EEO activity both

18  through filing individual complaints and

19  grievances, as well as being part of a class

20  complaint that was settled in May of 1991.

21  Complainant thus opines that actions by Miller

22  and his predecessors tainted the selection

① These arguments also apply to Complainant's allegation that he was denied stretch and at grade assignments.

1  process because they actively derailed his

2  ability to get promoted or work in assignments

3  that would lead to promotions.

4        Much of Complainant's testimony also

5  revolved on how his prior supervisors, when he

6  first joined FAS and first worked overseas,

7  harbored animus. Complainant recounted how he

8  was discriminated against in the interview

9  process and only hired as a result of legal

10 action in 1987. Complainant testified further

11 about animus by his prior supervisors because

12 it took him longer than his Caucasian co-

13 workers to become commissioned and tenured as

14 an FSO, and then ultimately to receive a

15 promotion from an FSO-4 to an FSO-3. See

16 Exhibit C-1, (a chart created by Complainant

17 noting and comparing entry dates and

18 promotions of Complainant versus other FSOs

19 and demonstrating that it took longer for

20 Complainant to be tenured and to be promoted).

21       Complainant noted how the class action

22 arose in 1991 when a high-level USDA employee

1  referred to a class agent as a "black dog" at

2  a public meeting.

3      In addition to the unusually long period

4  of time it took Complainant to be commissioned

5  as an FSO and receive a promotion, Complainant

6  also testified that of the roughly 150 to 160

7  FSOs in FAS, only 10 to 15 are African-

8  American and this statistical disparity is

9  further evidence of discrimination against

10  African-Americans, in particular, African-

11  American males who have engaged in prior EEO

12  activity.

13      Complainant also testified how one of

14  his first supervisors, Chris Goldthwait told

15  him he was doing an outstanding job, but that

16  such feedback could not be placed in his

17  evaluation forms, and that the Agency has a

18  history of discriminating against African-

19  American employees.

20      Complainant explained as to his belief

21  that there are unspoken lines observed by FAS

22  management that a black man from the south

1  should not cross in regard to how he portrays

2  himself and how he interacts with people of

3  all races, but especially with white women.

4  According to Complainant, he was approached

5  about modeling Jockey men's underwear in 1991

6  and when this outside opportunity was approved

7  by FAS management, his underwear modeling

8  angered several of his supervisors.

9  Complainant testified that these supervisors

10  harbored animus because as a black man, he was

11  embarrassing FAS by modeling men's underwear.

12    Complainant also testified about how

13  white supervisors were jealous of his

14  accomplishments and abilities as a FSO, and

15  they feared and were threatened by his success

16  as a FSO.

17    Complainant further testified about

18  false rumors spread by these jealous white

19  supervisors, one of which stated that he had

20  an affair with the wife the Ambassador of

21  Brazil while he was on an overseas assignment

22  between 1992 and 1996. The wife of the

1    Ambassador of Brazil was a white woman and a

2    false cable spreading this rumor was

3    apparently issued by a former white supervisor,

4    ⬟ Perkins testified that she saw ~~the cable~~ because

5    she was the secretary for an administrator and

6    she therefore had access to these cables.

7    Complainant denied having an affair.

8    Complainant explained that much of the work of

9    an FSO requires FSOs to attend cocktail

10   parties, socialize, make friends, and make

11   connections. See Exhibit C-47.

12   Complainant implied from his testimony

13   that jealous, white supervisors threatened by

14   his success and who harbor race-based animus

15   accused him of crossing a line that a black

16   man from the south should never cross, namely,

17   having an affair with a white woman.

18   Complainant alleges that his prior

19   supervisors who spread these false rumors have

20   been reaching out to his current supervisor

21   Miller, and are impacting, even today, how

22   Complainant's career has progressed or in

1  Complainant's mind has been derailed as a

2  result of actions by these prior bigoted

3  supervisors.  Thus, Complainant asserts that

4  Miller's acts are, at least in part, impacted

5  by his former supervisors.

6      Complainant opines that Miller's actions

7  and how he drafted the supervisor assessment

8  for Complainant impacted his promotability.

