UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARL HAMPTON,

     Plaintiff,

          v.                   No. 07-2221 (ESH)

CHARLES F. CONNER, Acting Secretary,
United States Department of Agriculture,

     Defendant.

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Plaintiff hereby opposes Defendant's motion to dismiss claims III, IV, and VII-X of his complaint. Plaintiff timely filed his claims regarding his termination. Plaintiff also fully exhausted his administrative remedies with respect to counts VII through X. For these reasons, the Court must deny Defendant's motion to dismiss in its entirety.

I.    <u>Plaintiff is not seeking judicial review of a decision of the Foreign Service Grievance Board.</u>

The USDA has moved to dismiss Mr. Hampton's claims challenging his termination asserting that he failed to file his complaint within 180 days of the FSGB's final decision. The USDA's argument is a non sequitur, however, for Mr. Hampton is not seeking judicial review of the decision of the FSGB. The EEOC, and not the FSGB, had jurisdiction over his discrimination and retaliation complaints. Accordingly, the critical question is not whether this complaint was filed within 180 days of the FSGB's decision, but instead whether it was filed within 90 days of the USDA's final action on his complaint. This it indisputably was, and, accordingly, the USDA's present motion is without merit.

Prior to receiving the January 27, 2005 notice proposing his separation, Mr. Hampton had filed a formal discrimination complaint with the USDA.  Comp. at ¶ 17.  Upon receiving this notice of proposed termination, Mr. Hampton sought to amend his EEO complaint, asserting that his proposed separation was the product of discrimination and retaliation.  Ex. 1 (October 24, 2005 memo from Hampton to USDA).  The USDA accepted this amendment to Mr. Hampton's complaint and undertook what it termed an "addendum supplemental investigation."  This investigative report was completed on July 24, 2006.  Ex. 2 (Amended Supp. Investigation report) at 2.  Thereafter, this complaint was forwarded to EEOC for assignment to an administrative judge for a hearing at EEOC.  Ex. 3 (October 11, 2006 letter noting that complaint had already been assigned to EEOC).

By letter dated April 25, 2006, Mr. Hampton was informed of the decision on his proposed removal recommending that he be terminated.  Ex. 4.  As explained in the decision letter, Mr. Hampton was to be placed on leave without pay pending a hearing before the FSGB and a final decision by the head of the Foreign Agriculture Service (or his designee)[1]:

> Once the FSGB has issued a decision, the FAS Administrator, Michael Yost, or his designee will make the final determination on your separation.

Ex. 4 (April 25, 2006 decision letter).

Shortly after receiving this notice, Mr. Hampton requested that the USDA amend his pending EEO complaint to include the issue of his termination.  By letter of June 22, 2006, the

---

[1]Foreign Service officers, unlike the vast majority of federal employees, are statutorily entitled to a pre-termination hearing before the FSGB.  22 U.S.C. 4010(a)(2).  Thus, in order to effect Mr. Hampton's termination, the USDA had to request a hearing before the FSGB where its burden was to establish cause for his separation.

2

USDA acknowledged receipt of Mr. Hampton's request "to amend the subject harassment complaint to include the claim that on April 25, 2006, [he] was notified of [his] termination." Ex. 5. The letter further informed Mr. Hampton that because his prior complaints were already pending before the EEOC, the EEOC "shall assume full responsibility of the adjudication of the complaint, including the development of the record." Ex. 5.

By order dated October 27, 2006, the EEOC administrative judge assigned to Mr. Hampton's case addressed the issue of his termination. The AJ directed that the "case be placed in abeyance until the FSGB issues a determination regarding jurisdiction" over the Title VII components of Mr. Hampton's removal claim. The AJ expressed his concern that Mr. Hampton and the USDA "ensure that his claims are properly processed either by the FSGB, the Commission, or perhaps both." Ex. 6.

The FSGB, in turn, issued its jurisdictional determination on November 27, 2006. Ex. 7. Under 22 U.S.C. § 4131(a)(1)(H), a Foreign Service grievant may raise a claim of discrimination before the FSGB. However, 22 U.S.C. § 4139(b)(1) provides that,

> [w]ith respect to a grievance based on an alleged violation of a law, rule, regulation, or policy directive referred to in section [22 U.S.C. § 4131(a)(1)(H)], a grievant may either–
>
> (A) file a grievance under this chapter, or
>
> (B) initiate in writing a proceeding under another provision of law, regulation, or Executive order that authorizes relief,
>
> but not both.

22 U.S.C. § 4139(b)(1). As noted above, it was the USDA, and not Mr. Hampton, that initiated the FSGB process. So too, Mr. Hampton had "initate[d] in writing a proceeding" under Title VII

concerning his proposed separation well before the USDA initiated the FSGB process. Accordingly, the FSGB concluded that while Mr. Hampton had could not be compelled to waive his right to challenge his separation before the FSGB, it "limited the subject of the proceeding to the removal for cause." Ex. 8 at 7. Thus the FSGB proceeded to adjudicate Mr. Hampton's separation grievance but did not address in any manner his complaints of discrimination or retaliation. Indeed, other than to note that the issue of his discrimination complaints was not to be addressed, there is no discussion whatsoever of Mr. Hampton's Title VII complaints in the FSGB decision. *See* Ex. 8.

Thus, while the USDA asserts in its present motion that "[the] issue of Plaintiff's termination was litigated before the FSGB," Def. P & A at 4, in fact the issues of retaliation and discrimination were not litigated before the FSGB. Quite to the contrary, the FSGB held that it could not litigate these issues as Mr. Hampton had brought these claims before the EEOC. Again, other than to note that the issue of his discrimination complaints was not to be addressed, there is no discussion whatsoever of Mr. Hampton's Title VII complaints in the FSGB decision.

As noted above, the EEOC administrative judge held Mr. Hampton's complaint in abeyance pending the FSGB's determination of its jurisdiction over Mr. Hampton's discrimination and retaliation complaints. Yet, in March 2007, after the FSGB had issued its jurisdictional decision, the EEOC administrative judge was still holding Plaintiff's termination claims in abeyance. *See* Ex. 9 (March 29, 2007 order), at 3. The EEOC administrative judge then conducted a hearing and issued a bench decision in September, 2007 but did not include the termination claims. *See* Ex. 10 (AJ decision). Those claims continued to be held in abeyance by EEOC. *Id.* Thus, Plaintiff's civil action filed in December 2007 terminated EEOC's

4

adjudication of the termination claims.  29 C.F.R. § 1614.107(a)(4).  *See also* Ex. 11 (March 17, 2008 letter) at 2-3.[2]

Mr. Hampton's path for exhausting his administrative remedies in this case could have been marked more plainly. But undoubtedly, Mr. Hampton sought to raise his complaints of discrimination administratively.  As the Supreme Court held:

> Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies. Construing ambiguities against the drafter may be the more efficient rule to encourage precise expression in other contexts; here, however, the rule would undermine the remedial scheme Congress adopted. It would encourage individuals to avoid filing errors by retaining counsel, increasing both the cost and likelihood of litigation.

*Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 1160 (2008).

In addition, the USDA is wrong regarding its assertion that Plaintiff was untimely in seeking judicial review of the FSGB decision. Indeed, the FSGB decision is still not final and Plaintiff's time limits for seeking judicial review of that decision have not yet begun to run. As the USDA's letter recommending separation states, "[o]nce the FSGB has issued a decision, the FAS Administrator, Michael Yost, or his designee will make the final determination on your separation." Ex. 4 (emphasis added). Indeed, the USDA's governing regulations require the head

---

[2]Without unduly trying to complicate this already complicated procedural history even further, plaintiff had filed another discrimination complaint on October 22, 2007 regarding the termination even though he had already previously filed a discrimination complaint regarding the termination. Ex. 11 (March 17, 2008 letter), at 2-3.  Although he filed this complaint in October 2007, the USDA did not render an acceptance decision on the complaint until March 17, 2008, nearly five months later.  In the intervening period, plaintiff had filed his civil action.  The USDA dismissed the new termination complaint, stating that he had previously raised issues leading to the termination and that he had filed a civil action.  *Id.*  Now, of course, more than 180 days have passed concerning the remainder of the issues filed in the October 2007 complaint and thus plaintiff again exhausted his administrative remedies regarding the termination, even if he had not done so before.

of the agency to take into consideration the decision of the FSGB before effecting the termination:

> After considering the notice of proposed separation for cause, the employee's response, if any, the record on which the proposal to separate was based *and the Foreign Service Grievance Board's decision*, if any, the head of the agency or his or her designee, may decide to . . . separate the employee for cause.

3 FAM 4367. To date, there has been no final determination from the FAS Administrator or a designee. The FAM requires that the head of the agency decide removal cases, not the FSGB. The statute states that the employee has 180 days from the final decision of the agency or the FSGB to seek judicial review of the decision. 22 U.S.C. § 4140. Where, as here, the agency head is required to make the final decision *after* considering the FSGB's decision, the 180-day time period does not commence until the agency head makes that decision.

Indeed, neither the FSGB or USDA ever gave Plaintiff the required notice triggering his right to judicial review. *See* 3 FAM 4367(c)(3) (the notice shall "make specific reference to the employee's right to obtain judicial review of the decision of the agency head under section 1110 of the Act (22 U.S.C. 4140)."). Defendant cannot complain about untimely filing of the claim when it failed to provide Plaintiff with the proper notice to seek judicial review. In the context of federal employment, the Federal Circuit has long affirmed that "as a general matter, an agency's failure to notify an employee of his or her . . . appeal rights under circumstances requiring it to do so will justify a waiver of the filing deadline." *Carpenter v. MSPB*, 111 F.3d 118, 119 (Fed Cir. 1997). The reason that no notice was provided here is that the USDA and the FSGB both understood that the FSGB decision was not final until the head of the agency conducted the required review of the decision.

Even if the Court determines that Plaintiff's termination claims were filed three days late, even though (1) he did not seek judicial review because it was not statutorily possible because it was not final and (2) he previously elected to have his discrimination claims heard by EEOC, the Court should excuse this late filing on equitable grounds. Equitable considerations should apply in this instance, notwithstanding *Egan v. Natsios*, 2003 U.S. Dist. 27066 (D.D.C. 2004), which holds that the filing deadlines in the Foreign Service Act are jurisdictional, and thus not subject to equitable waiver. The Supreme Court has recognized that certain circumstances allow for equitable estoppel, and this is one such case. *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990); *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982). Given the extremely complicated procedural posture of this case given the concurrent proceedings before the FSGB and the EEOC, his reliance on the FSGB's jurisdictional decision stating that it would not hear the discrimination claims because they were pending before EEOC, and the fact that the FSGB decision gave no notice of right to judicial review, the claims should be allowed to proceed here. Plaintiff should not be penalized given these circumstances.

II.    Plaintiff Exhausted His Administrative Remedies.

The Court should not dismiss any of Plaintiff's claims for failure to exhaust administrative remedies. Plaintiff fully exhausted his administrative remedies with respect to his claims of hostile work environment and discriminatory leave without pay.

A.    Plaintiff exhausted his administrative remedies with respect to his claims of a hostile working environment.

The Court should deny Defendant's motion to dismiss Plaintiff's hostile work environment claims. Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it. *Brown v. Marsh*, 777 F.2d 8,

7

13 (D.C. Cir. 1985).  If the defendant meets its burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (internal citations omitted).  Defendant has not met its burden to demonstrate that plaintiff failed to exhaust his administrative remedies.

Defendant wrongly characterizes the requirements for exhaustion of administrative remedies.  The regulations and procedures that apply to Title VII discrimination claims of federal employees like Plaintiff are different from those applicable to employment discrimination claims arising out of the private sector. *See* 29 C.F.R. § 1614.101 et seq.  An aggrieved individual in Plaintiff's position "must initiate contact with a[n] [Equal Employment Opportunity] Counselor [at the appropriate agency] within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

After contacting the EEO counselor and then filing a formal complaint of discrimination, a complainant has a right to file a civil action in district court for a trial de novo (a) within 90 days of receipt of the final action on an individual complaint if no appeal has been filed; (b) after 180 days from the date of filing an individual complaint if an appeal has not been filed and a final action has not been taken; (c) within 90 days of receipt of the Equal Employment Opportunity Commission's final decision on an appeal; or (d) after 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC. *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407.  An "appeal" with the EEOC means an appeal of a final agency decision, not a request for hearing before the EEOC prior to the issuance of a final

agency decision. *Compare* 29 C.F.R. § 1614.109 (request for hearing) *with* 29 C.F.R. § 1614.401 (appeals).

Contrary to Defendant's representation, a claim does not have to be "actually litigated" at EEOC in order to exhaust a complainant's administrative remedies. Def. P & A. at 6. Indeed, as the Commission's regulations allow, a complainant may seek de novo review in court after 180 days of filing a formal complaint if there has been no final action by the Agency or the EEOC. 29 C.F.R. § 1614.407. The filing of the formal complaint occurs at the employing agency and does not require litigation before the EEOC. 29 C.F.R. § 1614.106(a). After the formal complaint is filed, the employing agency must investigate the claims within 180 days. 29 C.F.R. §§ 1614.106(e)(2); 1614.108(e). After the investigation is complete or 180 days have passed since the filing of the formal complaint, the employee may choose to request a hearing before the EEOC. 29 C.F.R. §§ 1614.106(e)(2); 1614.108(g). However, as long as 180 days have passed since the filing of the formal complaint, there has been no final agency decision, and no appeal filed, the employee may seek review in federal court. 29 C.F.R. § 1614.407.

So, for example, if the plaintiff raised issues in his EEO formal complaint, but the issues had not yet been litigated at the EEOC more than 180 days later, the plaintiff may seek review de novo in federal district court. Thus, it is not necessary for Plaintiff to have actually litigated a hostile work environment claim before EEOC in order to trigger his right to file a civil action. 29 C.F.R. § 1614.407.

Because Mr. Hampton raised the issues that give rise to his hostile work environment claims in his EEO formal complaints more than 180 days ago, he fully exhausted his administrative remedies. Compl. at ¶ 17. For example, Mr. Hampton's 2004 EEO complaint

contained 14 issues, including claims that he was unlawfully denied overseas assignments,
improperly audited regarding his travel vouchers, his security clearance was improperly
suspended and he was investigated by the Foreign Agricultural Service beginning in 1993 for
alleged misconduct. Compl. at ¶ 17.  In that complaint, among other things, he repeatedly alleged
"harassment" and "continual harassment."  *See* Ex. 12 (U.S. Department of Agriculture,
Supplemental Report of Investigation Ex. 1 at 1, 3).  In addition, he raised in his formal EEO
complaint the allegation that he had been referred to by a manager as a "nigger from
Mississippi."  Comp. at ¶ 10.  He also complained about the continuing investigation of him by
the agency in his EEO complaints.  Comp. at ¶17, 32.  These claims, taken together, can be
construed as a hostile work environment claim.

Federal courts "liberally construe charges filed with the EEOC in determining whether
administrative remedies have been exhausted as to a particular claim."  *Jones v. UPS, Inc*., 502
F.3d 1176, 1186 (10th Cir. 2007).  A Title VII lawsuit following the EEOC charge is limited in
scope to claims that are "like or reasonably related to the allegations of the charge and growing
out of such allegations." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citations and
internal quotation marks omitted)).   At least one court has defined "reasonably related" to mean
a factual relationship between the issues, or at a minimum, the same conduct and implicating the
same individuals.  *See Cortes-Devito v. Vill. of Stone Park*, 390 F. Supp. 2d 706, 713  (N.D. IL
2005) (citing *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994)).  At the very least,
Mr. Hampton's current hostile work environment claims are reasonably related to the allegations
raised in his formal EEO complaint.  Mr. Hampton previously raised all of the composite facts
that comprise his current hostile work environment claim.

The Agency's interpretation of Plaintiff's complaint is simply too narrowly drawn and must be rejected. As we argued above, the Supreme Court has recently held that "[d]ocuments filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." *See Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147, 1160 (2008). The administrative charge requirement should not be construed to place a heavy technical burden on "individuals untrained in negotiating procedural labyrinths." *Park v. Howard Univ.*, 71 F.3d at 907.[3] Plaintiff should not be faulted for the way in which he phrased his allegations at the administrative level. As long as he put the Agency on notice as to the facts upon which he bases his claims of discrimination at the administrative stage, he should be permitted to develop his legal theories as appropriate when seeking relief in federal court. As the United States Court of Appeals for the D.C. Circuit has held:

> Exhaustion is required in order to give federal agencies an opportunity to handle matters internally whenever possible and to ensure that the federal courts are burdened only when reasonably necessary. Congress wanted to give each agency the opportunity as well as the responsibility to right any wrong that it might have done. Congress never, however, wanted the exhaustion doctrine to become a massive procedural roadblock to access to the courts. Rather, Congress contemplated that the exhaustion doctrine would be held within limits consonant with the realities of the statutory scheme.

*Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985).

Indeed, here, the USDA was on notice of Mr. Hampton's claims and understood them to be regarding "harassment." *See* Ex. 5 (June 22, 2006 letter). Defendant seriously cannot argue

---

[3]Notably, the Department of Agriculture's formal EEO complaint forms did not indicate that an employee should indicate "hostile work environment" claims. *See* Ex. 13 (October 29, 2004 complaint form). Indeed, when a form did allow for the indication of "harassment" as an issue, plaintiff selected that category. Ex. 12 (Supp. ROI Ex. 1, at 1-6).

11

that it had no opportunity to investigate and potentially resolve plaintiff's hostile work environment claim when he had put the Department of Agriculture on notice of such claim as far back as July 2004.  Ex. 12 (Supp. ROI, Ex. 1, at 1-6).  Plaintiff's civil action was not filed until more than three years later and the Defendant had ample time to investigate it.

As such, the Defendant's reliance on the *Park* case is inapt.  In the *Park* case, the administrative claim "not only lack[ed] the words "hostile work environment," but also lack[ed] any factual allegations supporting such a claim."  71 F.3d at 908.  But Plaintiff here claimed that actions were taken against him in a hostile manner, specifically alleged "harassment," and described a long pattern of actions that would support a claim of a hostile working environment.  *See* Ex. 12.  A "harassment" claim is basically the same as a "hostile work environment" claim, and the terms are used interchangeably.  *See e.g., Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*,  477 U.S. 57 (1986)).  It is also axiomatic that a hostile work environment consists of separate acts.  *See AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002).  Given that Plaintiff here administratively raised each act that consisted of the hostile work environment, his current claims should be permitted to proceed.  *See Bouknight v. District of Columbia,* 2008 U.S. Dist. LEXIS 17678, *9-11 n.2 (D.D.C March 10, 2008.) (citing *Park*, 71 F.3d at 907) (because the claim for hostile work environment was based on the discriminatory actions alleged in the complaint, plaintiff had adequately exhausted administrative remedies).

B.    Plaintiff exhausted his administrative remedies with respect to his claims regarding leave without pay.

Plaintiff also exhausted his administrative remedies concerning Counts IX and X, regarding his claim that he was discriminated against when he was placed on leave without pay. There is no dispute that Plaintiff filed a formal EEO complaint regarding being placed on leave without pay, and that the claim was forwarded to EEOC. *See* Ex. 3 (USDA Acceptance letter, October 11, 2006). The defendant concedes that Plaintiff raised his leave without pay claims before the EEOC, but complains that "the EEOC did not address that allegation." Def. Mot at 6. As discussed above, Plaintiff does not need to have his claim "litigated" before the EEOC in order to have exhausted his administrative remedies. As more than 180 days had passed since the filing of his formal complaint, Plaintiff was entitled to file his civil action in court. 29 C.F.R. § 1614.407.

Any remaining arguments Defendant makes about Claims IX and X are, at best, unpersuasive. For example, Defendant states, "while the issue of leave without pay was raised before the EEOC, the EEOC did not address that allegation. Moreover, any issue Plaintiff had with his alleged leave with*out* pay –an entirely different and separate issue– was not litigated before the . . . EEOC." Def. P & A, at 6 (emphasis in original). The issue of leave without pay and leave with*out* pay are one and the same, and were, as Defendant concedes, raised before EEOC. It is undisputed that more than 180 days have passed since Plaintiff filed his formal complaint, and that there was no final agency decision or appeal with respect to the claims regarding leave without pay. Plaintiff exhausted his administrative remedies with respect to the claims raised in Counts IX and X.

13

C.     Even if plaintiff failed to exhaust administrative remedies, equity demands that his claims proceed.

Even if this Court finds that plaintiff failed to exhaust his administrative remedies, equity demands that he be permitted to proceed with his claims.  The Supreme Court has held that statutes of limitations and prescriptions designed to operate as statutes of limitations as "subject to waiver, estoppel, and equitable tolling." *See Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982).  Thus, courts have excused parties who make diligent but technically defective efforts to act within a limitations period.  *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990).  More generally, courts have tolled time limits in Title VII cases when complainants neither knew nor had reason to know about the limit. *Bayer v. Dep't of Treasury,* 956 F.2d 330, 334 (D.C. Cir. 1992).

As also argued above, the particularly complicated and lengthy procedural history of this case excuses any failure of the plaintiff to exhaust administrative remedies.  Plaintiff has made every reasonable effort to comply with the requirements to exhaust administrative remedies.  He filed his initial EEO complaint in 2004.  Thereafter, he diligently filed additional complaints and amended his complaint many times.  *See e.g.,* Exs. 1, 3, 5, 14-18 (various acceptance and amendment letters).  Because the employing agency was clearly on notice as to plaintiff's claims and the facts upon which he based his claims, equity requires that plaintiff be permitted to proceed with his claims in court.

III.    <u>Conclusion</u>

For the foregoing reasons, Defendant's motion to dismiss must be denied in its entirety.

A proposed order is attached.


DATED:  May 9, 2008                          _____/s/_____
                                             Cathy A. Harris (Bar No. 467206)
                                             Michael J. Kator (Bar No. 366936)
                                             KATOR, PARKS & WEISER
                                             1200 18th Street, N.W., Suite 1000
                                             Washington, DC 20036
                                             (202) 898-4800

                                             Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KARL HAMPTON,

     Plaintiff,

        v.                          No. 07-2221 (ESH)

CHARLES F. CONNER, Acting Secretary,
United States Department of Agriculture,

     Defendant.

## **<u>ORDER</u>**

       Upon consideration of Defendant's motion to dismiss, Plaintiff's opposition, any replies thereto, and the entire record in this case, it is hereby ORDERED that Defendant's motion to dismiss is denied in its entirety.  IT IS SO ORDERED.

_____
Judge
United States District Court

# EXHIBIT 1



**United States Department of Agriculture**

Farm and Foreign Agricultural Services

Foreign Agricultural Service

1400 Independence Ave, SW
Stop 10xx
Washington, DC
20250-10xx

# MEMO TO DIRECTOR OF CIVIL RIGHTS

**DATE:**       October 24, 2005

**TO:**         USDA, Office of Civil Rights

**FROM:**       Karl Hampton
Office of Outreach and Exporter Assistance
Foreign Agricultural Service, United States Department of Agriculture

**SUBJECT:**    Request to amend my EEO Case #050077 to include the attached discrimination and reprisal.

Attached are amendments to my EEO Case #050077.

1) FAS discriminated and prejudiced me by failing to adhere to HR and Article 2.5 of the Foreign Service Bargaining Agreement for personnel procedures and timeline for decisions regarding the January 27, 2005 proposal to terminate my employment.

2) FAS discriminated and prejudiced me by failing to allow me to participate in the September 2005 Foreign Service promotion boards.

3) FAS discriminated and prejudiced me by denying me a promotion resulting in the September 19-23 promotion boards.

The EEO amendments are for FAS's discrimination and prejudice to deny me the opportunity to acquire performance accomplishments for promotions for the FY 04/05 and 05/06 Foreign Service promotion cycle boards and as well as for assignments abroad and as head of post in FY 06 and FY 07.



USDA is an Equal Opportunity Employer

Exhibit _1_
Page _7_ of _56_

17

## EEO COMPLAINT INPUT AT INTAKE

**Name of Complainant:**          **Karl Hampton**

**Social Security No.:**          ▮▮▮▮▮▮▮▮

**Home Address:**          **700 7th Street, S.W.  #225, Washington, D.C.  20024**

**Work Address:**          **USDA Washington, South Building, Rm 3114, 20250**

**Work Phone:**          **On Administrative Leave Since January 27, 2005 )
(202) 479-0392 home phone**

**Job Title/Series Grade:**          **Foreign Service Officer, Agricultural Economist, FO3**

**Employing Agency:**          **Foreign Agricultural Service, USDA**

**Status :**          **Permanent (Administrative Leave since January 27, 2005)**

**Organization:**          **United States Department of Agriculture**

**Responding Agency:**          **Foreign Agricultural Service**

**Name of Counselor:**          **Zenobia Wallace  - Amendment to present EEO**
**Phone No.:**          **202 720-7233**

**Date of Incident (or when became aware):   January 27, 2005 to Present (current
date September 29, 2005.**

**Date of Initial contact:**

**Issues: (circle all that apply)**
          Appointment/hire                                   Evaluation
          *Awards*                                                Harassment
          Assignment of duties                            Pay (including overtime)
          Conversion to Full Time                       *Promotion (non selection)*
          Disciplinary Action                               Reassignment
                    Demotion                                  *Request Directed or denied*
                    Suspension                               *Reinstatement*
                    Termination                              *Retirement Benefits*
                    Other                                        Terms – condition of employment
                    Duty Hours
                    Equal Pay Act Violation
                    Examination/Test
                    Time and Attendance
                    Training

Exhibit _____ 1

Page 8 of 56

18

Reasonable Accommodation, Other

**Specific of Issue(s): (circle)**

**Basis(es)**
      <u>Age</u>
      <u>Color</u>
      <u>National Origin</u> (specify, i.e., Hispanic)  <u>**MS/Southern African American**</u>
      Religion (specify)
      <u>**Reprisal**</u>
      Disability
      <u>**Sex**</u>
      Race (**Black x**  White_____  Asian _____  American Indian _____)
      Sexual Orientation
      Marital Status

**Union (Yes)** __x____ **(No)** _____

**Anonymity (Yes)** _____ **(No) x____**

**Representative: (Yes x_____ No _____)**
      Name/Firm    Philip Thompson Esq.
      Address       9450 Penn Ave., Suite 4, Upper Marlboro, MD  20772
      Phone No.:   301 599-5385

---

**Receipt of Counseling Process documents from Counselor:**
**Initials:** _____yes_____ **Date:** _____July 04_____

---

Alternative Dispute Resolution

In compliance with EEOC Management Directive 29 CFR 1614, Alternative Dispute Resolution options were discussed and offered during the informal counseling stage. Complainant chose:

- To accept ADR/Mediation     _____

- Not to accept ADR/Mediation   X_____

Signature: _Karl Slaughter_      Date: _Oct 24, 2005_

Exhibit ____1____
Page _9_ of _56_

19

# PROBLEM STATEMENT

1.  Statement of my problem:  9/29/05

The Foreign Agricultural Service denied me another promotion during the September 19-23, 2005 Foreign Service promotion boards for the Foreign Agricultural Service Officers.  FAS's action denies me any part of the promotion benefits/awards.  Since January 27, 2005, FAS denied me a 3-year overseas assignment opportunity for ATO Osaka, Manila, Philippines and a temporary duty assignment for Dominican Republic and Mexico City.  FAS denied me the opportunity to participate in the 2005 Washington Placement Plan and the detail opportunity for the February USTR assignment.  FAS also denied me opportunities to participate in the annual training programs.

2.  Statement of pertinent facts:

Since January 27, 2005 through the current date, the Foreign Agricultural Service (FAS) continuously prejudice me financially and emotionally through their discrimination against my career advancement and promotions opportunities by denying me the right to work and perform on the job to obtain superior performance accomplishments for the FAS foreign service promotion rating/evaluation cycle which is the period April 1 - March 31.

The FAS's actions denied me two promotions and the benefits that come with the career advancement.  In addition, the FAS's actions also prejudice my future career advancement for a head of post assignment in the fall of 05 and the fall of 06, or any temporary duty assignments.

On January 27, 2005, the FAS placed me on administrative leave without due cause, sufficient justification or evidence.  The FAS wrongly proposed my dismissal from the Foreign and federal service.  Additionally, the FAS has not reinstated me back to work based on the over whelming supporting factual evidence and information provided in my March 15, 2005 response and March 18, 2005 oral presentation.

As a result of my being on administrative leave since January 27, 2005, FAS knowingly discriminated against me, intentionally prejudiced my opportunities for a promotion for the September 04/05 promotion cycle and also for the 05/06 promotion cycle.  Their action denies me an assignment as head of FAS overseas office for fall of 06 and 07.

3.  Analysis of the facts:

The FAS management knowingly discriminates and is prejudice towards me, an African American from the South, as well as other African Americans and minorities in the Agency.

    1.    I think the causes of the situation are:

        The FAS upper management is dominated by Caucasian males who are still intimated by educated, competitive African American males.  The FAS and some supervisors are racist and are reprising against my filing of an EEO and my employment since 1987.

    2.    I have noticed the following effects from it:

2⁰

Exhibit ____1____
Page 1 of 56

I am unfairly prejudice and discriminated with the intent to cause financial strain and emotion duress. FAS defamed my professional character in the Department, amongst my peers, colleagues and customers. FAS denied promotions, awards and head of post assignments opportunities. I have suffered emotionally, mentally and endured financial losses from lack of career advancement over my 20-year career with FAS. For nine (9) years FAS discriminated against me, denying me promotions and the right to advance my career.

3.  The place where this happens is:

    Foreign Agricultural Service, United States Department of Agriculture

4.  The time this occurred is: Since my employment begin in 1987 and January 27, 2005 to the present time.

5.  Other pertinent comments are:

4.  Possible solutions:

A. These solutions have been tried: Communication with upper management.
B. Other possible solutions that occur to me are:

    1.  Given two (2) promotions immediately to F0-1 step 10 (GS 15) and promotion to Senior Foreign Service in two years.

    2.  Reinstatement back to work from administrative leave and compensation for the prejudice and emotion stress caused.

    3.  Nine years of back pay and benefits for denying me promotions.

    4.  The supervisor removed from his supervisory duties and suspended for two months.

    5.  The supervisor participates in diversity and discrimination training.

5.  I am requesting the following solution:

a.) I request a promotion immediately to F0-1 step 10 (GS 15/10) and nine years of back pay and benefits in addition to the current two years of back pay.
b.) Promoted to Senior Foreign Service in two – three years.
c.) Reinstated back to work immediately.
e.) Compensated financially to the full extent possible for the intended prejudice and the emotional duress caused me.
f.)  Assigned immediately my choice of head of post assignment.
g.) Requests supervisor's suspension for two months and supervisory responsibilities denied.
h.) I request freedom from future reprisal, discrimination and prejudice.
i.)  A success career without future prejudice and harm by the FAS/USDA.

21

Exhibit 1
Page 11 of 56

EXHIBIT 2

**Karl Hampton**
**USDA Complaint Number:  FAS-050077**
**Addendum Supplemental Investigation**
**FOREIGN AGRICULTURAL SERVICE**

**I.     DESCRIPTION OF COMPLAINT**

Name of Complainant and USDA
File Numbers:                                      Karl Hampton
                                                          FAS-050077

Job Title and Grade of Complainant's
Position:                                             Foreign Service Officer
                                                          Agricultural Economist
                                                          GS-F03/12

Complainant's Home Address and
Phone Number(s):                                 700 7th Street, S.W., #225
                                                          Washington, DC  20024

Complainant's Representative:               N/A

Name, Location of Agency and
Unit Involved in Complaint:                   USDA
                                                          Foreign Agricultural Service
                                                          Office of Outreach
                                                          Office of the Administrator
                                                          1400 Independence Avenue, SW
                                                          Washington, DC  20250

Identity of Investigator/Contractor:      Arnold V. Hawkins
                                                          CompuCon Incorporated
                                                          2059 Huntington Ave, Suite P-10
                                                          Alexandria, Virginia  22303-1636

Basis(es) and Issue(s):                           Discrimination based on race (African
                                                          American), sex (male), national origin
                                                          (Southern African American) reprisal (prior
                                                          EEO activity)

**II.    ISSUES IN COMPLAINT**

Whether the agency discriminated against the Complainant on the bases of race (African
American), sex (male), national origin (Southern African American) and reprisal (prior
EEO activity) when:  **(Exhibit 1, Supplemental ROI)**

FAS failed to adhere to Article 2.5 of the Bargaining Service Agreement for personnel
procedures and timeliness regarding the January 27, 2005 proposal to terminate
Complainant's employment.

III.    **SUMMARY**

The Complainant is a member of a protected group by virtue of his race (African American), sex (male), national origin (Southern African American) and reprisal (prior EEO activity). **(Exhibit 1(a), Addendum)** Complainant alleges he was subjected to discrimination and prejudiced by FAS failing to adhere to Article 2.5 of the Bargaining Service Agreement for personnel procedures and timeliness regarding the January 27, 2005 proposal to terminate his employment. **(Exhibit 1(a), Addendum)**

The Complainant filed the instant amended complaint against the Foreign Agricultural Service (FAS), USDA on November 10, 2005, alleging discrimination based on his race, sex, national origin and reprisal. **(Exhibit 1(a), Addendum)**

III.    **BURDEN OF PROOF REQUIREMENTS**

In the conventional process of adjudicating a complaint of discrimination, a Complainant must carry the initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. The employer must then articulate a legitimate, non-discriminatory reason for the challenged action(s). To prevail, the Complainant must then show, again by a preponderance of evidence that the stated reason(s) is but a pretext for discrimination.

