# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KARL HAMPTON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-2221 (ESH)** |
| ) | |
| **TOM VILSACK,** Secretary,[1] ) | |
| United States Department of Agriculture, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiff Karl Hampton was terminated from his position as a Foreign Service Officer for the United States Department of Agriculture ("USDA") and has now sued his former employer, claiming discrimination on the basis of his race, retaliation for engaging in protected activity, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the Court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion will be granted in part and denied in part.

## BACKGROUND

### I. FACTUAL HISTORY

#### A. Background

Plaintiff is an African-American male who was hired by the USDA in its foreign agriculture service ("FAS") in 1987. (Plaintiff's Deposition ["Pl.'s Dep."] at 13:6-13.) In 1991, plaintiff was a member of a class action alleging racial discrimination in FAS promotions,

---

[1] Tom Vilsack, current Secretary of the United States Department of Agriculture, is substituted for his predecessor. Fed. R. Civ. P. 25(d).

rotations, and training. (*Id.* at 14:12-15:10.) This case ultimately settled in the 1990s. (*Id.*)

While serving abroad as the Agricultural Attache to Brazil in 1996, Plaintiff again participated in protected employment activity by filing an EEO complaint against his then supervisor regarding "discriminating disparate statements in [his] performance assessment." (*Id.* at 16:14-20:13.) This case settled prior to 2000. (*Id.*)

Upon returning from Brazil in 1996, plaintiff's first-line supervisor was Dale Miller, a Caucasian USDA employee. (*Id.* at 20:14-17.) Plaintiff alleges his relationship with Miller at this time was marked by occasional "animosity," particularly when plaintiff was not selected for a requested promotion. (*Id.* at 22:3-25:6.)

From March through June 2002, plaintiff was detailed to the Executive Office of the President. (*Id.* at 25:7-10.) In reference to plaintiff's detail and his participation in an executive development program, plaintiff alleges that Miller told Patricia Perkins, one of plaintiff's African-American co-workers, that plaintiff was "thinking that he's a nigger from California instead of a nigger from Mississippi." (EEOC Testimony of Patricia Perkins, Sept. 18, 2007 ["Perkins Testimony"] at 644:19-20; 673:20-22.) Miller denies making this comment. (Dale Miller Deposition ["Miller Dep."] at 125:8-15.)

### B. 2002 Printing of Sexually Explicit Emails

On April 26, 2002, a male employee named Tim Powers informed Miller that he had found sexually explicit materials on one of the USDA printers. (Miller Dep. at 77:8-14; 80:21-81:5.) Miller retrieved the materials and asked the Human Resources Division what he should do about them. (*Id.* at 79:3-6.) Miller was informed that he should take the printed materials to the Computer Security Office, which he did. (*Id.* at 79:17-80:7.) Human Resources and the Computer Security Office then indicated they would handle the matter from that point forward and would conduct an investigation to determine who had printed the materials. (*Id.* at 80:18-

81:22; Lolla Smith Deposition ["Smith Dep."] at 28-33.)  The investigation (which Miller did not take part in) traced the electronic printer logs, and determined that the sexually explicit materials were printed from plaintiff's computer.  (Smith Dep. at 31:20-32:1.)

On July 12, 2002, Miller sent a letter to plaintiff proposing a two-week suspension for plaintiff based on "Misuse of a U.S. Government color printer to print sexually explicit pictures." (Def. Mot. Ex. 5 at 1.)[2]  Miller was not the deciding official for the matter and had no role in the ultimate decision on the suspension.  (Miller Dep. at 95:15-96:9.)  The deciding official was the then administrator, Ellen Terpstra, and Miller had no communications with Terpstra about his proposal or her decision.  (*Id.*)  In addition, the recommendation for the 14-day suspension originally came from Ms. Lolla Smith, an employee relations specialist, and was "based on the normal practices" within the office at the time.  (Smith Dep. at 79:4-6.)

Plaintiff responded in writing to the proposed suspension.  In his letter, plaintiff did not deny having printed sexually explicit materials to the USDA color printer—and indeed, admitted that he "did access these [sexually explicit] sites and . . . did misjudge the situation and printed off some pictures."  (Def. Mot. Ex. 6 at 48.)  Plaintiff argued, however, that he did not print sexually explicit materials during the exact periods of time specified by USDA.  (*Id.* at 47-49 (*e.g.*, "I did not print off over 218 pages of such material during the hours of midnight and 5 am on April 2, 2002.").)  Plaintiff further challenged the length of his proposed suspension as excessive.  (*Id.* at 50, 55.)