9  Thus, by writing an assessment without magic

10  words such as "highly recommend," Miller is

11  subtly derailing Complainant's ability to get

12  promoted because he knows that promotion

13  boards will rank him lower compared with his

14  Caucasian co-workers.

15      Complainant further argues that after

16  the allegation surfaced about his alleged

17  affair in Brazil, his career was curtailed

18  because he was placed in a position reporting

19  to Miller where he could not have access to

20  the kinds of opportunities that his non-

21  African-American colleagues had in order to

22  demonstrate leadership, accomplishments and

1    the other characteristics that are weighed by

2    Promotion Boards when deciding who to promote

3    or that are weighed by the EAG in deciding who

4    will receive at grade or stretch assignments.

5    Complainant thus implies that he was placed in

6    a dead end assignment where he could not gain

7    the requisite experience necessary to get a

8    promotion.

9         In addition to Complainant's argument

10   that his career was derailed due to bigotry by

11   his prior supervisors associated with being a

12   black man from the south who dared to have

13   relationships with white women, Complainant

14   also alleges that Miller, himself, harbors

15   animus.    Among other things, Complainant

16   alleged that Miller's actions to address

17   conduct issues among staff differed, and he

18   favored Caucasian employees, in particular,

19   Burkette, who engaged in inappropriate conduct

20   and yet were not disciplined.

21        Additionally, Complainant testified that

22   Perkins told him about a derogatory statement

1   uttered by Miller.    In this regard, Perkins

2   also   testified   at   the   hearing   about   the

3   statement and about how she told Complainant

4   of the statement.

5       Specifically, Perkins testified that on

6   one occasion in 2001 or 2002, Miller came to

7   Perkins and told her that he learned from a

8   colleague   that   Complainant's   presence   on

9   Capitol Hill upset this colleague.   According

10   to   Perkins,   Miller   was   frustrated   that

11   Complainant was doing things that were causing

12   his colleagues to become upset and to yell at

13   him.    In frustration, Perkins testified that

14   Miller told her that Complainant is acting

15   like a nigger from California, rather than a

16   nigger from Mississippi.

17       Complainant   explained   that   a   black

18   person from Mississippi knows his place in

19   society  and  does  not  act  inappropriately,

20   whereas, like the common image of individuals

21   from California being free spirited, such

22   individuals do not know their place and are

1    more free spirited. Complainant argues that

2    such a derogatory utterance by Miller further

3    supports his testimony that his career as an

4    FSO has been derailed by bigoted managers who,

5    like Miller, are jealous and threatened by a

6    successful black man and are offended when

7    such an individual steps out of bounds that

8    society sets for black men.

9        Complainant also noted testimony by Lee

10   wherein Lee affirmed the statements that he

11   made to an EEO counselor about Complainant's

12   early struggles with FAS.   See SROI Tab 2 at

13   pages 78 to 80, Exhibit C-19.   Lee first

14   recounted Complainant's problems getting hired

15   and selected as an FSO in or around 1986 or

16   1987.  Id. at 78, C-19.  Lee also noted that a

17   white female helped Complainant get in an

18   underwear commercial, and that this did not

19   play well with white males.  Id. at 79, C-19.

20   Lee also noted Complainant's difficulty

21   getting commissioned and tenured as an FSO in

22   the early 1990s.  Id.

52

1        Finally, Complainant argued that there

2   are several aspects of Miller's own testimony

3   that are not credible and demonstrate animus.