IV.    **DESCRIPTION OF THE INVESTIGATION**

Places of Investigation:              Washington, D.C.

Dates of Investigation:               June 23, 2006 through July 21, 2006

Date Report of Investigation
Submitted:                            July 24, 2006

Investigative Method Used:            Telephone Interviews

**BACKGROUND**

**Karl Hampton**, hereinafter referred to as "the Complainant," is an Agricultural Economist/Foreign Service Officer, F0-3/12, with the Office of Outreach, Office of the Administrator, Foreign Agricultural Service, Under Secretary for Farm & Foreign Agriculture, USDA, in Washington, D.C. Complainant has been in his current position for eight years under the same supervisor. Complainant filed an amended Complaint of Discrimination to Complaint Number FAS-050007 on October 24, 2005, which was considered filed on November 10, 2005. His amended complaint was referred for investigation accordingly. The Complainant based his complaint on race, sex, national origin and reprisal. **(Exhibit 1(a), Addendum)**

2

The following accepted issues resulted in an allegation of discrimination based on race, sex, national origin and reprisal. The following claims were accepted for investigation:

Did the agency discriminate against Complainant on the bases of race (African American), sex (male), national origin (Southern African American) and reprisal (prior EEO activity) when:

The agency subjected Complainant to discrimination and prejudiced him by failing to adhere to Article 2.5 of the Bargaining Service Agreement for personnel procedures and timeliness regarding the January 27, 2005 proposal to terminate his employment.

**Issue:**         **Whether the agency subjected Complainant to discrimination and prejudiced him by failing to adhere to Article 2.5 of the Bargaining Service Agreement for personnel procedures and timeliness regarding the January 27, 2005 proposal to terminate his employment?**

The Complainant states the January 27, 2005, proposal of termination letter was issued by his immediate supervisor, Dale Miller with the advice of Lacy Muir, Human Resources Development Specialist. He states the proposal to terminate his employment was based on: 1) submitting false documents for travel claims; 2) misuse of government travel card; 3) failure to reconcile travel voucher; 4) misuse of government position; 5) failure to disclose financial interest in financial disclosure statement OGE Form 450; and 6) providing false information during an official investigation. **(Exhibit 1(a), Addendum)**

The Complaint asserts that the bases for his proposed termination are not correct. He states a year prior to the proposed termination an investigation of his conduct concluded that there were no violations. The Complainant states the following employees have committed the same or similar conduct without being disciplined: Leslie Burkett (race/Caucasian, sex/Female, national origin/ American and prior EEO activity/unknown); Jeanne McDonald (race/African American, sex/Female, national origin/American and prior EEO activity/unknown). **(Exhibit 1(a), Addendum)**

The Complainant states he believes his race, sex, national origin and prior EEO activity were factors in his receiving the January 27, 2005, proposal of termination letter, because he was the only African American male FAS Officer under Mr. Miller. He states he was the highest ranking FAS Officer qualified to be a supervisor. The Complainant alleges Mr. Miller had issues with him because the Complainant questioned the rules and regulations regarding travel, administrative issues and supervisory opportunities. The Complainant states Mr. Miller told him "they" did not want to see him promoted and he assumed "they" meant management. The Complainant states Mr. Miller refused to allow him to be a part of the Acting rotation, but the White employees were allowed to be in the rotation. The Complainant alleges Mr. Miller did not want an African American to supervise his White employees. According to the Complainant, he has been trying for eight years to be a supervisor without success. The Complainant states Richard Maxwell,

3

FAS Compliance Review Officer, told him that the investigation conducted a year ago was about to be closed but Mr. Miller wanted it pursued further. **(Exhibit 1(a), Addendum)**

**Dale Miller** states he issued the January 27, 2005, proposal of termination letter to Complainant. He states he is unfamiliar with Article 2.5 of the Bargaining Service Agreement. Mr. Miller states Complainant was issued the letter of termination for submitting false documents for travel claims, misuse of government travel card, failure to reconcile travel voucher, misuse of government position, failure to disclose financial interest in his financial disclosure statement OGE Form 450 and providing false information during an official investigation. Mr. Miller states he based his decision on issuing the letter of proposed termination on the seriousness of Complainant's acts, supporting evidence, a review of the agency's Table of Penalties and in consultation with Human Resources regarding past penalties and similar acts of misconduct. He states once the proposal of termination letter was issued to the Complainant, the matter was handled by his immediate supervisor, Roy Henwood, Director of External Affairs who was working with Nancy Rodriguez Brown, Human Resources Specialist, Employee and Labor Relations Branch, Human Resources Division. **(Exhibit 1(b), Addendum)**

Mr. Miller states that similar misconduct by similarly situated employees of Complainant's unit was properly addressed in working with the FAS Employee Relations Staff and FAS Compliance Review Staff. He states in January 2001 with regard to Leslie Burkett, who was identified by Complainant as a similarly situated employee that was not disciplined, he requested an audit of all FAS Office of Outreach & Exporter Assistance (OOEA) travel vouchers. He states the Compliance Review Staff audit report revealed that five OOEA employees had unauthorized and/or undocumented expenses. He states the situation was resolved to the satisfaction of the Compliance Review Staff. Mr. Miller states Jeanne McDowney, also identified by Complainant, is no longer employed with USDA and information concerning her discipline can be obtained from Ms. Rodriguez Brown. **(Exhibit 1(b), Addendum)**

Mr. Miller states Complainant was not subjected to discrimination based on his race, sex, national origin and prior EEO activity when the January 27, 2005, proposal of termination letter was issued to him. **(Exhibit 1(b), Addendum)**

**Roy M. Henwood** (race/Caucasian, sex/Male, national origin/American), formerly Director of External Affairs, GS-15/10, Foreign Agriculture Service, USDA, states Complainant is one of approximately 42 employees he indirectly supervises. He states he was not aware of Complainant's prior EEO activity. Mr. Henwood states he is unfamiliar with Article 2.5 of the Bargaining Service Agreement. He states Complainant was charged with misuse of government position, misuse of government issued travel cards and misrepresentation of expenses. He states he does not believe there have been others who have committed similar offenses or committed the same offenses to the extent committed by Complainant who were not disciplined. He states he does not know whether Ms. Burkett or Ms. McDowney committed the same or similar conduct as Complainant without being disciplined. Mr. Henwood states Complainant was not

4

subjected to discrimination based on his race, sex, national origin and prior EEO activity when the January 27, 2005, proposal of termination letter was issued to him. **(Exhibit 1(c), Addendum)**

**Richard L. Maxwell**, (race/White, sex/Male and national origin/American), formerly, the Security Officer, GS-0080-14, for the Foreign Agriculture Service, USDA, states he had no work relationship with the Complainant. He states he conducted the administrative misconduct investigation involving the Complainant. He states he was unaware of Complainant's prior EEO activity. Mr. Maxwell states he has no knowledge of who issued the January 27, 2005, proposal of termination letter to Complainant, or the bases of the proposed termination. **(Exhibit 1(d), Addendum)**

Mr. Maxwell states he never told the Complainant that his investigation was about to be closed but Mr. Miller wanted it pursued further. He states he could have told Complainant he needed to clarify a particular point for Mr. Miller, or something similar. He states he remembers the administrative person completing Complainant's travel vouchers called him with additional information, which was incorporated into the investigation. According to Mr. Maxwell, the additional information increased the completion time of the investigation and Complainant may be referring to that situation. **(Exhibit 1(d), Addendum)**

Mr. Maxwell states he does not know whether Complainant was subjected to discrimination based on his race, sex, national origin and prior EEO activity when the January 27, 2005, proposal of termination letter was issued to him. He states, based on his investigation, it was clear that Complainant committed fraud against the government by filing fraudulent travel vouchers. He states Complainant should have been prosecuted, and he would have been probably found guilty. He states the agency, however, was not interested in referring the case to prosecution and the case remained an administrative matter. He states "Complainant should consider himself as being 'very lucky.'"[1] **(Exhibit 1(d), Addendum)**

**Nancy Y. Rodriguez Brown**, (race/African American-Hispanic, sex/Female, national origin/American), Human Resources Specialist, GS-0201-13, Employee and Labor Relations Branch, Human Resources Division, Farm Service Agency, USDA, states she has never met the Complainant, but worked on his proposal of termination letter with Mr. Henwood. She states she was unaware of Complainant's prior EEO activity. She states Article 2.5 of the Bargaining Service Agreement was not related to the issuance of the January 27, 2005, proposal termination letter issued to the Complainant. **(Exhibit 1(e), Addendum)**

Ms. Rodriguez Brown states the Complainant's proposed termination was based on submitting false documents for travel claims, misuse of government travel card, failure to reconcile travel voucher, misuse of government position, failure to disclose financial interests in (his) financial disclosure statement, and providing false information during an official investigation. She states similarly situated employees committing the same

---

[1] See Exhibit 3 regarding Complainant's rebuttal statement.

offenses have been disciplined for their misconduct.   She states she is unfamiliar with the charges against Ms. Burkett.  She states Ms. McDowney was removed for being absent without leave and failure to follow instructions.  She states the Complainant was not subjected to discrimination based on his race, sex, national origin and prior EEO activity when the January 27, 2005, proposal of termination letter was issued to him.  **(Exhibit 1(e), Addendum)**

V.    **SURVEY OF THE GENERAL ENVIROMENT**

See the Supplemental Report of Investigation.

VI.    **DESCRIPTION OF EXHIBITS**

Exhibit 1:    Affidavits

(a)    Supplemental Affidavit of Complainant, dated July 25, 2006

(b)    Supplemental Affidavit of Dale R. Miller, dated July 17, 2006

(c)    Affidavit of Roy M. Henwood, dated July 17, 2006

(d)    Affidavit of Richard L. Maxwell, dated July 17, 2006

(e)    Affidavit of Nancy Y. Rodriguez Brown, dated July 18, 2006

Exhibit 2:    Article 2.5 of the Bargaining Service Agreement (Source: Nancy Rodriguez Brown)

Exhibit 3:    Investigative Memorandum regarding Complainant's signed supplemental affidavit and rebuttal statement

Exhibit 4:    Proposal to Terminate letter, dated January 27, 2005

# EXHIBIT 3

United States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of
Civil Rights

1400 Independence
Avenue SW

Washington, DC
20250

Sloan & Associates, PC
7600 Georgia Avenue, N.W.
Suite 208
Washington, DC 20012

OCT 1 1 2006

Re: **USDA Complaint No: FAS-2005-00909 formerly USDACR050077[1]**
**EEOC No: 100-2006-0080X**
**Complainant: Karl Hampton**

Dear Sir/Madam:

On October 5, 2006, we received your client's letter dated September 25, 2006, and postmarked September 26, 2006, requesting to amend the subject complaint against the Foreign Agricultural Service (FAS), to include the following like or related claims based on race (Black):

1. from January 2005, to the present the agency has denied the complainant the right to work on and perform the job to obtain superior performance accomplishments for the FAS foreign service promotion rating/evaluation cycle April 1, 2004, through March 31, 2005, and April 1, 2005, through March 31, 2006; and,
2. on May 11, 2006, the complainant was placed on administrative leave without pay and recommended for termination.

The record reflects that his complaint is currently assigned to Equal Employment Opportunity Commission, Administrative Judge (AJ) A. Tonya Ellington Odom, for a hearing. Pursuant to C.F.R.1614.109 (a), upon appointment, the AJ shall assume full responsibility of the adjudication of the complaint, including overseeing the development of the record. Consequently, we are unable to render a decision regarding the amendment request because his EEO complaint is no longer in our jurisdiction.

Per this letter we are forwarding a copy of his amendment request to AJ Ellington Odom for consideration. However, our action does not supersede your adherence to

---

[1] In February 2005, the Department implemented a new Civil Rights database, which necessitated the assignment of a new case number.

AN EQUAL OPPORTUNITY EMPLOYER

Sloan and Associates, PC
Page 2

any order set forth by the AJ regarding filing a motion in this matter. Additionally, any future amendment requests should be made directly to the AJ.

Sincerely,

*for* Michele C. Marsh

Denise A. Banks
Chief
Employment Complaints Division

cc: Civil Rights Director, FAS (w/copy of amendment request)
    ECD Liaison

    A. Tonya Ellington Odom (w/copy of amendment request)
    Administrative Judge
    Equal Employment Opportunity Commission
    1801 L Street, N.W., Suite 100
    Washington, DC 20507

    Mr. Karl Hampton
    1250 4th Street, S.W.
    #W511
    Washington, DC 20024

# EXHIBIT 4



United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Foreign
Agricultural
Service

1400 Independence
Ave., SW
Stop 1023
Washington, DC
20250-1023

Karl Hampton
Foreign Agricultural Affairs Officer
Foreign Agricultural Service
U.S. Department of Agriculture
Washington, DC 20250

APR 2 5 2006

Dear Mr. Hampton:

On January 27, 2005, you were issued a proposal to remove you from your position
as a Foreign Agricultural Affairs Officer, FO-0135-03, with the Foreign
Agricultural Service. This action was based upon the following charges:

1) Submitting False Documents for Travel Claims;
2) Misuse of Government Travel Card;
3) Failure to Reconcile Travel Voucher;
4) Misuse of Government Position;
5) Failure to Disclose Financial Interests in Your Financial Disclosure
Statement OGE form 450 or 450A; and
6) Providing False Information During an Official Investigation.

In compliance with the provisions of the U.S. Department of Foreign Affairs
Manual, Volume 3 (3 FAM 4300) and Article 18 of the Collective Bargaining
Agreement between the American Foreign Service Association (AFSA), you were
provided an opportunity to respond to this proposal orally and/or in writing, within
fifteen (15) calendar days of receipt. You submitted a written response on March
15, 2005, and requested a date on which to present an oral response. This request
was granted, and your oral response was presented on March 21, 2005.

As the hearing official in this matter, I reviewed both your oral and written
responses, and concluded that additional information was needed. On May 3, 2005,
I requested that the Compliance Review staff do an additional investigation. This
later investigation was completed on July 29, 2005.

## FINDINGS

After careful consideration of the proposal, supporting documentation, your
responses, and the results of the subsequent investigation, I have made the following
determinations:

USDA is an Equal Opportunity Employer

Karl Hampton
Page 2

**Charge #1, Specifications #1-9:**

You were charged with allegations that you had deliberately altered hotel receipts to create the appearance of legitimate expenses in support of multiple requests for reimbursement of approved travel. These charges were supported by testimony and documentation provided by several hotel officials.

In your responses, you attempted to explain several inconsistencies by citing changes to your itinerary, a lack of familiarity with governmental regulations, and by suggesting that others may have altered these documents in efforts to deliberately malign your character. As a Foreign Service officer with over 18 years of federal service, you should be well-versed in travel and other federal regulations. You failed to supply original documentation and supplied documentation that had been altered. In your response, you went on to express concern that the supporting materials, upon which these charges were based, did not include copies of the actual hotel records.

When attempts were made to secure original copies of the hotel receipts, you not only refused to issue a release of this information, you also barred production and threatened legal action against a hotel official. Therefore, it is my belief that the timing of these threats serves as corroborative evidence of conduct demonstrating untrustworthiness, unreliability, and/or use of poor judgment. As such your actions have cast immediate and further doubt on your integrity, honesty and the credibility of your defense. Hence, I have determined that your subsequent actions demonstrate behavior that is consistent with the charges alleged, and recommend that the 9 specifications listed under this charge be sustained.

**Charge #2, Specifications #1-4:**

In this charge, the FAS alleged that you were not on official travel June 16 and 18, 2003, and were not entitled to use the government issued charge card for a series of charges you made in Mississippi on those days. You responded that you were on official travel during those dates, and provided a copy of your approved travel voucher. With the submission of this proof, I have determined that your use of the government charge card during this period was legitimate, and recommend that this charge not be sustained.

Karl Hampton
Page 3

## Charge #3

The FAS alleged that you failed to properly reconcile a travel voucher for June 25-30, 2003, and this resulted in your having unauthorized access to $301.48, that had been issued as a credit to your government issued charge card. When the credit was brought to your attention almost a year later, you did not dispute that the agency incurred the overcharge and rectified the matter by personal check.

In your responses, you have conceded that the events occurred as outlined in the proposal. You assert, however, that your actions were the result of insufficient record keeping and ignorance of departmental procedures, not a deliberate intent to commit fraud or otherwise mislead the Agency. I find this response less than credulous however, based upon the fact that you initiated action to receive credit for the hotel's initial overcharge within a month of its occurrence. These earlier actions demonstrate that you monitor your government issued charge card statements in a manner more frequent than you alleged in your responses. Therefore, I believe that it is highly unlikely that you would fail to notice a credit in excess of $300 for eleven months. Your delay in compensating the agency for the credit, and then only upon inquiry by investigatory staff, raises skepticism about your intentions. Consequently, I have determined that this charge should be sustained.

## Charge #4

The FAS alleged that you misused your government position to initiate a business venture that was of a personal interest, and beyond the authority of your official role. In your responses, you state that your efforts to provide information about the USDA and FAS programs were misinterpreted. You deny ever having intimated that you might be available to run a sweet potato processing facility, and state that you received no benefit from your conversations or relationship with the Chairman of the Board of the North Carolina Agricultural Finance Authority, Frank Timberlake.

Subsequent investigation into this matter has not produced additional evidence to corroborate Mr. Timberlake's recollection and interpretation of your actions. Therefore, in the absence of more definitive independent information, I recommend that this charge not be sustained.

Karl Hampton
Page 4

**Charge #5, Specifications #1-4:**

The FAS alleged that you failed to report your development and ownership of a company (Syrisia's Foods), as required on your Financial Disclosure Statement (OGE Form 450 or 450A), for four successive years (1998- 2002). In one of those years, 1998, you also neglected to mention your ownership of stocks in four other businesses (McDonald's, Intel, Disney and Worldcom). In your response, you concede that the events occurred as outlined in the proposal. You state, however, that your actions were the result of a lack of familiarity with departmental ethics requirements and careless record keeping, rather than an intentional act to defraud. You explained that the project for which Syrisia had been founded did not materialize; therefore, you did not realize a report was necessary.

It is my belief that, as a senior level employee, you should have known the Agency's ethics requirements, and been more vigilant in your compliance. FAS requires employees to take complete annual ethics training. Therefore, you should have known that your ownership of stock and majority interest in the companies listed above would have needed to be reported, and that failure to do so would have created a violation to the agency's rules. Even absent this knowledge however, you should have at least sought out the guidance of an ethics advisor, to make an unbiased assessment of whether your interactions required reporting. Absent any assertions or documentation that such efforts were made, I find your arguments to be less than persuasive, and recommend that Charge #5, Specifications #1-4, be sustained.

**Charge #6**

In this charge, it was alleged that you failed to provide accurate information when questioned by the Compliance Review staff during an official investigation. In your response to this charge, you reiterated your statement that you were a third generation minority farmer and made no statements to the contrary during the course of the investigation. You defended your status as a USDA Value-Added Development Grant (VADG) program recipient, by asserting that the selection process was not handled by the office under which you were employed. You further stated that as a USDA employee, you were not provided any special friendship, assistance or favoritism in the processing of your application. Therefore, your failure to disclose your status as an FAS/USDA employee was not an issue of ethical concern.

Karl Hampton
Page 5

It is my belief that the issue of your status as a minority farmer/business is unclear, and there is reasonable question about whether you represented yourself to be a small minority farmer, or a minority small business farmer. I therefore do not sustain this portion of the charge. I have concluded however, that the remaining issues in this charge should be sustained. Having reviewed the statements, testimony, and your responses, I have determined that the July 1, 2002, email and draft letter provided by Mr. Bennie Graves, Plant Test Director, Mississippi Department of Agriculture, sufficiently corroborate allegations that you discussed the specifics of your sweet potato processing facility with him. You have failed to provide any evidence, other than your own assertions, to rebut this independent corroboration of Mr. Graves' assertions. Hence, I recommend that this charge be sustained.

**CONCLUSION (Reviewing Official Recommendation)**

While having determined that Charges 2 and 4 should be withdrawn, I am left to determine whether the remaining charges warrant your removal. While your length of service and job performance are factors that weigh positively towards a less severe penalty, it is my belief that the nature and seriousness of the remaining Charges 1, 3, 5 and 6, and their relation to the duties and responsibilities of your position warrant your removal.

As a senior Foreign Service Officer within FAS, you are expected to work with little or no supervision and to have extensive contact with the public. Therefore, a great deal of trust is placed on employees in your position and utmost integrity is expected. It is my belief that the actions detailed above have demonstrated not only a disregard of ethical standards but also your unwillingness to comply with our basic code of conduct. The frequency of these actions and the fact that they often resulted in your material gain indicate that they were taken with deliberation. Many of the charges listed above directly involve your government issued charge card. You have received prior discipline for charge card matters. There appears to be little potential for your rehabilitation. Therefore, the agency has lost all faith and confidence that you could be trusted to perform ethically or with good judgment as a reliable member of the Foreign Service. For this reason, I have concluded that the proposed disciplinary action is a reasonable response to the sustained charges, and that your removal will promote the agency's efficiency of service.

Karl Hampton
Page 6

Your conduct calls into question your ability to meet the standards of suitability and
continued employment. I will submit the proposal, your reply, records supporting
the proposal, and a statement that the Department intends to separate you for cause
to the Foreign Service Grievance Board (FSGB). A separation hearing will be held
under the procedures provided in 22 CFR Chapter IX (Foreign Service Grievance
Board Regulations). The Board will contact you regarding a hearing to establish
cause for separation as provided in section 610 (a) (2) of the Foreign Service Act.
This hearing "shall be in lieu of any other administrative procedure authorized or
required by this or any other Act" (Section 610 (a) (3) of the Foreign Service Act of
1980, as amended).

During this process you may be represented, advised, or accompanied by any person
of your choice. A representative may be disallowed if there is a conflict of interest
or position, unreasonable costs to the Department, or if the employee has priority
work assignments.

In accordance with Section 610 (a) (6) of the Foreign Service Act, you will be
placed on Leave Without Pay (LWOP) pending final resolution of the underlying
matter, subject to reinstatement with back pay if cause separation is not established
in a hearing before the Board. You will be placed on LWOP at the end of the pay
period in which you receive this letter.

Once the FSGB has issued a decision, the FAS Administrator, Michael Yost, or his
designee will make the final determination on your separation. If you wish to waive
the hearing, please notify me in writing as soon as possible, and I will refer your
case directly to the Head of FAS or his designee for a final decision.

Please be aware that eligibility for retirement benefits under the Foreign Service,
Civil Service, or other Government retirement system may be affected when an
employee is separated for cause. For the Foreign Service retirement systems,
these are outlined in section 610(b) of the Foreign Service Act and 3 FAM 6000.
Any questions concerning the contents of this letter, your rights, or the
procedures involved should be directed to Nancy Rodriguez Brown, (202) 401-
0615.

Karl Hampton
Page 7

Please acknowledge receipt of this notice by signing and dating the attached copy in the space provided.

Sincerely,

*Roy M. Henwood*

Roy Henwood, FAS Confidential Assistant to the Administrator

_____          _____
Date                              Receipt Acknowledged Signature

# EXHIBIT 5



**USDA**

United States
Department of
Agriculture

Office of the
Assistant Secretary
for Civil Rights

Office of
Civil Rights

1400 Independence
Avenue SW

Washington, DC
20250

Mr. Karl Hampton
700 7th Street, S.W.
#225
Washington, DC 20024

JUN 2 2 2006

Re:    USDA Complaint No: FAS-2005-00909 formerly USDACR050077[1]
       EEOC No:  100-2006-0080X

Dear Mr. Hampton:

On June 21, 2006, the Foreign Agricultural Service (FAS), Civil Rights Office, provided
us a copy of your request to amend the subject harassment complaint to include the claim
that on April 25, 2006, you were notified of your termination[2].

Termination claims raised by non-probationary employees are typically designated as
"mixed case" complaints which are heard before the Merit Systems Protection Board.
However, the record reflects that your complaint is currently assigned to Equal
Employment Opportunity Commission, Administrative Judge (AJ) A. Tonya Ellington
Odom, for a hearing.  Pursuant to C.F.R. 1614.109 (a), upon appointment, the AJ shall
assume full responsibility of the adjudication of the complaint, including overseeing the
development of the record.  Consequently, we are unable to render a decision regarding
your amendment request because your EEO complaint is no longer in our jurisdiction.

Per this letter we are forwarding a copy of your amendment request to AJ Ellington
Odom for consideration.

Sincerely,

Denise A. Banks
Chief
Employment Complaints Division

cc:    Civil Rights Director, FAS

       ECD Liaison

       A.  Tonya Ellington Odom (w/copy of amendment request)
       Administrative Judge
       Equal Employment Opportunity Commission
       1801 L Street, N.W., Suite 100
       Washington, DC 20507

---

[1] In February 2005, the Department implemented a new Civil Rights database which necessitated the
assignment of a new case number.
[2] The record reflects that FAS received the amendment request on May 2, 2006.

AN EQUAL OPPORTUNITY EMPLOYER



# EXHIBIT 6

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**1801 L Street, N.W., Suite 100**
**Washington, D.C. 20507-1002**

| | |
|---|---|
| Karl Hampton,<br>     Complainant,<br><br>        v.<br><br>Mike Johanns,<br>Secretary,<br>Department of Agriculture,<br>     Agency. | EEOC No.  100-2006-00080X<br><br>Agency No.  FAS-2005-00909[1]<br><br><br><br>Date:      **October 27, 2006** |

## ORDER

I convened a conference call with the parties on October 26, 2006, in order to obtain the status of this EEO complaint since I had issued an Acknowledgment Order on July 6, 2006, and there had been no activity by the parties. During the conference call, I learned that Complainant had since been proposed for termination from employment as a Foreign Service Officer, Agricultural Economist, and had filed a grievance with the Foreign Service Grievance Board (FSGB). The parties informed me that they are required to brief the FSGB by November 6, 2006, regarding the scope of its jurisdiction over Complainant's termination vis-à-vis the above-captioned complaint and other issues that may or may not be related to Complainant's proposed removal from his position.

The Agency argues that the matters raised in this complaint are inextricably intertwined with Complainant's proposed termination and should be dismissed from the EEO process. Complainant disagrees, and suggests that Complainant's termination can be adjudicated before the FSGB, and his EEO related non-termination claims can be simultaneously adjudicated before the Commission. However, neither party was familiar with the particular jurisdictional questions at issue and its impact on the processing of this matter before me. I then discussed with the parties the feasibility of placing this case in abeyance for approximately thirty days pending a decision from FSGB.

I note that after a brief review of case law, the parties should note a few Commission decisions when addressing the propriety of processing this EEO complaint at the Commission. In James v. Agency for Int'l Dev., the Commission denied reconsideration of its previous decision to dismiss all of appellant's EEO complaints, noting that appellant raised all of his EEO issues through a grievance to the FSGB. James v. Agency for Int'l Dev., EEOC Request No. 05980394 (Nov. 1, 2000). The Commission noted that even though the FSGB declined to permit discovery into appellant's discrimination claims, the fact remained that the grievance procedure permitted claims of discrimination to be brought before it, and that once Appellant filed a grievance, he could not subsequently file an EEO complaint. Id. In reaching this conclusion, the Commission noted that Volume 3 of the Foreign Affairs Manual, in Appendix A § 1109(b)(1) provided that a person could either file a grievance under the applicable chapter or initiate a proceeding under another provision of law, but not both. Id.

---

1 The prior Agency number, and that found in the Acknowledgment Order, is 050077.

However, a prior Commission decision appears to have reached a different conclusion when it determined that an appellant's EEO complaint regarding his claims of religious discrimination and retaliation related to a reassignment and a subsequent termination were cognizable in the EEO process, and that any election to appear before the FSGB should not be deemed as an election under a negotiated grievance procedure as contemplated by 5 U.S.C. § 7121(d).  See Friedman v. Dep't of State, EEOC Request No. 05930276 (Apr. 7, 1994).  See also 29 C.F.R. § 1614.301 (2006).  The Commission examined the legislative history of § 610 of the Foreign Service Act at length and concluded that notwithstanding the confusion in the congressional record, it was not convinced that Congress intended to preempt an appellant's access to the administrative process when he was mandated to appear before the FSGB as part of an automatic separation hearing.  Id.  The Commission also noted that it had jurisdiction over the reassignment claim independent of the jurisdictional question regarding termination because the FSGB only addresses the propriety of proposed terminations.  Id.[2]

I note that the James decision only circulated through the Office of Federal Operations whereas the Friedman decision was reviewed and voted upon by the full Commission.  I also note that nearly six years has elapsed since the James decision, and there may be additional or updated materials or sources not cited by these Commission decisions that can shed further light on the question of jurisdiction.  Finally, I note that the facts of this case may be distinguishable from those presented in James and Friedman, and I have not been fully apprised of the circumstances of all of Complainant's various claims against the Agency.

Accordingly, I **ORDER** that this case be placed in abeyance until the FSGB issues its determination regarding jurisdiction.  The parties shall convene a conference call with me upon receipt of a decision by the FSGB.  The parties can then discuss if and how the case should be processed before me.  I note that Complainant appears to have submitted requests to amend his complaints to include other incidents without the knowledge of his representative, and I noted a few letters from the Agency's civil rights office addressing such requests for amendments.  While the case is in abeyance, I urge the parties to address and ensure that the complaints are properly identified and framed in order to facilitate discussion of Complainant's claims and ensure that his claims are properly processed either by FSGB, the Commission, or perhaps both.

Finally, I note that the parties should also consider whether settlement in lieu of further litigation in one or multiple forums is feasible and in the interest of both parties.  I note that litigation can be time consuming, expensive and risky to both parties, and that settlement permits the parties to control the outcome and receive some meaningful relief and closure as a compromise to avoid further litigation.  I am available to assist with informal resolution if the parties so request assistance and it does not interfere with any processing by the FSGB.

It is so **Ordered.**

Joel A. Kravetz
Administrative Judge
Telephone:  (202) 419-0723
Facsimile:  (202) 419-0701

---

2 A third Commission decision did not address whether the FSGB had jurisdiction over EEO related matters, but dismissed that portion of appellant's complaint on other grounds.  See Taubenfeld v. Dep't of State, EEOC Request No. 05930696 (June 10, 1994).

2

## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing **ORDER** and any attachments within five (5) calendar days after the date they were sent *via* first class mail, or the same day if sent via facsimile or electronic mail. I certify that on **October 27, 2006**, the foregoing **ORDER** and any attachments were sent *via facsimile or first class mail,* as set forth below, to the following:

Karl Hampton
1250 4th Street, S.W. Apt. W 511
Washington, D.C. 20024

E. Ned Sloan
7600 Georgia Avenue, N.W. Suite 208
Washington, D.C. 20012
VIA FACSIMILE to (202) 829-4249

Ejike Obineche
Department of Agriculture
Office of the General Counsel
Civil Rights Division
1400 Independence Ave, SW
Washington, DC 20250-1400
VIA FACSIMILE to (202) 205-3781

Joel A. Kravetz
Administrative Judge

3

# EXHIBIT 7

# BEFORE THE FOREIGN SERVICE GRIEVANCE BOARD

In the Matter Between

| | |
|---|---|
| Karl Hampton<br>Charged Employee | Record of Proceedings<br>FSGB No. 2006-012 |
| And | Date:  November 27, 2006 |
| Foreign Agricultural Service<br>Department of Agriculture | **SUMMARY OF PRE-HEARING<br>CONFERENCE AND ORDER** |

---

For the Foreign Service Grievance Board:

| | |
|---|---|
| Presiding Member: | Lois C. Hochhauser |
| Board Members: | Walter Greenfield<br>Johnny Young |
| Special Assistant: | Janet M. McGhee |

| | |
|---|---|
| Representative for the Charged Employee: | E. Ned Sloan, Esq. |
| Representative for the Department: | Ejike H. Obineche, Esq. |
| Employee Exclusive Representative: | American Foreign Service Association |

## SUMMARY OF PRE-HEARING CONFERENCE AND ORDER

### I. PRE-HEARING CONFERENCE

The pre-hearing conference in this matter took place on October 17, 2006, at the offices of the Foreign Service Grievance Board (FSGB). The following individuals were present: Karl Hampton, charged employee; E. Ned Sloan, Esq., Mr. Hampton's counsel; and Ejike H. Obineche, Esq., agency counsel. On behalf of the Board, the Panel consisted of: Lois Hochhauser, panel chair; Walter Greenfield, panel member; and Johnny Young, panel member. Janet McGhee, special assistant, was also present.

A.     Authority: The proceedings are conducted in accordance with Title 22 CFR 906.5 and FSGB procedures.

B.     Stipulations, and Pre-Hearing Statements: The parties agreed to submit stipulations and pre-hearing statements by November 16, 2006. The pre-hearing statement should summarize the party's factual and legal position and include any relevant case law and regulations relied upon by the party.