Administrator Terpstra noted that while FAS had not had a prior case of computer misuse related to sexually explicit materials, the proposed 14-day suspension was consistent with prior

---

[2] While Miller was officially the proposing official for plaintiff's suspension and signed the suspension letter, the letter itself was drafted by the Employee Relations Division.  (Miller Dep. at 90:1-91:18.)

incidents at the USDA. (Def. Mot. Ex. 2 at 5.) Terpstra ultimately sustained two of the three allegations against plaintiff and reduced his suspension to one week. (*Id.*)

### C. Alleged Conflict of Interest in Connection with Personal Business Venture

On June 30, 2003, Ms. Lolla Davies of the Employee and Labor Relations branch of FAS's human resources department opened an investigation into allegations that plaintiff had created a conflict of interest and had attempted to abuse his position for personal gain. (Def. Mot. Ex. 8 at 1.) Plaintiff had sought to open a sweet potato processing plant called Syrisia Foods by incorporating the company in 1998 and having a feasibility study done by Sparks Company. (Pl.'s Dep. at 134:8-13.) Plaintiff paid $66,000 of his own money for the feasibility study (*id.* at 136:3-13), and the study contained plaintiff's representation that he was a USDA employee. (Def. Mot Ex. 10.) Before having this feasibility study done, however, plaintiff successfully applied for a grant from the USDA. (Pl.'s Dep. at 137:22-138:12.) Plaintiff did not disclose his affiliation with the USDA as a part of this grant application, although apparently he was not required to disclose this information as part of the application process. (*Id.* at 143:16-144:14.) Plaintiff also failed to disclose his financial interest in Syrisia Foods to the USDA as required by USDA ethics regulations. (Def. Mot Ex. 11 [Proposed Removal Letter, January 27, 2005] at 10.)

In October 2003, plaintiff discussed his financial interest in Syrisia Foods with a FAS Ethics Officer, who recommended that plaintiff adjust his disclosure forms to include Syrisia Foods. (Plaintiff's Declaration ["Pl.'s Decl."] ¶ 15.)

### D. Investigation into Plaintiff's Hotel Receipts

In early 2004 plaintiff submitted a hotel receipt for reimbursement. A new employee, Christine Lipscomb, processed plaintiff's receipts for reimbursement.[3] (Miller Dep. at 176:21-179:21.) Following procedure, Lipscomb asked plaintiff for the original hotel receipt, having originally been provided only with a copy. (*Id.*) When plaintiff submitted what he purported to be the original receipt, Lipscomb noted that it seemed to contain handwritten changes, so she contacted the hotel for the original receipts. (*Id.*) Based on her review, she concluded that plaintiff's receipts had been altered. (*Id.*) Lipscomb contacted Miller, who upon looking at the documents took them to his supervisor, Mr. Roy Henwood. (*Id.*) Mr. Henwood in turn believed the matter should be investigated by Compliance Review Staff ("CRS"). (*Id.*) Mr. Miller concurred, and took the receipts to FAS Security Officer Richard Maxwell. (*Id.*) Maxwell, an Army criminal investigator for 25 years before joining the USDA, conducted an investigation into whether plaintiff had submitted additional altered travel receipts for reimbursement.[4]

Maxwell's investigation concluded that numerous hotel bills submitted by plaintiff had been altered. (Def. Mot. Ex. 11.) These alterations indicated that plaintiff had spent additional nights at hotels, thereby increasing the reimbursement amount supposedly owed to plaintiff. (*Id.*) Some receipts had been altered by pen, and printed bills had been changed. (*Id.* at 2-3.) Others were typed in a format that did not resemble genuine bills provided by the hotels, such as, different fonts, missing account numbers, misaligned columns, or missing signature lines. (*Id.* at 2-7.) Some receipts contained changed dates that did not match a hotel's file copy of the bill. (*Id.* at 3.) Some receipts indicated that plaintiff's Visa credit card was used to pay for charges. The credit card statements, however, contained no corresponding charges (or contained charges

---

[3] Plaintiff did not, and does not know Ms. Lipscomb. (Pl.'s Dep. at 249:14-17.)

[4] Plaintiff did not know Maxwell prior to meeting with him as part of the investigation. (Pl.'s Dep. at 249:7-13; Richard Maxwell Deposition ["Maxwell Dep."] at 36:1-3.)

for smaller amounts.) (*Id.* at 3-6.) Plaintiff became aware of this investigation on January 29, 2004, when he was contacted by Maxwell, who then met with plaintiff the following day to discuss his government travel, conflicts of interest, and possible ethics violations. (Pl.'s Decl. ¶ 16.)

At this time in mid-2004, plaintiff was under investigation by CRS for both possible conflicts of interest related to the Syrisia sweet potato plant, as well as for allegations that he had altered hotel receipts that he had submitted for reimbursement. In addition, plaintiff was due for "periodic reinvestigation," which is a background investigation that must be conducted every five years for all individuals who hold top secret security clearances, as plaintiff did at that time. (Martin Brumback Deposition ["Brumback Dep."] at 15:7-16:12.) The fact that plaintiff's periodic reinvestigation occurred at this time was not connected to the ongoing CRS investigations. (*Id.* at 41:11-42:1.) Martin Brumback, the Chief of the Personnel and Document Security Division and the official in charge of USDA security clearances, received a call from CRS notifying him that CRS was investigating allegations of misconduct that had been made against plaintiff. (*Id.* at 9:13-10:3; 16:20-17:17.) Such notification is required when CRS investigates allegations that would adversely reflect on a person's eligibility to hold a national security clearance. (*Id.* at 17:18-18:3.) Brumback reviewed a packet of information that contained both the allegations against plaintiff, as well as his response. (*Id.* at 20:5-18.) Pursuant to his normal practice, Brumback suspended plaintiff's security clearance on June 30, 2004, and held in abeyance his office's decision on plaintiff's eligibility for a renewed clearance pending resolution of the misconduct charges. (Pl. Opp. Ex. 12; Brumback Dep. at 28:9-29:1.)