4   Complainant argues, among other things, that

5   Miller did not follow proper rules and

6   regulations when he disciplined Complainant

7   for allegedly using a computer to print

8   pornography, and subsequently when he was

9   proposed for termination and ultimately

10   terminated for various offenses that he

11   alleged are unfounded.  See generally Exhibits

12   C-17, C-18, C-21, C-28, C-29, C-39.

13        Complainant alleges that Miller,

14   Henwood, and others knew about an Office of

15   Inspector General (OIG) report declining to

16   refer Complainant's alleged violations for

17   investigation for criminal prosecution, yet

18   proceeded with an internal investigation to

19   force him out of the Agency due to

20   discriminatory and retaliatory animus.  See

21   Exhibit C-12 at page 3, OIG report.

22        Complainant also testified how Miller

1    responded curtly and then verbally reprimanded

2    him in response to his request for additional

3    vacation back in 1998. Complainant noted that

4    in an email, Miller stated to him that until

5    he obtains the rank of Ambassador, he needs to

6    request, not simply take leave. See Exhibit

7    C-4.

8    Complainant and Perkins testified about

9    how several employees had problems once Miller

10   became the head of the office, and a memo was

11   generated in June of 2001 setting forth a

12   summary of the grievances and proposed

13   resolutions to address leadership management

14   problems by Miller. See Exhibit C-7.

15   Complainant alleges that there are

16   inconsistencies between the testimony of

17   Miller and the testimony of Bruce regarding

18   the extent to which Complainant would have or

19   should have been contacted by the Agency with

20   regard to submitting his own assessment of his

21   performance for the 2005 Promotion Boards.

22   Finally, Complainant alleges that FAS is

1   a  small,  white-dominated  Agency,  and  as  a

2   result  of  years  of  animus  and  stereotypes

3   against  the  African-American  employees  and  in

4   particular,  African-American  males  who  engage

5   in  EEO  activity,  they  fail  to  hire,  promote

6   African-Americans.       Additionally,     FAS

7   management   has   a   double   standard   for

8   minorities,   and   they   treat   differently

9   African-American  males,  especially  those  who

10  file  complaints.   See generally  Exhibit  C-1,

11  C-5, C-23, C-46.

12      After  assessing  Complainant's  various

13  arguments  against  the  evidence  presented  at

14  the  hearing,  I  find  that  none  of  Complainant's

15  arguments,  either  alone  or  in  the  aggregate,

16  are  sufficient  to  establish  by  a  preponderance

17  of  the  evidence  that  the  Agency's  actions

18  denying  him  promotions,  at-grade  or  stretch

19  assignments  were  a  pretext.

20      Regarding  Complainant's  testimony  of  on-

21  going  discrimination  as  a  black  male  from  the

22  south,  I  note  that  some  of  Complainant's

1   allegations about his initial hiring as well

2   as aspects of his work, modeling underwear,

3   and the feelings it may have generated, are

4   corroborated by Lee.   However, these actions

5   occurred between 1987 and 1996, almost eight

6   years prior to the allegations giving rise to

7   this complaint.   Moreover, almost all of the

8   prior complaints and grievances involved prior

9   supervisors.   Miller did not supervise

10  Complainant until Complainant returned from

11  his assignment in Brazil in or around August

12  of 1996.

13       Complainant argues that prior

14  supervisors impacted how FAS management, in

15  particular Miller and Henwood, took actions

16  against him.   I find, however, that

17  Complainant presents no credible evidence to

18  support his testimony that prior bigoted

19  supervisors are impacting decisions by Miller,

20  Henwood or other FAS management officials.

21  Essentially, Complainant's argument amounts to

22  nothing more than mere speculation on his

1   part.

2       Moreover, many of Complainant's

3   allegations regarding actions by Miller are

4   either not credible, not supported by the

5   record or insufficient to establish animus

6   based on race, gender, prior EEO activity or

7   age. The strongest allegation relates to

8   Complainant's and Perkins' testimony that

9   Miller uttered the 'N' word in reference to

10  acting like such an individual from California

11  as opposed to such an individual from

12  Mississippi, and that this remark was uttered

13  some time in 2001 or 2002. Miller denied

14  making any such remark and no other witness

15  testified hearing any racial remarks by

16  Miller. I also note that Perkins testified

17  that Miller would tell racist and sexist

18  jokes.

19      After considering the evidence and

20  credibility of the witnesses, I find

21  insufficient evidence in the record to

22  conclude that Miller uttered the 'N' word as

1   alleged by Complainant and Perkins. In

2   reaching this conclusion, I first note that

3   Complainant did not hear the remark himself.

4   Rather, he only heard about it through

5   Perkins. Complainant, however, never brought

6   up the 'N' word remark to the EEO counselor or

7   the EEO investigator even though Perkins told

8   him about the remark just after it occurred.