C.     The parties agreed that the issue to be determined is: Did the agency have good cause to separate the charged employee from his position?

D.     Discovery and Exchange of Lists of Witnesses and Documents: The parties raised no concerns about discovery and agreed to work cooperatively. They were provided with copies of the Record of Proceedings (ROP) and advised that they could object to any of the documents currently in the ROP being entered into evidence at the hearing.

It was agreed that discovery would close on November 16, 2006, at which time the parties are to exchange lists of witnesses and documents they intend to present at the

hearing. The parties have presented witness lists, but were advised they could revise their lists prior to that date. The parties were advised that the Board considers live testimony as the best evidence. If a witness is unavailable, the parties should advise the senior advisor so that other arrangements can be made.

E.    Hearing: The proceeding will take place on January 18, 2007, at the offices of the Foreign Service Grievance Board. It will begin at 9:30 a.m. The parties should arrive by 9:15 a.m. with a photo ID. The panel will be guided by the Federal Rules of Civil Procedure and the Federal Rules of Evidence in conducting the hearing. Since the agency bears the burden of proof, it will proceed first. The hearing will be recorded and transcribed, and testimony will be given under oath. The parties were advised that they are responsible for submitting copies of their proposed documentary evidence at the hearing.

F.    Status Conference: The parties agreed that a status conference was not necessary, but the panel advised them that it is available to confer with the parties in person or by telephone prior to the hearing at their request. A status conference was tentatively scheduled for November 30.

G.    _Ex Parte Communication_: No _ex parte communication_ will be permitted. All communication from the parties should be addressed to Ms. McGhee.

H.    Pre-Hearing Issue: The agency advised the panel that the charged employee had previously filed a discrimination complaint, and argued that he was required to choose one forum in which to proceed. Employee concurred and stated that he would notify the Board of his choice. He agreed to notify the Board by 5:00 p.m. on October 23, 2006, of his election.

I.    Review of Order: The parties were advised they could review this order

and provide comments. It would then become final and part of the ROP.

J.    Mediation: The parties were invited to avail themselves of the mediation

services offered by the Board. They indicated they might agree to mediation, and

that they were also attempting to resolve the matter through negotiations.

## II. AUTHORITY OF BOARD TO CONDUCT PROCEEDING:

Following the pre-hearing conference, the panel determined that charged employee might

not be required to elect between this proceeding and the discrimination complaint, currently

before another forum. By memorandum on October 20, 2006, it notified the parties that the

timeframes, as listed above, would be suspended, and it directed the parties to respond to the

following issue by November 6, 2006:

> May this Board require a charged employee who has been proposed for
> separation for cause under Section 610(a)(2) of the Foreign Service Act which
> mandates that FSGB conduct a hearing when an individual is separated for cause,
> to elect one forum pursuant to 22 U.S.C. Section 4139 when the charged
> employee has also filed an EEO matter with another authority involving similar
> issues and remedies?

The parties responded in a timely manner. The agency argued that since the charged

employee filed a grievance with the Board on June 26, 2006, "long after he had filed his

complaint of discrimination at the EEOC," he "lost the right to grieve his separation for cause

before the Board." (Agency Brief, p. 5). The charged employee contended that, since the

hearing before the Board is mandated by 22 U.S.C. 4010(a)(2), and since the removal is not part

of the discrimination complaint, he is not required to elect a remedy.

After considering the arguments of the parties and the applicable laws and regulations,

the Board concludes that it has authority to hear this matter regardless of the charged employee's

earlier filing of a discrimination complaint with another agency.

This matter was initiated on May 4, 2006 by the agency, which requested that the Board

conduct a separation hearing. The Board acknowledged the agency's request by letter dated May 16, 2006, and assigned Case Number 2006-012 to the matter. Mr. Hampton filed a memorandum entitled "Grievance for FSGB Case No. 2006-012" on June 26, 2006, but he, in fact, did not file a new grievance and it was not considered such by the Board. Rather, he responded to the agency's submission.

22 U.S.C. 4010(a)(2)(ii) provides that a member may not be separated from the Service until the member receives a hearing before the Foreign Service Grievance Board and the Board decides that cause for separation has been established, unless the member waives, in writing, the right to such a hearing, or the member's appointment has expired, whichever is sooner.

Section 610(a)(2) of the Foreign Service Act further provides:

> That this hearing is mandated by Section 610(a)(2) and is limited to the issue of whether cause for separation has been established.

The issue before this Board is the charged employee's removal for cause by agency. Charged employee previously filed a discrimination complaint and those charges will not be heard by the Board, except to the extent that they are raised by charged employee as defenses in the separation action. See Section 1109 of the Foreign Service Act, 22 U.S.C. 4139.

In sum, the Board may not require the employee to elect between this removal hearing and the discrimination complaint and may not require him to waive this proceeding. The hearing before the Board, however, is limited to the removal matter.

## III. ORDER

Based on the foregoing, the following is hereby:

**ORDERED:** The hearing on the removal will be heard on January 18, 2007, at the time and location noted in Section I(E) above. The issue is limited to the removal for cause action initiated by agency, as stated in Section I(C) above.

5

FSGB 2006-012

**ORDERED:** Stipulations, pre-hearing statements, and final lists of witnesses and documents, as described above, shall be filed by December 15, 2006.

**ORDERED:** The parties may advise the Board of any questions or concerns they have regarding this Summary of Pre-Hearing Conference and Order by 5:00 p.m. on November 30, 2006. After that time, it will become final and part of the ROP.

FSGB 2006-012

6

For the Foreign Service Grievance Board:


_Lois Hochhauser_

Lois C. Hochhauser
Presiding Member


_Walter Greenfield_

Walter Greenfield
Member


_Johnny Young_

Johnny Young
Member


FSGB 2006-012

EXHIBIT 8

# BEFORE THE FOREIGN SERVICE GRIEVANCE BOARD

In the Matter Between

Karl Hampton                                Record of Proceedings
Charged Employee                            FSGB No. 2006-012

And                                         Date:  June 6, 2007

Foreign Agricultural Service                **DECISION**
Department of Agriculture

---

For the Foreign Service Grievance Board:


Board Members:                  Walter Greenfield
                                Johnny Young

Special Assistant:              Janet M. McGhee


Representative for the Charged Employee:     E. Ned Sloan, Esq.

Representative for the Department:           Ejike H. Obineche, Esq.


Employee Exclusive Representative:     American Foreign Service Association

# CASE SUMMARY

**HELD:** Cause for separation for misconduct has been established because the sustained charges adversely affect the efficiency of the service.

## OVERVIEW

On May 11, 2006, the Department of Agriculture (agency) notified the Board of its decision to separate for misconduct Karl Hampton, a Foreign Agricultural Affairs Officer. In accordance with 22 CFR 906.2, the agency requested that a hearing be conducted to establish that proper cause had been established. A hearing on this matter was conducted on January 18-19, 2007.

On January 27, 2005, the agency notified the charged employee that it proposed to remove him from the service. Hampton responded to the proposed action both orally and in writing in March 2005. After reviewing the record, and conducting an additional investigation (completed in July 2005), the deciding official issued a final decision in April 2006 in which four of the original six charges were sustained; (1) Submitting False Documents for Travel Claims, Specifications 1-9; (2) Failure to Reconcile Travel Voucher; (3) Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specification 1-4; and (4) Providing False Information During an Official Investigation.

Citing several alleged procedural and substantive errors, Hampton opposed the agency's action to involuntarily separate him, *e.g.*, reliance on stale charges; initiation of a supplemental investigation after the record was established; failure to prove that employee "knowingly" and "willfully" violated regulations; agency's inclusion of charges not originally proposed; agency's failure to notify him that he could be criminally culpable; and improper reliance on copies of documents and hearsay evidence. In addition, the charged employee asserted that the actions of the proposing and deciding officials amounted to reprisal for having engaged in a protected activity (whistle blowing).

In regard to the specific charges:

Charge 1: Hampton claims that he was ignorant of travel regulations requiring him to use a government contractor-furnished credit card for all transactions related to official travel in the absence of a waiver. Moreover, government charges were stale since they referred to periods of travel two years in the past, and the agency incorrectly relied on copies of documents rather than originals.

Charge 2: The charged employee claimed that his failure to properly reconcile a travel voucher resulted from an oversight and sloppy record keeping, and not from an attempt to defraud the government

(Hampton failed to reconcile a travel voucher after receiving a credit to his
credit card for an overcharge despite the fact he had already received a full
claimed reimbursement).

Charge 3: Charged employee claimed that his failure to list his
ownership of a food processing company for four required reporting years,
in violation of agency disclosure requirements, resulted from ignorance of
his responsibilities. Hampton contends that since the company (though
incorporated) had never been built or generated any income, he was
unaware of the requirement that he report his interest.

Charge 4: Hampton maintains that he never discussed the details
of his food processing venture with a Mississippi Department of
Agriculture official, and that agency incorrectly relied on third-party
testimony in concluding that he had given false testimony during an
investigation of the matter.

We examined all of the charged employee's affirmative defenses and challenges
and found no support for his assertions. After careful review of the record, and the
testimony of witnesses provided during the hearing, we conclude that the agency has met
its burden by a preponderance of evidence that the charged employee did commit the acts
he is charged with, and knew, or should have known, that such acts could be grounds for
separation; there is a nexus between those acts and the efficiency of the service; and the
penalty is proportional to the acts committed and consistent with those imposed for
similar acts of misconduct. Separation for cause was established.

FSGB 2006-012

# DECISION

## I. REQUEST TO SEPARATE FOR CAUSE

On May 4, 2006, the Department of Agriculture (agency) notified the Board of its

intention to separate for cause Karl Hampton (charged employee), FO-03, and requested

a hearing as provided by 22 U.S.C. 4010(a)(2). The Board acknowledged receipt of the

agency's request on May 11, 2006. Hampton filed a memorandum with the Board on

June 26, 2006 entitled "Grievance for FSGB Case No. 2006-012" which the Board

considered not to be a grievance, but rather a response to the agency's submission. On

April 30, 2007, the Board issued a Summary Decision on the merits. The Board now

issues its full writing, which provides a detailed presentation of the positions of the

parties, the evidence, the Board findings, and the reasons for the decision.

## II. BACKGROUND

On January 27, 2005, the agency notified Hampton that it proposed to remove

him from his position and from the federal service for misconduct. He began his career

with the Foreign Agricultural Service (FAS) in April 1987, and at the time of the

proposed removal he was a FO-0135-03-11 Foreign Agricultural Affairs Officer. The

original proposal included six charges and set forth thirteen specifications. The charged

employee responded to the proposed action both orally and in writing on March 21 and

March 31, 2005, respectively. After reviewing the record, the deciding official requested

further investigation, which was completed on July 29. In its final decision issued on

April 25, 2006, the agency sustained only the following four of the six original charges:

- Submitting False Documents for Travel Claims
- Failure to Reconcile Travel Voucher
- Failure to Disclose Financial Interests in Financial Disclosure,
  Statement (OGE Form 450 or 450A)

- Providing False Information During an Official Investigation

Hampton defends against the agency's action to separate him involuntarily based on the four sustained charges. He contends that the agency's action amounts to a reprisal against him for having engaged in a protected activity (whistle blowing), and that it committed a procedural error by allowing Roy Henwood, FAS Director of External Affairs (who was his reviewing officer, also referred to as second line supervisor), to act as the deciding official. In addition, he asserts that Henwood violated administrative procedures by initiating another investigation on May 3, 2005, after the record for discovery had already been closed. Hampton further questions the legality of having Henwood sign the April 2006 decision letter recommending his termination since he was then on detail to the Senate. He alleges, also, that his supervisor failed to inform him that he was the target of a management-initiated investigation in which disciplinary action and possible criminal charges were being sought, in violation of his rights under 3 FAM 4322.3 (i). The agency, Hampton asserts, failed to review prior treatment in similar cases, and did not consider "progressive disciplinary action" before proposing his penalty of removal. He contends, too, that the agency's action is the result of discrimination against him based on race (African-American), gender (male), and national origin.

For remedies, he requests that remedies be granted to him under 22 CFR Chapter IX Part 908.1, 908.2, 908.3, and 909-b.[1]

A pre-hearing conference was held on October 17, 2006, during which the parties agreed upon procedural ground rules and a timetable. Since Hampton had already filed an EEO complaint raising similar issues, the agency insisted that he could not proceed

---

[1] In citing Section 909-b it seems likely Hampton meant 909.3. Given our decision this uncertainty has no bearing herein.

before the Board.  In its "Summary of Pre-hearing Conference and Order" issued on

November 27, 2007, the Board memorialized the matters discussed at the pre-hearing

conference and directed that the parties brief the issue of whether the charged employee

could be required to waive his right to a hearing before this Board regarding his

termination.  The parties responded in a timely manner.[2]  In our Order of November 27,

2006 we determined that since Section 610(a)(2) provides that a member may not be

separated from the Service without a hearing before this Board unless the member waives

this right in writing or the member's appointment expires, neither of which had occurred

in this matter, and since Section 610(a)(2) of the Foreign Service Act mandates a hearing

on the issue of whether the agency established "cause for separation," Hampton could

not be required to waive his right to a proceeding before the Board.  However, we limited

the subject of the proceeding to the removal for cause.

　　　An oral hearing was held on January 18 and 19, 2007.  At the hearing the parties

were given the opportunity to present documentary and testimonial evidence.[3]  The

following witnesses testified on behalf of the agency:  Roy Henwood, Confidential

Assistant to the Administrator of FAS; Richard Maxwell, FAS Investigator; Dale Miller,

FAS Director, Office of Outreach and Exporter Assistance; Lacy Muir, former FAS

Human Resources Employee Relations Specialist, and Tanya Willis, FAS Human

Resources Specialist.  The charged employee did not present any witnesses.  Neither did

---

[2]  In his submission, Hampton stated that he had filed EEO complaints with the agency on July 19, 2003 regarding agency's failure to promote him, and on February 8 and February 22, 2005, regarding revocation of his security clearance, his proposed termination and other allegations.  The agency contends the agency complaints were filed on October 30, 2004, January 26, 2005, and February 13, 2006, and that a complaint was filed with the Equal Employment Opportunity Commission some time after February 13, 2006.  Here again these discrepancies do not bear upon our decision.
[3]  Witnesses testified under oath and the hearing was transcribed.  The transcript is cited as "Tr," followed by "I" for January 18 proceedings and "II" for January 19 proceedings, followed by the page number.

he testify. The parties submitted written closing arguments and the Record of

Proceedings (ROP) was closed on March 21, 2007. We issued a Summary Decision on

April 30 and this is a statement of facts and conclusions to support and explain that

Decision. *See* 3 FAM 4366b.

## III. POSITIONS OF THE PARTIES

### The Agency

Charge 1:  Submitting False Documentation for Travel Claims, Specifications 1-9

Under this charge the agency listed nine specifications (individual travel claims

by dates) in which it claims the charged employee deliberately altered hotel receipts to

create the appearance of legitimate expenses in order to claim multiple requests for

reimbursement of approved travel. The periods of travel, as set out in the specifications,

ranged from August 2002 to February 2004, with six trips occurring in 2002, two in

2003, and one in 2004.

These charges are supported by the documentation and the statements of

witnesses interviewed during its investigation. It dismisses the charged employee's

attempt to explain the inconsistencies by claiming a lack of familiarity with government

travel regulations, changes in travel plans, and the suggestion that others may have

deliberately altered the records in order to malign his character. A Foreign Service

Officer with over eighteen years of federal service and whose assignment requires travel

should be well-versed in travel and other pertinent federal regulations.

Hampton's refusal to allow the hotels to cooperate in the investigation constitutes

proof of his misconduct. He had warned the hotels which were contacted by the agency

during the investigation that he would initiate a lawsuit against any hotel that cooperated

7                                    FSGB 2006-012

and provided the agency with requested documents. Hampton could have no legitimate

reason for refusing to sign an access release for its investigator, or for threatening hotel

officials with legal action if they provided copies of hotel receipts pertaining to his

lodging, other than they would provide evidence of conduct demonstrating

untrustworthiness, unreliability, and poor judgment. Even so, the agency maintains that

the repeated irregularities in the travel claims are otherwise well-documented and amount

to repeated attempts to defraud the government for personal gain. Taken alone, these

false claims under Charge 1 provide sufficient grounds for the penalty of separation.

### Charge 2: Failure to Reconcile Travel Voucher

The charged employee knowingly failed to properly reconcile a travel voucher for

eleven months, resulting in a reimbursement overpayment of $301.48 for official travel

undertaken from June 25-30, 2003. Hampton stayed at the Peabody Hotel in Memphis,

Tennessee. He was charged $1,225.28 (as shown on his credit card statement). He

submitted to the agency his travel claim in July, seeking full reimbursement in the

amount of $1,225.28. One month after his stay, Hampton notified the hotel of a $301.48

overcharge, and was given a credit by the hotel in that amount to offset the overcharge.

Even so, he never reconciled his travel claim or repaid the government until questioned

about it by an agency investigator in September 2004. Since the overpayment amounted

to a credit on the charged employee's government credit card (cards that are issued in the

name of the employee and maintained by that employee), the agency asserts that he had

during this time access to the $301.48 of unauthorized funds. It rejects Hampton's

explanation of insufficient record keeping and ignorance of agency procedures. In its

view, the rapidity with which Hampton was able to discover the overcharge and initiate

action to receive the credit (within one month of the occurrence) demonstrates that he monitored his government-issued credit card statements more frequently than he suggested or admitted. His long delay in reimbursing the government, and not until he was questioned by investigators, raises skepticism about his intentions with respect to the overcharge.

### Charge 3: Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specifications #1-4

The deciding official sustained the charge that grievant should have known that he was required to report certain stock holdings and ownership of a private company in his annual financial disclosure report (OGE Form 450 or 450A) from 1998 through 2002.

In June 1998, Hampton incorporated a small sweet potato processing plant in Mississippi called Syrisia's Foods. As the sole shareholder/owner, he stated that he intended to build a manufacturing facility to produce sweet potato pies using his mother's recipes. The plant was never built, but he invested some $40,000 in start-up costs and travel expense.

In October 1998 , Hampton failed to disclose on his statement his proprietorship of this business, as well as his ownership of shares of four common stocks (McDonald's, Intel, Disney, and WorldCom). He later amended his 1998 statement to include the stock holdings mentioned, but did not include Syrisia's Foods, as required by United States Department of Agriculture (USDA) regulation Ethics Issuance Section 4:14, for the years 1998-2002.

Since Hampton was a senior-level employee, the deciding official found his explanation of unfamiliarity with agency ethics requirements, and poor record keeping, unpersuasive. The agency requires that employees take annual ethics training and,

therefore, grievant should have known that his holdings and majority interest needed to

be reported. Tanya Willis, agency ethics official, testified that Hampton should have

known that he had to report his ownership of Syrisia's Foods because the instructions are

contained in the reporting form.

### Charge 4: Providing False Information during an Official Investigation

The charged employee knowingly failed to provide accurate information during

an official investigation in violation of USDA Employee Responsibilities and Conduct,

Section 735-208c and in doing so, caused doubt as to his honesty and integrity in

fulfilling a position of trust in the federal government.

Hampton, in a signed sworn statement to investigators, stated that he had never

discussed his sweet potato processing facility or business venture with Benny Graves, a

Mississippi Department of Agriculture official. However, Graves subsequently told

investigators that he had discussed funding for the charged employee's sweet potato

processing facility and that Hampton had stated that he planned to use his mother's sweet

potato recipes in the process. In addition, Graves provided investigators with an e-mail

message from Hampton in which Hampton requested that a letter from the Mississippi

Sweet Potato Council be sent to USDA Rural Development in support of his processing

facility and feasibility study. Graves also provided a copy of another e-mail message in

which he discussed the charged employee and his sweet potato business.

The deciding official, in the absence of any independent rebuttal from the charged

employee, found the corroborating evidence obtained from Graves sufficiently persuasive

to support the allegation that Hampton and Graves had discussed Hampton's sweet potato

FSGB 2006-012

processing facility. This evidence stood in direct contradiction to the charged employee's

sworn statement to agency investigators and raised doubts about his credibility.

### The Charged Employee

Charge 1:  Submitting False Documentation for Travel Claims, Specifications 1-9

Hampton did not intentionally submit false documents for travel claims as

specified under this charge. He only recently became aware of the travel regulation that

requires claims for lodging reimbursement to be charged to a government credit card.

> Only recently, January 27, 2005, did I become aware of the travel
> regulation that requires claims for lodging reimbursement to be charged to
> the government credit card. I have mistakenly paid cash in the past and
> used other forms of payment for some hotel charges. This would explain
> the lack of charges to my government credit card. I cannot with accuracy
> attest to why some hotel records are allegedly different than what I
> actually received and submitted as my claim for reimbursement, except
> that there could be a glitch in the hotels' record systems. I had no prior
> knowledge or counsel of the travel regulation that indicates charges not
> charged to the government credit card for lodging could be subject to
> forfeiture.

> According to the ROI the reimbursement claims in question totals
> *[sic]* $590.92. I understand now that these charges are subject to
> forfeiture. I have stated from the outset, that if I made an unintended
> mistake, I would take the appropriate corrective measure. I am more than
> willing to do so. However, I did not willfully or intentionally make this
> mistake. If the Agency decides to deny these claims, I will reimburse the
> full amount in question. My lack of familiarity with this rule, however,
> should not be cause for termination.

Further, Hampton asserts, the charge that he knowingly submitted fraudulent

documents in support of his travel reimbursement claims is merely circumstantial and

unsubstantiated. Whereas the agency asserts that he filed inaccurate hotel receipts with

his travel vouchers, it does not provide copies of the actual receipts of his stays from the

hotels in question, relying instead on sample templates or blank receipts.

FSGB 2006-012

<u>Charge 2: Failure to Reconcile Travel Voucher</u>

The charged employee maintains that he did not fail to reconcile his travel voucher reflecting his June 2003 stay at the Peabody Hotel in Memphis as charged by the agency:

> In fact, upon notification by CRS of the Peabody hotel *[sic]* credit, I immediately sent a personal check to IAB/FMD on September 8, 2004 in the full amount. The hotel made an honest error in over charging me. I attempted in good faith to settle the disagreement, but the hotel insisted I was correctly charged. I subsequently filed for reimbursement. I was unaware that the hotel credited the government charge card three months after my inquiry. (*See* Tab 7). However, as soon as I was made aware of the credit, I reconciled the voucher with the Agency.

<u>Charge 3: Failure to Disclose Financial Interest in Financial Disclosure Statement (OGE Form 450 or 450A), Specifications #1-4</u>

Hampton denied that he knowingly failed to list his ownership of Syrisia's Foods, in violation of agency financial disclosure requirements:

> In 2003, I was advised of my error and correctly filed a new form 450 that included my stock in Syrisia's Food[s]. In discussions in 2004 with Tonya Willis, Ethics Officer, it was concluded that I did not willfully and knowingly violate any ethical standards and that Syrisia's Food[s] was not a conflict of interest. Prior to the Agency administrative review, my ownership of stock holdings had been reported on form *[sic]* 450 for more [than] two years and none of the stocks were a conflict of interest.

When questioned by CRS investigator Maxwell as to why he had failed to report ownership of Syrisia's Foods from 1998 to 2003, Hampton said:

> I was unaware I needed to file. I did not work for or receive income or compensation from an outside source, entity or the company. I incorporated the company in June and honestly forgot about it when filing the disclosure forms. I did not receive any income or other benefit from my employment with FAS. My financial situation had not changed so I copied the same information to the new form.

> It is my understanding that I did not violate any ethical standards. I do not work for any outside source or entity and do not receive a salary or compensation from an outside company, source, or entity. The company does not benefit from my FAS responsibilities nor does it

FSGB 2006-012

conflict with my FAS duties. I have not nor do I conduct personal business while on official duty.

The investigator asked Hampton if he had ever considered the possibility that his activities involving Syrisia's Foods constituted the appearance of a conflict of interest and using his office for personal gain, he responded:

> I promote exports of agricultural products in foreign markets and have not used my public office for private gains nor presented the appearance of a conflict of interest. Syrisia's Food[s] is not a functioning manufacturing company or competing to export products abroad in the area for which I serve.

> I have not used or abused my position for personal gains. I have not discussed my personal ventures while on duty with officials. I am the sole shareholder of the June 1998 MS incorporated and copy righted company Syrisia's Foods. I incorporated the company with the idea to build a manufacturing facility to produce sweet potato pies using my mother ['s] *[sic]* recipies *[sic]*. The company is not generating any cash flow and I have never received any salary from the company.

Hampton further elaborated in his response to the proposing official's recommendation that he be separated for cause:

> Prior to 2003, I forgot about the company and the one stock issued in 2001 because the company was not viable. When it was brought to my attention that I should have noted this interest in October 2003, I took corrective action and filed a new form *[sic]* 450 that included the company's information. In discussions in 2004 with the Ethics Officer, it was concluded that I did not willfully and knowingly violate any ethical standards nor was there a conflict of interest.

> Although incorporated on paper in 1998, the company was and is not operational, as the manufacturing facility was and is not built. I have not received a salary from the company or any other outside source. I had 1500 certificates made when I incorporated the company and issued myself one share in 2001.

Charge 4:  Providing False Information during an Official Investigation

In addressing this charge, Hampton outlined the agency's burden:

> With respect to such a charge the Agency must prove that I
> "knowingly supplied incorrect information with the intent of deceiving the
> agency." *Blake v. Dept. of Justice*, 81 MSPR 394 at 409 citing *Coleman v.
> Dept. of the Air Force*, 66 MSPR 498 at 506 (1995), aff'd 79 F.3d 1165
> (Fed. Cir. 1996). The information provided was correct. Intent to deceive
> must be proven by the totality of the circumstance.

Hampton denies that he provided false information to investigators. This

sustained charge stems primarily from allegations that he discussed his sweet potato

processing venture with Benny Graves in 2002:

> As with charge 1 and charge 4, I note for the record that the
> Agency is again alluding to conversations and activities that allegedly
> occurred well over two years ago. To propose disciplinary action now,
> particularly something as severe as separation, on such stale charges is
> unduly punitive and unfair per FAM restriction and FSGB [case] law
> regarding timeliness in disciplinary action. According to the record of Mr.
> Graves' interview with Compliance, Mr. Graves obtained information
> about the company through the letter I sent to the state for technical
> assistance. I note for the record that this letter was not directed to Mr.
> Graves and did not identify me as a USDA employee or in any way
> indicate that I was pursuing this through my official position. Mr. Graves
> works for the state as an entomologist. He inspects fields and
> commodities for pests. I do not know who Candy Houck is, or why Mr.
> Graves sent her the email at attachment 36 to the Agency's proposal.
> There is certainly no evidence that I solicited or otherwise directly asked
> Mr. Graves for assistance in my capacity as a government employee. Nor
> is there evidence that the speculation enunciated by Mr. Graves in his
> email was based on a conversation with me. As stated during my
> interview with compliance, I do not recall discussing my sweet potato
> processing venture with Mr. Graves. I did not make a false statement at
> that time. I provided accurate information to the best of my knowledge
> and recollection during the interview and in my official statement. The
> Agency has not met its burden of proof that I intentionally or maliciously
> provided inaccurate or false information sufficient to sustain this charge.

Hampton expanded on his response to this charge in his June 26, 2006 letter to the

Board:

FSGB 2006-012

During the investigation I provided accurate information to the best of my memory, and; I never discussed my *[personal]* interests with anyone during work hours or while on official business travel. According to the information presented by the proposing official Mr. Graves *[sic]* information was obtained through a third party not directed to him.

## IV. DISCUSSION AND FINDINGS

This case is a proposed Separation for Cause from the Foreign Service on grounds

of misconduct. It is governed by Section 610(a)(2) of the Foreign Service Act which

requires that cause for such action must be established at a hearing before this Board,

unless the hearing is waived in writing by the charged employee.

In this action, the agency must establish by a preponderance of the evidence that

the proposed separation is for such causes as will promote the efficiency of the service.

(*See* 22 CFR 905.3).

In considering whether the agency has carried its burden, we focus on these

factors:

(1) Did the agency meet its burden of establishing that the charged employee committed the acts with which he is charged?

(2) Did the agency meet its burden of showing that the charged employee knew, or should have been reasonably expected to have known, that those acts were improper and could lead to separation? (The principles of due process require that employees be properly informed of rules of conduct through written procedures, regulations, or commonly understood policies.)

(3) Did the agency meet its burden of showing that there is a nexus between the employee's conduct and the efficiency of agency operations?

After a careful review of the documents of record, and the testimony of witnesses

provided during the hearing, we conclude that the agency has met its burden by a

preponderance of evidence that the charged employee did commit the acts he is charged

with, and knew, or should have known, that such acts could be grounds for separation;

there is a nexus between those acts and the efficiency of the service; and that separation

for cause has been duly established because of his conduct.

Before addressing the four sustained charges presented by the agency in support

of its separation for cause action, we address the defenses raised by the charged

employee.

**Violation of the Employee's Rights under the Whistleblower Protection Act (WPA)**

Hampton asserts that his rights under 5 U.S.C. 2302 (b)(8)(A) and (B), which

limits disciplinary action against him as a whistleblower, were violated.  He contends that

his first line supervisor, and the proposing official, Dale Miller, retaliated against him for

reporting Miller's prohibited practices regarding Leslie Burket, another FAS officer.  He

had raised this allegation in a September 9, 2004 letter to Martin Brumback, Chief,

Personnel Document Security Division, USDA after his security clearance was

suspended:

> In a similar situation (*see* Carol Brunnert emailed *[sic]* dated
> 6/04/02 to Keith Adams, FAS AgExport services, exhibit C) involving my
> colleagues *[sic]* Leslie Burket's presentation to our partner the Department
> of Commerce with whom we have a Memorandum of Understanding, no
> CRS investigation was open *[sic]* on Ms. Burket.  Instead of an
> investigation, Mr. Miller and Mr. Lee had Ms. Burket write a letter of
> apology to all involved and she continued to carry out her GS-14 acting
> deputy director duties.  I am struck by the disparate treatment that I am
> receiving when Ms. Burket was merely admonished and required to write
> an apology.

He raised the matter again in a January 7, 2005 memo to the agency's Office of

Civil Rights with regard to an EEO complaint:

> Mr. Hampton's security clearance was suspended due to an ill-
> warranted but deliberate investigation as a reprisal for whistle blowing on
> his colleague Leslie Burket and the agency's discrimination for lack of
> action toward her, a white female, compared to FAS proposed suspension
> (July 12, 2002) for Mr. Hampton, an African American male with great

leadership skills and excellent career advancement potential who is non-bias *[sic]* towards people, colleagues and leaders.

. . .

The Agency (Dale Miller, Frank Lee and Roy Henwood) looked into Leslie Burket ['s] misrepresentation of FAS (email dated June 4, 2002 from Carol Brunnert, Missouri Department of Agriculture to Keith Adams of FAS regarding Leslie Burket) only after Mr. Hampton included it in his August 16, 2002 reply letter to FAS Administrator Terpstra regarding Dale Miller's proposed suspension of Mr. Hampton. Patricia Perkins can attest to that along with Robert Tse.

Hampton charges that Miller's action constitutes reprisal under 3 FAM 4329, which states in pertinent part:

Whistleblower protections extend to any employee who makes disclosures protected of what he or she reasonably believes to be a violation of any law, rule, or regulation; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health and safety. A disciplinary action or other personnel action intended to punish an employee for whistleblowing may be investigated by the OIG or the Office of Special Counsel as a *reprisal*, a prohibited personnel practice under 5 U.S.C. 2302(b)(8)(A) and (B). A supervisor or other employee who is found to have committed a *reprisal* is subject to serious sanctions, including, but not limited to, removal, reduction in grade, and debarment from Federal employment. (Emphasis added).

The WPA protects from reprisal federal employees who disclose government wrongdoing, and is liberally construed. The provisions of Section 105 of the Foreign Service Act of 1980 were designed to shield members from prohibited personnel actions and are therefore grievable. While the charged employee initially made what he considered to be a protected disclosure for the purpose of supporting a charge of *disparate treatment* for similar acts of misconduct, he alleges in this proceeding that this same disclosure subjected him to reprisal.

FSGB 2006-012

To sustain charges of retaliation and reprisal with respect to whistleblower allegations, a grievant must meet the standards established in FSGB Case No. 97-090 (May 16, 2001), which found in part:

> . . . if grievants are able to establish by a preponderance of evidence that they made protected disclosures which prompted adverse personnel action and which were a contributing factor regarding the actions grieved, they will have made a *prima facie* showing. If so, USAID/OIG can defend itself only if it can show by clear and convincing evidence that it would have taken the same actions even in the absence of such disclosures.

What the charged party must provide is a non-frivolous allegation that he made protected disclosures and that these disclosures were a contributing factor in the adverse action he suffered. In order to prevail, Hampton must prove these elements by a preponderance of evidence. If he does, the burden will shift to the agency to establish by clear and convincing evidence that it would have taken the same action in the absence of any disclosures. *Morgan v. Dept. of Energy*, A24 Fed 1271 (Fed. Cir. 2005).