On June 20, 2004—the same day his security clearance was suspended—plaintiff filed an EEO complaint alleging that the investigation into his misconduct was discriminatory.  (Pl.'s Decl. ¶ 19.)

In October 2004, plaintiff was denied a promotion from FS-03 to FS-02.  (Compl. ¶ 16; Pl.'s Decl. ¶ 20.)

In November 2004, plaintiff was denied a foreign assignment by FAS.  (Compl. ¶ 18; Pl.'s Decl. ¶ 22.)  Later that month, plaintiff alleges that FAS Deputy Administrator Lyle Sebranek told Sheila Bruce, a Personnel Management Specialist in Human Resources, that plaintiff was not being sent overseas because of his EEO complaint.[5]  (Affidavit of Sheila Bruce, Pl.'s Opp. Ex. 15 at 2-3.)  Sebranek denies making this statement.  (Lyle Sebranek Deposition ["Sebranek Dep."] at 55:16-60:12.)

### E.      Plaintiff's Proposed Termination

The results of the investigation into plaintiff's hotel reimbursement requests were ultimately forwarded to Lacy Muir, a USDA employee relations specialist, who had had no prior interactions with plaintiff.  (Lacy Muir Deposition ["Muir Dep."] at 9:11-13; 12:17-19.)  After examining the results of the investigation, Muir believed that plaintiff should be terminated. (*Id.* at 41:15-42:13.)  Muir then discussed the matter with Miller, and she drafted a proposal of removal ultimately signed by Miller and delivered to plaintiff on January 27, 2005.  (*Id.* at 43:2-10; 44:12-46:2; Def. Mot. Ex. 11.)  Plaintiff was subsequently placed on paid administrative leave.  (*Id.*)

---

[5] The Court notes that Bruce's affidavit is somewhat at odds with plaintiff's complaint, which states that Sebranek told Bruce that plaintiff "was not being sent overseas *because of his suspended security clearance* and his EEO complaint."  (Compl. ¶ 19 (emphasis added).)

As plaintiff's second-line supervisor, the deciding official for plaintiff's removal was Mr. Roy Henwood, a political appointee and the then Director of External Affairs and Confidential Assistant to the Administrator. (Roy Henwood Deposition ["Henwood Dep."] at 6:21-7:7.)

Plaintiff responded to his proposed removal in writing and at a hearing in March 2005. (Def. Mot. Ex. 16; Pl.'s Dep. at 203:9-17.) Plaintiff, Henwood, and Muir were present at the hearing. (Pl.'s Dep. at 203:18-21.)

At least one hotel manager had already indicated to CRS investigators that he was unwilling to release the original receipts without a court order or a letter of authorization from plaintiff. (Henwood Dep. at 39:9-14; Def. Mot. Ex. 17.) Henwood therefore requested that plaintiff sign a release allowing the hotel to release the records. (Henwood Dep. at 38:4-40:4.) Plaintiff refused. (*Id.*) In addition (and unbeknownst to USDA), plaintiff had contacted the hotel manager first by telephone in August 2004 and later in a letter dated March 8, 2005, and he threatened legal action should the manager disclose further information to the USDA.[6] (Def. Mot. Exs. 18, 24.)

## F.    Henwood Requests Additional Details

On May 3, 2005, Henwood sent a letter to Maxwell requesting that CRS undertake additional investigation in order to clarify several "reasonable questions" raised by plaintiff regarding some of the charges against him. (Def. Mot. Ex. 17.) Specifically, Henwood wanted to see if it was possible to obtain the original hotel bills at issue (notwithstanding plaintiff's

---

[6] Plaintiff's March 8, 2005 letter also accused the hotel manager of having already violated plaintiff's rights. (*See* Def. Mot. Ex 18.) Plaintiff requested that the manager provide him with "a signed statement that [the manager] did not discuss or provide any information to Mr. Maxwell or anyone regarding [plaintiff's] records/file for [his] stay with [the] hotel." (*Id.*) Plaintiff then threatened legal action against the hotel manager in the event that any *prior* disclosure resulted in his termination. (*Id.*)

earlier refusal to authorize the release of these records) in order to determine "the extent of

alteration, if any, made to the copies submitted for reimbursement" (*Id.*) These originals had not

been submitted by plaintiff, nor could they be obtained during the course of the initial

investigation. (*Id.*) Alternatively, Henwood requested that Maxwell "supplement the record

with confirmation that each receipt in question is identified by the manager [of the hotel in

question] as fraudulent," preferably by means of sworn statements. (*Id.*)

Compliance Review Staff conducted a follow-up investigation by re-interviewing several

hotel managers and employees in mid-July 2005. (Def. Mot. Ex. 24.) This investigation was

completed on July 29, 2005. (Def. Mot. Ex. 19.) The reinvestigation revealed the legal threats

plaintiff had made against the hotel manager should he cooperate with the CRS investigation.

(Def. Mot. Ex. 24; Henwood Dep. at 27:2-15.) In addition, the reinvestigation revealed the

opinion of the employees of each of the hotels in question that the receipts submitted by plaintiff

for reimbursement were not valid or legitimate invoices used by the hotels during plaintiff's

alleged stays. (*Id.*)

Plaintiff was again denied promotion and overseas assignment in October and November

of 2005. (Pl.'s Decl. ¶ 27.) Plaintiff remained on a leave-with-pay status at this time. (Compl. ¶

33.)