9   Indeed, Complainant did not mention it until

10  he was deposed in June of 2007.

11      As Complainant has been alleging animus

12  by Miller since the summer of 2004, and this

13  derogatory remark occurred some time in 2001

14  or 2002, it is simply not plausible that such

15  an allegation would only surface in the summer

16  of 2007, roughly two months before the

17  hearing.

18      Moreover, Perkins, herself, met with the

19  EEO counselor in the summer of 2004 and the

20  EEO counselor prepared what appears to be

21  detailed notes about each conversation. In

22  reviewing the EEO counselor's report, it only

1    discloses how Perkins recounted that Miller

2    uttered racist and sexist jokes for a period

3    of time, and then stopped.   Notably, however,

4    Perkins never brought the 'N' word allegation

5    to the attention of the EEO counselor or

6    raised any kind of problem or complaint when

7    it was first uttered back in 2001 or 2002.

8        Perkins, as a union steward, testified

9    that she pursued many grievances on behalf of

10   employees.   Additionally, both Complainant and

11   Perkins were part of a 1991 _class action_ lawsuit where an

12   Agency management official referred to an

13   employee as a "black dog."   Furthermore, both

14   Complainant and Perkins also helped provide

15   information for a memo addressing management

16   problems caused by Miller in 2001 when he took

17   over as supervisor.

18        Clearly, both Perkins and Complainant

19   knew how to file a complaint and had a history

20   of speaking out or filing complaints.   Yet,

21   this highly inflammatory and derogatory remark

22   was allegedly made by Miller and not raised by

1   either one until the hearing, or, in

2   Complainant's, case roughly two months before

3   the hearing at his deposition.

4      Complainant testified that the Agency

5   does nothing to respond to such complaints and

6   so it's fruitless to raise them. That was

7   essentially Perkins' testimony also. However,

8   the Agency settled the class complaint brought

9   in 1991. See Exhibit C-6. The Agency also

10   settled Complainant's 1996 grievance. See

11   Exhibit C-48. The agency also settled a

12   grievance with Miller and Henwood about

13   rotational acting assignments in 2004.

14      Thus, Complainant's and Perkins'

15   argument that it is 'fruitless' to file

16   complaints or report such incidents is belied

17   by their own actions to file complaints and

18   obtain settlements. In the end, I simply

19   cannot conclude that such a remark was uttered

20   by Miller by a preponderance of the evidence.

21      Regarding Complainant's argument that

22   Miller and the Agency did not follow protocol

1  when investigating, disciplining or terminating

2  Complainant, I note that deviations from

3  standard procedures without explanation or

4  justification can be sufficient to support an

5  inference of pretext. Monroe v. Department of

6  the Navy, EEOC Request No. 05950248, August 8,

7  1996; Craig v. Y & Y Snacks, Inc., 721 F.2d

8  7780 (3rd Cir. 1983). Similarly, the

9  reasonableness of the employer's reasons may,

10 of course, be probative of whether they are

11 pretext. The more idiosyncratic or

12 questionable the employer's reason, the easier

13 it will be to expose it as a pretext. Loeb v.

14 Textron, Inc., 600 F.2d 1003, 1012 (1st Cir.

15 1979).

16     In this case, I first note that I am not

17 here to re-litigate or adjudicate

18 Complainant's suspension in 2002 for printing

19 pornography on government computers or his

20 termination. Consistent with my prior Orders,

21 Complainant's termination was litigated before

22 the Foreign Service Grievance Board.

1    Notwithstanding this fact, I did permit

2    Complainant some latitude to demonstrate that

3    procedural irregularities in how Miller

4    conducted Agency business vis a vis

5    Complainant may demonstrate animus toward

6    Complainant.

7        Contrary to Complainant's arguments, I

8    note that the record is full of corroborating

9    documents in support of the Agency's efforts to

10   suspend Complainant for downloading and

11   printing pornography in 2002. <u>See</u> Exhibit C-

12   21. The record also contains abundant

13   evidence documenting Complainant as having

14   committed several ethical and financial

15   violations that ultimately resulted in his

16   termination. <u>See</u> Agency's Motion for ·Summary

17   Judgment providing the decision of the Foreign

18   Service Grievance Board upholding the decision

19   to terminate Complainant.