Here, Hampton offered nothing but bare allegations. A party cannot prevail on allegations alone; evidentiary support is required. *Wilkins v. Dept. of Defense*, 2004 WL 2829047 9 Fed. Cir. 2004). Moreover, whistle blowing is not a shield against misconduct charges. We therefore conclude that the charged employee has failed in establishing a *prima facie* case that he was a victim of reprisal in this instance.[4]

## The Reviewing Officer May Propose Separation but the Deciding Official has to be the Head of the Agency

Hampton asserts that his reviewing officer may propose separation for cause, but under 3 FAM 4361 the deciding official has to be the head of the agency. He maintains that the deciding official in this case, Roy Henwood, was his reviewing officer, and not

---

[4] Even if we were to conclude Hampton made a *prima facie* showing, the agency has shown by clear and convincing evidence that the agency would have taken the same action.

the FAS Administrator. The charged employee also contends that since Henwood was the proposing official's supervisor, a conflict of interest existed.

Notwithstanding the fact that the charged employee fails to offer any explanation as to why Henwood, simply as Miller's supervisor, creates a conflict of interest, we conclude that Hampton misinterpreted the pertinent regulation 3 FAM 4361 (a) which reads:

> It is the responsibility of the head of the agency, or his or her designee, to determine whether to propose separation and/or to separate an employee for cause under Section 610 of the Act (22 U.S.C. 4010).

In the Department of Agriculture, the head of the agency has authorized the rating officer (also referred to as the first line supervisor) to serve as the proposing official. (*See* 3 FAM 4362). In this case, Miller is the charged employee's rating officer, hence appropriately the proposing official. Henwood, as his reviewing officer, was designated as the deciding official. We find agency action to be consistent with 3 FAM 4300 procedures. We see no evidence of a conflict of interest or that the agency members have not acted in good faith. And, we see no prejudice to Hampton.

**The Agency Violated Administrative Procedures by Initiating Additional Investigation after the Record was Closed**

Hampton alleges that the agency violated administrative procedures and his rights by initiating an additional investigation during the administrative inquiry, after the record for discovery had been closed. He further alleges that he and his representative were denied an opportunity to review and comment on this supplemental investigation. The supplemental investigation was requested by Henwood in May 2005, and a report was issued in July 2005. Henwood testified that the investigation became necessary because he still had additional questions regarding two of the charges after reviewing Hampton's

written and oral response to the charges, and after considering his refusal to grant a release of original hotel materials relating to his stays. The purpose of the supplemental investigation was deemed necessary to explore further because Hampton raised "reasonable questions" about the charges against him.

In separation for cause actions, the rules regarding a charged employee's access to relevant materials are set forth at 3 FAM 4364.1:

(6) That the employee shall be granted a reasonable amount of official time to:

(a) Review only the material relied on in proposing the action; and
(b) Prepare a response to the notice;

The regulation requires that the charged employee be given a reasonable amount of official time, *i.e.*, work time, to review those materials relied on by the proposing official. Hampton has not raised access questions regarding the materials used by the proposing official, Miller, in the notice proposing separation for cause. Moreover, he does not show how his case has been prejudiced by not receiving the materials in question until May 2006, since the charges he had already responded to remained unchanged, and the next step in this process , *i.e.*, this proceeding, was still eight months in the future. We find no harmful violation of regulation or procedural error in this instance and no prejudice to Hampton. He had adequate review time.

**The Agency Relied on Stale Charges**

Hampton cites 3 FAM 4321 in maintaining that disciplinary procedures should be carried out in a fair, timely, and equitable manner. Because he was not notified of the agency's proposal to separate him until January 2005, three years after several of the alleged violations had occurred, he contends that since seven of the nine specifications

FSGB 2006-012

(trips) listed in Charge 1 range from August 2002 (six trips) to February 2004 (one trip), they should be considered untimely:

> As the Foreign Service Grievance Board has found in a number of cases with regard to disciplinary actions, the pivotal question in the case was whether the Department complied with the regulatory requirement that disciplinary procedures be carried out in a timely manner. FSGB No. 98-011 (January 5, 1999) (quoting FSGB No. 91-071 dated May 19, 1992 *[sic]*.

In FSGB Case No. 91-071, over nineteen months passed between the date of the alleged violation and the proposed discipline. And the Board found the delay to be unduly prejudicial and violative of the FAM and vacated the proposed discipline. He further notes that in FSGB Case No. 98-011, the Board found that a delay of four years was also unfairly prejudicial and could not be used to sustain the charges against the grievant.

The agency counters that its action was not untimely and the charges were not stale under the circumstances, since the misconduct was first discovered in 2004 when the charged employee submitted the Quality Inn receipt which prompted the management inquiry. The findings in that inquiry led to a review of records for the preceding two years.

In reviewing allegations of staleness of charges, the Board looks at each case individually. In this matter, Richard Maxwell, who conducted the investigation, testified that in conducting inquiries of this nature, he generally looked at records dating back one to two years in an employee's travel history in order to see if there is a pattern of misconduct regarding travel regulations. The agency initiated its investigation promptly, and under these circumstances the Board finds the two-year investigative period to be reasonable. Hampton argues in his closing brief that he was prejudiced because he "was

unable to provide any witnesses to testify in his behalf because of the long period of

time." However, he neither offers information on why witnesses could not testify nor

does he allege how any missing witnesses would have disproved the agency's contention

that he purposefully altered his travel vouchers for personal gain. Hampton has not

demonstrated that he was in any way prejudiced by the delay. An extensive investigation

was necessary because of the complex factual pattern and Hampton's refusal to cooperate

in the investigation. *Jones v. Department of Justice*, 87 MSPR 91, 95 (Oct. 10, 2000).

The charged employee's reference to FSGB case law in support of his timeliness

argument is not on point. FSGB Case No. 98-011, quoting from FSGB Case No. 91-071:

> That case involved a proposal of discipline for loss of control of a diplomatic pouch in Leningrad for a period of hours. The Board declared that the pivotal question in the case was whether the Department complied with the regulatory requirement that disciplinary procedures be carried out in a timely manner. Finding that over nineteen months passed between the date of the security violation and the proposed discipline, the Board held that the Department had failed to do so and found for the grievant in vacating the proposed discipline.

> While "timeliness" is not defined in the regulation, we find it difficult to reconcile this requirement with an unexplained delay of some four years in bringing disciplinary action. The evidence in this case was apparently obtained in late 1992. There is no suggestion that further or prolonged investigation was required after that. In addition, eight months elapsed between the delivery of the report of investigation to PER/ER and the notification to grievant of the proposal of discipline. The proposal to discipline him faced grievant with the evidently difficult task of defending himself by gathering evidence concerning two runs by the embassy car which had taken place four or five years before.

> Finding in the *instant case* that the period of delay is more than twice that in the cited case, and mindful of its conclusion that the Department clearly did not act with the speed appropriate to that situation and so violated its own regulations, and concluding that the delay in the *instant case* unfairly disadvantaged grievant's ability to defend himself on this specification, we do not sustain the specification of misuse of GOVs for the transport of flowers.

FSGB 2006-012

FSGB Case No. 91-071 is not seen as a bar herein. In the instant case, Hampton

submitted a questionable travel voucher in February 2004 which resulted in a

management inquiry. The inquiry was concluded in May 2004. This is the earliest point

at which the *clock could start ticking* in comparison to FSGB Case No. 91-071, *i.e.*, the

point at which management became aware of a possible violation. The proposal to

separate for cause report was issued in January 2005, less than a year after the travel

voucher was submitted. More importantly, the Board made it abundantly clear in FSGB

Case No. 98-011 that its ruling in that matter extended only to that case and its particular

facts. The Board concluded that the agency had clear knowledge of the grounds for the

disciplinary action four or five years before bringing the action, and thus created an

undue delay to the detriment of the employee. The Board has relied on *Heffron v. United*

*States*, 405 F. 2d 1307 (Ct. C. 1969) in determining/analyzing whether charges are

"stale." In Heffron, the employee charged that he had suffered from a nine-month delay

between his alleged misconduct and a proposal to separate. The Court stated:

> . . . [W]e do not see and plaintiff has not offered any evidence to
> show any way in which he has been harmed by the delay. Because of the
> gravity of the charges and the consequences that would result from them,
> it was not unreasonable for the agency to await a complete investigation
> before bringing charges against plaintiff.

Using this analysis, in FSGB Case No. 2002-014, the Board

reasoned:

> . . . [grievant], does not indicate how the lapse of 10 months has
> prejudiced his ability to present a defense against the charge of "Failure to
> follow instructions." His observation "The longer the length of time
> between an incident and a proposal for discipline, the more difficult it
> becomes for an employee to respond to charges" merely states the
> obvious.

Using the case-by-case analysis, we conclude that the charged employee has not

demonstrated by the preponderant evidence how the agency's proposal to separate him

for cause was untimely under 3 FAM 4321 or more importantly, how he was prejudiced

by the delay. *See Hoover v. Dept. of the Navy*, 957 Fed 861 (Fed. Cir. 1992), where the

Court held that to be untimely there must be shown by the one alleging harm an

unreasonable delay and prejudice because of the delay. Hampton has not made that

showing.

**Agency Failed to Prove Employee Knowingly and Willfully Violated Regulations**

The charged employee asserts that the agency must prove that he "knowingly

supplied incorrect information with the intent of . . . deceiving the agency" in order to

sustain Charges 1 and 2. In considering the issue of "intent," the Merit System Protection

Board has stated:

> To sustain a falsification charge, the agency must prove by
> preponderant evidence that the employee knowingly supplied incorrect
> information with the intention of defrauding or deceiving the agency. *See
> Coleman v. Dept. of the Air Force.* While requisite intent can be
> established by direct or circumstantial evidence, the fact that the employee
> supplied incorrect information cannot in itself control the question of
> intent, and plausible explanations are to be supplied intentionally. The
> issue of the employee's intent to deceive must be resolved from the *totality*
> of the circumstances. (*See Blake v. Dept. of Justice,* Merit Systems
> Protection Board, Docket # CH-0752-97-0402-I-1 (03/30/99). (Emphasis
> added).

Utilizing this "totality of circumstances" standard, we conclude that the agency

met its burden of proof on this issue. Hampton acted knowingly. We note first that it

was the charged employee himself who submitted the challenged vouchers as valid.

Once the agency raised questions as to the integrity of the vouchers, Hampton would not

cooperate in the investigation and even threatened the hotels with litigation if they

cooperated with the agency's investigation by submitting his original receipts. Unquestionably the best person to supply the original receipts was Hampton. Yet he chose to submit the challenged documents. After that he had ample opportunity to either provide documentary or testimonial evidence that they were valid or to submit corrected vouchers. He did neither. We have carefully reviewed the challenged documents and considered the supporting documentary and testimonial evidence offered by the agency. There is credible testimonial and documentary evidence that the documents do not appear to be genuine. We so find. We do not know who created the documents, but we do know that Hampton knowingly and intentionally submitted them with his travel vouchers thereby implying their accuracy. He has provided no plausible explanation as to their inaccuracy.

**Agency's Separation for Cause Charges included a Charge not Proposed**

Hampton asserts that he was denied due process when Henwood concluded that he (Hampton) was trying to impede the investigation when he wrote to Raj Patel, General Manager at the Comfort Inn/Southwest, Jackson, Mississippi, threatening legal action if Patel shared any information with the agency relative to his stays at the hotel.

> According to a faxed hotel receipt and comments made by Richard Maxwell, Compliance Review staff, Foreign Ag Service, in February of 2004, you discussed and provided information to him on my hotel stay with you without my consent. If so, this is a violation of my rights under the Privacy Act and is subject to legal action under the law.

Henwood stated that he was "shocked" by the letter and viewed it as *"indicting"* and an attempt to *"impede the investigation."* Hampton argues that the deciding official relied on his personal feelings rather than on an objective fair assessment of the facts to determine whether the evidence supported the charge. The charged employee contends

that Henwood's conclusions amount to an "abuse of discretionary authority and was also arbitrary and capricious."

We find the charged employee's argument to be specious in this instance. He was charged with knowingly falsifying travel vouchers. In defending himself against this charge, he repeatedly challenged the agency's reliance on copies of hotel receipts rather than the originals, but refused to provide originals and/or sign a release to allow the hotels to release true copies of or replicas of the originals. In fact, he went a step further, by threatening legal action against the hotels that provided the true copies of originals. The charged employee did not explain why he was concerned with the hotel manager's cooperation. In the absence of knowing and agreeing with his reason, we do not find Henwood's concerns to be unreasonable. Hampton was not charged with failing to cooperate in the investigation, and the deciding official's consideration of his lack of cooperation is not a violation of Hampton's due process rights. Employees are expected to cooperate in investigations, not impede them. In the "totality" of the circumstances, it is logical.

**The Supervisor Failed to Notify the Employee of an Investigation which could Result in Disciplinary Action**

The charged employee asserts that the deciding official, by his testimony and subsequent action, charged him with impeding the investigation, but failed to make this a formal charge. Hampton charges that in doing so, the agency violated his rights under Union Agreement Right 3.4c and 3 FAM 4322.3 (i). There is no requirement that the investigator inform grievant of his rights under Federal law until he is being interviewed. We note that personnel actions that are disciplinary in nature are handled in accordance with either the AFSA or AFSCME contracts as appropriate to the agency. Since the

AFSA contract advises the agency to follow 3 FAM 4300 for disciplinary actions, we disregard the charged employee's assertions in regard to the AFSCME contract.

The agency investigator testified that he initiated an investigation of Hampton at the request of Miller in 2003. The investigation related to some alleged questionable activities on the charged employee's part. It is this inquiry that the charged employee alleges violates the regulations. Miller did not inform Hampton of the initial investigation into his ownership of Syrisia's Foods, or his application for a Value Added Development Grant (VADG) from USDA's Rural Development Agency. The applicable regulation at 3 FAM 4322.3 reads:

> (d)   As a general rule, an investigating official should give the employee appropriate notice that an administrative inquiry has been opened, unless such notice might compromise the inquiry.
>
> . . .
>
> (i)   If an employee is interviewed concerning matters for which he or she could be criminally prosecuted, the *investigating official* will inform the employee of the employee's rights under Federal law. (Emphasis added).

We see no violation of this regulation in regard to Miller's actions. Section (d) does not require the supervisor to notify the target of the inquiry. Section (i) requires the investigator to inform an employee of his rights under Federal law if he is interviewed concerning matters which could be criminally prosecuted. We note that Maxwell obtained sworn testimony from the charged employee, in the presence of his official representative, in February-March 2004, and, therefore, conclude that Hampton was appropriately informed of his legal vulnerabilities.

**Agency Relied on Non-Original Documents and Third-Party Evidence**

Hampton asserts in both his response to the agency's action and to the Board that

the charges of misconduct attributed to him are based upon circumstantial and

unsubstantiated evidence and do not meet the agency's burden of proof:

> The charges attributed to me are based on evidence that is
> circumstantial and unsubstantiated and does not meet the Agency's burden
> of proof. For example, the proposal asserts that I filed inaccurate hotel
> receipts with my travel claims for official travel re-imbursements *[sic]* for
> lodging, yet does not provide copies of the actual receipts the hotels in
> question should have of my stays, relying on sample templates of empty
> receipts.

The charged employee does not explain why the receipts he submitted with his

travel vouchers would not have probative value when compared to receipt templates of

the hotels in question. The investigator testified that the receipts submitted by Hampton

himself appeared to be altered legitimate receipts, transcribed onto computer-generated

ones. His assessment is supported by information obtained from Patel, the general

manager of the Comfort Inn/Southwest, in Jackson, MS, where Hampton stayed on

several occasions in August, October, and November 2002 and for which he submitted

challenged vouchers.

Patel stated that the copied receipts submitted by Hampton were fraudulent,

altered, and did not correspond with his data. He added that he could not release the

corresponding hotel receipts without the charged employee's permission. The charged

employee argued that since the templates were provided in 2004, almost two years after

the period in question, there was no way to determine if the same templates were used in

2002 and 2003. However, Patel's assessment supports the agency's other testimonial and

documentary evidence. Patel, as general manager, would have been aware of the types of

receipts being utilized by the hotel in 2002 and 2003, especially since he had the hotel

records in hand.

The decisions of the Board are based upon criteria established in 22 CFR 909.1:

> Decisions of the Board shall be based upon the record of
> proceedings, shall be in writing, shall include findings of fact, and shall
> include a statement of the reasons for the decision.

In determining facts, we do not agree that circumstantial and hearsay evidence, when

viewed in context of the whole report of the investigation, is insufficient in helping the

agency to meet its burden. We credit it. The Board held in FSGB Case No. 2003-012

(August 27, 2004):

> Hearsay evidence is admissible in administrative proceedings and
> may even constitute substantial evidence. *See Richardson v. Perales*, 402
> U.S. 389 (1971) and *Hoska v. Dept. of Army*, 677 F.2d 131 (D.C. Cir.
> 1982). At that, we recognize that whatever probative value hearsay
> evidence carries rests upon the circumstances in each case and, as the
> ultimate trier of fact, we weigh its probative value. In making our
> determination of whether hearsay evidence constitutes evidence sufficient
> to support the proposed disciplinary action we consider such evidence in
> light of the entire record, including comparing its credibility against
> contrary evidence. If it has probative value and bears indicia of reliability,
> it may constitute substantial evidence.

## The Agency Violated Employee's Rights by Excluding Him from Premises

The charged employee asserts that the agency violated his rights under 3

FAM 4323 by excluding him from the premises. This contention need not be

considered because it is not relevant to the separation for cause.

## Henwood Lacked Legal Authority to Decide or Recommend Employee Separation

The charged employee questioned Henwood's legal authority to act as the

deciding official while he was detailed to the U.S. Senate. Henwood was detailed to the

Senate in the fall of 2005, and was still there on detail when he signed the decision to

recommend separation for cause in April 2006. A "detail" is a temporary assignment and does not change the official's position assignment. The official continues to be the incumbent of the position from which he was detailed and retains those responsibilities incident to his official assignment. *See Barton v. Dept. of Education,* 20 MSPR 451(1984) and *Frankel v. Dept. of Education* 17 MSPR 453 (1983). Hampton has presented no legal or factual argument to support his contention that Henwood lacked legal authority to decide Hampton's case merely because he was on detail. It is clear from Farmer's letter (Human Resources Division, HR/D) that as the reviewing officer Henwood had been designated as the deciding official. The fact that he was subsequently and properly detailed to the Senate does not negate the fact that he remained the deciding official of record.

Having addressed the charged employee's overarching procedural complaints as outlined to this Board in his response to agency proposed action and the ROP, we turn to the specific charges.

Charge 1: Submitting False Documentation for Travel Claims, Specification 1-9

The agency charged Hampton with deliberately altering hotel receipts to create the appearance of legitimate expenses in order to claim multiple requests for reimbursements. In February 2004, an agency travel official questioned a copy of a hotel receipt which had been submitted by the charged employee. In her opinion, the receipt appeared to have been altered. She contacted the hotel in question and received a faxed copy of an original form, and concluded the document submitted by the charged employee had indeed been altered. An investigation was initiated, which uncovered similar discrepancies covering travel claims dating back to 2002.

Hampton contends that the agency has not proven by a preponderance of the evidence that he intentionally submitted false documents for travel claims. And he asserts that the agency's action is untimely because it refers to events which occurred two to three years earlier. In addition, he discounts the agency's reliance on copies of the receipts in question rather than the original documents, and the testimony of hotel officials. Additionally, he claims ignorance of key aspects of agency/federal travel regulations, *e.g.*, required use of government contractor credit card in paying for official travel.

We conclude that the agency has proven by a preponderance of the evidence that the charged employee did submit false documentation in support of the travel claims in question.

The investigator found that some of Hampton's challenged receipts had been altered, and others were actually created by the charged employee. The receipts show stays that did not occur, had altered departure dates, and included non-existent charges. The agency's charge was brought in a timely manner after an altered travel receipt was brought to the attention of Hampton's supervisor in February 2004. He initiated an administrative inquiry which concluded in May of the same year. This is the earliest point at which *the clock could start ticking* in comparison to FSGB Case No. 91-071. The proposal to separate for cause report was compiled in December and issued in January 2005 -- hardly an excessive amount of time given the complexity of the investigation and the serious nature of the charges. Hampton has alleged but not established laches. He shows no harm.

Allegedly he was unaware, until recently, of travel regulations which require the use of government contractor credit cards in paying official travel expenses.[6] Even so, he is unable to say how he paid for the claimed expenses in question, but proffers that he must have used cash or some other means (by that we can conclude that he means by personal check or money order). If by personal check or money order, it seems to us that it would be possible to obtain a record of the transaction even a few years later. In any case, the Board has consistently held that employees are responsible for knowledge of their agencies' regulations, as those regulations pertain to them. At a minimum, employees must make a reasonable effort to understand their responsibilities. (*See* FSGB Case No. 2005-050, April 10, 2006.) We simply do not accept this exculpatory explanation.

We find evidence to support the agency's conclusion that he submitted false claims. In so doing, we sustain Charge 1 and all of its specifications are sustained.

The agency also charges that Hampton knowingly failed to *properly reconcile* a travel voucher for eleven months, resulting in an overpayment of $301.48. This charge resulted from a stay by Hampton at the Peabody Hotel in Memphis while on official travel in June 2003. He submitted his travel voucher in July 2003 for the full amount, and then he notified the hotel of an overcharge. In October 2003, the hotel credited Hampton's government contractor issued credit card for the $301.48. Hampton did not reconcile his voucher until September 2004 and, only then, after he was questioned about it by agency investigators in March 2004 and told there was a discrepancy.

---

[6]  This contention has little credibility. In July 2003, Hampton wrote to the Peabody Hotel requesting a credit to his Government-issued credit card.

Consequently, the agency charges that he had access, through his credit card, to unauthorized funds for a period of eleven months.

The charged employee maintains that he did not fail to reconcile his travel voucher as charged by the agency. As a sign of his good faith, he states that he sent a personal check to the agency's finance section as soon as the oversight was brought to his attention by investigators.[7] In actuality, Hampton sent a personal check for $301.38 to the agency's financial section on September 8, 2004 to cover the overcharge. In a manner of explanation, he explained in his response to the agency's proposal to separate for cause that he had tried, to no avail, to get the hotel to recognize its error before submitting his voucher for the full amount in July 2003. He admits that he made a mistake in not checking his credit card statement more closely, but laments that "after three months of getting nowhere with the Hotel I had given up." We question how the charged employee counts three months in his effort to settle the issue with the hotel before submitting his voucher, since the voucher was submitted in July and by his own account, a letter was sent to the Peabody Hotel requesting the adjustment on July 21, 2003, and he heard nothing further until notified by the investigators in 2004.

In any case, the agency rejected the charged employee's explanation of insufficient record keeping, and ignorance of departmental procedures, and that it was not a deliberate effort to defraud. The deciding official correctly concluded that Hampton's explanation of inattention was not credible when considered alongside the rapidity with which he notified the hotel of the overcharge. We conclude, based on the chronology presented above as well as by Hampton's promptness in notifying the hotel of the

---

[7] Here again his credibility is doubted. Maxwell says he told Hampton about the discrepancy on March 22, 2004.

overcharge, that the agency met its burden that Hampton failed to reconcile promptly his statement as required. Charge 2 is sustained.

### Charge 3: Failure to Disclose Financial Interests in Financial Disclosure Statement (OGE Form 450 or 450A), Specifications 1-4

Disclosure of financial interest reports are required for designated federal employees in order to avoid conflicts of interest, or potential conflicts of interest. The agency asserts that the charged employee should have known that he was required to report his ownership of a private company in his annual financial disclosure report (OGE Form 450 or 450A) for the years 1998 through 2002, hence the four specifications under this charge. The agency bases its assertion on the fact that instructions detailing the reporting requirements are stated on the form, and designated employees are given frequent training in ethics/financial matters. The argument that this failure may have been an oversight is not convincing -- or even believable -- in light of other findings in the investigation. This was another indication that the charged employee just did not have the judgment or the trustworthiness that was required.

The charged employee denies that he knowingly failed to list his ownership of Syrisia's Foods in violation of agency financial disclosure requirements. He states that he incorporated the company in June 1998 with 1500 shares, one of which he issued to himself in 2001, and simply forgot[8] about it when filing his disclosure reports. He also asserts that the facility was never built, and he received no income from the company, and thus he saw no need to disclose his ownership until it was brought to his attention in

---

[8] It is not believable that an individual who invested $40,000 in a project of which he would be the owner simply "forgot" about it. He even submitted an application for Articles of Incorporation in the company to the Secretary of State of Mississippi.

2003. But this does not excuse his obligation to disclose. Instructions on the form alerted him.

Charge 3 with all of its specifications is sustained.

Charge 4: Providing False Information during an Official Investigation

The agency alleges that the charged employee knowingly failed to provide accurate information during an official investigation in violation of USDA Employee Responsibilities and Conduct, Section 735-208c. In doing so Hampton created concern in his agency about his honesty and integrity in fulfilling a Federal government position of trust.

More specifically, it charges that Hampton stated -- in a sworn statement to investigators--that he had never discussed his sweet potato processing facility with Benny Graves. But Graves informed investigators that he had indeed discussed with Hampton the facility and his plans for turning his mother's sweet potato recipes into marketable processed foods. For proof, Graves provided investigators with an email he had received from Hampton requesting that a letter be sent to USDA's Rural Development Agency in support of a grant to fund a feasibility study for his processing facility. In addition, he presented another e-mail in which he discussed Hampton's sweet potato business.

In the absence of any evidence to the contrary from the charged employee, the deciding official properly found the corroborating evidence obtained from Graves persuasive in supporting the allegation that Graves had indeed discussed Hampton's sweet potato processing facility with him. This evidence stands in direct contradiction to the charged employee's sworn statement to agency investigators. And it is more believable than Hampton's denials.

The charged employee denies that he intentionally or maliciously provided inaccurate or false information sufficient to sustain this charge. He contends that he provided accurate information to the best of his memory, and that he never discussed his personal interests with anyone during work hours and that the information cited was obtained from a third party and was not directed to Graves.

> According to the record of Mr. Graves' interview with Compliance, Mr. Graves obtained information about the company through the letter I sent to the state for technical assistance. I note for the record that this letter was not directed to Mr. Graves and did not identify me as a USDA employee or in any way indicate that I was pursuing this through my official position. Mr. Graves works . . . as an entomologist. I do not know who Candy Houck is, or why Mr. Graves sent her the email at attachment 36 to the Agency's proposal. There is certainly no evidence that I solicited or otherwise directly asked Mr. Graves for assistance in my capacity as a government employee. Nor is there evidence that the speculation enunciated by Mr. Graves in his email was based on a conversation with me. As stated during my interview with Compliance, I do not recall discussing my sweet potato processing venture with Mr. Graves.

But intent can be inferred from circumstances. Hampton further argues that the charge relates to conversations which allegedly occurred more than two years before, and as such, constitutes a "stale" charge that is unduly punitive and unfair per FAM restrictions and FSGB case law. Moreover, he asserts that the agency has the further burden of proving that he knowingly provided incorrect information to investigators with the intent to deceive, citing *Blake v. Dept. of Justice*, 81 MSPR 394 at 409 citing *Coleman v. Dept. of the Air Force*, 66 MSPR 498 at 506 (1995), aff'd 79 F.3d 1165 (Fed. Cir. 1996).

The charged employee argues strongly that the charge is stale; that the agency relied on third party input; and that he never used his official position, particularly during official travel, in trying to obtain support for his sweet potato processing facility. He is

less assertive in defending himself against the charge that he provided *false* information when questioned by investigators about his contact with Graves. The question was whether or not he had discussed his sweet potato venture with Graves:

> Q. What is your relationship with Mr. Bennie *[sic]* Graves?
>
> A. I believe Mr. Graves is state entomologist for the Mississippi Department of Agriculture.
>
> Q. Have you ever discussed your sweet potato processing facility or venture with him?
>
> A. I have not discussed the *details* of my sweet potato processing facility with Mr. Graves. (emphasis added).

Hampton appears to leave himself a little room by using the qualifying word *details* when answering the investigator's question as to whether or not he had discussed his venture with Graves. In any case, the deciding official concluded that Graves' July 1, 2002 e-mail had provided sufficient corroboration to support the allegation that the charged employee had discussed the specifics of his sweet potato processing facility with him. We agree. His untruthful statement has been established.

There is no "timeliness" issue here. In February 2004, Maxwell questioned Hampton about his relationship with Graves dating back two years. It seems logical that if he remembered Graves at all, he should have remembered the context in which he knew him. He has not demonstrated how the issue of time has prejudiced his case, *i.e.*, that witnesses such as Graves were no longer available. *See Kumfeman v. Dept. of the Navy*, 785 Fed 286 (Fed. Cir. 1986). Likewise, he has not demonstrated how Graves' knowledge of the letter he sent to the Mississippi Department of Agriculture, requesting assistance in obtaining support for his VDAG application, and the July 1, 2002 e-mail in which Graves discusses the sweet potato venture, would not constitute strong

37

circumstantial evidence of Graves' intimate knowledge of Hampton's business. The charge is not whether Hampton demonstrated a conflict of interest by conducting his personal business while on official business. The charge is that he provided false information during an investigation in violation of USDA Employee Responsibilities and Conduct, Section 735-208 c, which reads: "Employees are obligated to give information they possess to authorized representatives of the Department or Mission Area or Agency when called upon . . . ." We conclude that agency met its burden of proof on this charge. Charge 4 is sustained.

**Nexus**

The agency maintains that the charged employee's misconduct has a severe impact on the efficiency of the service which can only be remedied by his separation. They assert that his actions led to a breach of trust and a breach of fiduciary responsibility, which caused the agency to lose faith in his judgment and trustworthiness. Without this confidence, the agency asserts that it can no longer trust the charged employee to work, unsupervised, in the field in assisting the agency to carry out its mission. They point to his prior suspension for misconduct and the evidence of past deception for personal gain in holding out little hope for any rehabilitative possibilities. The agency cites FSGB Case No. 2001-007 (April 2, 2002) in maintaining that the Board has held in prior cases that falsification of documents "constitutes misconduct that goes to the employee's reliability, veracity, trustworthiness, and ethical conduct, and thereby affects the efficiency of the service."

We find that a nexus does exist between the charged employee's conduct, and the efficiency of the service. His conduct resulted in a loss of agency trust and confidence in

FSGB 2006-012

his ability to act in an unsupervised fashion in carrying out its mission. We conclude that the conduct, as described here, could reasonably have affected the ability of the agency to carry out its mission.

## CAUSE HAS BEEN ESTABLISHED

We readily conclude that the agency has established cause for separating Hampton from the service. This is not the first time he has been disciplined for misconduct. In 2002, the charged employee was suspended for seven days for misusing government equipment (personal computer) to print sexually explicit materials. In his defense, he stated that he had been away from the office on detail during the relevant period, and someone else may have accessed his PC, or that he may have inadvertently caused the materials to be downloaded. His conduct in the current proceeding:

1. Was a breach of the trust an agency can require of its employees;

2. Caused the agency to lose faith in his judgment and honesty, and;

3. Adversely impacted on the efficiency of the Foreign Service in carrying out its mission.

In this proceeding the Separation for Cause has been based upon misconduct. Accordingly, under 3 FAM 4361 (b) Hampton had a right to a pre-termination hearing. 3 FAM 4366(a) states:

a. After conducting a hearing on a proposed separation for cause, the Foreign Service Grievance Board shall issue a decision:

(1) Finding cause was established for separating the employee from the Service; or
(2) Finding cause was not established for separating the employee from the Service.

In making our decision here, 3 FAM 4366 describes our role as finding cause was –
or was not -- established for separating the employee from the Service. Once we have made
our decision, the Deciding Official then makes a determination as to what penalty to
impose per 3 FAM 4367.

Making false claims for official travel is a serious offense for it goes to the very
heart of the employer-employee relationship. Henwood gave reasoned and detailed
testimony, already described, about why he sustained the four charges he did sustain. He
considered both aggravating and mitigating circumstances. He noted Hampton was a
senior employee, that his misconduct was widespread and, to some extent, raised doubts
about his integrity. Not just that, but because of the involvement of the public, he could
bring discredit on the agency.

On the other hand, he noted Hampton had a long career with the agency and
maintained a good relationship with his peers and others.

His conclusion to separate Hampton for cause was the result of serious misconduct
aggravated by the fact of prior misconduct. We find the facts were as Henwood detailed
them and cause has been established by the preponderant evidence.

Procedurally he has shown no harmful error.

Based upon a careful analysis of the record and the arguments of the parties, we
hold that the agency has established by preponderant evidence that the proposed
separation from the Foreign Service is for such cause as will promote the efficiency of
the service. We do not consider Hampton as being truthful during this proceeding.

FSGB 2006-012

## V. DECISION

For the reasons discussed, we find that cause for separation from the Foreign

Service for Karl Hampton has been established.