On April 25, 2006, Henwood issued his decision recommending that plaintiff be

separated for cause. (Pl.'s Opp. Ex. 19; Pl.'s Decl. ¶ 28.) In reaching this decision, Henwood

sustained the allegations that plaintiff had: (1) submitted false documents for travel claims; (2)

failed to properly remit to USDA a credit issued by a hotel to his government-issued credit card;

(3) failed to report his development and ownership of Syrusia Foods as required on his financial

disclosure forms from 1998-2002; and (4) provided false information to CRS when questioned

during an official investigation. (Pl.'s Opp. Ex. 19.) In concluding that plaintiff should be suspended for cause, Henwood's April 25, 2006 letter focused particularly on the allegations involving plaintiff's government-issued charge card. (*Id.*) The next day plaintiff was placed on leave-without-pay. (Pl.'s Dep. at 225:12-18.)

On May 4, 2006, USDA notified the Foreign Service Grievance Board ("FSGB") that it intended to separate plaintiff for cause. (Compl. ¶ 39; Pl.'s Decl. ¶ 28.) On April 30, 2007, the FSGB issued its initial decision finding that that the USDA presented sufficient cause for plaintiff's separation. (Compl. ¶ 41.) On May 1, 2007, FAS issued plaintiff Standard Form SF-50 noting his termination. (Compl. ¶ 42; Pl.'s Decl. ¶ 29.) On June 6, 2007, the FSGB released its final recommendation recommending plaintiff's termination. (Compl. ¶ 44.)

Plaintiff filed a formal complaint of discrimination with the USDA on June 11, 2007. USDA issued its final order regarding this complaint on October 22, 2007. Plaintiff filed the instant suit on December 6, 2007. Defendant responded by moving to dismiss certain counts for untimeliness and failure to exhaust. This Court denied defendant's motion on June 25, 2008. *Hampton v. Schafer*, 561 F. Supp. 2d 99 (D.D.C. 2008). Defendant now moves for summary judgment.

## ANALYSIS

## I. LEGAL STANDARDS

### A. Summary Judgment

A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is a "genuine issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party."

*Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs*., 865 F.2d 320, 325 (D.C. Cir. 1989). However, the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 U.S. Dist. LEXIS 22376, at *3 (D.D.C. Mar. 31, 1998), *aff'd* No. 99-5126, 1999 U.S. App. LEXIS 25165 (D.C. Cir. Sept. 27, 1999) (internal citation omitted).

### B.    Discrimination Based on Race

Under Title VII, it is an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2. The "two essential elements" of a discrimination claim under this section are "that (i) plaintiff suffered an adverse employment action (ii) because of the race [or] color" *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). "A plaintiff must prove both elements to sustain a discrimination claim." *Id.*

Under the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), plaintiff "must [first] establish a prima facie case of discrimination*." Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). A plaintiff establishes a prima facie case of discrimination by showing that "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007). Once plaintiff makes out a prima facie case, the burden shifts to defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *see Reeves*, 530 U.S. at 142.

If the defendant satisfies its burden, "the *McDonnell Douglas* framework — with its presumptions and burdens — disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves*, 530 U.S. at 142-43 (internal quotations and citations omitted); *see also Brady v. Office of Sgt. at Arms*, 520 F.3d 490, 494 n.2 (D.C. Cir. 2008) ("In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."); *Baloch*, 550 F.3d at 1197 n.2.

"[I]n considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494; *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (to "survive

summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.").  The evidence to consider includes (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff.  *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc)).).  However, the plaintiff need not present evidence in each of these categories to avoid summary judgment.  *Aka*, 156 F.3d at 1289.  Rather, the court should assess the plaintiff's challenge to the employer's explanation "in light of the totality of the circumstances of the case," keeping in mind that "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  *Reeves*, 530 U.S. at 147 ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.").

A Title VII plaintiff may, however, bypass the *McDonnell Douglas* framework and rely instead on so-called "direct evidence"—expressions by the decision maker that are evidence of discriminatory or retaliatory intent.  The existence of such evidence in itself defeats the motion for summary judgment and takes the case to the jury.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.") (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)); *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000) ("A plaintiff may always prove a claim of discrimination [or retaliation] by introducing direct evidence of discriminatory [or retaliatory] intent.").

### C.     Retaliation

Under Title VII, it is an "unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The "two essential elements" of a retaliation claim under this section are that plaintiff has "suffered (1) a materially adverse action (2) because he or she had brought or threatened to bring a discrimination claim."  *Baloch*, 550 F.3d at 1198.

The same *McDonnell-Douglas* burden-shifting framework applies to claims of retaliation. *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).  Plaintiff establishes a prima facie case  of retaliation by showing "that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  Again, once plaintiff makes out a prima facie case, the burden shifts to the employer "to articulate some legitimate, non[retaliatory] reason" for the adverse action.  *McDonnell Douglas*, 411 U.S. at 802*; see Reeves*, 530 U.S. at 142.  If the employer satisfies that burden, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer retaliation from all the evidence."  *Jones*, 557 F.3d at 677.