20       Any procedural missteps were considered

21   by the Foreign Service Grievance Board

22   regarding Complainant's termination and don't

1  lead to any inference of discrimination or retaliation

2  regarding the earlier adverse actions pending

3  before me.

4      Regarding Complainant's argument that

5  Miller and FAS management ignored the OIG

6  report and investigated Complainant while

7  ignoring transgressions of others like

8  Burkett, I first note that Complainant

9  misunderstands the memo from OIG. The fact

10  that OIG declined to refer the matters for

11  criminal prosecution only means that, in the

12  opinion of OIG, Complainant's transgressions

13  did not rise to the level of criminal conduct, sufficient to justify resuming to conduct

14  under applicable U.S. code sections. The an investigation

15  Agency, however, had evidence of several

16  serious violations of Agency rules and

17  regulations, and I cannot infer any animus by

18  the Agency in proceeding with an

19  administrative investigation of those charges.

20      While Complainant argues that Burkett

21  spoke harshly about FAS, See Exhibit C-3, and

22  was out on leave on numerous occasions and yet

1  was not disciplined, <u>See</u> Exhibit C-37, such

2  transgressions pale in comparison to the

3  offenses investigated and ultimately

4  substantiated by the Foreign Service Grievance

5  Board. In this regard, I note that in

6  discipline cases for employees to be

7  considered similarly situated all relevant

8  aspects of the Complainant's employment

9  situation must be nearly identical to those

10  indicated as comparative employees. <u>Martin v.</u>

11  <u>U.S. Postal Serv.</u>, 94 FEOR 3092, (1993); <u>Payne</u>

12  <u>v. Illinois Central Railroad</u>, 665 F. Supp.

13  1308, 1333 (W.D. Tennessee 1987); <u>O'Neal v.</u>

14  <u>U.S. Postal Serv.</u>, EEOC Request No. 05910490

15  (July 31, 1991). Thus, in order to be

16  similarly situated, other comparative

17  employees must have reported to the same

18  supervisor, must have been subjected to the

19  same standards governing discipline and must

20  have engaged in conduct similar to

21  Complainant's without differentiating or

22  mitigating circumstances that would

1    distinguish    their    misconduct    or    the

2    appropriate discipline for it.   Id.

3         Burkett is not similarly situated to the

4    Complainant because her transgressions were

5    not nearly as severe.   Therefore, Burkett is

6    not a valid comparator, and any difference in

7    treatment    by    Miller    is    not    relevant    to

8    establish pretext.

9         To the extent Miller sent a curt email

10   to Complainant about his use of annual leave,

11   and    then    verbally    reprimanded    him    as

12   Complainant alleges, I note that this one

13   incident occurred in 1998, six years prior to

14   the incidents giving rise to this complaint.

15        Clearly, Miller did not like, as a

16   supervisor, being told by an employee that the

17   employee was simply going to take vacation.

18   However, I infer no animus based on race,

19   gender, EEO activity or age, based on Miller's

20   rather curt remark.   Indeed, age would not

21   apply as Complainant was not 40 years old at

22   the time the remark took place in 1998.

65

1    To the extent Complainant, Perkins, and
2    others had problems with how Miller supervised
3    the unit when he became the head of the unit
4    in 2001, I note that such evidence supports a
5    conclusion that Miller was not a good
6    supervisor at that time – and not that Miller
7    harbored animus based on race, gender, age, or
8    prior EEO activity. Indeed, Perkins testified
9    that everyone was upset with Miller's
10   leadership skills and his playing employees
11   off each other. Perkins noted that among
12   those employees who complained, it included
13   Robert Tse, an Asian male, and Marlene
14   Phillips, a white female, as well as
15   Complainant, a black male, Perkins, a black
16   female, and two other black female
17   secretaries. Clearly, people of different
18   races and genders were not happy. So I cannot
19   infer animus by Miller. I can only infer that
20   he did a poor job supervising many of his
21   employees from the perspective of those
22   employees at that time.