# EXHIBIT 9

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**WASHINGTON FIELD OFFICE**
**1801 L Street, N.W., Suite 100**
**Washington, D.C. 20507-1002**

| | |
|---|---|
| Karl Hampton,<br>　　　Complainant,<br><br>　　　　v.<br><br>Mike Johanns,<br>Secretary,<br>Department of Agriculture,<br>　　　Agency. | EEOC No.　100-2006-00080X<br><br>Agency No.　FAS-2005-00909<br><br><br>Date:　　　**March 29, 2007** |

## ORDER REGARDING PROCESSING

On March 6, 2007, I issued a Show Cause Order and Notice of Proposed Dismissal that outlined several problems related to repeated inappropriate *ex-parte* communications from Complainant as well as an apparent lack of cooperation by Complainant to liaise with the Agency to review several amendments and define the claims to be adjudicated before me. See Show Cause Order and Notice of Proposed Dismissal dated March 6, 2007. The Show Cause Order required Complainant's representative to submit a Response by March 23, 2007.

On March 26, 2007, I received a Response from Complainant's representative dated March 23, 2007.[1] In summary, Complainant's representative submitted a document from Complainant where he apologized for his repeated *ex-parte* written communications with me both before and after I had ordered such communications to cease. See Complainant's Response. Complainant's representative also explained that after the Agency served its Partial Consent Motion on February 16, 2007 attempting to define the claims to be adjudicated before me, Complainant apparently filed an Addendum to the Motion that set forth his position regarding these other claims that I summarized based on my review of his *ex-parte* communications. Id. See also Order dated January 26, 2007 (containing summary of documents submitted by Complainant and appearing to set forth proposed amendments to his claims).

On March 28, 2007, I convened a conference call with the parties. During the conference call, I explained that I never received Complainant's Addendum, and that Complainant's apparent failure to cooperate in conjunction with continued *ex-parte* communications prompted my decision to issue a Show Cause Order. The Agency representative confirmed that Complainant had served an Addendum to the Partial Consent Motion dated February 16, 2007.

---

[1] It is unclear if Complainant's Response was timely submitted, as the facsimile does not reveal when it was transmitted. I note that I was present through the close of business and did not receive any facsimile from Complainant's representative. Since I cannot determine with any degree of certainty whether Complainant's Response was served before the close of business on March 23, 2007, I will accept the submission as timely.

I find that dismissal of Complainant's complaint is not an appropriate sanction. In this regard, I note that Complainant's representative attempted to serve his Response to me via facsimile, but for some reason I never received it. Although Complainant's representative should have also served the Response via first class mail, preferably priority or overnight mail (see infra n. 2), I find that he attempted to comply with my Order and did not intentionally disregard it. Accordingly, dismissal is too severe of a sanction and is inappropriate under these circumstances. See Harris v. U.S. Postal Serv., EEOC Appeal No. 07A30039 (Sept. 1, 2005); (noting that imposing an excessive sanction, where a lesser one would be more appropriate, may constitute an abuse of discretion). Cole v. Dep't of the Navy, EEOC Appeal No. 01A42577 (Feb. 16, 2005) (same); Timerman v. U.S. Postal Serv., EEOC Appeal No. 07A20094 (Feb. 3, 2004) (same).[2]

Complainant continued *ex-parte* communication, however, is more troubling because I had specifically ordered him to refrain from such conduct. See Order dated January 26, 2007. Indeed, Complainant had informed his representative that he would not communicate directly with me, yet he continued to do so. I note that Complainant explained that during the time he was submitting numerous *ex-parte* documents, he was under severe emotional distress as a result of his termination from employment.

Based on the totality of the evidence, and utilizing my discretion, I will defer imposing a sanction at this time. See 29 C.F.R. § 1614.109(a) (2006), Malley v. Dep't of the Navy, EEOC Appeal No. 01951503 (May 22, 1997). Complainant and his representative shall cooperate during discovery and ensure that no additional *ex-parte* communications occur. Any further *ex-parte* communications by Complainant will most likely result in dismissal of this complaint from the hearings process. See Order and Notice of Proposed Removal dated March 6, 2007 (citing relevant background and authority). If Complainant prevails on any portion of his EEO complaint, I will then consider whether any adjustment in a fee or compensatory damage award is appropriate as a sanction in light of Complainant's actions.

Regarding the framing of Complainant's claims pending before me, I note that during the conference call, the parties, after some dialogue and argument, reached a basic agreement on the issues to be adjudicated after reviewing and discussing several proposed amendments submitted by Complainant and summarized in an Addendum to my Order dated January 26, 2007. Accordingly, and pursuant to my discretion to reframe the complaint and ensure that the record is fully developed, I **ORDER** that the parties immediately commence discovery on the following issues:[3]

---

[2] I remind Complainant's representative to serve an original Motion via first class mail (traceable delivery such as priority mail or federal express preferred due to ongoing delays due to irradiation for anthrax) as a follow-up to any submission via facsimile. Complainant's representative may also call to confirm receipt or submit documents via electronic mail.

[3] "It is well established that EEO charges are to be liberally construed to effectuate the purposes of the discrimination statutes and the crucial role of the private litigant in the statutory scheme. See Sanchez v. Standard Brand, Inc., 431 F.2d 455 (5th Cir. 1970); President v. Vance, 627 F.2d 353 (D.C. Cir. 1980) (applying the Sanchez principles to federal employees). Furthermore, the Commission has the authority to "reframe charges and use available materials and information to articulate lay Complainant's charges." Blue Bell Boots, Inc. v. EEOC, 418 F.2d 355, 357 (6th Cir 1969). Raipal v. U.S. Postal Serv., EEOC Request No. 05920037 (May 19, 1992)." Garrett v. U.S. Postal Serv., EEOC Appeal No. 01963466 (Nov. 29, 1996), request for reconsideration denied, EEOC Request No. 05970260 (Apr. 30, 1998).

2

Whether Complainant was discriminated against on the bases of race (Black), national origin (South African American), age (DOB 6/2/62), sex (male), and reprisal when:

1. In October of 2004, he was denied a promotion;
2. In _____, he was not allowed to act because his supervisor refused to institute rotating acting assignments;
3. In November of 2004, he was denied a stretch assignment;
4. In December of 2004, he was denied an at grade assignment;
5. He was denied the opportunity to participate in the September of 2005 Foreign Service promotion boards;
6. He was denied promotion benefits and an overseas assignment/temporary tour of duty in _____ of 2005; and
7. He was denied a within grade increase in _____ of 2006.

As noted above, there remain some lingering questions about when certain events occurred. During the conference call, the parties agreed that prior to commencing written discovery, Complainant's representative will make Complainant available for a deposition in order to clarify information regarding these claims.[4] Both parties recognize that if certain events occurred near or after Complainant's termination, then I may not have jurisdiction to hear such claims due to the parallel proceeding before the Foreign Service Grievance Board (FSGB) regarding Complainant's termination. See Order dated October 27, 2006 (summarizing jurisdictional issues arising as a result of parallel proceedings before the FSGB). As the deposition unfolds, I **ORDER** the parties to confer and complete missing information from the above stated claims. If the parties agree that one or more issues are not properly before me, then they can so inform me via conference call or through a consent motion to reframe the complaint. Finally, if the parties disagree about whether certain issues should remain before me, then the parties can schedule a conference call in order to present their arguments to me.

I also note that the parties will need to clarify which bases are being alleged, as Complainant's national origin claim was raised only with respect to claims five and six above. Similarly, Complainant only alleged race and reprisal regarding claim seven above. *All withdrawal reprisal*

I further note that some of Complainant's claims were not set forth as separate cognizable complaints for various reasons. For example, Complainant's claim that his supervisor submitted a travel voucher without his signature does not state a cognizable claim. See Diaz v. Dep't of the Air Force, EEOC Request No. 05931049 (Apr. 21, 1994). Likewise, Complainant's claims that he was denied overseas assignments in 2003 and 2004 comprise untimely discrete acts for which Complainant failed to timely seek EEO counseling. See 29 C.F.R. § 1614.105(a)(1). Complainant cannot use the amendment process to include prior acts of alleged discrimination where such acts are not part of and fail to rise to the level of a hostile work environment claim. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002). However, I explained to the parties that these claims may be appropriate for questions during discovery since it could comprise background information to the existing claims pending before me. See generally Id.

---

[4] The Agency agreed to attempt to conduct a complete deposition of Complainant during this deposition. I recognize, however, that Complainant may need to be briefly deposed a second time based on information gleaned after the first deposition and based on responses to written discovery or evidence from other witnesses. If the Agency requires a second short deposition, it must obtain consent from Complainant's representative. If the parties cannot agree, then they may schedule a conference call with me.

3

Finally, and although this was not discussed during the conference call, I note that the parties will need to determine whether I have jurisdiction over claim seven above as such claims are typically considered to be mixed case adverse actions that must be appealed to the Merit Systems Protection Board (MSPB). See Panlilio v. Dep't of Def., EEOC Appeal No. 01A11906 (Aug. 22, 2001) (summarizing AJ's dismissal of EEO complaint alleging both a minimally successful performance appraisal and a subsequent denial of WIGI claim and instructing parties that they could return claim to hearings unit for processing as a non-mixed EEO complaint if the MSPB denies jurisdiction). Under such circumstances, Complainant would not be entitled to a hearing before an EEOC AJ and should elect to file a mixed case complaint or mixed case appeal. Id.

During the conference call, the parties also agreed to a schedule for discovery, dispositive motions, and a hearing (if required). Accordingly, I **ORDER** the parties to take note of the schedule set forth below. Discovery shall commence immediately, and Complainant shall be deposed to clarify the issues and obtain relevant evidence in support of the claims set forth above. The discovery deadline is Friday, June 1, 2007. The Agency's Motion for Summary Judgment is due by Friday, June 29, 2007. Complainant's Opposition is due Tuesday, July 17, 2007. The Agency's Reply is due Tuesday, July 24, 2007.

A hearing is tentatively scheduled for Thursday and Friday, September 6 and 7, 2007. The parties shall ensure that their representatives and all relevant witnesses are available in person on these dates in the event a hearing is required. In due course, I will review the filings and determine if a hearing is required on some or all of the issues pending before me. If a hearing is necessary, I will contact the parties to so inform them and to schedule a prehearing conference. Otherwise, I will issue a decision and cancel the hearing.

It is so **Ordered**.

Joel A. Kravetz
Administrative Judge
Telephone: (202) 419-0723
Facsimile: (202) 419-0701
Email: joel.kravetz@eeoc.gov

4

## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing **ORDER** and any attachments within five (5) calendar days after the date they were sent *via* first class mail, or the same day if sent via facsimile or electronic mail. I certify that on **March 29, 2007**, the foregoing **ORDER** and any attachments were sent *via facsimile or first class mail,* as set forth below, to the following:

Karl Hampton
1250 4th Street, S.W. Apt. W 511
Washington, D.C. 20024

E. Ned Sloan
7600 Georgia Avenue, N.W. Suite 208
Washington, D.C. 20012
VIA FACSIMILE to (202) 829-4249

Ejike Obineche
Department of Agriculture
Office of the General Counsel
Civil Rights Division
1400 Independence Ave, SW
Washington, DC 20250-1400
VIA FACSIMILE to (202) 205-3781

Joel A. Kravetz
Administrative Judge

5

EXHIBIT 10

1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1801 L Street, N.W., Suite 100
Washington, D.C. 20507-1002

KARL HAMPTON,
        Complainant,

                v.

MIKE JOHANNS,
Secretary,
Department of
Agriculture,
        Agency

EEOC No.
100-2006-00080X

Agency No.
FAS-2005-00909


Washington, D.C.

Tuesday, September 25, 2007

U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Room 1037
Washington, D.C. 20250

The bench decision commenced at
1:07 p.m.


BEFORE:

        JOEL A. KRAVETZ
        Administrative Judge

2

APPEARANCES:

        On behalf of the Complainant:

                KARL HAMPTON, pro se
                1250 4th Street, S.W.
                Washington, D.C. 20024
                (202) 484-5150
                hamptonk27@hotmail.com

        On behalf of the Agency:

                ROBERT HARDIN, ESQ.
                U.S. Department of Agriculture
                Office of the General Counsel
                Civil Rights Division
                1400 Independence Avenue, S.W.
                Washington, D.C. 20250
                (202) 720-3962/3955
                (202) 720-4089 fax

3

## TABLE OF CONTENTS

Bench Decision by Joel A. Kravetz,
        Administrative Judge                          4

Closing Instructions                                 71

Adjourn                                              73

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

4

1                    P R O C E E D I N G S

2                                        1:07 p.m.

3              JUDGE KRAVETZ:   We are back on the

4    record.    It  is  just  after  1  o'clock  on

5    Tuesday, September 25th and we were off the

6    record for several hours while I worked on and

7    prepared a bench decision in this case. I gave

8    the parties instructions off the record about

9    what would happen in this matter.   I explained

10   to them that I would issue a bench decision

11   and then issue the transcripts.   The Agency

12   will then have 40 days to implement or not

13   implement my decision.  From that Final Order,

14   Complainant may then take action.

15              At  this  time,  I  am  ready  to

16   proceed with the bench decision.

17                    BENCH DECISION

18   I am reconvening this hearing in the matter of

19   Karl Hampton vs. The Department of Agriculture

20   in order to issue a decision from the bench.

21   As noted previously, EEOC procedures provide

22   for AJs to issue decisions from the bench.   I

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 6 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 6 of 74

5

1    note that the record is comprised of 49

2    Complainant exhibits, which will be referred

3    to as C-1, C-2, et cetera. I note, however,

4    that Exhibit C-49 was marked for

5    identification only and was not admitted into

6    evidence. There are also 17 Agency exhibits,

7    which will be referred to as A-1, A-2, et

8    cetera, and one Administrative Judge exhibit,

9    which will be referred to as AJ-1.

10        I note that the record also contains a

11    few different Reports of Investigation or ROI.

12    First, the two volume ROI will be referred to

13    as either volume one or volume two of the ROI.

14    Second, the Supplemental Report of

15    Investigation will be referred to as the SROI.

16    Finally, there is an addendum to the

17    Supplemental Report of Investigation, and if

18    or as necessary, it will be referred to as the

19    ASROI.

20              <u>Claims</u>

21    Whether Complainant was discriminated against

22    on the bases of race (black), age (date of

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 7 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 7 of 74

6

1    birth May 27, 1962), gender (male), and

2    reprisal(for engaging in prior EEO activity)

3    when,

4

5    1. in October 2004, he was denied a promotion;

6    2. he was not allowed to act because his

7    supervisor refused to institute rotating

8    acting assignments;

9    3. in November of 2004 he was denied a stretch

10    assignment;

11    4. in December of 2004, he was denied an at-

12    grade assignment;

13    5. he was denied the opportunity to

14    participate in the September of 2005 Foreign

15    Service Promotion Boards; and

16    6. he was denied promotion benefits and an

17    overseas assignment temporary tour of duty in

18    October or November of 2005.

19

20    I note that there were several other claims

21    raised by Complainant, and the record contains

22    several prior orders that helped to determine

7

1    the remaining claims to be adjudicated before

2    me.  With the agreement of Complainant and the

3    Agency, these six claims were brought forward

4    and litigated at the hearing.    There was

5    originally a claim seven, and that was dropped

6    voluntarily by Complainant prior to the

7    hearing because I did not have jurisdiction

8    over that claim.    Finally, I also note that

9    natural origin as a basis of discrimination

10   was also withdrawn prior to the hearing.

## Findings of fact

11

12   I note that the parties have set forth a

13   series of 13 stipulations of fact.  However,

14   the parties made handwritten edits to the list

15   of stipulations, so the original number of 13

16   stipulations has been reduced.    See Exhibit

17   AJ-1.  I find that Exhibit AJ-1 presents some

18   background evidence as to what occurred in

19   this particular case.    Any additional facts

20   will be raised and discussed as appropriate in

21   the analysis section in the interest of

22   brevity.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701          www.nealrgross.com

8

1                              Analysis

2          **A.  Prima Facie case**

3          In a claim involving non-selection or

4    non-promotion, Complainant may establish a

5    prima facie case by demonstrating that: 1) he

6    belongs to a statutorily protected group; 2)

7    that he was qualified for the position at

8    issue; 3) that he was not selected or not

9    promoted; and 4) that the selectee or promotee

10   was outside his protected group.  See Thornton

11   v.   National   Aeronautics   and   Space

12   Administration., EEOC Appeal No. 01931357 (May

13   19, 1994).   See also, McDonnell Douglas v.

14   Green, 411 U.S. at 792, 802 (1973); Krodel v.

15   Young, 748 F. 2d 71, 76 (D.C. Cir. 1984).

16         The   McDonnell   Douglas   framework,

17   although developed in the context of a Title

18   VII case, is equally applicable to cases under

19   the Age Discrimination and Employment Act,

20   ADEA, as amended 29 U.S.C. 623(a)(1).   See

21   Reeves v. Sanderson Plumbing Products, Inc.,

22   533 U.S. 133, 141 (2001) (applying McDonnell

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 10 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 10 of 74

9

1   Douglas to age discrimination cases). When a

2   complainant alleges that he or she has been

3   disparately treated by the Agency as a result

4   of   unlawful   age   discrimination,   then

5   "liability depends on whether the protected

6   trait (under the ADEA, age) actually motivated

7   the employer's decision." Id. at 141 (citing

8   Hazen Paper Company v. Biggins, 507 U.S. 604,

9   610) (1993). In an age case, the comparative

10  need not be outside the protected group (i.e.,

11  under age 40) but must be substantially

12  younger than Complainant.    O'Connor  v.

13  Consolidated Coin Caterers Corp., 517 U.S.

14  308, 311 (1996).

15         To establish a prima facie case of

16  retaliation, Complainant must show that (i) he

17  engaged in a protected activity; (ii) that the

18  Agency was aware of his protected activity;

19  (iii) subsequently, he was subjected to

20  adverse treatment by the Agency; and (iv) a

21  nexus exists between the protected activity

22  and the adverse action. Zysk v. U.S. Postal

Case 1:07-cv-02221-ESH     Document 9-12     Filed 05/09/2008     Page 11 of 74
Case 1:07-cv-02221-ESH     Document 5-3     Filed 03/26/2008     Page 11 of 74

10

1    Service., EEOC Appeal No. 01992995 (May 3,

2    2002); O'Neal v. Ferguson Construction

3    Company, 237 F.2d 1248, 1252 (10th Cir. 2001);

4    Hochstadt v. Worchester Foundation for

5    Experimental Biology, 425 F. Supp. 318, 324

6    (D. Mass.) aff'd, 545 F.2d 222 (1st Cir.

7    1976).

8         I note, however, that the

9    established order of analysis in

10   discrimination cases need not be followed in

11   all cases.  Where the Agency has articulated

12   legitimate, nondiscriminatory reasons for the

13   employment decisions at issue, the factual

14   inquiry can proceed directly to the third step

15   of the McDonnell Douglas analysis, that is,

16   the ultimate issue of whether Complainant has

17   shown by a preponderance of the evidence that

18   the Agency's actions were motivated by

19   discrimination.  U.S. Postal Service Board of

20   Governors v. Aikens, 460 U.S. 711, 713-14

21   (1983); Lau v. Department of Justice, EEOC

22   Appeal No. 01A32849 (January 3, 2005); George

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 12 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 12 of 74

11

1   v. Environmental Protection Agency, 407 F.3d

2   405, 411-12 (D.C. Cir. 2005).

3       Therefore, even assuming, arguendo, that

4   Complainant can establish a prima facie case,

5   I find that the Agency articulated legitimate,

6   nondiscriminatory reasons for its actions.

7   Texas Department of Community Affairs v.

8   Burdine, 450 U.S. 248, 253-54 (1983);

9   McDonnell Douglas, 411 U.S. at 802. First,

10  regarding claim one, involving Complainant's

11  allegation that he was not promoted in 2004.

12  Margaret Ting, (Asian female, date of birth

13  December 5, 1955, with prior EEO activity)

14  explained that she was the Chairperson of the

15  2004 Promotion Board who considered grade FS-

16  03 Foreign Service Officers (or FSOs) for

17  promotion to an FS-02 grade position.

18      In this respect, Complainant testified

19  and the parties stipulated that the

20  Complainant had previously been promoted to an

21  FS-03 position. See Exhibit AJ-1 at paragraph

22  3. Complainant also explained that in the

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 13 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 13 of 74

12

1    Foreign Service, the higher grade the employee

2    is, the lower the grade levels are. Thus, an

3    FS-01 is more senior to an FS-02, et cetera.

4        Eventually, the most senior FSOs join

5    the equivalent of a Senior Executive Service

6    and are no longer on the FS grade or salary

7    system.

8        Ting explained that as Chair of the

9    Promotion Board, she helped guide the panel's

10   discussion of the candidates, and she is

11   responsible for signing off on the Promotion

12   Board results.  Ting also explained that each

13   FSO Promotion Board is comprised of five

14   panelists.  Three are Foreign Agricultural

15   Service or FAS, FSOs, and one is an FSO from

16   another Agency that employs FSOs, such as the

17   State Department or the Animal and Plant

18   Health Inspection Service (APHIS) within USDA.

19       The final promotion board member is a

20   member of the general public.  According to

21   Ting, each of the five panelists performs an

22   independent assessment of the candidates for

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 14 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 14 of 74

13

1   promotion, and scores the packages independently.

2   Then, an aggregate score for each candidate

3   is calculated based on each of the individual

4   scores assigned by the panelists.   Ting also

5   explained that each Promotion Board is guided

6   by a set of precepts that instruct the Board

7   how   to   assess   the   candidate's   application

8   packages.   See   Exhibit   A1,   2004,   Foreign

9   Service  Selection  Board  -  instructions.   See

10  also Exhibit C-40, Article 25 Foreign Service

11  Selection Board's instructions.

12  Ting   noted   that   when   assessing   each

13  candidate  for  promotion,  the  panelists  will

14  consider,  among  other  things,  the  experience

15  and  ability  to  perform  at  the  next  higher

16  grade   level,   the   extent   and   quality   of

17  supervisory    management    experience,    a

18  demonstrated   ability   to   make   targets   and

19  goals, and significant accomplishments at that

20  grade.   Id.   Ting also explained that while

21  some  panel  members  may  know  the  candidates,

22  they  are  instructed  not  to  consider  outside

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 15 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 15 of 74

14

1    factors and only to weigh the application

2    packages when assigning scores to each

3    candidate.

4        In this respect, Ting explained that the

5    panelists must apply a forced ranking system,

6    meaning that only one candidate can receive

7    the highest score and each candidate down the

8    line must receive a score not assigned to

9    another candidate.    Therefore, the panelists

10   must place each candidate in rank order from

11   one, the lowest score, to ten, the highest

12   score.

13       Ting explained that based on the results

14   of the 2004 Promotion Board, several

15   candidates were recommended by the panel for

16   promotion, but Complainant was not among those

17   recommended.    See Exhibit A-2, (Results of

18   2004 Foreign Service Selection Process.)    Ting

19   then reviewed the application package of four

20   of the selectees, as well as Complainant, and

21   explained why the panel selected these

22   individuals, but did not select Complainant.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 16 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 16 of 74

15

1    Regarding selectee Ali Abdi, an African-

2    American male, age and prior EEO activity

3    unknown, Ting noted, among other things, that

4    he performed significant work addressing beef

5    issues after Mad Cow disease became a threat,

6    and also noted how he worked with the Deputy

7    Prime Minister of Egypt on projects that

8    impacted U.S. wheat marketing.  See Exhibit A-

9    3 (application of Abdi.)    Ting noted that

10   Abdi's assessment and performance demonstrated

11   strong management skills and he received a

12   strong rating by his supervisor and ~~rater~~ reviewer.  Id.

13   Regarding selectee Casey Bean, a white

14   male, date of birth and prior EEO activity

15   unknown, Ting noted his duel language

16   proficiency in Chinese and Japanese, two

17   difficult languages, and his work opening

18   markets in these difficult environments.  See

19   Exhibit A-4 (Application of Bean.)  Ting also

20   noted that Bean was able to get the Chinese to

21   lift restrictions, allowing several meat

22   packing plants to ship to China.  Ting also

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 17 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 17 of 74

16

1    emphasized    that    Bean    helped    to    improve

2    relationships    between    the    Food    Safety,    and

3    Inspection Service, or FSIS, and APHIS.    Id.

4    Ting    further    noted,    among    several    other

5    things,    that    Bean    helped    negotiate    a    new

6    stream-lined system of food additive approvals

7    and    foresaw    the    Mad    Cow    program    arising    in

8    Japan and took steps to prevent problems with

9    the shipment of meat.    Id.

10        Regarding    selectee    Brian    Goggin,    a

11    Caucasian    male,    age    and    prior    EEO    activity

12    unknown, Ting noted, among other things, that

13    Goggin helped reopen the Romanian market for

14    processed poultry products.    Ting also noted

15    that Goggin had excellent supervisor ratings

16    and    he    often    represented    the    Agency    in

17    negotiations    with    minister    level    officials.

18    See Exhibit A-5.

19        Finally,    regarding    selectee    David

20    Williams,    a    white    male,    date    of    birth    and

21    prior EEO activity unknown, Ting noted among

22    other things that he helped run a joint U.S.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 18 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 18 of 74

17

1    Agency for International Development (USAID)/

2    USDA mission and negotiated NAFTA issues

3    regarding dried beans with the government of

4    Mexico. See Exhibit A-6 (application of David

5    Williams.)

6         By contrast, when discussing

7    Complainant's application, Ting noted that

8    Complainant's materials lacked significant

9    accomplishments, and she did not observe a

10   pattern of increasing responsibility in his

11   body of work. See Exhibit A-7 (application of

12   Complainant.) Ting also noted that

13   Complainant's participation and training and

14   on committee advisory committees was

15   important, but no outcomes or accomplishments

16   were demonstrated by Complainant as a result

17   of such participation. Id. Likewise, while

18   Complainant was detailed to an assignment with

19   OMB to work on the Farm Bill, no specific

20   accomplishment was listed by Complainant as a

21   result of his work at OMB or on the Hill. Id.

22   Based on Ting's review of Complainant's

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 19 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 19 of 74

18

1    application, she explained that Complainant

2    did not demonstrate sufficient experience to

3    meet the criteria, as compared with her

4    colleagues, to be recommended for a promotion.

5        Regarding claim two, where Complainant

6    alleges that he was not allowed to act because

7    his supervisor refused to institute acting or

8    rotating assignments, I note that Dale Miller,

9    (Caucasian, male, DOB February 11, 1953, with

10   no prior EEO activity), testified that as

11   early as July 2001, when he was Acting

12   Director of the relevant office where

13   Complainant worked and was Complainant's

14   direct supervisor, Miller issued a memo to

15   institute rotating assignments among three GS-

16   14 senior staff, Leslie Burkett, (Caucasian

17   female, date of birth and prior EEO activity

18   unknown); Tim Powers, (Caucasian male, date of

19   birth and prior EEO activity unknown); and

20   Marlene Phillips, (female white with race, with age, and

21   prior EEO activity unknown), that did not

22   include Complainant. Miller stated that he

1  inquired with the human resources department

2  whether it would be appropriate to allow

3  Complainant to be included among those who

4  acted for him in his absence.  Miller noted,

5  however, that he was informed by Pat Carter in

6  human resources that it would be unwarranted

7  and unreasonable to allow Complainant, a

8  lower-graded Foreign Service Officer, or FSO,

9  to act along with his higher-graded co-

10  workers.

11      Later in 2001, after an audit by human

12  resources, it was determined that two

13  additional employees, Robert Tse, (Asian,

14  male, date of birth and prior EEO activity

15  unknown); and Complainant should be placed in

16  position descriptions that provide for GS-14

17  or equivalent job duties.  See Exhibit A-10 at

18  page 3 (memo noting audit completed and

19  Complainant should be at GS-14 or equivalent

20  position.)  At a subsequent senior level staff

21  meeting, it was recommended that Complainant

22  and Tse have position descriptions to reflect

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 21 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 21 of 74

20

1    their    higher    levels    of    responsibility

2    equivalent  to  a  GS-14  grade.  <u>See</u>  Exhibit  A-

3    10,  page 2  (Executive Advisory Group or  (EAG)

4    minutes  noting  that  Complainant  should  be

5    reassigned  to  GS-14  position  description.);

6    Exhibit C-8, page three (same).

7         In  July  of  2002,  Miller  testified  that

8    he  drafted  another  memo  to  the  Acting  Deputy

9    Administrator  establishing  30-day  rotating

10   assignments  to  include  the  three  original

11   employees from the prior rotation schedule, as

12   well as Complainant and Tse.  <u>See</u> Exhibit A-10

13   at  page 1,  (memo dated January 29, 2002, from

14   Miller  instituting 30-day rotating assignments

15   to include Complainant.)

16        Thus,  each  month,  if  Miller  was  absent

17   during that month, the person who was assigned

18   to  act  during  that  month  would  do  so.

19   Complainant  was  scheduled  to  act  in  June  of

20   2002, but because Miller testified that he was

21   not  out  during  that  month,  Complainant

22   therefore did not have any opportunity to act.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 22 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 22 of 74

21

1    Miller then explained that in July of

2    2002, Roy Henwood, (Caucasian, male, DOB March

3    19, 1946, no prior EEO activity), arrived.

4    They decided that Henwood would act for Miller

5    in Miller's absence because he was Miller's

6    direct supervisor.

7    Miller then explained that this occurred

8    until sometime in the spring of 2004, when the

9    Union filed a grievance to complain that

10   management was not implementing the terms of a

11   prior class action settlement agreement,

12   whereby employees would be rotated to act for

13   their supervisors.  See Exhibit C-5 (paperwork

14   related to a fall of 2004 grievance.); Exhibit

15   C-6, copy of class action settlement agreement

16   in Brooks et al. v. USDA, dated May 6, 1991.

17   Miller testified that management agreed

18   to reinstitute rotating assignments as long as

19   the employees received some management and

20   supervisory training.  If the employee was not

21   present during the 30-day period when he or

22   she was scheduled on the rotation calendar to

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C. 20005-3701         www.nealrgross.com

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 23 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 23 of 74

22

1    act, then Henwood would act for Miller.    The

2    Union was not satisfied and in the late summer

3    of 2004, a modified agreement was reached

4    whereby if the employee was not present during

5    the 30-day period when he or she was scheduled

6    on the rotation calendar to act, then another

7    employee    on    the    alphabetical    list    of

8    employees, not Henwood, would be permitted to

9    act for Miller. See ROI, volume 2, Tab 6B at

10    468 (email dated August 6, 2004 announcing new

11    rotational policy consistent with grievance

12    resolution.); p. 480 (email dated September 9,

13    noting that the next eligible staff member on

14    the rotation list would be assigned to act).

15        Miller then testified that on September

16    8, 2004, he was out of the office and the

17    designated person, Burkett, was scheduled to

18    act.    However, Burkett was also out of the

19    office.    Therefore, based on the new agreement

20    with the Union that was announced in a

21    subsequent September 9 email, Complainant then

22    acted for Miller.    See Exhibit A-8, at page 1

Case 1:07-cv-02221-ESH   Document 9-12   Filed 05/09/2008   Page 24 of 74
Case 1:07-cv-02221-ESH   Document 5-3   Filed 03/26/2008   Page 24 of 74

23

1   (email announcement that Complainant was

2   acting the afternoon of September 8, 2004);

3   ROI volume 2, tab B at 481.

4       Subsequently, on November 2, 2004,

5   Complainant was also named acting director for

6   Miller. Id. at page 2; ROI Volume II, Tab 6B

7   at 486. Miller denied that any action

8   regarding acting assignments were based on

9   race, gender, age, or prior EEO activity.

10      Regarding claims three and four, where

11  Complainant alleges that he was denied both a

12  stretch and an at-grade assignment, I first

13  note that Complainant explained the

14  distinction between these two types of

15  assignments. Complainant explained that as an

16  FSO, he had the ability to be assigned to

17  perform work up to two grade levels higher

18  than his originally assigned grade. Such

19  assignments are referred to as stretch

20  assignments, because the incumbent 'stretches'

21  to perform a career enhancing assignment

22  beyond his or her grade level. By contrast,

Case 1:07-cv-02221-ESH     Document 9-12     Filed 05/09/2008     Page 25 of 74
Case 1:07-cv-02221-ESH     Document 5-3     Filed 03/26/2008     Page 25 of 74

24

1    FSOs can also be assigned to perform work at

2    their assigned grade, and quite logically,

3    such assignments are referred to as at-grade

4    assignments.

5         Complainant noted that pursuant to the

6    collective bargaining agreement, or CBA,

7    between the Agency and the FSOs, all FSOs are

8    required to bid on overseas assignments.

9    Complainant noted that there are rules

10   pertaining to the minimum and maximum number

11   of stretch or at-grade assignments that one

12   can bid on for overseas posts. Complainant

13   also noted that an FSO can only work in the

14   United States eight years, and he or she must

15   then bid on and be assigned to an overseas

16   post pursuant to the eight year rule. See

17   Exhibits C-14 (article 28, limitations and

18   waivers for U.S. tours, eight year rule);

19   Exhibit C-13 (Complainant's request for a

20   waiver and the Agency's response).