## II.     PLAINTIFF'S NON-PROMOTION AND NON-SELECTION FOR FOREIGN ASSIGNMENT (COUNTS ONE, TWO, FIVE AND SIX)

Defendant argues that it had a legitimate, non-discriminatory reason for failing to promote plaintiff or select him for a foreign assignment: namely, that plaintiff engaged in misconduct, which ultimately triggered an investigation into this misconduct.  This investigation

affected his ability to be promoted and led to the suspension of his security clearance. (Def. Mot. at 23-27.) Plaintiff argues that defendant's proffered reasons for its actions are in fact a pretext for discrimination and retaliation.[7] (Pl.'s Opp. at 21-36.) With respect to plaintiff's non-promotion, the record supports the legitimate, non-retaliatory nature of defendant's explanation, and plaintiff has failed to demonstrate that it is pretextual. Plaintiff appears, however, to have raised a material dispute of fact regarding his non-selection for foreign assignment, and the Court will, therefore, deny defendant's motion for summary judgment as to Count Five only.

### A.    Dale Miller's Alleged Remarks

Plaintiff focuses a significant portion of his Opposition on his first-line supervisor, Dale Miller, accusing him of having "constantly made jokes [about him] as an African American male from the south," telling plaintiff in 1996 that he "had skill sets that [he] should not have because if [his] race," and having told one of plaintiff's co-workers in 2002 that plaintiff acted like "he's a nigger from California instead of a nigger from Mississippi." (Perkins Testimony at 644:19-20; 673:20-22.) Plaintiff argues that a reasonable factfinder could conclude that USDA's reasons for taking action against him are pretextual because "each allegation of plaintiff's misconduct was initiated by Dale Miller." (Pl.'s Opp. at 22.)

Plaintiff's argument suffers from several fatal flaws. While Miller, plaintiff's first-line supervisor, officially "initiated" the investigations into his conduct, the investigations were triggered as a result of other individuals reporting this conduct to Miller. For example, the

---

[7] The Court finds that plaintiff's prior protected activity as a member of a class action that settled in the 1990s cannot form the basis for a retaliation claim. At least four years had elapsed between plaintiff's prior activity and the allegations against him in this case, and plaintiff has offered no additional evidence suggesting a causal relationship between the two. *See, e.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (two-and-a-half month lapse between prior protected activity and allegedly materially adverse action insufficient to show a relation between the two); *Brown v. Mills*, 674 F. Supp. 2d 182, 193 (four-year delay between EEO claims and adverse action did not suggest causation).

investigation into plaintiff's hotel reimbursement requests was triggered when Christine Lipscomb noted handwritten changes to plaintiff's hotel bills and concluded that plaintiff's receipts had been altered in some fashion. (Miller Dep. at 176:21-179:21.) Presented with this evidence, Miller asked CRS to open an investigation. (*Id.*) Plaintiff has put forward no evidence suggesting that Ms. Lipscomb, a new employee at the time, bore any discriminatory animus toward him. Indeed, the two have never met. (Pl.'s Dep. at 249:14-17.) And no reasonable jury could conclude that Miller's decision to at least investigate such serious charges of wrongdoing was so unreasonable as to itself suggest pretext for discrimination. Rather, plaintiff argues that Miller's racially-tinged remarks—the most recent of which allegedly occurred more than a year before, outside plaintiff's presence, and had no relation to any alleged misconduct by plaintiff—automatically taint any and all actions taken by Miller from that date forward. This is not the law. "'[S]tray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff." *Simms v. United States GPO*, 87 F. Supp. 2d 7, 9 (D.D.C. 2000). *See also Sewell v. Chao*, 532 F. Supp. 2d 126, 139 (D.D.C. 2008), *aff'd sub nom. Sewell v. Hugler*, 2009 U.S. App. LEXIS 4136 (D.C. Cir., Feb. 25, 2009) (quoting *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996) ("Stray remarks in the workplace, particularly those made by nondecisionmakers or statements made by decisionmakers unrelated to the decisional process itself," do not constitute evidence of discrimination.).

### B. Merits of Underlying Allegations

Plaintiff argues that defendant's articulated legitimate reasons for not promoting him or selecting him for foreign assignment are pretextual because "the Agency's allegations of misconduct are without merit." (Pl.'s Opp. at 23.) Plaintiff expends considerable effort arguing, variously, that: he did not violate USDA policies (*id.* at 24), he had legitimate reasons for failing

to disclose his employer on his grant application (*id.*), he has repeatedly denied submitting inaccurate hotel receipts (*id.* at 25), the investigation into his hotel receipts was insufficiently "persuasive" and therefore defendant failed to "prove" that the receipts were falsified (*id.* at 26). Each and every one of these challenges must fail. "[W]hether [plaintiff's] supervisors were ultimately correct in their belief that plaintiff was violating the policies is totally irrelevant." *Velikonja v. Gonzales*, 501 F. Supp. 2d 65, 75 (D.D.C. 2007), *aff'd sub nom. Velikonja v. Mukasey*, 2008 U.S. App. LEXIS 22465 (D.C. Cir., Oct. 27, 2008). "Once the employer has articulated a non-discriminatory reason for its action, . . . the issue is not the correctness or desirability of the reasons offered, but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks, modifications, and ellipses omitted); *Brady*, 520 F.3d at 496 ("The question is not whether the underlying . . . incident occurred; rather, the issue is whether the employer *honestly and reasonably believed* that the underlying . . . incident occurred." (emphasis in original)).