1          Regarding contradictory testimony by

2   Bruce, ~~Henwood and~~ Miller about who is responsible for

3   contacting Complainant to advise him that he

4   could have and should have submitted his own

5   assessment of his performance for the 2005

6   Promotion Board to consider, I note that

7   Complainant presented insufficient evidence

8   that this inconsistency was motivated by race,

9   gender, age, or EEO activity. I note that

10  during this time, Complainant was on

11  administrative leave with pay while the Agency

12  was addressing how to respond to the numerous

13  allegations of misconduct. Complainant had

14  been barred from the facility at that time.

15  Under the circumstances, more likely than not,

16  any animus by Miller in not contacting

17  Complainant was more likely on account of his

18  overall feeling that Complainant could not be

19  trusted based on the allegations and

20  misconduct investigations that were on-going

21  at that time.

22          While an Agency representative could

1    have contacted Complainant, I note that

2    Complainant could also have submitted

3    information by mail or fax or email. The

4    evidence shows that Complainant had completed

5    such assessments in prior years. The evidence

6    also shows that the application process

7    occurred at the same time every year.

8    Complainant's argument that he had to

9    coordinate the preparation of his assessment

10   with Miller, but was threatened with further

11   disciplinary action if he contacted Miller or

12   showed up at the Agency facility is not

13   sufficient to establish animus by Miller based

14   on race, gender, age or prior EEO activity.

15   Complainant could have submitted an assessment

16   and Miller could have contacted the

17   Complainant, even through Human Resources.

18   Both their failures do not lead me to conclude

19   that Complainant was discriminatorily denied

20   the opportunity to participate in the 2005

21   Promotion Boards.

22       I also note that also Bruce seemed to

68

1    suggest in an affidavit to an EEO investigator

2    that Complainant's EEO activity played a role

3    in Complainant not getting a promotion in

4    2005, See SROI Tab 6E at 258-59.  However, I

5    find that Bruce credibly testified that the

6    investigator    improperly    summarized    her

7    statement, and she should have read her

8    statement more carefully before signing it.

9    Bruce was very credible when she testified,

10   and I could infer no intent to deceive from

11   the tone and pace of her speech or her body

12   language generally.  Moreover, aside from this

13   one apparently inappropriate remark from the

14   investigator, there is credible evidence from

15   Chaudhry as to how the 2005 Promotion Board

16   rated Complainant and recommended others for

17   promotion independent of Complainant's EEO

18   activity.  Thus, I credit Bruce's testimony

19   and do not find that the statement in the

20   Supplemental Report of Investigation ▬▬▬ has

21   any credibility or that Complainant's EEO

22   activity had any impact or bearing in the 2005

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.

1    promotion process.

2              Finally, regarding Complainant's

3    argument that FAS management has a culture of

4    discriminating against minorities and in

5    particular black males, as well as older

6    employees or those who have engaged in EEO

7    activity, I find that Complainant's evidence,

8    at best, may relate to the atmosphere of FAS

9    in the '80s and early 1990s. Complainant's

10   evidence that the atmosphere of bigotry in FAS

11   continues, and that it impacted his

12   assignments and promotions in 2004 and 2005,

13   amounts to nothing more than speculation on

14   his part.

15             By contrast, Complainant's conduct

16   issues resulted in his security clearance

17   being suspended and his ultimate termination.

18   Credible evidence from Lee established that

19   Complainant could not be assigned to an at-

20   grade or stretch assignment, while his clearance was suspended. Moreover, the

21   benefits of such assignments were not

22   available while his security clearance was

1  suspended.   Complainant fails to present any

2  evidence that suggests that his race, gender,

3  EEO activity or age impacted any of these

4  decisions, as well as the promotion decisions

5  in 2004, 2005, or the Complainant's ability to

6  act for Miller in his absence.