21   Accordingly, Complainant submitted a bid form

22   requesting four stretch assignments and three

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 26 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 26 of 74

25

1    at-grade assignments.  See Exhibit C-11.  See

2    also Exhibit C-42 (instructions to complete

3    bid form), Exhibit C-43, (article 27 -

4    assignment policy.)

5         Franklin Lee, (African-American, male,

6    DOB March 13, 1947, with no prior EEO

7    activity) testified that during the relevant

8    time, he was the Deputy Administrator of

9    Commercial and Marketing Programs, and he has

10   been a career FSO with FAS for several

11   decades.  Lee testified that as a Senior FSO

12   and Deputy Administrator, all Deputy

13   Administrators meet to form an Executive

14   Advisory Group (EAG).  The EAG is responsible

15   for, among other things, personnel issues

16   which includes making decisions on stretch and

17   at-grade assignments for FSOs.  See Exhibit C-

18   8 at 1(summary of responsibilities of EAG.)

19        Lee testified that during relevant EAG

20   meetings in late 2004, the group was informed

21   that Complainant's security clearance had been

22   suspended or revoked.  See Exhibit C-12 at 3

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 27 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 27 of 74

26

1    (memo dated June 30, 2004, suspending

2    Complainant's security clearance).  This memo

3    was also in the ROI, volume 1, tab 2 at 68 and

4    SROI tab 2 at 67.  <u>See</u> also SROI Tab 6C at 253

5    (affidavit of Lyle Sebranek, (Caucasian male,

6    date of birth and prior EEO activity unknown),

7    noting that Complainant cannot be assigned

8    overseas until the issues regarding his Top

9    Secret security clearance suspension are

10    resolved.

11        Lee noted that FSOs must be able to

12    obtain and maintain a Top Secret clearance

13    because overseas post assignments require

14    access to classified documents sent through

15    the State Department cable system.  Lee also

16    explained that there is a secure area in all

17    U.S. Embassies often referred to as 'the

18    bubble' where the Ambassador and all FSOs

19    would discuss classified matters.  Lee

20    therefore explained that because the group was

21    informed by a member of the EAG, that

22    Complainant's security clearance had been

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 28 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 28 of 74

27

1    suspended, he was not considered or placed in

2    any overseas stretch or at grade assignments

3    when the EAG convened and determined such

4    assignments in the fall of 2004.  See Exhibit

5    A-17 (email message from Susan Schayes, Lee's

6    Deputy, to Lee outlining the reasons for

7    Complainant's non-consideration.  See also

8    Exhibit C-11 (paperwork from EAG noting those

9    who received what assignment).  Lee explained

10   that race, gender, age or prior EEO activity

11   was not a factor, and that EEO activity was

12   not divulged during these meetings.

13       Sheila Thomas Bruce (African-American,

14   female, DOB October 25, 1960, with prior EEO

15   activity), a Branch Chief of the Foreign

16   Operations Branch of the human resources

17   department in FAS during the relevant time,

18   also testified that FAS Administration had the

19   final say as to which FSOs receive stretch or

20   at grade overseas assignments based on their

21   bids.  Bruce noted that EAG member Sobranek is

22   responsible for presenting recommendations for

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 29 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 29 of 74

28

1    which FSO should serve in what overseas

2    assignment and in what capacity -- stretch or

3    at grade.  The EAG members would then discuss

4    each of Sobranek's recommendations and

5    ultimately vote on the assignment of FSOs to

6    the various stretch and at grade assignments

7    that needed to be filled.  Bruce also

8    explained that Complainant's security

9    clearance had been suspended during the

10   relevant time.

11       Regarding claim 5, which involves

12   Complainant's allegation that he was denied

13   the opportunity to participate in the

14   September of 2005 Foreign Service Promotion

15   Boards, I note that Complainant testified that

16   he was never permitted the opportunity to

17   participate in the Promotion Board.

18   Complainant testified and acknowledged that he

19   was on administrative leave with pay during

20   the relevant time, but opines that he should

21   have been informed about the Promotion Board

22   being convened, and allowed to submit an

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 30 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 30 of 74

29

1   assessment of his own performance consistent

2   with past practice.

3       In this respect, Complainant testified

4   that all promotion packages contain, among

5   other things, a performance accomplishment

6   statement that is created by the candidate.

7   See SROI Tab 8 at 267 (Complainant's

8   performance accomplishment statement noting

9   that nothing was submitted by Complainant).

10  Complainant then noted that both the

11  supervisor and reviewing official complete

12  statements and Complainant is permitted an

13  opportunity to submit a rebuttal to these

14  supervisory statements. Id. at 268 and 269.

15  Complainant testified that he was not

16  permitted to submit either a rebuttal or his

17  own original assessment of his performance for

18  consideration by the 2005 promotion board.

19      Bruce testified that as Branch Chief,

20  she is responsible for ensuring that all

21  Promotion Boards are conducted consistent with

22  the CBA, the Foreign Service promotion

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 31 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 31 of 74

30

1    precepts -- or instructions, and the Foreign

2    Service Act of 1980.    Bruce then testified

3    that    Complainant    was    not    denied    the

4    opportunity to participate in the September of

5    2005 Foreign Service Promotion Boards.    Bruce

6    explained that in the late summer of 2005, in

7    anticipation of the Promotion Boards meeting

8    in the fall, a question arose as to whether or

9    not Complainant's promotion package should be

10    submitted and considered by the 2005 Promotion

11    Board    because    Complainant    was    on

12    administrative    leave    with    pay    pending    an

13    internal    administrative    investigation    of

14    allegations of misconduct.    Bruce explained

15    that the CBA was silent on whether employees

16    in such a leave status should be considered

17    for promotion.    Bruce decided that because the

18    CBA was silent on whether or not Complainant's

19    package of materials should be submitted to

20    the Promotion Board, she erred on the side of

21    including his materials.

22    Therefore, Complainant's promotion package

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 32 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 32 of 74

31

1   was considered by the 2005 Promotion Board.

2   See SROI Tab 8 at 266 to 269 (containing

3   portions of relevant documents in

4   Complainant's 2005 promotion package that was

5   considered by the Promotion Board). Bruce

6   testified that she knew Complainant's gender

7   and race, but that his race and sex were not

8   factors in her decision.

9       Bruce also testified that it is not her

10  responsibility or the responsibility of the

11  employee's supervisor to inform or apprise the

12  employee that he or she can submit their

13  accomplishment statement. Rather, it is the

14  responsibility of the employee to submit such

15  a statement. Bruce noted that the Promotion

16  Boards convene at the same time each year, and

17  all FSOs should know the routine to submit

18  appropriate paperwork in anticipation of the

19  September Promotion Board meetings.

20      Asif Chaudhry (Asian, male, DOB November

21  15, 1956, with prior EEO activity outside

22  USDA), testified that he was the chairperson

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 33 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 33 of 74

32

1    of the 2005 Promotion Board that considered

2    Grade  FS-03  FSOs  like  Complainant  for

3    promotion to the FS-02 grade level.  Chaudhry

4    testified that the Promotion Board followed a

5    set of guidelines or precepts and considered

6    the application packages of all candidates,

7    including  Complainant.  See  Exhibit  A-13

8    (Precepts  and  Instructions  to  the  2005

9    Promotion Board).

10    Chaudhry  testified  that  during  the

11    review process, each Board member reviews the

12    promotion folders for each candidate and ranks

13    the packages on a numerical scale, with 1

14    being the lowest score.  Chaudhry explained

15    that the Board uses a forced ranking system,

16    thus forcing the Board members to assign the

17    highest score to certain candidates, while the

18    lowest scores must also be assigned so that

19    all  scores  are  distributed  among  the

20    candidates.  Chaudhry then explained that from

21    his review of the scoring matrix, all five

22    Board members gave Complainant a score of 1,

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 34 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 34 of 74

33

1    so Complainant received the lowest possible

2    score -- 5 -- on the scoring matrix.  <u>See</u> SROI

3    Tab 10 at 277.  Chaudhry also explained that

4    after reviewing and tallying the scores, a

5    natural break emerged, and Chaudhry drew a

6    line and signed his name.  Thus, all

7    candidates above the line were considered as

8    qualified for promotion by the Board, and all

9    those below the line would not be recommended

10   for promotion by the Board.  <u>Id</u>.

11   Complainant's name fell below the line, so he

12   was not recommended for a promotion by the

13   Board.  <u>Id</u>.

14        Chaudhry then provided additional

15   details about three of the candidates

16   selected.  Based on his review of the

17   application packages, he explained why all

18   three candidates received higher scores based

19   on the work performed and results achieved by

20   these candidates as demonstrated in their

21   respective application packages. <u>See</u> Exhibits

22   A-14 through A-16 (application packages of

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 35 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 35 of 74

34

1    three of the selectees.)  Chaudhry explained

2    that the Board looks for language in the

3    assessment forms that demonstrates leadership,

4    communication skills, management skills,

5    initiative and projects that demonstrate

6    results.  Chaudhry then explained how each of

7    the above selectees demonstrated these

8    attributes in their promotion packages.

9        Chaudhry noted, for example, that

10   selectee W. Garth Thornburn II, an African-

11   American male like Complainant, date of birth

12   and prior EEO activity unknown, demonstrated

13   great achievements in trade policy where sales

14   in his region increased 600 percent and better

15   market access was achieved in his region for

16   U.S. Products.  See Exhibit A-15.  Chaudry

17   also explained how selectee Kimberly Svec, a

18   Caucasian female, dated of birth and prior EEO

19   activity unknown, handled a touchy situation

20   with an APHIS employee very well, and she also

21   provided training to a new attaché in her

22   embassy.  See Exhibit A-14.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 36 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 36 of 74

35

1      By contrast, Chaudhry noted that the

2    information in the application package about

3    Complainant's work explained that Complainant

4    attended conferences, but it did not express

5    the value to FAS of Complainant's attendance.

6    The lack of any demonstration of achievements

7    or explanation of how projects demonstrated

8    concrete results resulted in Complainant's

9    promotion package receiving a very low score.

10   See also SROI Tab 12 at 286 (listing

11   Complainant as a candidate not recommended for

12   promotion). Chaudhry noted that the third

13   selectee was also an African-American male

14   like Complainant, and that at no time during

15   deliberations of the candidates for promotion

16   was a candidate's race, gender, age or prior

17   EEO activity considered.

18      Finally, regarding claim six wherein

19   Complainant alleges that he was denied

20   promotion benefits and an overseas

21   assignment/temporary tour of duty in October

22   or November of 2005, I note that this claim in

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 37 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 37 of 74

36

1    and of itself really amounts to nothing more

2    than a restatement of Claims 1, 3, 4 and 5,

3    with additional detail related to promotion

4    benefits such as special leave and salary

5    benefits that flow from being placed in an

6    overseas assignment.  I note that prior to the

7    hearing, it was unclear if there was a

8    separate incident that gave rise to an adverse

9    action as set forth in Claim 6.  I note that

10   Complainant did not articulate any specific

11   adverse action beyond the denial of a

12   promotion from both the 2004 and 2005

13   Promotion Boards -- Claims 1 and 5, as well as

14   the denial of stretch and at grade assignments

15   -- Claims 3 and 4.  Thus, it appears that

16   Complainant believes he should have received

17   such benefits solely as a result of those

18   claims that he has already brought before and

19   are being adjudicated at this hearing.

20        Even assuming _arguendo_ that Claim 6 is

21   in and of itself a cognizable claim, I note

22   that Lacy Muir (Caucasian, female, DOB

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 38 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 38 of 74

37

1   September 24, 1966, with some prior EEO

2   activity) who was a member of the Human

3   Resources Department within FAS during the

4   relevant time, explained that FSOs are not

5   entitled to promotion benefits if the FSO is

6   not selected for any of assignment to an

7   overseas post, be it an at grade assignment,

8   stretch assignment or a promotion.

9       Because the Agency articulated

10  legitimate, nondiscriminatory reasons for its

11  actions, Complainant must now establish that

12  these reasons are a pretext for

13  discrimination. Hicks, 509 U.S. at 511;

14  Burdine, 450 U.S. at 253-54; McDonnell

15  Douglas, 411 U.S. at 804. In this regard, I

16  note that a finding of pretext may be based on

17  the elements of a prima facie case and a

18  determination that the employer's explanation

19  is not credible. Reeves v. Sanderson Plumbing

20  Products, Inc., 530 U.S. 133, 146-147 (2000);

21  Hicks, 509 U.S. at 511. However, Complainant

22  always retains the ultimate burden of

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 39 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 39 of 74

38

1    persuading the trier of fact that the Agency

2    unlawfully discriminated against him. <u>Hicks</u>,

3    509 U.S. at 511; <u>Aikens</u>, 460 U.S. at 715.

4        After reviewing the evidence and

5    assessing the credibility of the witnesses at

6    the hearing, I conclude that Complainant

7    failed to establish by a preponderance of the

8    evidence that discrimination or retaliation

9    more likely than not motivated the Agency's

10   actions. In reaching this conclusion, I note

11   that none of Complainant's arguments, either

12   alone or in the aggregate, are sufficient to

13   call into question any of the legitimate,

14   nondiscriminatory reasons proffered by Agency

15   management officials who testified at the

16   hearing.

17       Regarding Claim 6, the denial of

18   benefits flowing from not being assigned to an

19   overseas post or being promoted, I note that

20   Complainant presented no independent evidence

21   that he should have received such benefits,

22   and that such benefits were denied because of

Case 1:07-cv-02221-ESH   Document 9-12   Filed 05/09/2008   Page 40 of 74
Case 1:07-cv-02221-ESH   Document 5-3   Filed 03/26/2008   Page 40 of 74

39

1  his race, gender, age, or prior EEO activity.

2  Complainant's arguments relate back to his

3  specific denial of promotions, at grade or

4  stretch assignments, and are not independent

5  of those claims.   Accordingly, when I assess

6  those claims, I will be considering and

7  assessing all of Complainant's arguments.

8  Regarding Claim 2, Complainant presents

9  evidence from a co-worker, Patricia Perkins

10  (African-American, female, DOB July 14, 1949,

11  with prior EEO activity), in an effort to

12  demonstrate that he was discriminatorily

13  denied the opportunity to act.   Perkins

14  testified that she and Complainant worked

15  together and reported to Miller, ▇▇▇ Perkins

16  was very active in the Union as the local shop

17  steward and also Treasurer of the National

18  Union for a year.   Perkins recounted the

19  Agency's failure to abide by the 1991 class

20  action settlement agreement and institute

21  rotating assignments, thus necessitating a

22  grievance.   See Exhibits C-5 and C-6.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 41 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 41 of 74

40

1    Perkins, like Complainant, testified that

2    Complainant was never given the opportunity to

3    act for Miller.

4    In contrast to both Perkins and

5    Complainant, Miller testified as to the

6    reasoning behind how rotational assignments

7    were first instituted, then removed; and

8    subsequently reinstituted. I note that the

9    initial acting assignments between 2001 and

10    early 2004 comprise only background evidence,

11    as any denials would have comprise discrete

12    acts that occurred beyond the 45-day period

13    that Complainant had to contact an EEO

14    counselor. See ROI Volume I, Tab 2 at 100

15    (noting the date of EEO counselor contact as

16    July 19, 2004). Notwithstanding the lack of

17    timely EEO counselor contact relating back to

18    the prior opportunities to act between 2001

19    and early 2004, I note that during a part of

20    that time, Complainant was not considered as

21    even occupying the equivalent of a GS-14

22    position. Ultimately, an audit was certified

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 42 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 42 of 74

41

1    and the EAG recommended placing Complainant

2    into a GS-14 position.    See Exhibit A-10 at

3    page 2.    Thus, it is logical that the

4    Complainant would not act if he was not

5    considered among the senior staff.

6        Subsequently,    Miller    and    Henwood's

7    action between 2002 and 2004 deprived all

8    employees, regardless of race, gender, age or

9    EEO activity, the right to act in Miller's

10   absence.    Finally, the Union negotiated a

11   resolution to their grievance in or around the

12   late summer or fall of 2004.    Finally, and

13   contrary to the testimony of both Complainant

14   and Perkins, there is documentary evidence

15   that Complainant was indeed assigned to act on

16   a couple of occasions.    See Exhibit A-8.

17   Thus, the record belies both Complainant's and

18   Perkins' testimony that Complainant never

19   acted as supervisor in Miller's absence.    In

20   light of such contemporaneous records

21   demonstrating otherwise, I do not find

22   Complainant's or Perkins' testimony credible

42

1   regarding this aspect of Complainant's claim.

2   I note that while Complainant and Perkins

3   present other evidence of animus by Miller, I

4   will assess and address such evidence when

5   analyzing the remaining claims regarding the

6   denial of promotions, stretch, and at grade

7   assignments.

8       Regarding Complainant's non-promotion

9   claims in 2004 (Claim 1) and 2005 (Claim 5), I

10  note that Complainant presents no evidence

11  that any of the members of the selection

12  board, in particular its chairperson, harbored

13  animus or took any actions to discriminate or

14  retaliate against Complainant.    In this

15  regard, I note that both Ting and Chaudhry

16  were very credible witnesses in how they

17  consistently recounted how the selection

18  process works and how their respective panels

19  arrived at their conclusions as to who they

20  recommended for promotion.    They both

21  explained credibly that Complainant's

22  candidate package did not demonstrate the

43

1   requisite    levels    of    experience    or

2   accomplishments that would rank him among the

3   most qualified of his colleagues in a forced

4   ranking system that requires the panelists to

5   rank all candidates against each other.

6       Complainant's theory of discrimination

7   and retaliation stems from his belief that the

8   selection process was tainted from the onset

9   by the actions of his former supervisors,

10   Human Resources staff, such as Muir and

11   Davies, and FAS management, in particular

12   Miller and Henwood. ①

13       Complainant argues that from the time of

14   his employment through to Miller's supervision

15   of him, his supervisors have harbored animus

16   because he's an African-American employee from

17   the south who has engaged in EEO activity both

18   through filing individual complaints and

19   grievances, as well as being part of a class

20   complaint that was settled in May of 1991.

21   Complainant thus opines that actions by Miller

22   and his predecessors tainted the selection

① These arguments also apply to Complainant's allegation that he was denied stretch and at grade assignments.

44

1    process because they actively derailed his

2    ability to get promoted or work in assignments

3    that would lead to promotions.

4         Much of Complainant's testimony also

5    revolved on how his prior supervisors, when he

6    first joined FAS and first worked overseas,

7    harbored animus. Complainant recounted how he

8    was discriminated against in the interview

9    process and only hired as a result of legal

10   action in 1987. Complainant testified further

11   about animus by his prior supervisors because

12   it took him longer than his Caucasian co-

13   workers to become commissioned and tenured as

14   an FSO, and then ultimately to receive a

15   promotion from an FSO-4 to an FSO-3. See

16   Exhibit C-1, (a chart created by Complainant

17   noting and comparing entry dates and

18   promotions of Complainant versus other FSOs

19   and demonstrating that it took longer for

20   Complainant to be tenured and to be promoted).

21        Complainant noted how the class action

22   arose in 1991 when a high-level USDA employee

45

1    referred to a class agent as a "black dog" at

2    a public meeting.

3        In addition to the unusually long period

4    of time it took Complainant to be commissioned

5    as an FSO and receive a promotion, Complainant

6    also testified that of the roughly 150 to 160

7    FSOs in FAS, only 10 to 15 are African-

8    American and this statistical disparity is

9    further evidence of discrimination against

10   African-Americans, in particular, African-

11   American males who have engaged in prior EEO

12   activity.

13       Complainant also testified how one of

14   his first supervisors, Chris Goldthwait told

15   him he was doing an outstanding job, but that

16   such feedback could not be placed in his

17   evaluation forms, and that the Agency has a

18   history of discriminating against African-

19   American employees.

20       Complainant explained as to his belief

21   that there are unspoken lines observed by FAS

22   management that a black man from the south

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE. N.W.

46

1    should not cross in regard to how he portrays

2    himself and how he interacts with people of

3    all races, but especially with white women.

4    According to Complainant, he was approached

5    about modeling Jockey men's underwear in 1991

6    and when this outside opportunity was approved

7    by FAS management, his underwear modeling

8    angered several of his supervisors.

9    Complainant testified that these supervisors

10   harbored animus because as a black man, he was

11   embarrassing FAS by modeling men's underwear.

12       Complainant also testified about how

13   white supervisors were jealous of his

14   accomplishments and abilities as a FSO, and

15   they feared and were threatened by his success

16   as a FSO.

17       Complainant further testified about

18   false rumors spread by these jealous white

19   supervisors, one of which stated that he had

20   an affair with the wife the Ambassador of

21   Brazil while he was on an overseas assignment

22   between 1992 and 1996. The wife of the

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 48 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 48 of 74

47

1    Ambassador of Brazil was a white woman and a

2    false cable spreading this rumor was

3    apparently issued by a former white supervisor,

4    ⬛⬛⬛ Perkins testified that she saw~~the cable~~because

5    she was the secretary for an administrator and

6    she therefore had access to these cables.

7    Complainant denied having an affair.

8    Complainant explained that much of the work of

9    an FSO requires FSOs to attend cocktail

10   parties, socialize, make friends, and make

11   connections.  See Exhibit C-47.

12        Complainant implied from his testimony

13   that jealous, white supervisors threatened by

14   his success and who harbor race-based animus

15   accused him of crossing a line that a black

16   man from the south should never cross, namely,

17   having an affair with a white woman.

18        Complainant alleges that his prior

19   supervisors who spread these false rumors have

20   been reaching out to his current supervisor

21   Miller, and are impacting, even today, how

22   Complainant's career has progressed or in

Case 1:07-cv-02221-ESH     Document 9-12     Filed 05/09/2008     Page 49 of 74
Case 1:07-cv-02221-ESH     Document 5-3     Filed 03/26/2008     Page 49 of 74

48

1    Complainant's mind has been derailed as a

2    result of actions by these prior bigoted

3    supervisors.   Thus, Complainant asserts that

4    Miller's acts are, at least in part, impacted

5    by his former supervisors.

6        Complainant opines that Miller's actions

7    and how he drafted the supervisor assessment

8    for Complainant impacted his promotability.

9    Thus, by writing an assessment without magic

10   words such as "highly recommend," Miller is

11   subtly derailing Complainant's ability to get

12   promoted because he knows that promotion

13   boards will rank him lower compared with his

14   Caucasian co-workers.

15       Complainant further argues that after

16   the allegation surfaced about his alleged

17   affair in Brazil, his career was curtailed

18   because he was placed in a position reporting

19   to Miller where he could not have access to

20   the kinds of opportunities that his non-

21   African-American colleagues had in order to

22   demonstrate leadership, accomplishments and

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 50 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 50 of 74

49

1  the other characteristics that are weighed by

2  Promotion Boards when deciding who to promote

3  or that are weighed by the EAG in deciding who

4  will receive at grade or stretch assignments.

5  Complainant thus implies that he was placed in

6  a dead end assignment where he could not gain

7  the requisite experience necessary to get a

8  promotion.

9      In addition to Complainant's argument

10  that his career was derailed due to bigotry by

11  his prior supervisors associated with being a

12  black man from the south who dared to have

13  relationships with white women, Complainant

14  also alleges that Miller, himself, harbors

15  animus.    Among other things, Complainant

16  alleged that Miller's actions to address

17  conduct issues among staff differed, and he

18  favored Caucasian employees, in particular,

19  Burkette, who engaged in inappropriate conduct

20  and yet were not disciplined.

21      Additionally, Complainant testified that

22  Perkins told him about a derogatory statement

50

1    uttered by Miller.    In this regard, Perkins

2    also testified at the hearing about the

3    statement and about how she told Complainant

4    of the statement.

5        Specifically, Perkins testified that on

6    one occasion in 2001 or 2002, Miller came to

7    Perkins and told her that he learned from a

8    colleague that Complainant's presence on

9    Capitol Hill upset this colleague.    According

10   to Perkins, Miller was frustrated that

11   Complainant was doing things that were causing

12   his colleagues to become upset and to yell at

13   him.    In frustration, Perkins testified that

14   Miller told her that Complainant is acting

15   like a nigger from California, rather than a

16   nigger from Mississippi.

17       Complainant explained that a black

18   person from Mississippi knows his place in

19   society and does not act inappropriately,

20   whereas, like the common image of individuals

21   from California being free spirited, such

22   individuals do not know their place and are

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 52 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 52 of 74

51

1   more free spirited. Complainant argues that

2   such a derogatory utterance by Miller further

3   supports his testimony that his career as an

4   FSO has been derailed by bigoted managers who,

5   like Miller, are jealous and threatened by a

6   successful black man and are offended when

7   such an individual steps out of bounds that

8   society sets for black men.

9        Complainant also noted testimony by Lee

10  wherein Lee affirmed the statements that he

11  made to an EEO counselor about Complainant's

12  early struggles with FAS. See SROI Tab 2 at

13  pages 78 to 80, Exhibit C-19. Lee first

14  recounted Complainant's problems getting hired

15  and selected as an FSO in or around 1986 or

16  1987. Id. at 78, C-19. Lee also noted that a

17  white female helped Complainant get in an

18  underwear commercial, and that this did not

19  play well with white males. Id. at 79, C-19.

20  Lee also noted Complainant's difficulty

21  getting commissioned and tenured as an FSO in

22  the early 1990s. Id.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 53 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 53 of 74

52

1        Finally, Complainant argued that there

2    are several aspects of Miller's own testimony

3    that are not credible and demonstrate animus.

4    Complainant argues, among other things, that

5    Miller did not follow proper rules and

6    regulations when he disciplined Complainant

7    for allegedly using a computer to print

8    pornography, and subsequently when he was

9    proposed for termination and ultimately

10    terminated for various offenses that he

11    alleged are unfounded. See generally Exhibits

12    C-17, C-18, C-21, C-28, C-29, C-39.

13        Complainant alleges that Miller,

14    Henwood, and others knew about an Office of

15    Inspector General (OIG) report declining to

16    refer Complainant's alleged violations for

17    investigation for criminal prosecution, yet

18    proceeded with an internal investigation to

19    force him out of the Agency due to

20    discriminatory and retaliatory animus. See

21    Exhibit C-12 at page 3, OIG report.

22        Complainant also testified how Miller

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 54 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 54 of 74

53

1    responded curtly and then verbally reprimanded

2    him in response to his request for additional

3    vacation back in 1998.   Complainant noted that

4    in an email, Miller stated to him that until

5    he obtains the rank of Ambassador, he needs to

6    request, not simply take leave.   See Exhibit

7    C-4.

8         Complainant and Perkins testified about

9    how several employees had problems once Miller

10   became the head of the office, and a memo was

11   generated in June of 2001 setting forth a

12   summary of the grievances and proposed

13   resolutions to address leadership management

14   problems by Miller.   See Exhibit C-7.

15        Complainant alleges that there are

16   inconsistencies between the testimony of

17   Miller and the testimony of Bruce regarding

18   the extent to which Complainant would have or

19   should have been contacted by the Agency with

20   regard to submitting his own assessment of his

21   performance for the 2005 Promotion Boards.

22        Finally, Complainant alleges that FAS is

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 55 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 55 of 74

54

1    a  small,  white-dominated  Agency,  and  as  a

2    result  of  years  of  animus  and  stereotypes

3    against  the  African-American  employees  and  in

4    particular,  African-American  males  who  engage

5    in  EEO  activity,  they  fail  to  hire,  promote

6    African-Americans.            Additionally,       FAS

7    management      has      a      double      standard      for

8    minorities,      and      they      treat      differently

9    African-American  males,  especially  those  who

10   file  complaints.    See generally  Exhibit  C-1,

11   C-5,  C-23,  C-46.

12        After    assessing    Complainant's    various

13   arguments  against  the  evidence  presented  at

14   the  hearing,  I  find  that  none  of  Complainant's

15   arguments,  either  alone  or  in  the  aggregate,

16   are  sufficient  to  establish  by  a  preponderance

17   of  the  evidence  that  the  Agency's  actions

18   denying  him  promotions,  at-grade  or  stretch

19   assignments  were  a  pretext.

20        Regarding  Complainant's  testimony  of  on-

21   going  discrimination  as  a  black  male  from  the

22   south,  I  note  that  some  of  Complainant's

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 56 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 56 of 74

55

1    allegations about his initial hiring as well

2    as aspects of his work, modeling underwear,

3    and the feelings it may have generated, are

4    corroborated by Lee. However, these actions

5    occurred between 1987 and 1996, almost eight

6    years prior to the allegations giving rise to

7    this complaint. Moreover, almost all of the

8    prior complaints and grievances involved prior

9    supervisors. Miller did not supervise

10   Complainant until Complainant returned from

11   his assignment in Brazil in or around August

12   of 1996.

13       Complainant argues that prior

14   supervisors impacted how FAS management, in

15   particular Miller and Henwood, took actions

16   against him. I find, however, that

17   Complainant presents no credible evidence to

18   support his testimony that prior bigoted

19   supervisors are impacting decisions by Miller,

20   Henwood or other FAS management officials.

21   Essentially, Complainant's argument amounts to

22   nothing more than mere speculation on his

56

1    part.

2        Moreover,    many    of    Complainant's

3    allegations regarding actions by Miller are

4    either not credible, not supported by the

5    record or insufficient to establish animus

6    based on race, gender, prior EEO activity or

7    age.    The strongest allegation relates to

8    Complainant's and Perkins' testimony that

9    Miller uttered the 'N' word in reference to

10   acting like such an individual from California

11   as    opposed    to    such    an    individual    from

12   Mississippi, and that this remark was uttered

13   some time in 2001 or 2002.    Miller denied

14   making any such remark and no other witness

15   testified    hearing    any    racial    remarks    by

16   Miller.    I also note that Perkins testified

17   that Miller would tell racist and sexist

18   jokes.

19       After    considering    the    evidence    and

20   credibility    of    the    witnesses,    I    find

21   insufficient    evidence    in    the    record    to

22   conclude that Miller uttered the 'N' word as

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 58 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 58 of 74

57

1    alleged  by  Complainant  and  Perkins.    In

2    reaching this conclusion, I first note that

3    Complainant did not hear the remark himself.

4    Rather,  he  only  heard  about  it  through

5    Perkins.  Complainant, however, never brought

6    up the 'N' word remark to the EEO counselor or

7    the EEO investigator even though Perkins told

8    him about the remark just after it occurred.

9    Indeed, Complainant did not mention it until

10   he was deposed in June of 2007.

11        As Complainant has been alleging animus

12   by Miller since the summer of 2004, and this

13   derogatory remark occurred some time in 2001

14   or 2002, it is simply not plausible that such

15   an allegation would only surface in the summer

16   of  2007,  roughly  two  months  before  the

17   hearing.

18        Moreover, Perkins, herself, met with the

19   EEO counselor in the summer of 2004 and the

20   EEO  counselor  prepared  what  appears  to  be

21   detailed notes about each conversation.    In

22   reviewing the EEO counselor's report, it only

58

1    discloses how Perkins recounted that Miller

2    uttered racist and sexist jokes for a period

3    of time, and then stopped.  Notably, however,

4    Perkins never brought the 'N' word allegation

5    to the attention of the EEO counselor or

6    raised any kind of problem or complaint when

7    it was first uttered back in 2001 or 2002.

8        Perkins, as a union steward, testified

9    that she pursued many grievances on behalf of

10   employees.  Additionally, both Complainant and

11   Perkins were part of a 1991 class action lawsuit where an

12   Agency management official referred to an

13   employee as a "black dog."  Furthermore, both

14   Complainant and Perkins also helped provide

15   information for a memo addressing management

16   problems caused by Miller in 2001 when he took

17   over as supervisor.

18       Clearly, both Perkins and Complainant

19   knew how to file a complaint and had a history

20   of speaking out or filing complaints.  Yet,

21   this highly inflammatory and derogatory remark

22   was allegedly made by Miller and not raised by

59

1  either one until the hearing, or, in

2  Complainant's, case roughly two months before

3  the hearing at his deposition.

4      Complainant testified that the Agency

5  does nothing to respond to such complaints and

6  so it's fruitless to raise them. That was

7  essentially Perkins' testimony also. However,

8  the Agency settled the class complaint brought

9  in 1991. See Exhibit C-6. The Agency also

10  settled Complainant's 1996 grievance. See

11  Exhibit C-48. The agency also settled a

12  grievance with Miller and Henwood about

13  rotational acting assignments in 2004.

14      Thus, Complainant's and Perkins'

15  argument that it is 'fruitless' to file

16  complaints or report such incidents is belied

17  by their own actions to file complaints and

18  obtain settlements. In the end, I simply

19  cannot conclude that such a remark was uttered

20  by Miller by a preponderance of the evidence.