C.     **"Neutral Bodies" Determination of Underlying Merits**

Plaintiff additionally argues that defendant's investigation lacked merit because "several neutral bodies had determined that [his] conduct did not warrant further investigation" (Pl.'s Opp. at 24), thereby bolstering an inference of pretext. These claims do not withstand scrutiny. Plaintiff argues that in January 2004, the Office of the Inspector General ("OIG") and the Department of Justice ("DOJ") concluded that the USDA grant matter was not "appropriate for prosecution under conflict of interest statutes." (*Id*. Ex 8.) Similarly, plaintiff notes that OIG and DOJ also declined to prosecute plaintiff for the travel-related allegations as well. (*Id.* at 25.) The fact that OIG and DOJ declined to bring *criminal* charges against plaintiff, however, has no bearing on the underlying merits of the charges themselves, particularly when coupled with the

testimony of Robert Huttenlocker (the USDA Director of Investigative and Enforcement Services) that OIG and DOJ declined to prosecute because the amount at issue "was not of sufficient magnitude to warrant prosecution." [8] (Robert Huttenlocker Deposition ["Huttenlocker Dep."] at 109:16-22.)

### D. Alleged Procedural Defects in Suspension of Plaintiff's Security Clearance

Plaintiff claims that USDA failed to follow its own policies when it held his security clearance in abeyance pending completion of the investigation into his conduct. (Pl.'s Opp. at 28-29.) The record is to the contrary. In support of his position, plaintiff cites section 4429 of volume three of the U.S. State Department's Foreign Affair's Manual, which provides, "The agency will use its best endeavors to expedite security clearance procedures whenever necessary to assure a fair and prompt resolution of a grievance." Plaintiff does not allege how defendant's procedures regarding his security clearance violate this provision, and it is the uncontroverted testimony of Martin Brumback, the Chief of the Personnel and Document Security Division and the official in charge of USDA security clearances, that it is his normal practice to suspend the determination of eligibility for a security clearance in cases where allegations have been made against an employee that would have a bearing on that determination. (Brumback Dep. at 26:12-28:15.) Defendant's actions were therefore *consistent* with its standard practice and therefore do demonstrate pretext.

### E. Lyle Sebranek's Statement to Sheila Bruce

Plaintiff alleges that he was denied a foreign assignment because of his EEO complaint filed in June 2004, notwithstanding the ongoing investigation into his conduct and the suspension of his security clearance the very day plaintiff filed his complaint. (Pl.'s Opp. at 16-17; Pl.'s

---

[8] Defendant cites portions of Maxwell's deposition supporting Huttenlocker's recollection of events (Def. Reply at 3), but failed to submit this testimony to the Court.

Decl. ¶ 19.)  Plaintiff offers direct evidence in support of this claim: namely, a sworn affidavit by

Sheila Bruce, a Personnel Management Specialist in Human Resources, stating that she was

informed by FAS Deputy Administrator Lyle Sebranek that plaintiff was not being sent overseas

in November 2004 because of his EEO complaint.  (Pl.'s Opp. Ex. 15 at 2-3.)  While Sebranek

denies making this statement (Sebranek Dep. at 55:16-60:12), Bruce's statement creates a

genuine issue of material fact as to the issue of direct evidence of retaliation against plaintiff for

his June 2004 EEO activity.  *See Swierkiewicz*, 534 U.S. at 511 ("The *McDonnell Douglas* test is

inapplicable where the plaintiff presents direct evidence of discrimination.") (quoting *Trans

World Airlines*, 469 U.S. at 121).

Even such direct evidence of retaliation, however, could be negated at the summary

judgment stage if defendant were able to demonstrate that it would have reached the same

decision absent the prohibited discrimination.  *See Beckford v. Geithner*, 661 F. Supp. 2d 17, 25

(D.D.C. 2009) (suggestion that retaliation was merely "among" the factors motivating adverse

action is insufficient as a matter of law to defeat summary judgment); *Pennington v. City of

Huntsville*, 261 F.3d 1262 (11th Cir. 2001) ("mixed-motive" theory not available to prove

retaliation claim under Title VII); *Speedy v. Rexnord Corp.*, 243 F.3d 397 (7th Cir. 2001) (same);

*Matima v. Celli*, 228 F.3d 68 (2d Cir. 2000) (same); *Norbeck v. Basin Elec. Power Coop.*, 215

F.3d 848 (8th Cir. 2000) (same); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544 (4th Cir.

1999) (same); *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) (same); *Tanca v.

Nordberg*, 98 F.3d 680 (1st Cir. 1996) (same).  Here, the burden shifts to USDA to prove that it

would have denied plaintiff's request for an overseas assignment regardless of any allegedly

retaliatory animus.