7         Finally, I cannot ignore the record of

8  misconduct     in     this     case     regarding

9  Complainant's actions that led first to his

10  seven-day   suspension   for   downloading   and

11  printing pornography, and then ultimately to

12  his    termination    for    several    different

13  violations.   These   facts   further   impact

14  Complainant's credibility, and as between

15  Complainant's testimony and that of Miller and

16  the    other    Agency    management    officials,

17  Complainant simply fails to establish by a

18  preponderance    of    the    evidence    that

19  discrimination or retaliation more likely than

20  not motivated the Agency's actions in the six

21  claims that I address at this hearing.

22

71

## Conclusion

1

2    Based on a careful analysis of the record,

3    and after hearing and assessing the

4    credibility of the witnesses at the hearing, I

5    conclude that Complainant failed to

6    demonstrate that more likely than not,

7    discriminatory animus motivated the Agency's

8    actions. Accordingly, judgment in favor of

9    the Agency is appropriate.

10                End of bench decision.

11                Closing instructions.

12    I want to thank you all for your

13    participation and cooperation during the

14    hearing. Pursuant to the EEOC's Management

15    Directive 110 at page 7-16, the court reporter

16    shall send all copies of the transcripts and

17    exhibits to me.

18    I've already explained to the court

19    reporting service and to the Agency's

20    representative the requirements in order to

21    get the transcripts to me. The Agency has

22    agreed to ensure that the transcripts are

1    delivered to me with the exhibits by Friday,

2    early afternoon.  Is that fair, Mr. Hardin?

3         MR. HARDIN:  Yes, Your Honor.

4         JUDGE KRAVETZ:  I've also explained to

5    the court reporter, but I'll put on the record

6    just to ensure that it's clear that the Report

7    of Investigation should essentially be five

8    volumes.  Volume I would be the testimony of

9    the first day of the hearing.  Volume II would

10   be testimony of the second day of the hearing.

11   Volume III would be the testimony that

12   occurred today which was Complainant's

13   rebuttal and the closing arguments.  Volume IV

14   would be all the exhibits.  And Volume V would

15   be the bench decision.

16        Thus, the Agency should ensure that

17   there are five separate volumes and that there

18   are three copies, or excuse me, three total

19   sets of all five volumes so in other words,

20   there are three total sets of transcripts.

21   One full set would be the original which would

22   include the original exhibits, the original

1    bench   decision   and   all   the   original

2    transcripts.   There should also be two copies

3    of all the exhibits and all the other volumes.

4    And all 15 volumes, all three sets should be

5    sent  to  me  at  the  EEOC's  Washington  Field

6    Office  at  the  address  provided  to  the  court

7    reporter.   I will then make appropriate edits

8    to   the   bench   decision,   as   I   did   stumble

9    through a few words here and there, and I will

10    then issue the bench decision with appropriate

11    instructions and rights, appeal rights to the

12    parties.   And the Agency will then have 40

13    days  to  implement  or  not  implement  the

14    decision.

15    Having heard all of the testimony of the

16    approved witnesses, the opening and closing

17    arguments of the parties, and since there are

18    no other matters to be discussed, I declare

19    this  hearing  closed  at  2:10.   Thank you.

20    We're off the record.

21    (Whereupon,   at   2:10   p.m.,   the   bench

22    decision was concluded.)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
KARL HAMPTON,                             )
                                          )
                    Plaintiff,            )
          v.                              )
                                          )    Civil Action No. 07-2221 (ESH)
CHARLES F. CONNER, Acting Secretary       )
United States Department of Agriculture,  )
                                          )
                    Defendant.            )
_____)

## ORDER ON MOTION TO DISMISS

UPON CONSIDERATION of Defendant's Motion to Dismiss, and the entire record herein, it is hereby

ORDERED that the motion is GRANTED, and it is further

ORDERED that Counts III and IV and Counts VII through X of Plaintiff's Complaint are hereby dismissed, and it is further

ORDERED that Defendant shall file an answer or otherwise respond to the remaining counts in the Complaint on or before the_____ day of _____, 2008.

So ordered, this _____ day of _____ 2008.

                                    _____
                                    Ellen S. Huvelle
                                    United States District Judge