21      Regarding Complainant's argument that

22  Miller and the Agency did not follow protocol

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS

Case 1:07-cv-02221-ESH     Document 9-12     Filed 05/09/2008     Page 61 of 74
Case 1:07-cv-02221-ESH     Document 5-3     Filed 03/26/2008     Page 61 of 74

60

1   when investigating, disciplining or terminating

2   Complainant, I note that deviations from

3   standard procedures without explanation or

4   justification can be sufficient to support an

5   inference of pretext. <u>Monroe v. Department of</u>

6   <u>the Navy</u>, EEOC Request No. 05950248, August 8,

7   1996; <u>Craig v. Y & Y Snacks, Inc.</u>, 721 F.2d

8   7780(3rd Cir. 1983). Similarly, the

9   reasonableness of the employer's reasons may,

10  of course, be probative of whether they are

11  pretext. The more idiosyncratic or

12  questionable the employer's reason, the easier

13  it will be to expose it as a pretext. <u>Loeb v.</u>

14  <u>Textron, Inc.</u>, 600 F.2d 1003, 1012 (1st Cir.

15  1979).

16      In this case, I first note that I am not

17  here to re-litigate or adjudicate

18  Complainant's suspension in 2002 for printing

19  pornography on government computers or his

20  termination. Consistent with my prior Orders,

21  Complainant's termination was litigated before

22  the Foreign Service Grievance Board.

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 62 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 62 of 74

61

1    Notwithstanding this fact, I did permit

2    Complainant some latitude to demonstrate that

3    procedural irregularities in how Miller

4    conducted Agency business vis a vis

5    Complainant may demonstrate animus toward

6    Complainant.

7        Contrary to Complainant's arguments, I

8    note that the record is full of corroborating

9    documents in support of the Agency's efforts to

10    suspend Complainant for downloading and

11    printing pornography in 2002. See Exhibit C-

12    21. The record also contains abundant

13    evidence documenting Complainant as having

14    committed several ethical and financial

15    violations that ultimately resulted in his

16    termination. See Agency's Motion for Summary

17    Judgment providing the decision of the Foreign

18    Service Grievance Board upholding the decision

19    to terminate Complainant.

20        Any procedural missteps were considered

21    by the Foreign Service Grievance Board

22    regarding Complainant's termination and don't

62

1    lead to any inference of discrimination or retaliation

2    regarding the earlier adverse actions pending

3    before me.

4        Regarding Complainant's argument that

5    Miller and FAS management ignored the OIG

6    report and investigated Complainant while

7    ignoring transgressions of others like

8    Burkett, I first note that Complainant

9    misunderstands the memo from OIG. The fact

10   that OIG declined to refer the matters for

11   criminal prosecution only means that, in the

12   opinion of OIG, Complainant's transgressions

13   did not rise to the level of criminal conduct, *resources to conduct*

14   under applicable U.S. code sections. *sufficient to justify* *an investigation* The

15   Agency, however, had evidence of several

16   serious violations of Agency rules and

17   regulations, and I cannot infer any animus by

18   the Agency in proceeding with an

19   administrative investigation of those charges.

20       While Complainant argues that Burkett

21   spoke harshly about FAS, See Exhibit C-3, and

22   was out on leave on numerous occasions and yet

· 63

1   was not disciplined, See Exhibit C-37, such

2   transgressions pale in comparison to the

3   offenses investigated and ultimately

4   substantiated by the Foreign Service Grievance

5   Board. . In this regard, I note that in

6   discipline cases for employees to be

7   considered similarly situated all relevant

8   aspects of the Complainant's employment

9   situation must be nearly identical to those

10  indicated as comparative employees. Martin v.

11  U.S. Postal Serv., 94 FEOR 3092, (1993); Payne

12  v. Illinois Central Railroad, 665 F. Supp.

13  1308, 1333 (W.D. Tennessee 1987); O'Neal v.

14  U.S. Postal Serv., EEOC Request No. 05910490

15  (July 31, 1991). Thus, in order to be

16  similarly situated, other comparative

17  employees must have reported to the same

18  supervisor, must have been subjected to the

19  same standards governing discipline and must

20  have engaged in conduct similar to

21  Complainant's without differentiating or

22  mitigating circumstances that would

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS

64

1    distinguish    their    misconduct    or    the

2    appropriate discipline for it.  *Id.*

3        Burkett is not similarly situated to the

4    Complainant because her transgressions were

5    not nearly as severe.  Therefore, Burkett is

6    not a valid comparator, and any difference in

7    treatment    by    Miller    is    not    relevant    to

8    establish pretext.

9        To the extent Miller sent a curt email

10    to Complainant about his use of annual leave,

11    and    then    verbally    reprimanded    him    as

12    Complainant alleges, I note that this one

13    incident occurred in 1998, six years prior to

14    the incidents giving rise to this complaint.

15        Clearly, Miller did not like, as a

16    supervisor, being told by an employee that the

17    employee was simply going to take vacation.

18    However, I infer no animus based on race,

19    gender, EEO activity or age, based on Miller's

20    rather curt remark.  Indeed, age would not

21    apply as Complainant was not 40 years old at

22    the time the remark took place in 1998.

65

1    To the extent Complainant, Perkins, and
2    others had problems with how Miller supervised
3    the unit when he became the head of the unit
4    in 2001, I note that such evidence supports a
5    conclusion that Miller was not a good
6    supervisor at that time – and not that Miller
7    harbored animus based on race, gender, age, or
8    prior EEO activity.  Indeed, Perkins testified
9    that everyone was upset with Miller's
10   leadership skills and his playing employees
11   off each other.  Perkins noted that among
12   those employees who complained, it included
13   Robert Tse, an Asian male, and Marlene
14   Phillips, a white female, as well as
15   Complainant, a black male, Perkins, a black
16   female, and two other black female
17   secretaries.  Clearly, people of different
18   races and genders were not happy.  So I cannot
19   infer animus by Miller.  I can only infer that
20   he did a poor job supervising many of his
21   employees from the perspective of those
22   employees at that time.

66

1       Regarding contradictory testimony by

2   Bruce *Henwood and* Miller about who is responsible for

3   contacting Complainant to advise him that he

4   could have and should have submitted his own

5   assessment of his performance for the 2005

6   Promotion Board to consider, I note that

7   Complainant presented insufficient evidence

8   that this inconsistency was motivated by race,

9   gender, age, or EEO activity. I note that

10   during this time, Complainant was on

11   administrative leave with pay while the Agency

12   was addressing how to respond to the numerous

13   allegations of misconduct. Complainant had

14   been barred from the facility at that time.

15   Under the circumstances, more likely than not,

16   any animus by Miller in not contacting

17   Complainant was more likely on account of his

18   overall feeling that Complainant could not be

19   trusted based on the allegations and

20   misconduct investigations that were on-going

21   at that time.

22       While an Agency representative could

67

1   have contacted Complainant, I note that

2   Complainant could also have submitted

3   information by mail or fax or email. The

4   evidence shows that Complainant had completed

5   such assessments in prior years. The evidence

6   also shows that the application process

7   occurred at the same time every year.

8   Complainant's argument that he had to

9   coordinate the preparation of his assessment

10  with Miller, but was threatened with further

11  disciplinary action if he contacted Miller or

12  showed up at the Agency facility is not

13  sufficient to establish animus by Miller based

14  on race, gender, age or prior EEO activity.

15  Complainant could have submitted an assessment

16  and Miller could have contacted the

17  Complainant, even through Human Resources.

18  Both their failures do not lead me to conclude

19  that Complainant was discriminatorily denied

20  the opportunity to participate in the 2005

21  Promotion Boards.

22      I also note that also Bruce seemed to

68

1    suggest in an affidavit to an EEO investigator

2    that Complainant's EEO activity played a role

3    in Complainant not getting a promotion in

4    2005, See SROI Tab 6E at 258-59.  However, I

5    find that Bruce credibly testified that the

6    investigator    improperly    summarized    her

7    statement, and she should have read her

8    statement more carefully before signing it.

9    Bruce was very credible when she testified,

10   and I could infer no intent to deceive from

11   the tone and pace of her speech or her body

12   language generally.  Moreover, aside from this

13   one apparently inappropriate remark from the

14   investigator, there is credible evidence from

15   Chaudhry as to how the 2005 Promotion Board

16   rated Complainant and recommended others for

17   promotion independent of Complainant's EEO

18   activity.    Thus, I credit Bruce's testimony

19   and do not find that the statement in the

20   Supplemental Report of Investigation ▄▄▄▄ has

21   any credibility or that Complainant's EEO

22   activity had any impact or bearing in the 2005

Case 1:07-cv-02221-ESH   Document 9-12   Filed 05/09/2008   Page 70 of 74
Case 1:07-cv-02221-ESH   Document 5-3   Filed 03/26/2008   Page 70 of 74

69

1   promotion process.

2        Finally, regarding Complainant's

3   argument that FAS management has a culture of

4   discriminating against minorities and in

5   particular black males, as well as older

6   employees or those who have engaged in EEO

7   activity, I find that Complainant's evidence,

8   at best, may relate to the atmosphere of FAS

9   in the '80s and early 1990s. Complainant's

10  evidence that the atmosphere of bigotry in FAS

11  continues, and that it impacted his

12  assignments and promotions in 2004 and 2005,

13  amounts to nothing more than speculation on

14  his part.

15        By contrast, Complainant's conduct

16  issues resulted in his security clearance

17  being suspended and his ultimate termination.

18  Credible evidence from Lee established that

19  Complainant could not be assigned to an at-

20  grade or stretch assignment, while his clearance was suspended. Moreover, the

21  benefits of such assignments were not

22  available while his security clearance was

Case 1:07-cv-02221-ESH    Document 9-12    Filed 05/09/2008    Page 71 of 74
Case 1:07-cv-02221-ESH    Document 5-3    Filed 03/26/2008    Page 71 of 74

70

1    suspended. Complainant fails to present any

2    evidence that suggests that his race, gender,

3    EEO activity or age impacted any of these

4    decisions, as well as the promotion decisions

5    in 2004, 2005, or the Complainant's ability to

6    act for Miller in his absence.

7         Finally, I cannot ignore the record of

8    misconduct    in    this    case    regarding

9    Complainant's actions that led first to his

10   seven-day   suspension   for   downloading   and

11   printing pornography, and then ultimately to

12   his   termination   for   several   different

13   violations.   These   facts   further   impact

14   Complainant's   credibility,   and   as   between

15   Complainant's testimony and that of Miller and

16   the   other   Agency   management   officials,

17   Complainant simply fails to establish by a

18   preponderance   of   the   evidence   that

19   discrimination or retaliation more likely than

20   not motivated the Agency's actions in the six

21   claims that I address at this hearing.

22

Case 1:07-cv-02221-ESH   Document 9-12   Filed 05/09/2008   Page 72 of 74
Case 1:07-cv-02221-ESH   Document 5-3   Filed 03/26/2008   Page 72 of 74

71

## Conclusion

1

2   Based on a careful analysis of the record,

3   and after hearing and assessing the

4   credibility of the witnesses at the hearing, I

5   conclude that Complainant failed to

6   demonstrate that more likely than not,

7   discriminatory animus motivated the Agency's

8   actions. Accordingly, judgment in favor of

9   the Agency is appropriate.

10                  End of bench decision.

11                  Closing instructions.

12     I want to thank you all for your

13   participation and cooperation during the

14   hearing. Pursuant to the EEOC's Management

15   Directive 110 at page 7-16, the court reporter

16   shall send all copies of the transcripts and

17   exhibits to me.

18     I've already explained to the court

19   reporting service and to the Agency's

20   representative the requirements in order to

21   get the transcripts to me. The Agency has

22   agreed to ensure that the transcripts are

72

1   delivered to me with the exhibits by Friday,

2   early afternoon. Is that fair, Mr. Hardin?

3      MR. HARDIN: Yes, Your Honor.

4      JUDGE KRAVETZ: I've also explained to

5   the court reporter, but I'll put on the record

6   just to ensure that it's clear that the Report

7   of Investigation should essentially be five

8   volumes. Volume I would be the testimony of

9   the first day of the hearing. Volume II would

10   be testimony of the second day of the hearing.

11   Volume III would be the testimony that

12   occurred today which was Complainant's

13   rebuttal and the closing arguments. Volume IV

14   would be all the exhibits. And Volume V would

15   be the bench decision.

16      Thus, the Agency should ensure that

17   there are five separate volumes and that there

18   are three copies, or excuse me, three total

19   sets of all five volumes so in other words,

20   there are three total sets of transcripts.

21   One full set would be the original which would

22   include the original exhibits, the original

73

1   bench   decision   and   all   the   original

2   transcripts.   There should also be two copies

3   of all the exhibits and all the other volumes.

4   And all 15 volumes, all three sets should be

5   sent   to   me   at   the   EEOC's   Washington   Field

6   Office   at   the   address   provided   to   the   court

7   reporter.   I will then make appropriate edits

8   to   the   bench   decision,   as   I   did   stumble

9   through a few words here and there, and I will

10  then issue the bench decision with appropriate

11  instructions and rights, appeal rights to the

12  parties.   And   the   Agency   will   then   have   40

13  days   to   implement   or   not   implement   the

14  decision.

15      Having heard all of the testimony of the

16  approved  witnesses,   the   opening   and   closing

17  arguments of the parties, and since there are

18  no other matters to be discussed, I declare

19  this   hearing   closed   at   2:10.     Thank   you.

20  We're off the record.

21      (Whereupon,   at   2:10   p.m.,   the   bench

22  decision was concluded.)

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS

EXHIBIT 11



**United States Department of Agriculture**

Office of the Assistant Secretary for Civil Rights

Office of Adjudication and Compliance

1400 Independence Avenue SW

Washington, DC 20250

MAR 1 7 2008

Mr. Karl Hampton
1250 4th Street, S.W. W511
Washington, DC 20042

**Re: USDA Complaint No.: FAS-2007-00895**

Dear Mr. Hampton:

This letter acknowledges receipt of and accepts your Equal Employment Opportunity (EEO) complaint of discrimination against the Foreign Agricultural Service (FAS), dated October 22, 2007, and based on the facsimile date is considered filed on October 23, 2007.[1] Please refer to this complaint number in any future communication on the subject EEO complaint.

We are accepting and referring for investigation the following allegations:

> Whether the agency subjected the complainant to discrimination based on race (African American), sex (male), age (D.O.B.: 5/27/62) and reprisal (prior EEO activity), when:
>
> 1. subsequent to his termination, management refused and/or delayed in paying him for 651 hours of annual, restored and credit time; and,
> 2. on June 11, 2007, he learned that he had been placed on a "stay out" list which resulted in his being denied access to the Agriculture Building and its' amenities such as the Credit Union?

The Department of Agriculture (Department) is required under 29 C.F.R. §1614.108 to complete an impartial, factual and appropriate investigation of the accepted claim within 180[2] days of the date the subject EEO complaint was filed. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. The complainant and the Department may voluntarily extend the 180-day time period not to exceed an additional 90 days. In addition, the Department may unilaterally extend the 180-day time period or any period of extension for not more than 30 days where it must sanitize a complaint file that contains classified information.

When the investigation begins, an EEO Investigator will contact you. You are required to cooperate fully with the EEO Investigator. Failure to do so may result in dismissal of your EEO complaint. You must present to the EEO Investigator all the information you

---

[1] The FAS Civil Rights Office provided a supplemental EEO counselor report on March 11, 2008.

[2] All references to days refer to calendar days unless specified otherwise.

7007 0220 0001 3719 5673

Karl Hampton
Page 2

wish considered relevant to the accepted claim. In addition, you must provide the EEO
Investigator with the names of any witnesses you believe should be contacted.

You must keep the agency informed of your current address. If the Department is unable
to locate you, your complaint may be dismissed under 29 C.F.R. §1614.107(a)(6).

When you receive the EEO investigative report, you will be notified of your right to elect
either an agency decision based on the record or a hearing with a decision from an Equal
Employment Opportunity Commission (EEOC) Administrative Judge (AJ). The
notification will provide you with the specifics on how to exercise your election rights.

If you have not received the EEO investigative report after 180 days from the filing of
your EEO complaint, you have the right to request a hearing from an EEOC AJ. Should
you request a hearing, you must send your request to the EEOC District Office and
address identified in the enclosed document. Additionally, you must certify to the EEOC
that a copy of the hearing request was sent to the following address:

> Civil Rights Director
> Foreign Agricultural Service
> United States Department of Agriculture
> Mail Stop: 0509
> 1400 Independence Avenue, S.W.
> Washington, DC  20250

If you do not agree with the defined claims, you must provide us with sufficient reasons,
in writing, within 7 calendar days of receipt of this letter. The statement should be sent to
the following address:

> Division Chief, Employment Complaints Division
> Office of Adjudication and Compliance
> United States Department of Agriculture
> 1400 Independence Avenue, S.W.
> Stop Code 9440
> Washington, DC  20250-9440

The formal complaint also included the claim that you were improperly terminated on
May 1, 2007. The complaint outlined a multitude of events leading up to the termination
including being placed on administrative Leave Without Pay on April 26, 2006, and the
Agency's failure to issue you a final decision regarding the termination, with applicable
appeal rights. These claims are dismissed because on December 6, 2007, you filed civil
action with the United States District Court for the District of Columbia on the
termination and the specific events surrounding the termination.[3] Additionally, on
October 22, 2007, the USDA issued a Final Agency Decision implementing the EEOC

---

[3] Case number: 107-CV-02221.

Karl Hampton
Page 3

AJ's Order[4] on complaint number FAS-2005-00909, which addressed events between
October 2004 and November 2005, leading to the termination.

Incorporated within regulations promulgated by the EEOC is the concept that dual
processing of the same charge is wasteful of governmental resources. Accordingly,
complainants sometimes have choices between forums in which they wish to pursue their
concerns, but once such a choice is made, only one avenue is available. One of those
choices is to file a civil suit. If more than 180 days have passed since filing an EEO
complaint without receiving a final agency decision, and a civil suit is filed on the same
matter, the EEO complaint must be closed. See Washington v. Department of
Agriculture, EEOC Appeal No.: 01A35065 (February 25, 2004). Additionally, claims
that have already been decided by the Agency or the EEOC must be dismissed.
Consequently, this information may only be presented to the investigator as background
information to the accepted claims. The regulatory basis for this decision is found at 29
C.F.R. §1614.107(a)(4).

In accordance with 29 C.F.R. §1614.107(b), our determination that the cited issues are
dismissed will be reviewed by an EEOC AJ, if you request a hearing on the remainder of
the subject EEO complaint. However, you may not appeal this dismissal until a final
action is taken by the Department on the remainder of your complaint.

Please be advised that, consistent with EEOC regulations and the Secretary of
Agriculture's strong commitment to the early resolution of EEO complaints, parties are
encouraged to seek resolution at any stage of the EEO complaint process. Settlement
discussions may take place throughout the administrative complaint process. If
resolution is achieved, a copy of the settlement agreement must be provided promptly to
avoid unnecessary processing and additional cost. Likewise, if at any stage of the EEO
complaint process you wish to voluntarily withdraw your complaint, you must provide
promptly written notification of your desire to withdraw your EEO complaint. The
withdrawal notice must be signed, dated, and contain the EEO complaint number. To
ensure prompt receipt, please fax a copy of the voluntary settlement agreement or
voluntary withdrawal notice to the Complaints Adjudication Division, at Fax Number
(202) 401-8035.

---

[4] EEOC Case number 100-2006-00080X

Karl Hampton
Page 4

Please contact the Customer Service Unit at 1-800-795-3272 if you have questions or
concerns regarding the status of this complaint.

Sincerely,

Kenneth J. Baisden, Sr.
Division Chief
Employment Complaints Division

Enclosure

cc:   Civil Rights Director, FAS
      ECD Liaison

EXHIBIT 12

# EEO COMPLAINT INPUT AT INTAKE

**Name of Complainant:**    **Karl Hampton**

Social Security No. ▓▓▓▓▓▓▓

Home Address: 700 7th Street, S.W. #225, Washington, D.C. 2002

Work Address:    Office of Outreach and Export Assistance, Office of the Administrator
14th & Independence Ave. SBldg. Rm 3114, Wash., D.C. 20250

Work Phone: 202 690-0188

Job title/Series Grade: Agricultural Economist/FO-3

Employing Agency: Foreign Agricultural Service, USDA

Status (i.e. permanent, part-time, intermittent, Schedule A, probationary, etc.): Permanent

Organization: United States Department of Agriculture

Responding Agency: Foreign Agricultural Service, USDA

Name of Counselor: Zee Wallace        Phone No. 202 720-7233

Date of Incident (or when became aware): July 16, 2004 – December 1986

Date of Initial contact: July 16, 2004

**Issues: (circle all that apply)**
Appointment/hire
Awards  x
Assignment of duties   x
Conversion to Full Time
Disciplinary Action
    Demotion
    Suspension   x
    Termination   x
    Other   x
    Duty Hours
    Equal Pay Act Violation   x
    Examination/Test
    Time and Attendance
    Training
    Terms – condition of employment

Evaluation        x
Harassment        x
Pay (including overtime
Promotion (non selection)  x
Reassignment   x
Request Directed or denied
Reinstatement
Retirement

**Exhibit**

**Page** 1 of 56

Reasonable Accommodation, Other

**Specific of Issue(s): (circle)**

**Basis(es)**
      Age   x
      Color   x
      National Origin (specify, i.e., Hispanic)   x
      Religion (specify)
      Reprisal   x
      Disability
      Sex   x
      Race (Black _x_ White_____ Asian_____ American Indian_____
      Sexual Orientation - Male
      Marital Status - Divorced

**Union (Yes)   x    No_____**

**Anonymity (Yes) _____ (No)  x**

**Representative:  (Yes x No_____)**

      Name/Firm: To be named at a later date.
      Address
      Phone No.

| **Receipt of Counseling Process documents from Counselor:** |
| **Initials:**           **Date:** |

## Alternative Dispute Resolution

In compliance with EEOC Management Directive 29 CFR 1614, Alternative Dispute Resolution options were discussed and offered during the informal counseling stage.  Complainant chose:

- To accept ADR/Mediation   _____

- Not to accept ADR/Mediation    ✓

Signature: _Ken S. Sherrington_ Date: _7/19/04_

Exhibit _1_
Page _2_ of _26_

12

# PROBLEM STATEMENT

1. Statement of my problem – Karl Hampton July 19, 2004: *Karl Hampton*

Despite excellent performance, executive-level experience acquired and acknowledgement of outstanding service from various sources inside and outside of the Department, FAS leadership has intentionally denied me a promotion since 1998 based on racial and personal bias. In addition, prior to 1998 FAS kept me at grade FO-04 for nine years. None of my white colleagues has encountered similar in-grade time at the FO-04 level and lack of promotion when having acquired my level of experience and training. The FAS has continued to erect barriers to limit my advancement and success within the agency due to intentional racial discrimination and personal bias.

The Foreign Agricultural Service (FAS), its Administrator A. Ellen Terpstra, my first line supervisor Dale Miller and second line supervisor Director of External Affairs Roy Henwood, the Deputy Administrator for Foreign Agricultural Affairs Lyle Sebranek, the FAS Executive Advisory Group, the Human Resources Division Director, the FAS 1992-95 foreign service commissioning and tenure board, the FO-3 1999 – 2003 FAS foreign service promotion board chairs and members intentionally and personally targeted me for continual prolonged racial discrimination and harassment based on color, gender, age, marital status, skill-set and foreign assignment for career advancement opportunities. This bias treatment, racial discrimination and continual harassment prejudice me financially and emotionally.

I have exhausted all attempts in good faith to resolve these issues with FAS management prior to the filling of this complaint. This includes sharing information regarding FAS racial discrimination with the Under Secretary for Farm and Foreign Agricultural Affairs J.B. Penn and the Assistant Secretary for Civil Rights Vernon Parker and others in USDA.

2. Statement of pertinent facts:

   A. Racial bias and unequal treatment: In August 2003, my supervisor Dale Miller requested FAS Compliance to open an investigation into my conduct allegedly because Mr. Miller was verbally informed by FAS Jim Warden that I misspoke about FAS programs and misrepresented the agency to a non FAS partner Robert Timberlake of North Carolina. Both Director Rod Henwood and Frank Lee, Deputy Administrator was informed of the alleged incident. In a similar situation prior to August 2003, Mr. Miller did not request an investigation whereby the misrepresentation of FAS was noted in writing by a FAS partner, the U.S. Department of Commerce, regarding my more senior white colleague Leslie Burket in the Office of Outreach, Office of the Administrator. Instead Ms. Burket was required to write a statement of apology and has not been allowed to travel without being accompanied. Additionally, her work was reassigned to Tim Powers but she maintains her GS-14 position and salary, even though she rarely comes to work. Robert Tse is also familiar with this incident. The investigation with me is still pending one year later and being used as a means not to give me a senior-level overseas assignment and possibly as a reason to consider termination of my employment with FAS. Since

13

Exhibit 1
Page 3 of 6e

becoming my immediate supervisor in 1996, Mr. Miller has racially discriminated me in the form of sexist and racial jokes (Patricia Perkins and Robert Tse are my witness).

B. Racial bias and unequal treatment: Each of my travel vouchers regardless of the amount is audited by NFC. No one else is my office is audited for travel the same as I am. No one else in my office is subject to scrutiny for travel and activities by Mr. Miller the way he scrutinizes me. Tim Powers, Marlene Phillips and Robert Tse can travel at will, including weekends and can use the rental car without prejudice by Mr. Miller. Marie Rice and Ron Turner went to Jackson, MS in 2004. They rented a car and put lots of miles on it. They were not asked to pay for the extra miles. Again, why I am treated differently?

C. Racial bias and unequal treatment: In January 2002, the FAS Administrator suspended me for a week for allegedly printing pornographic material from the net. Granted, during the alleged printing I was on detail away from USDA. The suspension and letter placed in my promotion file caused me not to be promoted to the FO-2 level according to the promotion board chair Randy Zeitner. Several FAS employees in Washington and overseas had been caught doing similar acts prior to FAS's accusation of me. However, my white colleagues, including the Foreign Service officers, were not suspended and a letter placed in their promotion file. Additionally, regarding this situation, my supervisor did not counseled or meet with me before raising this issue with HRD for action. In a yet similar situation but more provocative, the Deputy Administrator for Foreign Agricultural Affairs, Lyle Sebranek and his formal Assistant Deputy Administrator Suzanne Heinen was caught having sex on a Friday evening in his seven wing office by James Dever. Instead of investigating him for the sexual act, he is under investigation for favoring an employee for promotion. My supervisor Dale Miller has had sexual relations with Denise Huttenlocker and Lisa Twedt. There are others situations I can name in the Department where no investigation was conducted.

D. Racial bias and unequal treatment: I have requested TDY assignments (Hong Kong, Kula Lumpur for example) abroad and stretch assignment at the FO-2 level in a variety of posts including Pakistan, Ivory Coast, Domininical Republic, Miami, Venezuela, Mexico City, etc. Mr. Sebranek and the EAG have not offered me one TDY or stretch assignment, not even Pakistan. My white Foreign Service officers have been given more time than not what they requested for their first preference, but not me. Before returning to Washington I requested an onward assignment but was denied. Several of my white colleagues were given onward assignment including my replacement in Brazil Leslie O'Connors.

E. Training: Mr. Miller as refused to institute the rotating training assignment for the four GS-14 level individuals on his staff during his present as well as while he is away from the office. His refusal is aimed primary to deny me the opportunity and experience of managing at the Deputy Director level. On several occasions, he has verbally informed Tim Powers and Ron Turner that he is out but does not provide that courtesy to me, Robert or Patricia Perkins. Mr. Miller and the agency prejudice my career advancement

Exhibit  1
Page  4  of  96
Karl Thompos

by denying me the opportunity to utilize my recent executive development training and previous management training.

3. Analysis of the facts:

   1. I think the causes of the situation are: Historically, FAS management culture is racially biased based on color, gender, age, marital status as well as skill set possessed. I also believe that the discrimination and reprisal towards me dates back to the 1985 FAS Class Action Law Suit. At age 23, I was the first African American male hired following the class suit and the first in 1987 after ten years. The agency hired and promoted white females instead of African Americans, a loophole left in the legislative language for the minority definition. The FAS was and is predominately dominated by white males and used this loophole to their benefit, preference and sexual pleasures. I have personal knowledge of many situations. I believe I was hired in 1987 to be a test case to fail. Many of the individuals hired the same year as me and after with FAS have been promoted at a faster rate than I have. This is because of racial bias and preference as was told to me by the great Donald Novotny, Director of Grain and Feed Division. Several African Americans representatives such as Frank Lee and Mattie Sharpless fought hard to bring me aboard based on my resume. However, many whites such as Richard McDonald and Forest Gerkin who interviewed me thought otherwise and told me so. Following my December 1986 interviews, the recruiter Larry Klopeck informed me that many of the whites thought that I would not be able to transition from rural Mississippi to urban Washington, or that I would not get along with the predominately white FAS. In fact, I was told on several occasions by my supervisors and senior-level managers that my work performance was outstanding but that none of this could be written on my behalf. FAS did not intend for me to get into the foreign service, but I did after overcoming the odds. However, FAS attempted to kick me out in 1995 but to no avail as I won my grievance complaint against the supervisory assessment. The FAS has traditionally promoted individuals with good technical skills but poor management skills. This is a major problem of the agency. My supervisor Dale Miller is an example of this. Mr. Miller lack effective leadership and management skills. FAS managers should be required to take management training every year and have at least one element rated by their employees.

   2. I have noticed the following effects from it: Excessive complaints filed against managers, loss of many cases by FAS management, lack of management promotion opportunities for minorities, lack of stretch assignments for minorities, lack career advancement opportunities and harsh treatment by my supervisors that is no corrected by upper management.

   3. The place where this happens is: In the workplace in Washington, D.C. and Brasilia

Exhibit 1
Page 6 of 56

Karl Harris

15

4.    The time this occurred is: The present and dating back to December 1986.

5.    Other pertinent comments are:

4.    Possible solutions:

A.  These solutions have been tried:  To no avail, I have attempted come to a productive medium to work with my supervisor Dale Miller, Director External Affairs Roy Henwood, and FAA Deputy Administrator Lyle Sebranek.

B.  Other possible solutions that occur to me are:  Re-assignment and promotion to

1)  A leadership post/assignment abroad at the FO-1 level and promotion and overseas assignment guaranteed for promotion within 3-5 years into the Senior Foreign Service.

2)  Conversion to Civil Service at the GS-15 level and acceptance into the Senior Executive Service within 3-5 years.

3)  Placement in another federal USDA agency at the GS-15 level and acceptance into the Senior Executive Service within 3-5 years.

4)  Compensation for back pay and benefits not less than $1 million and punitive damages in the amount of $5 million

5)  Retirement from FAS service with salary and benefits paid at the FO-1 step 10 Washington-based cost of living adjusted level until January 2012, my 50th birthday, and retirement age for the Foreign Service.

5.    I am requesting the following solution:

1)  Compensation for back pay and benefits not less than $1 million, and punitive damages in the amount of $5 million.

2)  Retirement from FAS – Salary and benefits paid at the FO-1 step 10 Washington based cost of living level until January 2012, my 50th birthday.

Exhibit _____1_____
Page _6_ of _56_

16

EXHIBIT 13

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**

United States Department of Agriculture                    300 7th Street SW, Room #607
Civil Rights Employment Complaints and Adjudication Division     Washington, DC 20050

1.    Name    (First)    (Mi.)    (Last)

[ ✓ ]Mr. [ ]Ms.  *Karl Hampton*          [ ]USDA Employee    [ ]USDA Applicant

2.  w/c Address  *U.S. Department of Agriculture*    3. 7.  Telephone Number    *Hm Address*
*Foreign Agriculture Service*
*1400 Independence Ave*                    Work ( ) *202- 670-0188*  *700 7th Street S.W.*
(Street)  *Stop 1002   Rm 3121*                            *Apt. 22.*
*Washington D.C. 20250*        Home ( )  *202- 479-0382  Washington, D.C. 20024*
(City)      (State)    (Zip)

4.    Name of Agency Which You Believe Discriminated Against You

*U.S. Department of Agriculture, Foreign Agriculture Service, Stop 1002*
(Office)
*Washington D.C.  20250*
(City)      (State)      (Zip)

5.    Bases of Discrimination on Which You Were Counseled (Do not include bases for which you did not receive counseling.) The bases are age, race, color, national origin, religion, sex, physical or mental disability, marital status, sexual orientation and reprisal. Be specific in your identification of bases (i.e., age (55), sex (female), race (white)).

*Race (Black)  Reprisal.*

6.    Issues(s) on Which You Were Counseled (Do not include issues or allegations for which you did not receive counseling. Provide, if you deem necessary, additional details on reverse side.) Be specific with exact issue and the date of the issue (i.e., Non-selection to Vacancy Announcement USDA-96-174, Secretary, GS-318-9, on March 1, 1996, or two day suspension for misconduct on January 29 & 30, 1996.) You do not need to elaborate on why you feel this was discriminatory, you will be given the opportunity to support your complaint during the investigation process.