Defendant argues that as a result of the CRS investigation into allegations of misconduct, plaintiff's security clearance was suspended in June 2004, pending resolution of the misconduct charges. (Pl. Opp. Ex. 12; Brumback Dep. at 28:9-29:1.) Brumback testified at his deposition that this suspension was his normal practice where allegations have been made that would adversely reflect on a person's eligibility to hold a national security clearance. (Brumback Dep. at 17:18-18:3.) Defendant's position is that its suspension of plaintiff's security clearance precluded FAS from assigning him abroad. (Def. Mot. at 17, 24; Def. Statement of Undisputed Facts ¶ 33.)

Defendant's sole evidence in support of this position is an excerpt of Lyle Sebranek's deposition[9]:

> Q. Were there ever any instances where someone was perhaps considered ineligible for assignment at the time that you all met?
>
> A. Yes.
>
> Q. What kind of instances would those have been?
>
> A. Would have lost their security clearance.

(Sebranek Dep. at 23:11-18.) In the absence of something more (i.e., a regulation or rule), this exchange is insufficient to establish the existence of a *per se* rule precluding plaintiff's assignment overseas. Furthermore, Brumback himself testified later in his deposition that various agencies within USDA had different policies for dealing with employees whose clearances had been suspended, including "detail[ing] them to other positions that don't require a

_____

[9] Defendant initially cited the deposition of Martin Brumback (Def. Mot. at 17, 24; Def. Statement of Undisputed Facts ¶ 33), but, after receiving notification by the Court of its error, it notified the Court and counsel that it had actually intended to cite to the deposition transcript of Lyle Sebranek. (Dkt. #36.)

clearance."[10]  (Brumback Dep. at 29:2-12.)  The Court is therefore left without sufficient evidence to support what would otherwise be a persuasive argument that the suspension of plaintiff's security clearance would have precluded an overseas assignment regardless of his EEO complaint.  Given this record, the Court has no choice but to deny defendant's motion for summary judgment as to Count Five.

## III.  PLAINTIFF'S LEAVE-WITHOUT-PAY STATUS AND TERMINATION (COUNTS TWO, THREE, NINE, AND TEN)

Defendant again argues that plaintiff's misconduct motivated its decision to place him on leave-without-pay and ultimately to terminate him for cause. (Def. Mot. at 23-27.)  Plaintiff likewise argues that defendant's proffered legitimate reasons for its actions are a pretext for discrimination and retaliation.  (Pl.'s Opp. at 21-36.)  With respect to plaintiff's placement on leave-without-pay and his ultimate termination, the record amply supports the legitimate, non-retaliatory nature of defendant's explanation, and plaintiff has failed to rebut this explanation. The Court will therefore grant defendant's motion for summary judgment as to Counts Two, Three, Nine, and Ten.

### A.    Dale Miller

As previously argued, plaintiff contends that a reasonable factfinder could conclude that USDA's reasons for placing him on leave-without-pay and terminating his employment are pretextual due to Dale Miller's involvement in initiating the investigations against him.  (Pl.'s Opp. at 29, 31-32.)  Specifically, plaintiff asserts that because Henwood did not sustain two of the six charges against him, "a reasonable fact-finder would almost have to conclude that the allegation[s] w[ere] pretext for discrimination and retaliation.  (Pl.'s Opp. at 30-31.)  Because

---

[10] It is unclear from Brumback's deposition transcript whether any foreign assignments are among the "other positions that don't require a clearance."

these two charges were not sustained, however, they did not formally support Henwood's decision to place plaintiff on leave-without-pay or his decision to ultimately terminate him for cause. (Def. Mot. Ex. 19.) Moreover, plaintiff's invocation of Miller is irrelevant to the issue of plaintiff's leave-without-pay status and termination, because Henwood—not Miller—was the deciding official. *See Hall v. Giant Food, Inc.*, 175 F.3d 1074 (D.C. Cir. 1999) (supervisor's discriminatory remarks cannot be considered as evidence of discrimination where decision to dismiss the employee was made not by the supervisor, but a different individual or department who "made an independent assessment" of challenged conduct); *accord Holbrook v. Reno*, 196 F.3d 255, 260-261 (D.C. Cir. 1999). And although plaintiff has claimed that Henwood's actions were likewise motivated by discriminatory animus, (*see, e.g.*, Pl's Opp. at 9; Pl's Dep. at 212:8-1), he has put forward no evidence whatsoever to support this allegation.

### B. Merits of Underlying Allegations

Plaintiff also rehashes his arguments regarding the merits of the underlying allegations against him by arguing that his failure to reconcile his travel vouchers was an honest mistake. (Pl.'s Opp. at 30.) Henwood, however, concluded to the contrary, noting that he found plaintiff's explanation "less than credulous" in light of the evidence. (Def. Mot. Ex. 19 at 3.) Plaintiff may not re-litigate the underlying misconduct charges against him in this fashion: the only question is whether Henwood honestly and reasonably believed the reasons he gave for his decision, not whether this decision was ultimately correct. *Brady*, 520 F.3d at 496.