*Phillip E. Thompson*

7.    Representative, if any

*Phillip E. Thompson*                    *(304 599-5585*
(Telephone Number)
(Street) *9450 Pennsylvania Ave*  Suite 4  (City) *Upper Marlboro*  (State) *MD*  (Zip) ~~20747~~ *20772*

8.    Name of EEO Counselor Contacted

*Delois Ruffin*

9.    Requested Corrective Action

*Promotion  Grant Position  Damages.*

10.    Signature  *[signature]*        Date
(Month) *10*  (Day) *29*  (Year) *2004*

EXHIBIT 14



**USDA**

United States
Department of
Agriculture

Mr. Phillip Thompson, Esquire
9450 Pennsylvania Avenue, Suite 4
Upper Marlboro, Maryland 20772

DEC 1 0 2004

Office of the
Assistant Secretary
for Civil Rights

Re: **EEO Complaint of Karl Hampton # 050077**

Office of
Civil Rights

Dear Mr. Thompson:

1400 Independence
Avenue SW

Washington, DC
20250

This letter acknowledges receipt of and accepts your client's Equal Employment
Opportunity (EEO) complaint of discrimination dated October 29, 2004. Based on the
postmark of the envelope transmitting this EEO complaint of discrimination against the
Foreign Agricultural Service (FAS), it is considered filed on October 30, 2004. It has
been assigned the complaint number shown above. Please refer to this complaint number
in any future communication on the subject EEO complaint.

We are accepting and referring for investigation the following claims:

Whether the agency subjected the complainant to discrimination based on race
(black), age (DOB: 5/27/62), color (Black), sex (male) and reprisal (prior EEO
activity), when:

1. on June 30, 2004, complainant's security clearance was suspended;
2. on July 8, 2004, complainant's supervisor submitted his travel voucher
   without his signature; and
3. he was not allowed to act because his supervisor refused to institute rotating
   acting assignments?

If the complainant desires, he may submit a written statement concerning the agency's
articulation of the accepted claims. Any such statement must be submitted within 7
calendar days from receipt of this letter and will be included in the complaint file. The
statement should be sent to the following address:

> United States Department of Agriculture
> **Office of Civil Rights**
> **Employment Complaints Division**
> Intake, Accept/Dismiss Branch
> 1400 Independence Avenue, S.W.
> Stop Code 9440
> Washington, DC 20250-9440

The following allegations are dismissed and will not be investigated since they are
discrete acts and these acts did not occur within the regulatory time limit[1] for contacting
an EEO Counselor. Therefore, this act will be investigated only for background purposes

---

[1] Claims of discrete acts (unlawful employment practices) must be filed within the regulatory time limit of
45 days.

224

Exhibit 3
Page 1 of 4

2

pursuant to the ruling by the U.S. Supreme Court[2], See National Railroad Passenger Corp. v. Morgan, 122 S. Ct. 2061 (Jun 10, 2002, and Ornelas v. Department of Justice, EEOC Appeal No. 01995301 (September 26, 2002):

- he was not given a performance review since 2000;
- he was not granted an award in past 2 years;
- he was denied his requests for Temporary Duty or stretch assignments to a foreign post since 2001;
- his travel voucher was audited by the National Finance Center since 2001; and
- he was subjected to racial comments and jokes since 2001?

In addition, the following allegations are dismissed in its entirety pursuant to Equal Employment Opportunity Commission (EEOC) Regulation 29 C.F.R. §1614.107(a)(2) because the complainant failed to contact and Equal Employment Opportunity (EEO) Counselor within the regulatory time limit.

Record evidence indicates that the complainant contacted the EEO Counselor on July 19, 2004, alleging that he was discriminated based on race (Black), age (DOB: 5/27/62), color (Black), National Origin (Black), sex (Male) and reprisal (Prior EEO Activity) when:

- he was required to serve two probationary period when he was hired in 1986;
- he was denied a promotion since 1998;
- he was suspended from duty without pay for 7 calendar days in January 2003;
- he was denied assignment to an overseas post for 2 years after entering the Foreign Service; and
- his supervisor requested FAS Compliance Staff to investigate his conduct in August 2003?

Efforts to resolve the complaint failed and the complainant was issued a Notice of Right to File (NRF) on October 15, 2004. The complainant received the NRF on October 18, 2004, and filed a timely formal discrimination complaint on October 30, 2004.

EEOC regulation 29 C.F.R. §1614.105(a)(1) requires that complaints of discrimination be brought to the attention of the EEO Counselor within forty-five (45) days of the date of the matter alleged to be discriminatory or, in the case of a personal action, within forty-five (45) days of the effective date of the action. The Commission has adopted a "reasonable suspicion" standard (as opposed to a "supportive facts" standard) to determine when the forty-five (45) day limitation period is triggered. See Howard v. Department of the Navy, EEOC Request No.05970852 (February 11, 1999). Thus, the time limitation is not triggered until a complainant reasonably suspects discrimination, but before all the facts that support a charge of discrimination have become apparent.

---

[2] Claims of discrete acts, if time barred are not actionable even if they relate to acts, which are timely. However, the untimely acts may constitute background information.

Exhibit 3
Page 2 of 4

3

In addition, EEOC regulations provide that the agency or the Commission shall extend the time limits when the individual shows that he was not notified of the time limits and was not otherwise aware of them, that he did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, that despite due diligence he was prevented by circumstances beyond his control from contacting the Counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

In accordance with 29 C.F.R. §1614.107(b), our determination that the cited claims are dismissed, and will be reviewed by an administrative judge at the Equal Employment Opportunity Commission (EEOC) if the complainant requests a hearing on the remainder of the subject EEO complaint. However, the complainant may not appeal this dismissal until the Department takes a final action on the remainder of this complaint.

The Department of Agriculture (Department) is required; less than 29 C.F.R. §1614.108 to complete an impartial, factual and appropriate investigation of the accepted claim within 180[3] days of the date the subject EEO complaint was filed. An appropriate factual record is one that allows a reasonable fact finder to draw conclusions as to whether discrimination occurred. The complainant and the Department may voluntarily extend the 180-day time period not to exceed an additional 90 days. In addition, the Department may unilaterally extend the 180-day time period or any period of extension for not more than 30 days where it must sanitize a complaint file that contains classified information. When the investigation begins, the complainant will be contacted by an investigator. The complainant is required to fully cooperate with the investigator. Failure to do so may result in dismissal of the EEO complaint. The complainant is required to present to the investigator all information he wishes considered relevant to the accepted claim. Also, the complainant is required to provide the investigator with the names of any witnesses he believes should be contacted.

The complainant must keep the agency informed of his and your current address. If the Department is unable to locate the complainant, it may dismiss this EEO complaint under 29 C.F.R. §1514.107 (a) (6).

When the complainant receives the investigation report; he will be notified of his rights to elect either an agency decision based on the record or a hearing with a decision from an Equal Employment Opportunity Commission (EEOC) administrative judge. The notification will provide the complainant with specifics on how to exercise his election rights.

If the complainant has not received the investigation report after 180 days from the filing of his EEO complaint, he has the right to request a hearing from an EEOC administrative judge. Should the complainant request a hearing, he must send the request to the EEOC office designated in the initial letter we sent acknowledging receipt of the complaint. As

[3] All references to days refer to calendar days unless specified otherwise.

Exhibit 3
Page 3 of 4

226

4

instructed in that letter, the complainant must also certify to the EEOC that a copy of the hearing request was sent to the following address:

> United States Department of Agriculture
> **Foreign Agricultural Service**
> **Civil Rights Director**
> Mail Stop: 0509
> 1400 Independence Avenue, SW
> Washington, DC 20250

Please also be advised that, consistent with EEOC Regulations and the Secretary of Agriculture's strong commitment to the early resolution of EEO complaints, parties are encouraged to seek resolution to complaints at any stage of the EEO complaint process. Settlement discussions may take place throughout the administrative complaint process. If a resolution is achieved, a copy of the settlement agreement must be provided to this office promptly to avoid unnecessary confusion and additional cost. Likewise, if at any stage of the EEO complaint process you wish to voluntarily withdraw your complaint, you must promptly provide to this office, a written request to withdraw your EEO complaint. The withdrawal request must be signed, dated, and include your EEO complaint number. To ensure prompt receipt, please fax a copy of the voluntary settlement agreement or voluntary withdrawal directly to the **Employment Adjudication Division, at Fax Number (202) 401-8035.**

If there are any questions or concerns regarding the status of this complaint, please call the **CUSTOMER SERVICE UNIT** at 1-800-795-3272.

Sincerely,

Gail Booker-Jones
Chief, Employment Complaints Division
Office of Civil Rights

Enclosure:    EEOC Field Office

        cc:    Civil Rights Director, FAS

            Mr. Karl Hampton
            700 7th street SW
            Apartment 22
            Washington, DC 20024

            Liaison FAS

Exhibit 3
Page 4 of 4

227

EXHIBIT 15



**received**
10·14·05  AM.
FAS·CR050077

# MEMO TO DIRECTOR OF CIVIL RIGHTS

United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Foreign
Agricultural
Service

1400 Independence
Ave, SW
Stop 10xx
Washington, DC
20250-10xx

**DATE:**     September 29, 2005

**TO:**     USDA, Office of Civil Rights

**FROM:**     Karl Hampton
Office of Outreach and Exporter Assistance

**SUBJECT:**     Request to amend my EEO Complaint  (050077) and your letter dated
September 20, 2005 to include the attached complaint: Denial of
promotion, TDY assignment and overseas assignment.


The Foreign Agricultural Service denied me another promotion during the September 19-
20, 2005, Foreign Service promotion boards for the Foreign Agricultural Service Officers.
FAS's denied me promotion benefits and overseas assignment for 3-years tour of duty and
temporary duty.

Enclosures:

EEO Intake and Problem Statement
Supporting Documentation for Problem Statement

## AMENDMENT TO EEO COMPLAINT #050077
## EEO COMPLAINT INPUT AT INTAKE

| | |
|---|---|
| Name of Complainant: | Karl Hampton |
| Social Security No.: | 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 |
| Home Address: | 700 7th Street, S.W.  #225, Washington, D.C.  20024 |
| Work Address: | USDA Washington, South Building, Rm 3114, 20250 |
| Work Phone: | On Administrative Leave Since January 27, 2005 |
| Job Title/Series Grade: | Foreign Agricultural Affairs Officer, FO-0135-03, Agricultural Economist |
| Employing Agency: | Foreign Agricultural Service, USDA |
| Status: | Permanent (Administrative Leave since January 27, 2005) |
| Organization: | United States Department of Agriculture |
| Responding Agency: | Foreign Agricultural Service |
| Name of Counselor: | Zenobia Wallace:  Amendment to present EEO Complaint #050077 |
| Phone No.: | 202 720-7233 |
| Date of Incident: | January 27, 2005 to Present June 20, 2005. *September & October KH* |
| Date of Initial contact: | Amendment to present EEO Compliant # 050077 |

Issues: (circle all that apply)

| | |
|---|---|
| Appointment/hire | Evaluation |
| **Awards** | Harassment |
| **Assignment of duties** | Pay (including overtime) |
| Conversion to Full Time | **Promotion (non selection)** |
| Disciplinary Action | Reassignment |
| Demotion | Request Directed or denied |
| Suspension | Reinstatement |
| **Termination** | Retirement |
| **Other** | Terms – condition of employment |
| Duty Hours | Training |
| Equal Pay Act Violation | Reasonable Accommodation, Other |
| Examination/Test | **Performance Accomplishments** |

Exhibit  1
Page  13 of 56

23

of getting your number

Time and Attendance

**Specific of Issue(s): (circle)**

**Basis(es)**

    <u>Age</u>

    <u>Color</u>

    <u>National Origin</u> (specify, i.e., Hispanic)  **MS/Southern African American**

    Religion (specify)

    <u>Reprisal</u>

    Disability

    <u>Sex</u>

    Race (Black **X** White_____ Asian _____ American Indian ____)

    Sexual Orientation

    Marital Status

**Union (Yes)** __X__ **(No)** _____

**Anonymity (Yes)** _____ **(No)** _____

**Representative: (Yes** x _____ **No** _____ **)**

    Name/Firm:   Philip Thompson Esq.

    Address:     9450 Penn Ave., Suite 4, Upper Marlboro, MD  20772

    Phone No.:   301 599-5385

| Receipt of Counseling Process documents from Counselor: |
| --- |
| Initials: _____ Date: _____ |

Alternative Dispute Resolution

In compliance with EEOC Management Directive 29 CFR 1614, Alternative Dispute
Resolution options were discussed and offered during the informal counseling stage.
Complainant chose:

- To accept ADR/Mediation      _____

- Not to accept ADR/Mediation     X_____

Signature: _Karl Hampton_        Date: _Oct. 24, 2000_

24

Exhibit 1
Page 14 of 56

# PROBLEM STATEMENT

1.  Statement of my problem:

FAS denied me the opportunity to participate in the September 2005 foreign service promotion boards and my ability to compete for a promotion. FAS's discrimination of my employment status (administrative leave) prejudices my opportunities for two promotions 2005 and 2006 and the benefits that come with them. In addition, the FAS's actions also prejudice my advancement for a head of post assignment to be named in the fall of 05 and fall of 06. Since January 27, 2005, the FAS continuously prejudice me financially and emotionally through their discrimination against my career advancement and promotions by denying me the right to work and perform on the job to obtain superior performance accomplishments for the FAS foreign service promotion rating/evaluation cycle April 1, 2004 - March 31, 2005 and also April 1, 2005 – March 31, 2006.

2.  Statement of pertinent facts:

On January 27, 2005, my supervisor/FAS placed me on administrative leave without due cause, sufficient justification or evidence and proposed my dismissal from the federal and Foreign Service. Additionally, since the submission on March 15, 2005 of my response to the supervisor's/FAS's January 27, 2005 proposal/allegation for dismissal the FAS has not reinstated me back to work based on the evidence and information provided in my March 15, 2005 response and my March 18, 2005 oral presentation.

As a result of my being on administrative leave since January 27, 2005, FAS knowingly prejudice my opportunities for a promotion for the FY 04/05 promotion cycle and also for the 05/06 promotion cycle. Their actions will deny me an assignment as head of FAS overseas office beginning the fall of 06 and 07.

3.  Analysis of the facts:

The FAS management knowingly discriminates and is prejudice towards me, an African American from the South, as well as other African Americans and minorities in the Agency.

1.      I think the causes of the situation are:

The FAS upper management is dominated by Caucasian males who are still intimated by educated, competitive African American males. The FAS and some supervisors are racist and are reprising against my filing of an EEO

2.      I have noticed the following effects from it:

I am unfairly prejudice and discriminated with the intent to cause financial strain and emotion duress. My character within the FAS, the Department and the agricultural industry has been defamed. I am denied promotions, awards and head of post assignments opportunities. I have suffered emotionally, mentally and endured financial losses from lack of career advancement.

3.      The place where this happens is:

Foreign Agricultural Service, United States Department of Agriculture

Exhibit
Page 15 of 26

25

Foreign Agricultural Service, United States Department of Agriculture

4.    The time this occurred is:  Since September 2005 and back to January 27, 2005 to the present time.

5.    Other pertinent comments are:

4.    Possible solutions:

A.  These solutions have been tried:  Communication with upper management.
B.  Other possible solutions that occur to me are:
Given two (2) promotions immediately to F0-1 step 10 (GS 15) and promotion to Senior Foreign Service in two years.  Reinstatement back to work from administrative leave and compensation for the prejudice and emotion stress caused.  The supervisor should be removed from his supervisory duties and suspended for two weeks.

5.    I am requesting the following solution:
a.)  Given two (2) promotions immediately to F0-1 step 10 (GS 15/10) and back promotion pay and benefits for the nine years held in grade at F0-04, and denial of grade FO 02 and 01, etc…
b.)  Promoted to Senior Foreign Service in two years.
c.)  Reinstated back to work immediately or full retirement immediately at 80 percent of earnings at the new promotion level of SFS.
e.)  Compensated financially $20 million dollars for the Agency's continuous and intended discrimination, prejudice and emotional duress over my nineteen-year career.
f.)    Assigned immediately my choice of head of post assignment.
g.)   Requests supervisor's suspension for two months and supervisory responsibilities revoked indefinitely.
h.)  Freedom from reprisal, discrimination and prejudice.
i.)   A success career without future prejudice and harm by the FAS/USDA.

26

# EXHIBIT 16



November 20, 2006



**United States
Department of
Agriculture**

Foreign
Agricultural
Service

Civil Rights
Staff

1400
Independence
Ave, SW
Stop 1008
Washington, DC
20250-1008

Mr. Karl Hampton
1250 4th Street #W511
Washington, D.C. 20024

Dear Mr. Hampton:

In response to your letter dated October 10, 2006 reference EEO Case No. 050077, we
will address the key issues you highlighted in your letter which are within the FAS Civil
Rights Staff purview. As you are aware, the Departmental Office of Civil Rights (OCR)
has amended your formal complaint to include the issues you have identified. The Equal
Employment Opportunity Commission's (EEOC), Management Directive (MD) 110
requires that, for the purpose of investigation, like or related issues of the complaint be
consolidated. The investigation process is designed to obtain Reports of Investigation
(ROI), and prepare investigative files in conformance with standards established by
EEOC. Investigations shall obtain evidence from all relevant sources and gather
sufficient information, concerning the bases and issues of the complaint. Please also note
that amendments to a complaint extend the time the agency has for completing the
investigation.

To date the following issues, as you stated them, have been investigated:

1. On June 30, 2004 Complainant's security clearance was suspended;
2. On July 8, 2004, Complainant's supervisor submitted his travel voucher
   without his signature;
3. Complainant was not allowed to act because his supervisor refused to
   institute rotating acting assignments;
4. On January 27, 2005, Complainant received proposal for termination
   from Foreign Service and Federal Service;
5. Personal information was released without Complainant's permission;
6. Complainant was placed on administrative leave with restricted access to
   the worksite;
7. The Complainant's request for a third party neutral to observe his Oral
   Review held on March 18, 2004 was denied;
8. The agency failed to allow Complainant to participate in the September
   2005 Foreign Service Promotion Board;
9. The agency denied the Complainant a promotion in the September 19-23,
   2005 Foreign Service Promotion Board; and
10. The agency denied Complainant promotion benefits and an overseas
    assignment for a three year tour of duty and a temporary duty.

205-3281

The EEO Reports of Investigation (ROIs) on these issues were forwarded to EEOC on May 24, 2006.

Issue: *"The agency failed to adhere to Article 2.5 of the Bargaining Service Agreement for personnel procedures and timeliness regarding the January 27, 2005 "proposal to terminate employment".*

This issue was referenced in Ms. Wallace's email dated June 22, 2006, but was not addressed in the Supplemental ROI submitted by the contractor, CompuCon, Inc, dated May 12, 2006. Therefore, it was determined that the ROI was insufficient and Ms. Wallace directed the contract investigator, Mr. Hawkins, to conduct a follow-up investigation and prepare an Addendum to the Supplemental ROI to specifically address this issue. This Addendum was prepared to address the question of timeliness regarding your proposed termination. Please refer to Exhibit 2 of the Addendum. This follow-up investigation is in accordance with the Departmental guidelines for contract investigations. The Addendum was delivered to your attorney of record, Mr. Phillip Thompson, on August 11, 2006 via Fed-Ex. However, you indicated in your email that he did not receive the Addendum. Subsequently, on October 5, 2006, a duplicate copy of the Addendum was forwarded to both you and your attorney.

You also indicated the signed version of your affidavit was not included in the duplicate copy of the Addendum sent to your and your attorney. Unfortunately, the signed affidavit was inadvertently not incorporated in the duplicate copy of the Addendum. However, enclosed is a copy of your signed affidavit dated July 25, 2006. This document has now been included in the Addendum sent to you and your attorney and is being forwarded to EEOC for inclusion in the record.

Issue: *"FAS proposal to terminate your employment and place you on administrative leave"* was addressed in the original ROI dated June 17, 2005 (see Pages 9 – 13 prepared by CompuCon Inc).

Your amendment dated May 2, 2006 was referred to OCR for guidance because your claims referenced **"termination and reprisal."** OCR issued a letter dated June 22, 2006 explaining that "termination claims" are typically designated a "mixed case" complaint which are typically heard before the Merit Systems Protection Board but your complaint has been assigned to EEOC for hearing. You further indicated the letter from OCR had not been received. Therefore, we have enclosed a copy of OCR's letter dated October 11, 2006 ref: your amendment dated September 26, 2006 for your records.

However, in accordance with CFR 1614.19, your complaint has been assigned to an EEOC Administrative Judge who now has jurisdiction over the processing of your complaint, including the written record **and any additional related amendments.** Should you decide to further modify or amend your current complaint, please submit your documents to the attention of the EEOC Administrative Judge for consideration.

Questions regarding the Foreign Service Grievance process should be addressed to Mr. Ejike Obineche, Agency Representative, Employee Relations Staff, HRD. His email address is ejike.obineche@usda.gov.

We hope that this letter clarifies and responds to the concerns you identified relative to the EEO Investigation process.

Sincerely,

Robert J. Day, Jr.
Director, Civil Rights Staff


Enclosures

Addendum ROI with signed Affidavit
Amendment dated May 2, 2006
USDA Office of Civil Rights Letter dated October 11, 2006

cc: Ned Sloan, Attorney
    EEOC Administrative Judge, Andrew Culbertson

EXHIBIT 17

# EEO COMPLAINT INPUT AT INTAKE

**Name of Complainant:**    Karl Hampton

**Social Security No.:**    ▓▓▓▓▓▓▓

**Home Address:**    700 7th Street, S.W., Apt. #225
Washington, D.C. 20024

**Work Address:**    14th & Independence Ave., S.W., Rm 3121
Washington, D.C. 20024

**Work Phone:**    202 690-0188

**Job Title/Series Grade:**    Outreach specialist/Economist – Foreign Service FO

**Employing Agency:**    Foreign Agricultural Service

**Status (i.e. permanent, part-time, intermittent, Schedule A, probationary, etc.):**

**Organization:**    U.S. Department of Agriculture

**Responding Agency:**

**Name of Counselor:**    **Phone No.:**

**Date of Incident (or when became aware):**    January 27, 2005

**Date of Initial contact:**    January 27, 2005

**Issues: (circle all that apply)**

| | |
|---|---|
| Appointment/hire | Evaluation |
| Awards | **Harassment** |
| Assignment of duties | Pay (including overtime) |
| Conversion to Full Time | Promotion (non selection) |
| Disciplinary Action | Reassignment |
|    Demotion | Request Directed or denied |
|    Suspension | Reinstatement |
|    **Termination** | Retirement |
|    Other | Terms – condition of employment |
|    Duty Hours | |
|    Equal Pay Act Violation | |
|    Examination/Test | |
|    Time and Attendance | |
|    Training | |
|    Reasonable Accommodation, Other | |

Exhibit _1_
Page _1_ of _80_

19

**Specific of Issue(s): (circle)**

**Basis(es)**

      <u>**Age**</u>

      <u>Color</u>

      <u>**National Origin**</u> (specify, i.e., Hispanic)  <u>**African-American**</u>

      Religion (specify)

      <u>**Reprisal**</u>

      Disability

      <u>**Sex**</u>

      Race (Black x_ White_____ Asian _____ American Indian ____)

      Sexual Orientation

      <u>**Marital Status**</u>

**Union (Yes)** __**x**_____ **(No)** _____

**Anonymity (Yes)** _____ **(No)**   x

**Representative: (Yes**__**x**___ **No** _____**)**

      Name/Firm    Philip Thompson Esq.

      Address:      9450 Penn Ave., Suite 4, Upper Marlboro, MD  20772

      Phone No.:   301 599-5385

---

**Receipt of Counseling Process documents from Counselor:**
**Initials: _____ Date: _____**

---

Alternative Dispute Resolution

In compliance with EEOC Management Directive 29 CFR 1614, Alternative Dispute Resolution options were discussed and offered during the informal counseling stage. Complainant chose:

- To accept ADR/Mediation          _____

- Not to accept ADR/Mediation        x

Signature: *Karl Thompson*                    Date:  2/8/05

Exhibit  1
Page  2  of  80

20

## PROBLEM STATEMENT

1. Statement of my problem:

On January 27, 2005, my first line supervisor proposed to terminate my Foreign Service Appointment and federal employment. He alleges 1) the I submitted false documents for travel claims in 2002 and 2003, 2) I misused the government travel card 3) I failed to reconcile a travel voucher, 4) I misused my government position, 5) I failed to disclose financial interests in my financial disclosure statement OGE form 450, 6) I provided false information during an official investigation. He also attempted to use the 11 Douglas Factors to support his reasoning for termination.

2. Statement of pertinent facts:

The Office of Inspector General found no basis in this case for a criminal investigation or cause for separation. The Report of Investigation did not provide any proof that indicated or implicated me as the individual who committed the acts of misconduct Mr. Miller alleges. I did not falsify travel documents. I did not misuse the travel card. I did not fail to reconcile a travel voucher. I did not misuse my government position. I did not fail to disclose financial interests in my financial disclosure statement. I did not provide false information during an official investigation. I did not display highly inappropriate behavior that was dishonest and disgraceful in performing my duties. My performance did not undermine the trust of the agency, my customers or the Department. The letters of commendation I received from my customers and officials denote my integrity, credibility and work ethics. I did not knowingly and willingly violate any agency policies or regulations. I did not engage in criminal, infamous, dishonest, immoral or disgraceful conduct or other conduct prejudicial to the government.

3. Analysis of the facts:

1.    I think the causes of the situation are: Reprisal because I filed an EEO case against him for his discrimination of me over the years; also because I whistle blew on him for mismanagement. I believe he is also threatened by my skill set compared to his. I also believe that it is because I am a black and from the rural south as an African American. He is a racist. Mr. Miller lacks the core leadership and management skills necessary to excel or to effectively supervise. Mr. Miller has an inferiority complex and should seek counseling and adequate training.

2.    I have noticed the following effects from it: Mr. Miller continually harasses me without due cause. His actions create a hostile work environment. His misuse of authority and discrimination has removed my confidence in his ability to perform his supervisory duties objectively without prejudice to me, my coworkers, and the agency.

3.    The place where this happens is: In the place of employment, his office.

21

Exhibit ___1___
Page _3_ of _80_

4.    The time this occurred is:  January 27, 2005

5.    Other pertinent comments are:

4.    Possible solutions:

A.  These solutions have been tried:

I filed an EEO case against Mr. Miller for discrimination.  I reported him to the Office of Special Counsel for prohibited personnel practices, reprisal and whistle blowing.

B.  Other possible solutions that occur to me are:

Mr. Miller should be demoted or removed from the federal service for his blatant abuse of authority.

5.    I am requesting the following solution:

I want to be financially compensated for Mr. Miller's violation of my rights under 5 U.S.C. 2302 (b) (8).

I recommend that Mr. Miller's be removed from office for his blatant misuse of authority for no apparent reason or evidence.  Mr. Miller's and HRD Lacy Muir's deliberate misuse of authority undermines the integrity of the system of good sound management practices and decision-making for the agency and it employees.  They willingly and knowingly charged me with a variety of misconduct allegation without due cause or sufficient proof in the Report of Investigation to justify or merit the termination of my employment. Their abuse of authority caused me financial hardship, emotional stressed, depression, some physical impairment, and many sleepless nights.

22

Exhibit ____1____
Page __4__ of __80__

EXHIBIT 18

## AMENDMENT TO EEO COMPLAINT #050077
## EEO COMPLAINT INPUT AT INTAKE

**Name of Complainant:**     Karl Hampton

**Social Security No.:**     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

**Home Address:**     700 7th Street, S.W.  #225, Washington, D.C.  20024

**Work Address:**     USDA Washington, South Building, Rm 3114, 20250

**Work Phone:**     On Administrative Leave Since January 27, 2005

**Job Title/Series Grade:**     Foreign Agricultural Affairs Officer, FO-0135-03,
Agricultural Economist

**Employing Agency:**     Foreign Agricultural Service, USDA

**Status:**     Permanent (Administrative Leave since January 27, 2005)

**Organization:**     United States Department of Agriculture

**Responding Agency:**     Foreign Agricultural Service

**Name of Counselor:**     Zenobia Wallace;- Amendment to present EEO
Complaint #050077

**Phone No.:**     202 720-7233

**Date of Incident:**     ~~Present June 29, 2005 - December 1986.~~ *October 2005 – April December 1986 KH*

**Date of Initial contact:**     Amendment to present EEO Compliant # 050077

**Issues: (circle all that apply)**

| | |
|---|---|
| Appointment/hire | **Evaluation** |
| **Awards** | **Harassment** |
| **Assignment of duties** | **Pay (including overtime)** |
| Conversion to Full Time | **Promotion (non selection)** |
| **Disciplinary Action** | **Reassignment** |
| **Demotion** | **Request Directed or denied** |
| **Suspension** | **Reinstatement** |
| **Termination** | Retirement |
| **Other** | Terms – condition of employment |
| Duty Hours | Training |
| Equal Pay Act Violation | Reasonable Accommodation, Other |
| Examination/Test | **Performance Accomplishments** |

60

Exhibit
Page 5° of 56

Time and Attendance
**Specific of Issue(s): (circle)**

**Basis(es)**
    <u>Age</u>
    <u>Color</u>
    <u>**National Origin**</u> (specify, i.e., Hispanic)   **MS/Southern African American**
    Religion (specify)
    <u>Reprisal</u>
    Disability
    <u>Sex</u>
    <u>Race</u> (Black X White_____ Asian _____ American Indian ____)
    Sexual Orientation
    Marital Status

**Union (Yes)** __X__ **(No)** _____

**Anonymity (Yes)** _____ **(No)** _____

**Representative: (Yes** _x_____ **No** _____)
    Name/Firm:   Philip Thompson Esq.
    Address:     9450 Penn Ave., Suite 4, Upper Marlboro, MD  20772
    Phone No.:   301 599-5385

| |
|---|
| **Receipt of Counseling Process documents from Counselor:**<br>**Initials:** _____ **Date:** _____ |

Alternative Dispute Resolution

In compliance with EEOC Management Directive 29 CFR 1614, Alternative Dispute Resolution options were discussed and offered during the informal counseling stage. Complainant chose:

- To accept ADR/Mediation     _____

- Not to accept ADR/Mediation     X____

Signature: _Karl Slaughter_       Date: _Oct. 24, 2005_

Exhibit  1
Page _61_ of _56_

61

# PROBLEM STATEMENT

1. Statement of my problem:

The FAS has not abided by general personnel practices for timeline for decision-making and Article 2.5 of the Foreign Service Bargaining Agreement. On January 27, 2005, my supervisor placed me on administrative leave without due cause, sufficient justification or evidence and proposed my dismissal from federal and Foreign Service. On March 15, 2005 I submitted my response to the supervisor's/FAS's January 27, 2005 proposal/false allegation for my dismissal. The FAS deciding official has not made a decision to reinstate me back to work based on the evidence and information provided in my March 15, 2005 response and March 18, 2005 oral presentation.

Additionally, on Wednesday, June 29, 2005, FAS granted an FAS employee, Stephanie Riddick, a third-party oral hearing. FAS denied my request for a third-party hearing. However, under Article 19.2 of my Foreign Service bargaining agreement, I have the right to request a neutral third party to review my case.

FAS again knowingly and intentionally discriminated against me. Since joining FAS in 1987, FAS knowingly and intentionally discriminated against me with the intent to prejudice me financially, emotionally and to discredit my professional character within FAS and amongst my peers, customers and agricultural industry. As a result of FAS's current and constant discrimination against me dating back to 1987, my career advancement has been limited, my income opportunities have been kept to a minimum, and my character and emotional stability have been damaged.

2. Statement of pertinent facts:

The Foreign Agricultural Service continuously violates my rights under the Collective Bargaining Agreement between the American Foreign Service Association (AFSA) and the Foreign Agricultural Service (FAS) based upon my initial 2004 filing of an EEO complaint, the amendments submitted, and the request for a continuation against FAS's discrimination practices towards me dating back to 1987. The FAS discriminates against me by failing to abide by the agreement under Article 2.1, 2.2, 2.3., 2.5, 3.4, 3.5, 3.6, 3.7, 3.8, 3.10, 3.11, 3.13, 3.14, 3.15, 4, 5, 11, 12, 14, 18, 19.1, 19.2, 24.4, 24.6, 24.7, 24.10, 24.11, 24.12, 24.13, 24.14, 24.19, 24.20, 24.22, 25 25.20, 25, 25.19, 25.21, 25.25, 25.27, 25.30, 25.31, 25.33, 25.34, 25.53, 25 Appendix A, 27, 28, 29, 31, 33.27, 34, 36, 36.18, 36.19, and 36.22.

The FAS denied my Union Representative and me copies of reports pertaining to FAS's investigation of me. This is in disagreement to Article 3.11 of the Bargaining Agreement. In order to obtain copies of FAS's reports, FAS required me to request a FOIA. In addition, according to the FOIA I received from the Office of Inspector General FAS referred a conflict of interest against me to their office for investigation (attached). The letter dated January 20, 2004, from Brian Haaser, Special Agent-in-Charge, states that "Based on the facts generated by [7(c)] preliminary investigation, DOJ indicated the case would not support criminal prosecution of Hampton....DOJ does not consider this matter to be appropriate for prosecution under conflict of interest statutes. In conjunction with DOJ's opinion regarding the lack of potential for criminal prosecution in this matter, OIG will decline to initiate it