### C. Procedural Flaws

Finally, plaintiff cites a number of minor procedural flaws regarding his termination. (Pl.'s Opp. at 33-35.) Specifically, plaintiff complains that the wrong official's name appeared on the form notifying him that he would be terminated, that this form was issued after the initial decision by the Foreign Service Grievance Board instead of one month later after the final

decision by the Board, and that he has not received a "decision in writing" informing him of what he already knew: that USDA had terminated him as a result of the FSGB's decision. (*Id.*) While "a plaintiff can . . . discredit the employer's [stated] reason [for adverse action] by," *inter alia*, "pointing to the employer's failure to follow established procedures or criteria," *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 221 (D.D.C. 2010) (internal citation and quotation marks omitted), "to show pretext, a plaintiff 'must show both that the reason was false, and that discrimination . . . was the real reason.'" *Id.* (quoting *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007) (internal citation omitted). The "procedural errors" cited by plaintiff are immaterial, occurred after Henwood's final decision to terminate plaintiff, and are simply" not enough from which to reasonably infer that [USDA's] true motivation for [its] treatment of [plaintiff] was racially discriminatory." *Id.*

Plaintiff's alleged "procedural errors" committed by USDA when it placed him on leave-without-pay are frivolous. Plaintiff claims that 3 FAM 4364.3(d) required his first-line supervisor, Miller, to place plaintiff on leave-without-pay, where in fact plaintiff was placed on this status by Henwood, his second-line supervisor. In fact, this provision of the Foreign Affairs Manual states that where, as here, the first-line supervisor's decision is to recommend that an employee be separated for cause, an employee should be placed on leave without pay status *at that time*, pending final decision. In other words, USDA's deviation from the FAM resulted in plaintiff being placed on leave *with* pay status for over a year when he should have been placed on leave-without-pay. Needless to say, such a "deviation" hardly supports any inference of pretext.

**IV.    HOSTILE WORK ENVIRONMENT (COUNTS SEVEN AND EIGHT)**

Plaintiff argues that the investigations into his conduct were not only pretexts for defendant's direct discrimination and retaliation against him, but separately constituted a hostile work environment. (Pl.'s Opp. at 36-39.)

To establish a claim of a hostile work environment, "plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal citation omitted)); *accord Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (quoting *Harris*).  To determine whether a hostile work environment exists, courts should consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201.  Plaintiff cannot satisfy this test, because none of the acts that he alleges, whether considered alone or cumulatively, meets "the demanding standards" for a hostile work environment claim. *Sewell*, 532 F. Supp. 2d at 141-42.

Plaintiff complains that Miller's jokes about plaintiff's race, his 1996 comment that plaintiff "had skill sets that [he] should not have because if [his] race," and  his having told one of plaintiff's co-workers in 2002 that plaintiff had acted like "he's a nigger from California instead of a nigger from Mississippi" are sufficiently severe to constitute a hostile work environment.  (Pl.'s Opp. at 37; Perkins Testimony at 644:19-20; 673:20-22.)  Even when abusive behavior is "'motivated by discriminatory animus,'" it may not be actionable, especially where, as here, much of the conduct occurred many years earlier. *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C. Cir. 1999).  The conduct complained of "must be *extreme* to amount to a change in the terms and

conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (emphasis added). This standard is designed to be "sufficiently demanding" so that anti-discrimination statutes do not become "'general civility code[s].'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). *See also Vickers v. Powell*, 493 F.3d 186, 198-201 (D.C. Cir. 2007) (noting that district court correctly concluded that a hostile work environment was not created solely by three incidents that involved being "singled out for a requirement to provide inordinate amounts of medical information to support requests for leave," poor performance evaluations, supervisor's "angry threats," and derogatory comments about minorities).

In short, the acts that plaintiff complains about are simply not the type of "discriminatory intimidation, ridicule, and insult' that are 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21). This is particularly true where, as here, Miller's alleged use of a racial slur was not made in plaintiff's presence, but rather was relayed to him by another employee. *See Manson v. General Motors Corp.*, 66 Fed. Appx. 28, 33 (7th Cir. 2003) (unpublished) ("[A]lthough [plaintiff] claimed that another co-worker had told him that derogatory language had been used in reference to him, such third-hand allegations are insufficient to create a hostile work environment."); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that comments were not directed at plaintiff herself contributed to conclusion that they were merely "offensive" rather than objectively hostile).

The remainder of plaintiff's hostile work environment claims merely restates his underlying discrimination and retaliation claims, alleging a hostile work environment resulted from defendant's "continual investigations" into plaintiff's misconduct. (Pl.'s Opp. at 38.)

Plaintiff cannot, however, rely on the discrete acts upon which he bases his discrimination and retaliation claims to support a hostile work environment claim. "Because plaintiff's allegedly 'hostile' events 'are the very employment actions he claims are retaliatory[,] he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.'" *Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) (quoting *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005)); *accord Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) ("[I]nsofar as Plaintiff attempts to base his hostile work environment claim on his [compressed work schedule] revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim."). "Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim . . . .'" *Franklin*, 600 F. Supp. 2d at 77 (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003)); *accord Wada v. Tomlinson*, 517 F. Supp. 2d 148, 211 (D.D.C. 2007), *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008). "'[T]he dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent. Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address.'" *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) (quoting *Parker v. State Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 475 (D. Del. 1998)).

The Court will therefore grant defendant's motion for summary judgment as to Counts Seven and Eight.

**CONCLUSION**

For the foregoing reasons, the Court grants defendant's motion for summary judgment as to Counts One through Four and Six through Ten and denies defendant's motion for summary judgment as to Count Five.  A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   January 13, 2011